**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO: 1:20-cv-21707-UU**

RAYMOND JAMES FINANCIAL, INC.,

       Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA; GREAT
AMERICAN INSURANCE COMPANY; AND
BEAZLEY INSURANCE COMPANY, INC.,

       Defendants.

_____/

**DEFENDANT GREAT AMERICAN INSURANCE COMPANY'S**
**ANSWER AND AFFIRMATIVE DEFENSES**

       Defendant Great American Insurance Company ("GAIC" or "Defendant"), through its
undersigned attorneys, files the following answer and affirmative defenses to the complaint
("Complaint") filed by Raymond James Financial, Inc. ("Raymond James").

**NATURE OF ACTION**

       1.     GAIC admits that Raymond James purports to bring this action under certain
financial institution bonds, the terms of which speak for themselves.  GAIC denies the remainder
of the allegations of paragraph 1 of the Complaint.

**PARTIES, JURISDICTION AND VENUE**

       2.     GAIC admits the allegations set forth in paragraph 2 of the Complaint.

       3.     GAIC, on information and belief, admits that Federal is incorporated in the State
of Indiana, that its principal place of business is in New Jersey, and that it conducts business in
Florida.  GAIC denies the remaining allegations set forth in paragraph 3 of the Complaint.

4.      GAIC admits the allegations set forth paragraph 4 of the Complaint.

5.      GAIC admits the allegations set forth paragraph 5 of the Complaint.

6.      GAIC, on information and belief, admits that Beazley is incorporated in the State of Connecticut, that its principal place of business is in Connecticut, and that it conducts business in Florida.  GAIC denies the remaining allegations set forth in paragraph 6 of the Complaint.

7.      Paragraph 7 of the Complaint contains legal conclusions to which no response is required.

8.      Paragraph 8 of the Complaint contains legal conclusions to which no response is required.

## BURSTEIN AND QUIROS' SCHEME

### *The Jay Peak Resort and the EB-5 Program*

9.      GAIC admits that Raymond James alleges that it sustained a loss in connection with the Jay Peak Resort and the Burke Mountain Resort, that MSSI owned the Jay Peak Resort, and that Stenger ran the Jay Peak Resort at one point.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 9 of the Complaint.

10.     GAIC admits the allegations contained in paragraph 10 of the Complaint.

11.     GAIC admits that Quiros was the father-in-law of Burstein until in or about 2010, Burstein was a Raymond James employee, Quiros was a Raymond James customer starting in or about 2007, and Q Resorts and GSI opened accounts at Raymond James.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 11 of the Complaint.

12.     GAIC admits that MSSI solicited investments from foreign investors under the EB-5 Immigrant Investor Program through two limited partnerships and that Quiros created six additional partnerships after he acquired Jay Peak.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 12 of the Complaint.

### *The Financing and Phases*

13.     GAIC admits that improvements and expansions to the Jay Peak Resort occurred in phases through a series of limited partnerships governed by a series of limited partnership agreements.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 13 of the Complaint.

14.     GAIC admits that improvements and expansions to the Jay Peak Resort occurred in phases through a series of limited partnerships governed by a series of limited partnership agreements; limited partnerships had accounts at People's Bank in Vermont; Raymond James received transfers from accounts in the name of the Jay Peak partnerships into accounts in the name of a partnership, Jay Construction Management, or Q Resorts; and Quiros provided authorized instructions on transfers from accounts at Raymond James.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 14 of the Complaint.

15.     GAIC admits that Burstein served as one of the financial advisors who serviced each Raymond James account Quiros opened; Burstein was the Branch Manager with responsibility for the Miami, Miami Beach, and Dadeland locations; and Burstein was married to Quiros' daughter at the time the Raymond James accounts were opened.  GAIC denies the remaining allegations set forth in paragraph 15 of the Complaint.

16.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 16 of the Complaint.

17.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 17 of the Complaint.

18.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 18 of the Complaint.

19.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 19 of the Complaint.

20.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 20 of the Complaint.

21.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 21 of the Complaint.

22.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 22 of the Complaint.

23.     GAIC is without knowledge or information sufficient to form a belief as to truth of the allegations of paragraph 23 of the Complaint.

***Burstein and Quiros Misappropriate and Convert Partnership Funds***

24.     GAIC admits that Raymond James was approached in late 2007 by Burstein's then father-in-law, Quiros, regarding Raymond James potentially financing his prospective purchase of the Jay Peak resort.  GAIC denies the remaining allegations set forth in paragraph 24 of the Complaint.

25.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25 of the Complaint.

26.     GAIC admits that Burstein prepared a PowerPoint presentation concerning the acquisition of the Jay Peak Resort and details of the proposed transaction and that Amigo spoke with Burstein regarding the presentation.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 26 of the Complaint.

27.     GAIC denies the allegations set forth in paragraph 27 of the Complaint.

28.     GAIC denies the allegations set forth in paragraph 28 of the Complaint.

**i.**     ***The Purchase of Jay Peak Resorts***

29.     GAIC admits the allegations set forth in paragraph 29 of the Complaint.

30.     GAIC admits that Phase I and Phase II partnership funds were to be deposited into the MSSI-controlled Phase I and Stenger-controlled Phase II Raymond James accounts and, upon closing transferred to Quiros-controlled accounts.   GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 30 of the Complaint.

31.     GAIC admits that paragraph 31 of the Complaint purports to quote a document and refers thereto for its full content, meaning and import.  GAIC denies the remaining allegations set forth in paragraph 31 of the Complaint.

32.     GAIC admits that MSSI transferred $11 million from its Phase I account at People's Bank to its Phase I account at Raymond James and $7 million from its Phase II account at People's Bank to its Phase II account at Raymond James; individuals involved in the transaction discussed the use of partnership funds; and paragraph 32 quotes a portion of the June 18, 2008 draft letter and the revised letter the contents of which speak for themselves.  GAIC denies the remaining allegations set forth in paragraph 32 of the Complaint.

33.     GAIC denies the allegations set forth in paragraph 33 of the Complaint.

34.     GAIC admits that paragraph 34 of the Complaint purports to quote portions of email correspondence between MSSI's counsel and Burstein and refers thereto for its full meaning, content and import.  GAIC denies the remaining allegations set forth in paragraph 34.

35.     GAIC denies the allegations set forth in paragraph 35 of the Complaint.

36.     GAIC admits that $11 million was transferred from MSSI's Phase I account to Quiros' Phase I account and $7 million was transferred from MSSI's Phase II account to Quiros' Phase II account on or about June 23, 2008, and the transfers were approved by Frank Amigo. GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 36 of the Complaint.

37.     GAIC admits that Quiros made additional payments in connection with the Jay Peak Resort purchase from on or about June 23, 2008, through September 26, 2008.  GAIC denies the remaining allegations set forth in paragraph 37 of the Complaint.

38.     GAIC denies the allegations set forth in paragraph 38 of the Complaint.

39.     GAIC admits that Q Resorts transferred approximately $13,544,346 to Spiegel Sohmer on June 23, 2008.  GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 39 of the Complaint.

### ii.     *Margin Loans are Used by Quiros and Burstein to Conceal the Fraud*

40.     GAIC admits that Raymond James authorized three margin lending arrangements with Quiros between June 2008 and March 2014, which were secured by Treasury bills purchased with funds held in an account in the name of a partnership.  GAIC denies the remaining allegations set forth in paragraph 40 of the Complaint.

41.     GAIC denies the allegations set forth in paragraph 41 of the Complaint.

42.     GAIC admits that Quiros directed the withdrawal of approximately $7.6 million from the Phase I account and approximately $6 million from the Phase II account and that Q Resorts transferred approximately $13,544,346 to Spiegel Sohmer on June 23, 2008.   GAIC denies the remaining allegations set forth in paragraph 42 of the Complaint.

43.     GAIC admits that Quiros purchased Treasury bills with funds deposited in accounts held by the partnerships associated with Phase I and Phase II, which settled on or about June 24, 2008.   GAIC denies that this was part of Burstein's "plan."   GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 43 of the Complaint.

44.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44 of the Complaint.

45.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 45 of the Complaint.

### iii.     _Burstein and Quiros Misappropriate and Commingle Other Funds for Their Personal Use_

46.     GAIC denies that Burstein "assist[ed]" in any misappropriation of funds.   GAIC is otherwise without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 45 of the Complaint.

47.     GAIC denies the allegations set forth in paragraph 47 of the Complaint.

48.     GAIC admits that Quiros paid off the third iteration of the margin loan using $18.2 million of funds held in the partnership account associated with "Phase VII."   GAIC denies the remaining allegations set forth in paragraph 48 of the Complaint.

49.     GAIC admits that Burstein was married to Quiros' daughter from 2006 through 2010; they had a child together; Burstein received $225,000 through his divorce settlement as

reimbursement of attorneys' fees and costs associated with facilitating visitation with his child across state lines; and paragraph 49 quotes portions of email correspondence between Quiros and Burstein and GAIC refers thereto for its full content, meaning and import.  GAIC denies the remaining allegations set forth in paragraph 49 of the Complaint.

> ### iv. _Burstein Concealed the Fraud from the Partnerships, Regulators, and Raymond James_

50.     GAIC denies the allegations set forth in paragraph 50 of the Complaint.

51.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 51 of the Complaint.

52.     GAIC admits that paragraph 52 of the Complaint purports to quote portions of email correspondence, and GAIC refers thereto for its full content, meaning and import.  GAIC is without knowledge and information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 52 of the Complaint.

53.     GAIC admits that paragraph 53 of the Complaint purports to quote portions of email correspondence, and GAIC refers thereto for its full content, meaning and import.  GAIC denies the remainder of the allegations set forth in paragraph 53 of the Complaint.

54.     GAIC admits that paragraph 54 of the Complaint purports to quote correspondence between Burstein and Quiros, and GAIC refers thereto for its full content, meaning and import.  GAIC denies the remainder of the allegations set forth in paragraph 54 of the Complaint.

55.     GAIC admits that paragraph 55 of the Complaint purports to quote correspondence between Burstein and Quiros, and GAIC refers thereto for its full content, meaning and import.  GAIC denies the remainder of the allegations set forth in paragraph 55 of the Complaint.

56.     GAIC admits that Raymond James opened an account for Jay Construction Management, Inc.   GAIC denies the remaining allegations set forth in paragraph 56 of the Complaint.

57.     GAIC admits that Burstein met with the AML Department to provide information about the Jay Construction Management account; that AML Department approved the JCM account; and paragraph 57 quotes a portion of an AML report documenting same and GAIC refers thereto for its full content, meaning and import.   GAIC is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 57 of the Complaint.

58.     GAIC admits that Burstein prepared a letter dated February 29, 2012 that stated "as of February 27th, 2012 there are no encumbrances on any of the Jay Peak Partnership accounts," and GAIC refers thereto for its full content, meaning and import; Quiros paid his margin debit on or about February 24, 2012; and Quiros executed a new credit agreement to secure a margin loan in another account on or about February 29, 2012.   GAIC denies the remaining allegations set forth in paragraph 58 of the Complaint.

59.     GAIC admits that paragraph 59 of the Complaint purports to quote portions of email correspondence between Quiros and Burstein, and GAIC refers thereto for its full content, meaning and import.   GAIC otherwise denies the remaining allegations set forth in paragraph 59 of the Complaint.

60.     GAIC admits that Burstein communicated with Quiros via text message.   GAIC denies the remaining allegations set forth in paragraph 60 of the Complaint.

### *The Scheme Collapses*

61.     GAIC admits that Quiros' management of partnership funds resulted in alleged shortages.  GAIC denies the remaining allegations set forth in paragraph 61 of the Complaint.

### *The Litigations and Court-Approved Settlement*

62.     GAIC admits the allegations of paragraph 62 of the Complaint.

63.     GAIC admits that the claims against Raymond James alleged various torts.  GAIC denies the remaining allegations set forth in paragraph 63 of the Complaint.

64.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 64 of the Complaint.

65.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 65 of the Complaint.

66.     GAIC admits that paragraph 66 of the Complaint purports to describe a settlement agreement, and GAIC refers thereto for its full contents, meaning and import.

67.     GAIC admits that paragraph 67 of the Complaint purports to describe a settlement agreement, and GAIC refers thereto for its full contents, meaning and import. GAIC is without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 67 of the Complaint.

68.     GAIC admits that paragraph 68 of the Complaint purports to describe a settlement agreement, and GAIC refers thereto for its full contents, meaning and import. GAIC is without knowledge or information sufficient to form a belief as to the remaining allegations of paragraph 68 of the Complaint.

69.     GAIC admits that the Settlement Agreement and Release was approved by Judge Gayles on or about June 30, 2017.  The remaining allegations of paragraph 69 contain legal conclusions to which no response is required.

70.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 of the Complaint.

71.     GAIC admits that paragraph 71 of the Complaint purports to refer to an Order issued by the SEC, and GAIC refers thereto for its full content, meaning and import.  GAIC otherwise denies the remaining allegations of paragraph 71 of the Complaint.

72.     GAIC admits that paragraph 72 purports to refer to federal indictment of Quiros, Stenger and two other individuals from in or about May 2019, and GAIC refers thereto for its full content, meaning and import.

### THE FIDELITY BONDS

73.     GAIC admits that Raymond James purchased Bond No. 70436970, Bond No. 82126526 and Bond No. 82210871, and that copies thereof are attached as Exhibit A to the Complaint.  GAIC denies that paragraph 73 of the Complaint fully or accurately characterizes the scope of coverage under the bonds and denies all allegations about those bonds that are inconsistent with their terms, conditions, definitions, limitations and exclusions.

74.     GAIC admits that the Primary Bond contains the quoted language.  GAIC otherwise denies that paragraph 74 of the Complaint fully or accurately characterizes the scope of coverage under the Primary Bond and denies any allegations that are inconsistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

75.     GAIC admits that the Primary Bond contains the quoted language.  GAIC otherwise denies that paragraph 75 of the Complaint fully or accurately characterizes the scope

of coverage under the Primary Bond and denies any allegations that are inconsistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

76.     GAIC admits that the Primary Bond contains the quoted language.   GAIC otherwise denies that paragraph 76 of the Complaint fully or accurately characterizes the scope of coverage under the Primary Bond and denies any allegations that are inconsistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

77.     GAIC admits that Raymond James purchased Bond No. 70436970, Bond No. 82126526 and Bond No. 82210871, and that copies thereof are included in Exhibit A.   GAIC denies that paragraph 77 of the Complaint fully or accurately characterizes the scope of coverage under those bonds and denies all allegations about those bonds that are inconsistent with their terms, conditions, definitions, limitations and exclusions.

## THE COVERED LOSS

78.     GAIC denies the allegations set forth in paragraph 78 of the Complaint.

79.     GAIC admits that the Primary Bond contains the quoted language.   GAIC otherwise denies that paragraph 79 of the Complaint fully or accurately characterizes the scope of coverage under the Primary Bond and denies any allegations that are inconsistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

80.     GAIC denies the allegations set forth in paragraph 80 of the Complaint.

81.     GAIC admits the allegations of paragraph 81 of the Complaint.

82.     GAIC admits that Raymond James has purported to have paid in excess of $60 million to the SEC Receiver and admits that the Insurers have not issued any payment in connection with the claim.   GAIC denies the remaining allegations set forth in paragraph 82 of the Complaint.

## **GENERAL ALLEGATIONS**

83.     GAIC denies the allegations set forth in paragraph 83 of the Complaint.

84.     GAIC admits that Raymond James has purported to retain the counsel that has signed the Complaint.  GAIC is without knowledge or information sufficient to form a belief as to the truth of remainder of the allegations of paragraph 84 of the Complaint.

85.     GAIC is without knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 85 of the Complaint.

## **COUNT I – BREACH OF CONTRACT (AGAINST FEDERAL)**

86.     GAIC incorporates its responses to all of the foregoing allegations as if fully set forth herein.

87.     As Count I of the Complaint is directed against Federal, no response from GAIC to paragraph 87 of the Complaint is required.  To the extent a response is required, GAIC denies that Raymond James has established a covered loss under the Primary Bond, Second Excess Bond, and Third Excess Bond.

88.     As Count I of the Complaint is directed against Federal, no response from GAIC to paragraph 88 of the Complaint is required.  To the extent a response is required, GAIC admits that the Primary Bond contains the quoted language.  GAIC denies that paragraph 88 of the Complaint fully or accurately characterizes or alleges the scope of coverage afforded by the Primary Bond, the Second Excess Bond, and the Third Excess Bond; denies any allegations that are inconsistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond, the Second Excess Bond, and the Third Excess Bond; and denies that Raymond James is entitled to coverage thereunder.

89.     As Count I of the Complaint is directed against Federal, no response from GAIC to paragraph 89 of the Complaint is required.  To the extent a response is required, GAIC denies the allegations set forth in paragraph 89 of the Complaint.

90.     As Count I of the Complaint is directed against Federal, no response from GAIC to paragraph 90 of the Complaint is required.  To the extent a response is required, GAIC denies the allegations set forth in paragraph 90 of the Complaint.

91.     As Count I of the Complaint is directed against Federal, no response from GAIC is required.  To the extent a response is required, GAIC admits that Federal has not paid Raymond James, and denies the remaining allegations set forth in paragraph 91 of the Complaint.

92.     As Count I of the Complaint is directed against Federal, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations set forth in paragraph 92 of the Complaint.

**COUNT II – BREACH OF CONTRACT (AGAINST BEAZLEY)**

93.     GAIC incorporates its responses to all of the foregoing allegations as if fully set forth herein.

94.     As Count II of the Complaint is directed against Beazley, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained paragraph 94 of the Complaint.

95.     As Count II of the Complaint is directed against Beazley, no response from GAIC is required.  To the extent a response is required, GAIC admits that the Primary Bond contains the quoted language and denies the remainder of the allegations contained in paragraph 95 of the Complaint.

96.     As Count II of the Complaint is directed against Beazley, no response from GAIC is required.  To the extent a response is required, GAIC denies that Raymond James denies the allegations contained in paragraph 96 of the Complaint.

97.     As Count II of the Complaint is directed against Beazley, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained in paragraph 97 of the Complaint.

98.     As Count II of the Complaint is directed against Beazley, no response from GAIC is required.  To the extent a response is required, GAIC admits that Beazley has not paid Raymond James, and denies the allegations contained in paragraph 98 of the Complaint.

99.     As Count II of the Complaint is directed against Beazley, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained in paragraph 99 of the Complaint.

### COUNT III – BREACH OF CONTRACT (AGAINST TRAVELERS)

100.    GAIC incorporates its responses to all of the foregoing allegations as if fully set forth herein.

101.    As Count III of the Complaint is directed against Travelers, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained in paragraph 101 of the Complaint.

102.    As Count III of the Complaint is directed against Travelers, no response from GAIC is required.  To the extent a response is required, GAIC admits that the Primary Bond contains the quoted language and denies the remainder of the allegations of paragraph 102 of the Complaint.

103.    As Count III of the Complaint is directed against Travelers, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained in paragraph 103 of the Complaint.

104.    As Count III of the Complaint is directed against Travelers, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained in paragraph 104 of the Complaint.

105.    As Count III of the Complaint is directed against Travelers, no response from GAIC is required.  To the extent a response is required, GAIC admits that Travelers has not paid Raymond James, and denies the remainder of the allegations contained in paragraph 105 of the Complaint.

106.    As Count III of the Complaint is directed against Travelers, no response from GAIC is required.  To the extent a response is required, GAIC denies the allegations contained in paragraph 106 of the Complaint.

**COUNT IV – BREACH OF CONTRACT (AGAINST GREAT AMERICAN)**

107.    GAIC incorporates its responses to all of the foregoing allegations as if fully set forth herein.

108.    GAIC admits that Raymond James was an insured under the Third Excess Bond during the Bond Period set forth therein.  GAIC denies that Raymond James has established a covered loss under the Primary Bond or the Third Excess Bond, and denies any allegations suggesting that Raymond James is entitled to coverage.  The remainder of the allegations of paragraph 108 assert legal conclusions to which no response is required.

109.    GAIC admits that the Primary Bond contains the quoted language and denies the remainder of the allegations of paragraph 109 of the Complaint.

110.   GAIC denies the allegations contained in paragraph 110 of the Complaint.

111.   GAIC denies the allegations contained in paragraph 111 of the Complaint.

112.   GAIC admits that it has not paid Raymond James under the Third Excess Bond. GAIC denies the remainder of the allegations contained in paragraph 112 of the Complaint.

113.   GAIC denies the allegations contained in paragraph 113 of the Complaint.

### COUNT V – DECLARATORY JUDGMENT (AGAINST ALL INSURERS)

114.   GAIC incorporates its responses to all of the foregoing allegations as if fully set forth herein.

115.   GAIC admits that Raymond James purports to seek a declaratory judgment. GAIC denies the remainder of the allegations contained in paragraph 115 of the Complaint.

116.   GAIC admits that Raymond James has attached to its Complaint copies of what it calls the "Earlier Bonds."  GAIC denies the remainder of the allegations of paragraph 116 of the Complaint.

117.   GAIC admits that Raymond James asserts that it did not discover its purported loss until May 2016.  GAIC denies the remainder of the allegations of paragraph 117 of the Complaint.

118.   GAIC admits that Federal has asserted that Raymond James discovered its purported loss prior to May 2016.  GAIC denies the remainder of the allegations of paragraph 118 of the Complaint.

119.   GAIC denies the allegations set forth in paragraph 119 of the Complaint.

120.   GAIC denies the allegations set forth in paragraph 120 of the Complaint.

121.   GAIC denies the allegations set forth in paragraph 121 of the Complaint.

122.   GAIC denies the allegations set forth in paragraph 122 of the Complaint.

123.    GAIC denies the allegations set forth in paragraph 123 of the Complaint.

124.    GAIC denies the allegations set forth in paragraph 124 of the Complaint.

125.    GAIC denies the allegations set forth in paragraph 125 of the Complaint.

<u>**AFFIRMATIVE DEFENSES**</u>

GAIC, without prejudice to its answers and denials to the allegations in the Complaint, asserts the following Affirmative Defenses.

**FIRST AFFIRMATIVE DEFENSE**

Any claim under the Third Excess Bond is subject to a $1,000,000 deductible "plus any unpaid portion of the AGGREGATE LIMIT OF LIABILITY of the **Underlying Bonds** on the date of payment of any **Single Loss** under this bond," pursuant to ITEM 4. of the Declarations (as amended by Endorsement No. 5) and Section 1.a. of the Conditions and Limitations. Raymond James is not entitled to recover under the Third Excess Bond unless it can establish a covered loss in excess of the applicable deductible.

**SECOND AFFIRMATIVE DEFENSE**

Section 2 of the Third Excess Bond's Conditions and Limitations states that "The COMPANY'S liability for each **Single Loss** shall not exceed the SINGLE LOSS LIMIT OF LIABILITY as stated in ITEM 3. of the DECLARATIONS or the unpaid portion of the AGGREGATE LIMIT OF LIABILITY, whichever is less."   Pursuant to ITEM 3. of the DECLARATIONS, any claim under the Third Excess Bond is subject to a SINGLE LOSS LIMIT OF LIABILITY of $20,000,000 excess of $30,000,000.  Raymond James cannot recover in excess of this SINGLE LOSS LIMIT OF LIABILITY under the Third Excess Bond.

### THIRD AFFIRMATIVE DEFENSE

Section 2 of the Third Excess Bond's Conditions and Limitations states that "The COMPANY'S total cumulative liability for all **Single Losses** of all ASSUREDS discovered during the BOND PERIOD shall not exceed the AGGREGATE LIMIT OF LIABILITY as stated in ITEM 2. of the DECLARATIONS.  Each payment made under the terms of this bond shall reduce the unpaid portion of the AGGREGATE LIMIT OF LIABILITY until it is exhausted." Pursuant to ITEM 2. of the DECLARATIONS, any claim under the Third Excess Bond is subject to an AGGREGATE LIMIT OF LIABILITY of $40,000,000 excess of $60,000,000. Raymond James cannot recover in excess of this AGGREGATE LIMIT OF LIABILITY under the Third Excess Bond.

### FOURTH AFFIRMATIVE DEFENSE

Section 3 of the Third Excess Bond's Conditions and Limitations (as amended by Endorsement/Rider No. 3) states that "This bond applies only to loss discovered by the Vice President of Corporate Insurance and/or Legal Department of the ASSURED during the BOND PERIOD.  Discovery occurs at the earlier of the Vice President or Corporate Insurance and/or Legal Department of the ASSURED being aware of: a. facts which may subsequently result in a loss of a type covered by this bond, or b. an actual or potential claim in which it is alleged that the ASSURED is liable to a third party, regardless of when the act or acts causing or contributing to such loss occurred, even though the amount of loss does not exceed the applicable **Deductible Amount**, or the exact amount or details of loss may not then be known."  Raymond James cannot recover under the Third Excess Bond unless it proves that discovery, as described in the Third Excess Bond, occurred during the BOND PERIOD.

### FIFTH AFFIRMATIVE DEFENSE

General Agreement C. of the Third Excess Bond (as amended by Endorsement/Rider No. 4) states that "The ASSURED shall notify the COMPANY at the earliest practical moment, not to exceed sixty (60) days after the Vice President of Corporate Insurance and/or Legal Department receives notice, of any legal proceeding brought to determine the ASSURED'S liability for any loss, claim or damage which, if established, would constitute a collectible loss under this bond or any of the **Underlying Bonds**.  Concurrent with such notice and as requested thereafter, the ASSURED shall furnish copies of all pleadings and pertinent papers to the COMPANY."  Raymond James cannot recover under the Third Excess Bond unless it proves that it provided timely notice.

### SIXTH AFFIRMATIVE DEFENSE

The Insuring Clause of the Third Excess Bond provides coverage for "[l]oss which would have been paid under the **Primary Bond** but for the fact that the loss exceeds the **Deductible Amount**."  Raymond James cannot recover under the Third Excess Bond unless it proves it is entitled to coverage under the Primary Bond.

### SEVENTH AFFIRMATIVE DEFENSE

Section 5(b) of the Primary Bond's Conditions and Limitations states that "Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars."  Raymond James cannot recover under the Third Excess Bond unless it proves that it provided timely proof of loss.

### EIGHTH AFFIRMATIVE DEFENSE

General Agreement F. of the Primary Bond states that "With respect to this General Agreement, subsections (b) and (d) of Section 5 of this bond apply upon the entry of such

judgment or the occurrence of such settlement instead of upon discovery of loss.  In addition, the Insured must notify the Underwriter within 30 days after such judgment is entered against it or after the Insured settles such legal proceeding, and, subject to subsection (e) of section 5, the Insured may not bring legal proceedings for the recovery of such loss after the expiration of 24 months from the date of such final judgment or settlement."  Raymond James cannot recover under the Primary Bond and therefore the Third Excess Bond unless it proves that it provided timely notice and submitted timely proof of loss.

### NINTH AFFIRMATIVE DEFENSE

Insuring Agreement (A) (as amended by Endorsement/Rider No. 3) of the Primary Bond provides coverage for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent: (a) to cause the Insured to sustain such loss; or (b) to obtain financial benefit for the Employee, or another person or entity. Notwithstanding the foregoing, however, it is agreed that with regard to Loans and Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and to obtain a financial benefit for the Employee."   Raymond James cannot recover under the Primary Bond and therefore the Third Excess Bond unless it proves it suffered loss resulting directly from an Employee's dishonest or fraudulent acts with the intent to cause Raymond James a loss and to obtain a financial benefit.

### TENTH AFFIRMATIVE DEFENSE

Section 10 of the Primary Bond's Conditions and Limitations states that "This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable."  Raymond James cannot recover under the Primary Bond

and therefore the Third Excess Bond unless it proves that it owned, held, or was legally liable for loss of Property under the Primary Bond.

## ELEVENTH AFFIRMATIVE DEFENSE

Section 11 of the Primary Bond's Conditions and Limitations states that "This bond terminates as to any Employee or any partner, officer, or employee of any Processor (a) as soon as any Insured, or any director or officer not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person…. Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured after the effective date of such termination." Raymond James cannot recover under the Primary Bond and therefore the Third Excess Bond for any loss caused by Burstein after any director or officer not in collusion with Burstein learned of any dishonest or fraudulent act committed by Burstein at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person.

## TWELFTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (v) (as amended by Endorsement/Rider No. 22) precludes coverage for "indirect or consequential loss of any nature…." Raymond James alleges a loss sustained to satisfy its liability to a third party; therefore, Raymond James' loss is not covered.

### THIRTEENTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (u) (as amended by Endorsement/Rider No. 5) precludes coverage for "all fees, costs and expenses incurred by the Insured (1) in establishing the existence of or amount of loss covered under this bond, except to the extent covered under the portion of Insuring Agreement (a) entitled Audit Expense; or (2) as a party to legal proceeding whether or not such legal proceeding exposes the Insured to loss covered by this bond." Raymond James seeks to recover fees and costs not covered under the Primary Bond and therefore not covered under the Third Excess Bond.

### FOURTEENTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (f) precludes coverage for "loss resulting from any violation by the Insured or by any Employee (1) of law regulating (i) the issuance, purchase or sale of securities, (ii) securities transactions upon security exchanges or over the counter market, (iii) investment companies, or (iv) investment advisers, or (2) of any rule or regulation made pursuant to any such law, unless it is established by the Insured that the act or acts which caused the said loss involved fraudulent or dishonest conduct which would have caused a loss to the Insured in a similar amount in the absence of such laws, rules or regulations." Raymond James alleges its Employee violated securities laws; therefore, Raymond James' loss is not covered unless it establishes the Employee's conduct would have caused a loss absent such violations.

### FIFTEENTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (h) precludes coverage for "loss caused by an Employee, except when covered under Insuring Agreement (A)…." Raymond James alleges loss caused by an Employee; therefore, Raymond James' loss is not covered unless it establishes

the conditions of coverage in Insuring Agreement (A) (as amended by Endorsement/Rider No. 3).

### SIXTEENTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (i) (as amended by Endorsement/Rider No. 35) precludes coverage for "loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful withdrawal and conversion of Money, securities or precious metals, directly from a customer's account by an Employee provided such unlawful withdrawal and conversion is covered under Insuring Agreement (A)...." Raymond James alleges loss from transactions in a customer's account; therefore, Raymond James' loss is not covered unless it establishes the conditions of coverage in Insuring Agreement (A) (as amended by Endorsement/Rider No. 3).

### SEVENTEENTH AFFIRMATIVE DEFENSE

Raymond James claim is barred by the applicable statute of limitations and/or contractual limitations period as outlined in the Primary Bond.

### EIGHTEENTH AFFIRMATIVE DEFENSE

Raymond James claim is barred by the doctrine of laches.

### NINETEENTH AFFIRMATIVE DEFENSE

Raymond James claim is barred by the doctrines of waiver, estoppel and ratification.

### TWENTIETH AFFIRMATIVE DEFENSE

Raymond James claim is barred by the doctrines of unclean hands and/or *in pari delicto*.

### INCORPORATION OF AFFRMATIVE DEFENSES AND RESERVATION OF RIGHTS

GAIC hereby incorporates by reference all affirmative defenses asserted by any other defendant in this action and otherwise reserves the right to seek leave of Court to amend its

Answer or add Affirmative Defenses that become known to it through discovery and the course of this litigation.

**WHEREFORE**, Defendant, Great American Insurance Company, respectfully requests that the Court enter judgment in its favor and dismiss the Complaint herein with prejudice, and provide such other and relief that the Court deems just, equitable and proper.

Dated: June 23, 2020
    West Palm Beach, Florida

        Respectfully submitted,

        */s/ Dustin C. Blumenthal*
        Dustin C. Blumenthal, Esq.
        Florida Bar No. 083799
        **Goldberg Segalla LLP**
        222 Lakeview Avenue, Suite 800
        West Palm Beach, FL 33401
        Tel:   (561) 618-4485
        Fax:   (561) 618-4549
        dblumenthal@goldbergsegalla.com
        tploskunak@goldbergsegalla.com

        Stephen N. Dratch, Esq.
        *Admitted Pro Hac Vice*
        **Franzblau Dratch, P.C.**
        354 Eisenhower Parkway
        Livingston, NJ 07039
        Tel:   (973) 992-3700
        sdratch@njcounsel.com
        *Counsel for Great American Insurance Company*

### CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 23, 2020, I electronically filed the attached with the Clerk of Court using CM/ECF which will serve a copy on all counsel or parties of record.

        */s/ Dustin C. Blumenthal*
        Dustin C. Blumenthal, Esq.