## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO: 20-21707-CV-UNGARO

RAYMOND JAMES FINANCIAL, INC.,

       Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA; GREAT
AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC., AND
ST. PAUL MERCURY INSURANCE COMPANY

       Defendants.

_____

## FEDERAL INSURANCE COMPANY'S ANSWER AND AFFIRMATIVE DEFENSES

Federal Insurance Company files the following Answer to the First Amended Complaint for Damages filed by Raymond James Financial, Inc. ("Raymond James") and the following affirmative defenses:

## NATURE OF ACTION

1.     This is an action for breach of contract against the Insurers that promised a $60 million tower of "single" loss employee fidelity bond coverage, but have failed and refused to indemnify Raymond James for loss resulting from dishonest and fraudulent acts committed by Raymond James employee, Joel Burstein ("Burstein"), while acting in collusion with his former father-in-law, Ariel Quiros ("Quiros"), with the intent to financially benefit himself, Quiros, and entities operated and controlled by Quiros and others. The bonds issued by the Insurers to Raymond James provide coverage for the dishonest and fraudulent acts committed by Burstein as described herein. And because no exclusions drafted by the Insurers unambiguously bar coverage for the substantial losses suffered by Raymond James as a result of Burstein's dishonest conduct,

1

the Insurers have breached their obligations to indemnify Raymond James.

**ANSWER:** Federal admits that it jointly issued a Financial Institution Bond Form 14 (identified as Bond Number 70436970 and referred to herein as "Primary Bond") to Raymond James, that Raymond James submitted a claim under the Primary Bond alleging loss caused by dishonest and fraudulent acts committed by Joel Burstein ("Burstein") and collusion with his former father-in-law, Ariel Quiros ("Quiros"), and that Federal denied the claim. Federal denies the remaining allegations set forth in paragraph 1.

### PARTIES, JURISDICTION AND VENUE

2.    Plaintiff Raymond James is a Florida corporation with its principal place of business in St. Petersburg, Florida.

**ANSWER:** Admitted.

3.    Defendant Federal is an Indiana corporation with its principal place of business in Whitehouse Station, New Jersey. Federal is authorized to conduct the business of insurance in Florida, including issuing policies in exchange for a premium.

**ANSWER:** Federal admits that it is incorporated in the State of Indiana, that its principal place of business is in New Jersey, and that it conducts business in Florida. Federal denies the remaining allegations set forth in paragraph 3.

4.    Defendant Travelers is Connecticut corporation with its principal place of business in Hartford, Connecticut. Travelers is authorized to conduct the business of insurance in Florida, including issuing policies in exchange for a premium.

**ANSWER:** Admitted.

5.    Defendant Great American is an Ohio corporation with its principal place of business in Cincinnati, Ohio. Great American is authorized to conduct the business of insurance in Florida, including issuing policies in exchange for a premium

**ANSWER:** Admitted.

6.    Defendant Beazley is a Connecticut corporation with its principal place of business in Farmington, Connecticut. Beazley is authorized to conduct the business of insurance in Florida,

including issuing policies in exchange for a premium.

**ANSWER:** Admitted.

7.      Defendant St. Paul is a Connecticut corporation with its principal place of business

in Hartford, Connecticut.  St. Paul is authorized to conduct the business of insurance in Florida,

including issuing policies in exchange for a premium.

**ANSWER:** Admitted.

8.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) because this is an

action between citizens of different states and the matter in controversy exceeds $75,000.00,

exclusive of interest and costs.

**ANSWER:** Admitted.

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391 because a substantial

part of the events giving rise to the claim occurred in the Southern District of Florida.

**ANSWER:** Admitted.

## BURSTEIN AND QUIROS' SCHEME

### *The Jay Peak Resort and the EB-5 Program*

10.      Raymond James' loss is connected to the Jay Peak Resort in Jay Peak, Vermont,

and the Burke Mountain Resort in East Burke, Vermont. Jay Peak was owned by Jay Peak, Inc.

("JPI") and had been operating for over fifty (50) years. In 1972, Mont Saint-Saveur International

("MSSI") purchased JPI and later recruited William Stenger ("Stenger") to run the company.

**ANSWER:** Federal admits that Raymond James alleges loss sustained in
connection with the Jay Peak Resort and the Burke Mountain Resort, that MSSI
owned the Jay Peak Resort, and that Stenger ran the Jay Peak Resort at one point.
Federal is without knowledge or information sufficient to form a belief as to the
truth of the remaining allegations set forth in paragraph 10.

11.      In 2008, Q Resorts, Inc. ("Q Resorts") acquired the stock of JPI from MSSI. Ariel

Quiros ("Quiros") was the sole owner, officer, and director of Q Resorts.

**ANSWER:** Admitted.

12.    Until 2010, Quiros was the father-in-law of Joel Burstein, who was at all material times a Raymond James employee. Quiros was a Raymond James customer starting in 2007 and in 2008, his companies, Q Resorts and GSI, also opened accounts at Raymond James.

> **ANSWER:** Federal admits that Quiros was the father-in-law of Burstein until 2010, Burstein was a Raymond James employee for a period of time, Quiros was a Raymond James customer starting in 2007, and Q Resorts and GSI opened accounts at Raymond James. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 12.

13.    Beginning in December 2006, while still owned by MSSI, JPI sought investments from foreign investors who wanted an expedited path to citizenship through investment of $500,000 in a new economic venture that would create new jobs in the United States—otherwise known as the EB-5 Immigrant Investor Program. While under MSSI control, two partnerships were created to obtain those benefits. Six additional partnerships were created under Quiros' control.

> **ANSWER:** Federal admits that MSSI solicited investments from foreign investors under the EB-5 Immigrant Investor Program through two limited partnerships and that Quiros created six additional partnerships after he acquired Jay Peak.  Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 13.

### *The Financing and Phases*

14.    The funding for the improvement and expansion of the Jay Peak resort occurred in phases. Each phase took the form of a limited partnership governed by a separate limited partnership agreement. Each limited partnership agreement restricted use of the partnership funds and prevented the general partner from borrowing or commingling investor funds, acquiring property with investor funds that would not belong to the limited partnership, or mortgaging, conveying, or otherwise encumbering partnership property.

**ANSWER:** Federal admits that improvements and expansions to the Jay Peak Resort occurred in phases through a series of limited partnerships governed by a series of limited partnership agreements.  Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 14.

15.    To facilitate investments, each phase had an account at People's Bank in Vermont, where investors would deposit their funds. From June 2008 to March 2014, the various Jay Peak partnerships would transfer investor funds to Raymond James accounts either in the name of the particular phase, to Jay Construction Management, or to Q Resorts. Once funds were transferred into Raymond James accounts, Quiros would give further instructions to disburse them or to transfer them among accounts.

**ANSWER:** Federal admits that improvements and expansions to the Jay Peak Resort occurred in phases through a series of limited partnerships governed by a series of limited partnership agreements; limited partnerships had accounts at People's Bank in Vermont; Raymond James received transfers from accounts in the name of the Jay Peak partnerships into accounts in the name of a partnership, Jay Construction Management, or Q Resorts; and Quiros provided authorized instructions on transfers from accounts at Raymond James. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 15.

16.    Quiros was the authorized signatory on all Raymond James accounts. Burstein served as the broker on each Raymond James account and monitored and supervised the accounts. Burstein was the Miami Branch Manager and Vice President of Raymond James' South Florida Complex, with managerial responsibility for the Miami, Miami Beach, and Dadeland locations. At the time the Raymond James accounts were opened, Burstein was married to Quiros' daughter.

**ANSWER:** Federal admits that Burstein served as one of the financial advisors who serviced each Raymond James account Quiros opened; Burstein was the Branch Manager with responsibility for the Miami, Miami Beach, and Dadeland locations; and Burstein was married to Quiros' daughter at the time the Raymond James accounts were opened.  Federal denies the remaining allegations set forth in paragraph 16.

17.    In December 2006, JPI began a $17.5 million offering of limited partnership

interests in Jay Peak Hotel Suites, LP ("Phase I"). The purpose of Phase I was to expand the resort through the acquisition of new land and the construction of a new fifty-seven (57) suite hotel. Phase I was fully subscribed by May 2008 with thirty-five (35) investors.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17.

18.     In March 2008, JPI began offering interests in Jay Peak Hotel Suites Phase II, L.P. ("Phase II"). Between March 2008 and January 2011, Phase II raised $75 million from 150 EB-5 investors. The purpose of Phase II was to acquire additional land and construct a hotel, office, clubhouse, and waterpark. Jay Peak Management, Inc., is a wholly owned subsidiary of JPI and the general partner of Phases I and II.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18.

19.     In July 2010, JPI began a $32.5 million offering of limited partnership interests in Jay Peak Penthouse Suites, L.P. ("Phase III"). The purpose of Phase III was to construct fifty-five (55) penthouse units and a mountain learning center. Phase III was fully subscribed by October 2012. Jay Peak GP Services, Inc. is the general partner of Phase III.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19.

20.     In December 2010, JPI began a $45 million offering of limited partnership interests in Jay Peak Golf and Mountain Suites, L.P. ("Phase IV"). The purpose of Phase IV was to construct fifty (50) golf and mountain suites, a mountain top cafe, and a wedding chapel. Phase IV was fully subscribed in November 2011. JPI served as the developer for Phase IV, with Jay Peak GP Services Golf, Inc. serving as the general partner for the limited partnership.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20.

21.     In May 2011, JPI began a $45 million offering of limited partnership interests in

Jay Peak Lodge and Townhouse, L.P. ("Phase V"). The purpose of Phase V was to construct vacation rental properties and cottages, a cafe, and a parking garage. Phase V was fully subscribed by November 2012. JPI was the contractor for Phase V, with Jay Peak GP Services, Inc. serving as the general partner of the limited partnership.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21.

22.     In October 2011, JPI began a $67 million offering of limited partnership interests in Jay Peak Hotel Suites Stateside, L.P. ("Phase VI"). The purpose of Phase VI was to construct a hotel, vacation cottages, a recreation center, and a medical center. Phase VI was fully subscribed in December 2012, with JPI as the developer.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 22.

23.     In November 2012, JPI began a $110 million offering of limited partnership interests in Jay Peak Biomedical Research Park, L.P. ("Phase VII"). The purpose of Phase VII was to construct a facility for biotech research and development and biotech manufacturing, and to exploit the intellectual property of a South Korean company, AnC Bio Inc. AnC Bio Vermont GP Services, LLC ("AnC Bio") is the general partner of Phase VII. Stenger and Quiros were the managing members of AnC Bio. By April 2016, nearly $83 million had been raised from 166 EB-5 investors. Land for Phase VII was purchased by JPI from a company owned and controlled by Quiros called GSI of Dade County, Inc. ("GSI"). As of November 2016, almost all of the funds raised had been converted to pay for unrelated debts and expenses or payments of illusory intellectual property rights and component construction.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23.

24.     A final limited partnership investment offering of Q Burke Mountain Resort Hotel

and Conference Center, L.P. ("Phase VIII") began in June 2012. The purpose of Phase VIII was to build a hotel with conference center and outdoor pool in East Burke, Vermont. Between June 2013 and April 2016, Phase VIII raised approximately $53 million from 106 EB-5 investors. Q Burke Mountain Resort, LLC is the general partner of Phase VIII. Quiros is the 100% owner of Q Burke Mountain Resort, LLC.

**ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 24.

### *Burstein and Quiros Misappropriate and Convert Partnership Funds*

25.     In late 2007, Burstein was approached by his then father-in-law Quiros regarding Raymond James potentially financing his prospective purchase of the Jay Peak resort.

**ANSWER:** Federal admits that Raymond James was approached, in late 2007, by Burstein's then father-in-law, Quiros, regarding Raymond James potentially financing his prospective purchase of the Jay Peak resort.  Federal denies the remaining allegations set forth in paragraph 25.

26.     In March 2008, Burstein, Quiros, and Burstein's manager, Frank Amigo, met to discuss potential avenues for financing through Raymond James. Amigo and Burstein outlined three potential funding options: (1) financing through Raymond James Investment Banking; (2) mortgage lending through Raymond James Bank; or (3) funding the purchase through margin loans using Raymond James brokerage accounts. Following that meeting, Burstein approached Raymond James Investment Bank and Raymond James Bank in an effort to obtain conventional financing. Citing a lack of adequate experience with resorts and the EB-5 investment program, both entities declined.

**ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26.

27.     It was discovered during this time frame that Burstein prepared and emailed from his personal email account a Powerpoint presentation concerning the purchase of Jay Peak, which

outlined a prospective deal in which Raymond James financed the acquisition of Jay Peak for $26 million. Burstein was told by Amigo that he could not use it, as Raymond James was not going to be involved in these types of transactions.

> **ANSWER:** Federal admits that Burstein prepared a PowerPoint presentation concerning the acquisition of the Jay Peak Resort and details of the proposed transaction and that Amigo spoke with Burstein regarding the presentation.  Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 27.

28.     Frustrated with Raymond James' refusal, Burstein actively designed, developed, and implemented a scheme to facilitate Quiros' withdrawal and conversion of Jay Peak limited partnership funds for Quiros' and his benefit.

> **ANSWER:** Denied.

29.     The scheme involved: (1) causing funds generated by EB-5 investments and owned by the limited partnerships to be deposited into Raymond James brokerage accounts; (2) withdrawing, collateralizing, commingling, and misappropriating partnership assets to fund Q Resorts' purchase of Jay Peak, expenses of partnerships other than those to which the funds belonged, and other personal and non-Jay Peak related expenses in violation of the limited partnership agreements; (3) concealing the misappropriation by using an intricate web of transactions throughout multiple accounts, misleading explanations for the volume and nature of those transactions, creating new accounts to hide unauthorized margin debt, issuing letters to comfort those not involved in the scheme, and remaining silent in response to audit and information requests; (4) issuing margin loans and buying treasury bills to create the appearance that partnership funds remained in the partnership accounts while evading Raymond James' internal review protocols and corporate guidelines; and (5) preparing different sets of schedules in order to camouflage the true nature of transactions and hide the existence of margin debt. Quiros referred to this scheme as "RJ magic" and his and Burstein's "original plan."

**ANSWER:** Denied.

### i.    *The Purchase of Jay Peak Resorts*

30.    From approximately January 27, 2008 through June 2008, MSSI and Quiros, through Q Resorts, negotiated a stock transfer agreement whereby MSSI would transfer the real estate and other assets of JPI to Q Resorts in exchange for $23.5 million, plus any applicable closing adjustments. The purchase was scheduled to close on June 23, 2008. By that time, MSSI had raised substantial sums from Phase I and Phase II investors.

**ANSWER:** Admitted.

31.    In anticipation of the closing, and at Quiros' and Burstein's request, MSSI opened brokerage accounts with Raymond James in the name of each limited partnership. MSSI expressly informed Burstein that instructions regarding those accounts could only be given by MSSI's President, Louis Dufour, and CEO, Louis Hebert. Burstein, however, contemporaneously opened identically-titled accounts at Raymond James, with Quiros as the sole authorized signatory, along with an account in the name of Q Resorts, Inc. While the accounts had different authorized signors, as they were accounts for the limited partnerships, they had the same tax ID number as the corresponding MSSI accounts. Burstein only submitted to the Raymond James New Accounts department the first and last page of the Jay Peak Hotel Suites Limited Partnership I agreement for both that limited partnership and the Jay Peak Hotel Suites Limited Partnership II. Subsequently, each time a new Jay Peak limited partnership account was opened, Burstein submitted the same two pages of the Jay Peak Hotel Suites Limited Partnership I agreement. Phase I and Phase II partnership funds were to be deposited into the MSSI-controlled Phase I and Phase II Raymond James accounts and, upon closing, transferred to Quiros' controlled accounts in the same names.

> **ANSWER:** Federal admits that Phase I and Phase II partnerships were to be deposited into the MSSI-controlled Phase I and Stenger-controlled Phase II Raymond James accounts and, upon closing transferred to Quiros-controlled

accounts.  Federal lacks knowledge or information sufficient to form a belief as to
the truth of the remaining allegations set forth in paragraph 31.

32.     On June 16, 2008, Burstein reached out to Jeff Tyler, a Raymond James' customer

services supervisor, regarding the documentation needed to transfer the MSSI accounts to Q

Resorts. In an email, Burstein described MSSI as having "sold all of their holding to Q Resorts"

and there being a "stock transfer agreement that shows all assets being transferred over to Q

Resorts dates as of last Friday [June 13, 2008."] This was a misrepresentation, as the transaction

had not yet closed and the assets were not transferred until June 23, 2008. Burstein used the assets

to send them back to the seller to pay for the purchase of the resorts when he could not get

financing. He then used the remainder of the assets to buy securities on margin so that the accounts

would show an asset value consistent with the expected cash value.

> **ANSWER:** Federal admits that paragraph 31 quotes a portion of the June 16, 2008
> email from Burstein to Tyler.  Federal denies the remaining allegations set forth in
> paragraph 32.

33.     On June 16 and June 17, 2008, MSSI transferred $11 million from its Phase I

escrow account at People's Bank to its Phase I account at Raymond James. On June 20, 2008,

MSSI transferred $7 million from its Phase II account at People's Bank to its Phase II account at

Raymond James. MSSI informed Burstein, Stenger, Quiros, and Q Resorts that, pursuant to the

offering materials, limited partnership agreements, and as a condition of the sale, these funds could

not be used directly or as collateral to purchase Jay Peak. The next day, June 18, 2008, Burstein

provided his supervisor with a draft of a "funding letter" he intended to send MSSI's counsel that

detailed some of the final steps needed to close the transaction. In this letter, Burstein falsely stated

that Raymond James would be "provid[ing] financing" for Q Resorts' purchase of Jay Peak.

Burstein's supervisor immediately revised the letter by specifically deleting the statement that

Raymond James was financing the transaction and writing instead that the firm was merely

"wir[ing] funds" in connection with the closing. Burstein ignored his supervisor's revision and instead relayed to MSSI the false claim that Raymond James would be financing the deal.

> **ANSWER:** Federal admits that MSSI transferred $11 million from its Phase I account at People's Bank to its Phase I account at Raymond James and $7 million from its Phase II account at People's Bank to its Phase II account at Raymond James; individuals involved in the transaction discussed the use of partnership funds; and paragraph 32 quotes a portion of the June 18, 2008 draft letter and the revised letter. Federal denies the remaining allegations set forth in paragraph 33.

34.     Although Burstein was advised that he would need MSSI's consent to transfer the funds from the MSSI-controlled accounts at Raymond James, Burstein disregarded this instruction and misrepresented to Raymond James' customer accounts department that the deal had already closed, causing the funds to be transferred prior to closing and payment for the sale.

**ANSWER:** Denied.

35.     Shortly before the closing, MSSI again sought confirmation from Burstein and Quiros that Raymond James would be providing financing for the transaction and that "the funds transferred to the Phase I and Phase II bank accounts [at Raymond James] will not be used as collateral or any guarantee to finance the purchase of the Jay Peak Resort." Despite knowing that Raymond James had declined to finance the transaction, had not received the full Limited Partnership agreements, and that Quiros fully intended to use the transferred partnership funds to purchase Jay Peak, Burstein misleadingly responded by stating:

> (1) "You are correct Raymond James will be financing the transaction through QResorts, Inc. as Mr. Quiros is [Raymond James'] client";
>
> (2) "You are correct we will wiring (sic) the money as instructed"; and
>
> (3) "None of the funds in the MSSI Jay Peak Hotel Suites LP will be used for margin, as this was not approved by Mr. Dufour & Mr. Hebert."

**ANSWER:** Federal admits that paragraph 35 quotes portions of email correspondence between MSSI's counsel and Burstein. Federal denies the remaining allegations set forth in paragraph 35.

36.     Burstein also failed to refer MSSI's concerns to Raymond James' legal or compliance departments, instead directing MSSI to speak directly with Quiros. To further his deception, Burstein forwarded MSSI's inquiry to Raymond James' advertising department in an attempt to show that he passed his response through "compliance." Burstein then set in motion Quiros' and his scheme, and began facilitating Quiros' use of limited partnership assets to fund Q Resorts' purchase of Jay Peak.

**ANSWER:** Federal admits that Burstein referred MSSI's concerns to his supervisor, Frank Amigo and denies that Burstein set a scheme in motion. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 36.

37.     On June 23, 2008, without MSSI's authorization, Burstein transferred the $11 million in MSSI's Phase I account at Raymond James to Quiros' Phase I account at Raymond James. Burstein, without MSSI's authorization, also transferred the $7 million from MSSI's Phase II account at Raymond James to Quiros' Phase II account at Raymond James. Quiros then immediately transferred the funds to his Q Resorts account at Raymond James. This allowed Quiros to create the illusion to MSSI that the monies came from Q Resorts and not from partnership funds. It also ensured that the transfer to Q Resorts to allow Q Resorts to pay the closing price did not appear on the account statements for the accounts controlled by MSSI.

**ANSWER:** Federal admits that $11 million was transferred from MSSI's Phase I account to Quiros' Phase I account and $7 million was transferred from MSSI's Phase II account to Quiros' Phase II account on June 23, 2008; and the transfers were approved by Frank Amigo. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 37.

38.     Between June 23, 2008 and September 26, 2008, Quiros, through Q Resorts and with Burstein's assistance, made five installment payments to MSSI for the Jay Peak purchase and

13

three installment payments to Quiros' attorneys at the Burgess law firm toward the Jay Peak purchase and Quiros' attorneys' fees. Each transfer was an unlawful withdrawal of funds either raised or derived from Phase I and Phase II investor funds.

> **ANSWER:** Federal admits that Quiros made additional payments in connection with the Jay Peak Resort purchase from June 23, 2008, through September 26, 2008.  Federal denies the remaining allegations set forth in paragraph 38.

39.     Burstein and Quiros effectuated these withdrawals by funding Quiros' Phase I and II Raymond James accounts with EB-5 investor funds, transferring those funds through two separate Raymond James accounts, and sending the funds back to the seller for the purchase. Because Burstein orchestrated the unauthorized transfer of the MSSI-held partnership assets at Raymond James to Quiros-controlled accounts at Raymond James before MSSI received payment from Quiros, MSSI only saw funds coming from Quiros' Q Resorts account and was unaware that partnership assets were being used to fund the purchase.

> **ANSWER:** Denied.

40.     Of the $25.7 million purchase price, $12.4 million was misappropriated from Phase I and $9.5 million was misappropriated from Phase II. After an initial $13.544 million payment, the remaining purchase price was funded using margin loans collateralized by the Phase I and Phase II limited partnership accounts.

> **ANSWER:** Federal admits that Q Resorts transferred $13,544,346 to Spiegel Sohmer on June 23, 2008.  Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 40.

### ii.   *Margin Loans are Used by Quiros and Burstein to Conceal the Fraud*

41.     Between June 2008 and March 2014, Burstein facilitated three separate margin lending arrangements with Quiros. In each instance, the Raymond James-held partnership assets collateralized the margin loans. The first iteration of the margin loan was created in mid-2008 and

allowed a loan against the assets of the Phase I and Phase II partnership accounts. The second

iteration of the margin loan was created in February 2009 and initially collateralized by Phase I

and II partnership funds, although the loan would ultimately be collateralized by the assets of the

Phase I through V partnerships. In an apparent attempt to disguise the existence of the margin loan

and related collateralization of partnership assets, a new account was created to hold all of the debt

so that only the assets would appear on the partnership account statements. Thus, while the

partnership assets were pledged, the pledge no longer appeared on the partnership statements. The

third iteration was created in February 2012 and collateralized by the assets, including those of the

Phase V, VI and VII limited partnerships.

> **ANSWER:** Federal admits that Raymond James authorized three margin lending
> arrangements with Quiros between June 2008 and March 2014, which were secured
> by Treasury bills purchased with funds held in an account in the name of a
> partnership.  Federal denies the remaining allegations set forth in paragraph 41.

42.     Throughout the course of their scheme, Burstein and Quiros used these margin

loans to convert and misappropriate partnership funds while concealing from JPI officers,

accountants, and auditors the absence of limited partnership funds in the Raymond James-held

partnership accounts. As JPI deposited newly acquired partnership assets into the partnership-

specific Raymond James accounts, Burstein and Quiros disguised their withdrawal of those funds

by purchasing treasury bills in the amounts deposited while increasing the limited partnerships'

indebtedness under the margin loans. As assets were depleted in each limited partnership, the later-

phase limited partnerships were added to collateralize the margin loan then in existence. Those

proceeds were then used to pay down earlier margin loans until Burstein and Quiros' scheme came

to an end.

> **ANSWER:** Denied.

43.     By the close of business on June 23, 2008, Quiros and Burstein had withdrawn $7.6

million of the $11 million then-existing in the Phase I Raymond James account and $6 million of the $7 million then-existing in the Phase II Raymond James account to fund the first installment of the Jay Peak purchase. These withdrawals left $3.4 million and $1 million remaining in the Phase I and Phase II Raymond James accounts, respectively.

> **ANSWER:** Federal admits that Quiros directed the withdrawal of $7.6 million from the Phase I account and $6 million from the Phase II account and that Q Resorts transferred $13,544,346 to Spiegel Sohmer on June 23, 2008.  Federal denies the remaining allegations set forth in paragraph 43.

44.     On June 25, 2008, to disguise the fact that they had unlawfully withdrawn money from the Phase I and Phase II partnership accounts, Burstein and Quiros implemented a plan to purchase U.S. treasury bills equal to the $11 million and $7 million that MSSI initially deposited into the Phase I and Phase II accounts. Because only $3.4 million remained in the Phase I account, Quiros, through Burstein, caused Phase I to incur a $7.6 million "margin loan" to purchase the $11 million in treasury bills. The $3.4 million in remaining Phase I assets were collateralized but remained in the Phase I account. Similarly, because only $1 million remained in the Phase II account, Quiros and Burstein caused Phase II to incur a margin loan balance of $6 million to purchase the $7 million in treasury bills. The $1 million remaining in Phase II assets were similarly collateralized but remained in the Phase II account. Because the treasury bills were purchased on loan, the limited partnerships did not have a claim to the full $18 million in treasury bills and the remaining Phase I and Phase II partnership assets were at risk if there was a margin call. Nonetheless, the existence of $11 million in treasury bills in the Phase I account and $7 million of treasury bills in the Phase II account created the appearance that the full amount of partnership assets previously deposited remained intact.

> **ANSWER:** Federal admits that Quiros purchased Treasury bills with funds deposited in accounts held by the partnerships associated with "Phase I" and "Phase II", which settled on June 24, 2008.  Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44.

16

45.      Burstein and Quiros continued to draw on the remaining Phase I and Phase II

partnership assets held at Raymond James to fund Q Resorts' purchase of Jay Peak. Each time a

withdrawal was made, the margin balance on the specific account would increase while the amount

of the treasury bills in the account remained the same. This process continued until Q Resorts'

$25.7 million purchase of Jay Peak had been fully funded and thereafter.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief
> as to the truth of the allegations set forth in paragraph 45.

46.      Over the course of the scheme, more than $133.9 million of investor funds from

Phases I through VII were used to pay down the margin loans in violation of the limited
partnership
agreements.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief
> as to the truth of the allegations set forth in paragraph 46.

### iii.    *Burstein and Quiros Misappropriate and Commingle Other Funds for Their Personal Use*

47.      Following Q Resorts' acquisition of Jay Peak, Quiros had access to all Jay Peak

EB-5 investor funds held by each limited partnership. Beginning on June 23, 2008, Quiros, with

Burstein's assistance, misused at least $199 million in investor assets. This misuse included the

conversion of $65.8 million of investor money to: (1) finance Q Resorts' purchase of Jay Peak; (2)

finance Quiros' purchase of Q Burke Resort using $7 million in Phase VII funds; (3) purchase a

luxury condominium at the Setai Fifth Avenue Hotel and Residences in New York City using $3.8

million in Phase IV and V funds; (4) improperly purchase seven acres of land from GSI of Dade

County, Inc. and buy a luxury condominium at Trump Place in New York City using $6.0 million

in Phase VII funds; (5) pay Quiros' personal income taxes using $6 million in Phase VII funds; (6)

pay Quiros' unrelated corporate income taxes using $5.5 million in Phase V, VI, and VII funds; (7)

"acquire" non-existent or valueless Korean patents, equipment, and distribution rights from a close

associate, ostensibly for Phase VII; and (8) pay "construction supervision" fees to Quiros or Quiros-
owned entities that were never earned using $7.8 million in Phase VII funds.

    **ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 47.

    48.    Burstein and Quiros also misappropriated at least $144.1 million in partnership assets to pay down balances on the margin loans. At least $125.9 million came from the Raymond James held limited partnership accounts for the first six phases, as follows:

- Phase I - $2.2 million (of the $17.5 million in total investor funds raised);

- Phase II - $51.6 million (of the $75 million in total investor funds raised);

- Phase III - $33.4 million (more than the $32.5 million in total investor funds raised);

- Phase IV - $23.3 million (of the $45 million in total investor funds raised);

- Phase V - $9.6 million (of the $45 million in total investor funds raised);

- Phase VI - $5.8 million (of the $67 million in total investor funds raised).

**ANSWER:** Denied.

    49. Quiros, through Burstein, also paid off the balance on the third iteration of the margin loan using $18.2 million of Phase VII partnership funds. Burstein knowingly exposed Raymond James to losses resulting from his scheme to obtain direct and indirect benefits for himself and his family.

    **ANSWER:** Federal admits that Quiros paid off the third iteration of the margin loan using $18.2 million of funds held in the partnership account associated with "Phase VII." Federal denies the remaining allegations set forth in paragraph 49.

    50.    Burstein was married to Quiros' daughter from 2006 through 2010. They had one daughter together. Over the course of Burstein and Quiros' scheme, Burstein was paid thousands of dollars in checks from Quiros' management company for "services." Following Burstein's divorce from Quiros' daughter in 2010, Quiros reminded Burstein that their scheme was a "once

in a life time opportunity for all of us." Quiros pledged to Burstein that he would give "all that [he]

can." Burstein responded: "This is exactly what we planned years ago, [and] it's exciting to see it

all coming together." Shortly thereafter, Burstein received additional payments from Quiros of at

least $225,000.

> **ANSWER:** Federal admits that Burstein was married to Quiros' daughter from
> 2006 through 2010; they had a child together; Burstein received $225,000 through
> his divorce settlement as reimbursement of attorneys' fees and costs associated with
> facilitating visitation with his child across state lines; and paragraph 49 quotes
> portions of email correspondence between Quiros and Burstein.  Federal denies the
> remaining allegations set forth in paragraph 50.

### iv.   *Burstein Concealed the Fraud from the Partnerships, Regulators, and Raymond James*

51.     Burstein and Quiros' concealment went beyond margin loans. It started even before

the purchase of Jay Peak resort closed and continued thereafter.

> **ANSWER:** Denied.

52.     Following the purchase, JPI and the partnerships were able to review certain

monthly statements for Raymond James partnership accounts. Beginning in January 2009,

however, when JPI's CFO/Controller inquired about transactions in the Phase I and Phase II

accounts, Burstein refused to provide information on the basis that Quiros, not the limited

partnership, was his client. Burstein, through Quiros, instead provided only account summaries,

which did not identify the specific transactions in each account, thus making it far more difficult

to detect the commingling and misappropriation of partnership assets.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief
> as to the truth of the allegations set forth in paragraph 52.

53.     Wanting to ensure that "Hotel I and Hotel II funds are being used and not

commingled," JPI complained to Stenger that the summaries were inadequate, and that Burstein's

responses were "quite weak." To "address" JPI's concerns, Burstein allowed Quiros to conceal the

margin debt by transferring it to a separate account whose statements were not provided to anyone other than Quiros. Burstein later received an audit letter from Jay Peak's accountants. Burstein never responded directly to the auditors and the audit response letter was never completed, despite their follow up requests. Burstein failed to forward any of these requests to anyone at Raymond James; instead, he provided the audit requests directly to Quiros only.

> **ANSWER:** Federal admits that paragraph 53 quotes portions of email correspondence between Mike Dupont and Stenger and that Burstein received requests to provide information in connection with the audit of Jay Peak's financial statements.  Federal is without knowledge and information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 53.

54.     In August 2009, Burstein sent an email to Quiros outlining the scheme. Burstein described how he facilitated the collateralization and misuse of those funds to purchase treasury bills. Burstein acknowledged that the treasury bills were purchased to create the appearance that the partnership funds remained in the respective accounts in order to deceive the recipient. Burstein further acknowledged that he "create[s] margin on the account so that there is no time lapse," "create[s] specialized reports," "create[s] a summary statement that shows a snapshot of [each] account as of today with deposits withdrawals and current account balances," and "balance[s] each account so that the totals match perfectly, making each dollar accounted for."

> **ANSWER:** Federal admits that that paragraph 54 quotes portions of email correspondence between Quiros and Burstein.  Federal denies the remaining allegations set forth in paragraph 54.

55.     In December 2009, Burstein – despite knowing that the initial Phase I and Phase II partnership assets were used by Quiros to purchase Jay Peak – wrote a letter to Quiros on Raymond James letterhead "confirming" that the Phase I and II investor funds had been used for "construction costs," despite knowing this was false. This letter was sent by email, thus evading correspondence review.

**ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 55.

56.     In April 2010, Quiros asked Burstein not to advise Stenger when funds arrived and that, if Stenger were to call Burstein, to tell Quiros so Quiros would "advise [B]ill [Stenger] accordingly on any and all matters concerning these accounts." Despite knowing that Stenger was President and CEO of the general partners of the limited partnerships, Burstein agreed.

**ANSWER:** Federal admits that this paragraph quotes a portion of an email. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 56.

57.     In 2011, Quiros, through Burstein, opened an account for Quiros-controlled Jay Construction Management, Inc. ("JCM"). The JCM account became one of the principal accounts used by Quiros to commingle and misappropriate partnership assets and was established as a deliberate structure to hide the source of payments by moving money into the JCM account before transferring it elsewhere.

**ANSWER:** Federal admits that Raymond James opened an account for Jay Construction Management, Inc.  Federal denies the remaining allegations set forth in paragraph 57.

58.     Upon opening the JCM account, Burstein met with Raymond James' Anti-Money-Laundering ("AML") department to "provide information related to large dollar transactions that will be occurring in th[e] new account . . . and related to Quiros Hotel and Jay Peak." Without any basis, Burstein informed AML that the account was to be used "to better account for expenditures related to real estate development," and was recommended by Quiros' accountants. Burstein failed to mention to AML, however, that the JCM account was owned by a good friend of Quiros and that Quiros had been granted a power of attorney over the account.

**ANSWER:** Federal admits that Burstein met with the AML Department to provide information about the Jay Construction Management account; that AML Department approved the JCM account; and paragraph 57 quotes a portion of an AML report documenting same.  Federal is without knowledge or information

21

sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 58.

59.     In February 2012, concerns were raised at Jay Peak regarding the accounts at Raymond James and whether any margin debt existed. To hide this debt, Burstein prepared a "no encumbrances" letter for six Jay Peak accounts purporting to show account balances free of margin debt, despite a margin balance of more than $23 million. To create the appearance that no margin debt existed, Burstein shifted funds between accounts such that the margin loans were temporarily extinguished for a single business day, even though Burstein and Quiros planned to re-establish the debt immediately thereafter. Burstein then issued a "no encumbrances" letter to JPI and Stenger as of that specific date. After the letter was sent, Burstein immediately opened a new margin account and created a debt to cover the balances used to pay off the prior account and the letter was no longer accurate. Burstein typed and emailed the letter (as opposed to printing and faxing or scanning) in an apparent attempt to avoid Raymond James' internal correspondence review process. Indeed, Burstein was the only employee at Raymond James aware of the letter and its impropriety.

> **ANSWER:** Federal admits that Burstein prepared a letter dated February 29, 2012 that stated "as of February 27th, 2012 there are no encumbrances on any of the Jay Peak Partnership accounts;" Quiros paid his margin debit on February 24, 2012; and Quiros executed a new credit agreement to secure a margin loan in another account on February 29, 2012. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 59.

60.     In April 2012, Quiros warned Burstein that they "must be stronger and diligent" because they "will get attack (sic) from the complainers and people who are out right jealous," and instructed Burstein to "play the same protocall (sic) going forward" because "no talking has proven to be the best way." Quiros also exclaimed that "now that [Burstein] [is] willing to open the escrow it is going to be unbelievable," but warned that "[t]his dimension has to be well calculated." Quiros

also instructed Burstein to "like always let me come up with the scope and task [and] together [we]

will come up with a plan, and then you put your RJ Magic."

> **ANSWER:** Federal admits that paragraph 60 quotes portions of email correspondence between Quiros and Burstein. Federal denies the remaining allegations set forth in paragraph 60.

61.     Throughout this process, Burstein actively violated and evaded Raymond James'

internal review protocols and corporate polices. Burstein would regularly communicate with

Quiros via text message, decline to refer external account-related complaints to his supervisors,

legal, or compliance, provide intentionally misleading descriptions and explanations to Raymond

James' compliance and AML departments, authorize transactions without the requisite authority,

and draft emails and letters to avoid Raymond James' review system.

> **ANSWER:** Federal denies that Burstein authorized transactions without the requisite authority. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 61.

### *The Scheme Collapses*

62.     Burstein and Quiros' scheme crashed when investor money ran out and additional

offerings could not be made. Having pilfered their assets to purchase Jay Peak, fund the obligations

of Phases I through V, and for Quiros' personal benefit, Quiros and Burstein left Phases VI through
VIII holding the bag. Phases VI through VIII therefore could not be completed. These shortfalls

totaled more than $99.6 million, consisting of a shortage of at least $26 million in Phase VI, $67

million invested in Phase VII that is virtually worthless, and at least a $6.6 million shortage in Phase
VIII.

> **ANSWER:** Federal admits that Quiros' management of partnership funds resulted in alleged shortages. Federal denies the remaining allegations set forth in paragraph

### *The Litigations and Court-Approved Settlement*

63.     On April 12, 2016, the U.S. Securities and Exchange Commission ("SEC") initiated

litigation against Quiros which resulted in the appointment of Michael Goldberg as Receiver for the Jay Peak limited partnerships and related entities (the "SEC Receiver"), in the matter-styled *SEC v. Quiros, et. al.*, Case No. 16-CV-21301-GAYLES. Soon thereafter, numerous lawsuits were filed against Raymond James and Burstein. They included an action brought by the SEC Receiver (*Goldberg v. Raymond James Financial, Inc., et al.*, Case No. 1:16-CV-21831-JAL), and a consolidated class action lawsuit (*Daccache, et. al. v. Raymond James & Associates, Inc., et al.*, Case No. 1:16-CV-21575-FAM). Additional lawsuits were filed on behalf of groups of individual investors.

    **ANSWER:** Admitted.

    64.    The claims against Raymond James alleged various intentional torts, including aiding and abetting fraud and aiding and abetting breach of fiduciary duty as well as statutory claims under RICO. The liability against Raymond James was predicated on the alleged intentional wrongdoing of Burstein.

    **ANSWER:** Federal admits that the claims against Raymond James alleged various torts.  Federal denies any allegations about the claims that are inconsistent with the pleadings filed in the litigation.  Federal denies the remaining allegations set forth in paragraph 64.

    65.    A total of 836 investors contributed to the eight limited partnerships now in SEC receivership. Each invested $500,000 for a total of $418,000,000. In addition, investors were required to pay an administrative fee of $50,000, totaling approximately $41,800,000.

    **ANSWER:** Federal admits that investors principally invested $500,000 and were required to pay an administrative fee.  Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 65.

    66.    Raymond' James potential exposure was substantial – at least hundreds of millions of dollars, exclusive of interest, attorneys' fees, punitive damages or treble damage, which were sought by the plaintiffs under various legal theories including RICO. There was a significant

likelihood of an adverse outcome in the litigation given the substantial evidence regarding the misconduct of Burstein. The prospects for a negative result were exacerbated because Burstein advised he would refuse to testify and invoke his Fifth Amendment rights – potentially resulting in an adverse inference against both Burstein and Raymond James.

**ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 66.

67.     On June 29, 2016, Raymond James entered into a settlement agreement with the Securities Division of the Vermont Department of Financial Regulation to resolve alleged violations of Vermont securities laws stemming from the scheme (the "Vermont Regulatory Settlement"). Under that settlement agreement, Raymond James paid a total of $5.95 million, consisting of an administrative penalty ($1.25 million), costs ($200,000) and reimbursement to the SEC Receiver ($4.5 million). The payment made to the SEC Receiver consisted of $2.75 million representing the "total revenues earned by [Raymond James] . . . in connection with the Quiros controlled accounts" and $1.75 million in restitution.

**ANSWER:** Admitted.

68.     After several months of confidential negotiations, on April 13, 2017, Raymond James entered into a Settlement Agreement and Release with the SEC Receiver and class counsel. The agreement provided for the dismissal of all Jay Peak related civil litigation against Raymond James and a bar of future litigation (other than actions brought directly by government entities) in exchange for payment by Raymond James to the SEC Receiver totaling $150,000,000, which included the previously-funded Vermont Regulatory Settlement.

**ANSWER:** Admitted.

69.     Raymond James' exposure was driven by the amount of limited partnership assets held by Raymond James and converted and misappropriated by Burstein and Quiros over a six-

year period. The settlement required the SEC Receiver to distribute and use this payment in specific ways, including but not limited to: (1) $67,000,000 "to return the Five Hundred Thousand Dollar ($500,000) principal investments to each remaining Investor who invested in Jay Peak Biomedical Research Park, L.P., ("Biomedical Phase VII")"; (2) $10,000,000 "to be paid up to twenty (20) Q Burke Phase VIII Investors who are not eligible to apply for permanent residency through [the EB-5 program]"; (3) $1,000,000 "to refund the Five Hundred Thousand Dollar ($500,000) principal investments to the two (2) investors in Q Burke Phase VIII whose I-526 petitions were denied. . . ."; and (4) $15,391,386.47 to pay the investors in Phase I who were promised a return of their investments.

> **ANSWER:** Federal admits that the Settlement Agreement outlined how the Settlement Amount was to be allocated and that paragraph 68 quotes a portion of the Settlement Agreement.  Federal denies the remaining allegations set forth in paragraph 69.

70.    The Settlement Agreement and Release was approved by Judge Gayles on June 30, 2017, and became final and non-appealable on August 30, 2017.

> **ANSWER:** Federal admits that the Settlement Agreement and Release was approved by Judge Gayles on June 30, 2017.  Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 70.

71.    Raymond James completed its payment obligations under the Settlement Agreement and Release on September 18, 2017. In a settlement agreement reached with the SEC in February 2018, Quiros agreed to pay back to the Jay Peak investors more than $81 million in investor money that he used illegally, pay a $1 million penalty to the SEC, and forfeit $417,000 in cash that was frozen by the SEC. Quiros also agreed to surrender ownership of the two condos and ski resort he purchased with investor funds and give up his stake in more than a dozen other properties, including the Jay Peak Resort.

**ANSWER:** Federal is without knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 71.

72.     In September 2018, Burstein was restrained and enjoined by the SEC from working in the securities industry for 10 years. Burstein agreed to pay the SEC an $80,000 fine in connection with his involvement in the Jay Peak scheme.

**ANSWER:** Denied.

73.     In May 2019, Quiros, Stenger and two others were indicted by a federal grand jury on criminal charges in connection with the Phase VII project. The charges against Quiros included money laundering and misrepresenting facts to the SEC.

**ANSWER:** Admitted.

## THE FIDELITY BONDS

74.     Prior to the discovery of Burstein and Quiros' scheme, Raymond James purchased a series of Financial Institution Bonds providing a total of $60 million in "single loss" employee fidelity coverage as follows:

   a.   Federal Insurance Company Bond No. 70436970, written on a co-surety basis with Beazley Insurance Company, Inc., with an effective date of October 1, 2015 through October 1, 2016, and a $10 million single loss limit of liability (the "Primary Bond");

   b.   Travelers Casualty and Surety Company of America Policy No. 106384318, with an effective date of October 1, 2015 through October 1, 2016, and a $10 million single loss limit of liability (the "First Excess Bond");

   c.   Federal Insurance Company Bond No. 82126526, with an effective date of October 1, 2015 through October 1, 2016, and a $10 million single loss limit of liability (the "Second Excess Bond");

   d.   Federal Insurance Company Bond No. 82210871, written on a co-surety basis with Great American Insurance Company, with an effective date of October 1, 2015 through October 1, 2016, and a $20 million single loss limit of liability (the "Third Excess Bond"); and

   e.   Beazley Insurance Company, Inc. Policy No. V1431F150301, with an effective date of October 1, 2015 through October 1, 2016, and a $10 million single loss limit of liability (the "Fourth Excess Bond") (collectively, the "Bonds").

True and correct copies of the Bonds, including all endorsements, are attached hereto as

Composite Exhibit "A."

> **ANSWER:** Federal admits that Raymond James purchased Bond No. 70436970, Bond No. 82126526 and Bond No. 82210871, and that true and correct copies thereof as included in Exhibit A.  Federal denies that his paragraph fully or accurately characterizes the scope of coverage under the bonds and denies all allegations about those bonds that are inconsistent with their terms, conditions, definitions, limitations and exclusions.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 74.

75.     The Primary Bond grants coverage for loss pursuant to the following fidelity insuring agreement:

> "Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:
>
> (a) To cause the Insured to sustain such loss, or
>
> (b) To obtain financial benefit for the Employee, or another person or entity."

Primary Bond, Endorsement No. 3.

> **ANSWER:** Federal admits that Insuring Agreement (A) (as amended by Endorsement/Rider No. 3) provides coverage for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent: (a) to cause the Insured to sustain such loss; or (b) to obtain financial benefit for the Employee, or another person or entity. Notwithstanding the foregoing, however, it is agreed that with regard to Loans and Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and to obtain a financial benefit for the Employee."  Federal denies that paragraph 75 fully or accurately characterizes the scope of coverage under the Primary Bond and denies any allegations that are consistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

76.     The term "Employee" is defined in relevant part to include "a natural person in the service of the Insured, at any of the Insured's offices or premises covered hereunder whom the Insured compensates directly by salary or commissions and whom the Insured has the right to direct and control while performing services for the Insured." Primary Policy, Conditions and

Limitations, p. 6.

> **ANSWER:** Federal admits that paragraph 76 quotes a portion of the Primary Bond's definition of "Employee" but denies that paragraph 76 fully or accurately characterizes the scope of coverage under the Policy and denies any allegations that are consistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

77.     The Primary Bond applies to "loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable." Primary Policy, Conditions and Limitations, p. 16. "Property" includes "[m]oney." Primary Bond, Endorsement No. 19.

> **ANSWER:** Federal admits that paragraph 77 quotes a portion of the Primary Bond's Conditions and Limitations and the definition of "Property" but denies that paragraph 77 fully or accurately characterizes the scope of coverage under the Primary Bond and denies any allegations that are consistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

78.     Each of the excess bonds provides coverage on a follow-form basis incorporating the terms of the Primary Bond.

> **ANSWER:** Federal admits that Raymond James purchased Bond No. 70436970, Bond No. 82126526 and Bond No. 82210871, and that true and correct copies thereof as included in Exhibit A.  Federal denies that his paragraph fully or accurately characterizes the scope of coverage under those bonds and denies all allegations about those bonds that are inconsistent with their terms, conditions, definitions, limitations and exclusions.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 78.

### THE COVERED LOSS

79.     Raymond James suffered a covered loss resulting directly from Burstein's dishonest and fraudulent actions, acting in collusion with his former father-in-law Quiros, with the intent to benefit himself, Quiros, and entities operated and controlled by Quiros and others. None of the commingling and misappropriation of limited partnership funds could have occurred without Burstein, as the broker on each account, orchestrating, supervising, and implementing requests

made by Quiros and others to transfer funds and concealing his and Quiros' actions. The funds in each limited partnership account were held by Raymond James and represent money for which Raymond James would be legally liable if lost.

**ANSWER:** Denied.

80.     The Primary Bond is triggered when a loss is "discovered." The Primary Bond provides the following with respect to Discovery:

> "This bond applies to loss discovered by the Vice President of Corporate Insurance and/or Legal Department of the Insured located at the Insured's principal address as stated in Item 1 of the Declarations during the Bond Period. Discovery occurs when the Vice President of Corporate Insurance and/or Legal Department of the Insured first becomes aware of facts that would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount details of loss may not then be known.

> Discovery also occurs when the Vice President of Corporate Insurance and/or Legal Department of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute a loss under this bond."

Primary Policy, Endorsement No. 23.

> **ANSWER:** Federal admits that paragraph 80 quotes the Primary Bond's definition of Discovery but denies that paragraph 80 fully or accurately characterizes the scope of coverage under the Primary Bond and denies any allegations that are consistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond.

81.     The Vice President of Corporate Insurance and/or Legal Department of Raymond James did not become aware that Burstein and Quiros' fraudulent scheme may have existed until approximately May 2016, which is within the Bond Period.

**ANSWER:** Denied.

82.     On February 27, 2018, Raymond James reported a claim for loss under the Bonds to the Insurers.

**ANSWER:** Admitted.

83.     The amount certain of Raymond James' claim for covered loss exceeds the

aggregate limit of the Bonds described herein. More than $200 million in funds have thus far been

identified as misappropriated, and Raymond James has paid at least $78 million to the SEC

Receiver for the limited partnerships in order to repay investors whose investment principal was

both held at Raymond James and lost as result of Burstein and Quiros' scheme. None of the

Insurers have made any payment for covered loss.

> **ANSWER:** Federal admits that Raymond James has paid in excess of $60 million
> to the SEC Receiver and that the Insurers have not issued any payment in
> connection with the claim.  Federal denies the remaining allegations set forth in
> paragraph 83.

## GENERAL ALLEGATIONS

84.     All conditions precedent to bringing this action have been performed, waived, or

excused.

> **ANSWER:** Denied.

85.     Raymond James has retained undersigned counsel to represent its interests in this

matter and is obligated to the undersigned firm for the payment of their attorneys' fees and costs.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief
> as to the truth of the allegations set forth in paragraph 85.

86.     Raymond James offers to do equity in the premises.

> **ANSWER:** Federal is without knowledge or information sufficient to form a belief
> as to the truth of the allegations set forth in paragraph 86.

## COUNT I – BREACH OF CONTRACT (AGAINST FEDERAL)

87.     Raymond James realleges paragraphs 1 through 85 as if fully set forth herein.

> **ANSWER:** Federal repeats and realleges its answers and denials to paragraphs 1
> through 86 as though fully set forth herein.

88.     At all times material hereto, Raymond James was insured by Federal under the

Primary Bond, the Second Excess Bond, and the Third Excess Bond, which are enforceable

contracts under the laws of the State of Florida.

> **ANSWER:** Federal admits that Raymond James was insured by Federal under the Primary Bond, Second Excess Bond, and Third Excess Bond.  Federal denies the remaining allegations set forth in paragraph 88.

89.     The Primary Bond, the Second Excess Bond, and the Third Excess Bond obligate

Federal to indemnify Raymond James for loss sustained by Raymond James under the following

insuring agreement, the terms of which are expressly incorporated into the Second and Third

Excess Bonds:

> "Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:
>
> > (a) To cause the Insured to sustain such loss, or
> >
> > (b) To obtain financial benefit for the Employee, or another person or entity."

Primary Bond, Endorsement No. 3.

> **ANSWER:** Federal admits that Insuring Agreement (A) (as amended by Endorsement/Rider No. 3) provides coverage for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent: (a) to cause the Insured to sustain such loss; or (b) to obtain financial benefit for the Employee, or another person or entity. Notwithstanding the foregoing, however, it is agreed that with regard to Loans and Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and to obtain a financial benefit for the Employee."  Federal denies that this paragraph fully or accurately characterizes or alleges the scope of coverage afforded by the Primary Bond, the Second Excess Bond, and the Third Excess Bond; denies any allegations that are consistent with the terms, definitions, conditions, provisions, limitations, and exclusions in the Primary Bond, the Second Excess Bond, and the Third Excess Bond; and denies that Raymond James is entitled to coverage thereunder.

90.     Raymond James' loss resulting from Burstein's dishonest and fraudulent acts as

described herein is a covered loss under the Primary Bond, the Second Excess Bond, and the Third

Excess Bond.

**ANSWER:** Denied.

91.     No exclusions in the Primary Bond, the Second Excess Bond, or the Third Excess Bond apply to bar coverage for the claim.

**ANSWER:** Denied.

92.     Federal has failed and refused to pay Raymond James for the direct loss sustained by Raymond James resulting from Burstein's dishonest and fraudulent acts.

**ANSWER:** Federal admits that it has not issued payment to Raymond James under the Primary Bond, Second Excess Bond, and Third Excess Bond.  Federal denies the remaining allegations set forth in paragraph 92.

93.     As a direct, proximate, and foreseeable result of Federal's breaches of its duties under the Primary Bond, the Second Excess Bond, and the Third Excess Bond, Raymond James has suffered and continues to suffer damages.

**ANSWER:** Denied.

**COUNT II – BREACH OF CONTRACT (AGAINST BEAZLEY)**

94.     Raymond James realleges paragraphs 1 through 85 as if fully set forth herein.

**ANSWER:** Federal repeats and realleges its answers and denials to paragraphs 1 through 86 as though fully set forth herein.

95.     At all times material hereto, Raymond James was insured by Beazley under the Primary Bond and the Fourth Excess Bond, which are enforceable contracts under the laws of the State of Florida.

**ANSWER:** The allegations set forth in paragraph 95 are not directed against Federal, such that no response is required.  Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

96.     The Primary Bond and the Fourth Excess Bond obligate Beazley to indemnify Raymond James for loss sustained by Raymond James under the following insuring agreement,

the terms of which are expressly incorporated into the Fourth Excess Bond:

"Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:

(a) To cause the Insured to sustain such loss, or

(b) To obtain financial benefit for the Employee, or another person or entity."

Primary Bond, Endorsement No. 3.

**ANSWER:** The allegations set forth in paragraph 96 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

97.     Raymond James' loss resulting from Burstein's dishonest and fraudulent acts as described herein is a covered loss under the Primary Bond and Fourth Excess Bond.

**ANSWER:** The allegations set forth in paragraph 97 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

98.     No exclusions in the Primary Bond or the Fourth Excess Bond apply to bar coverage for the claim.

**ANSWER:** The allegations set forth in paragraph 98 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

99.     Beazley has failed and refused to pay Raymond James for the direct loss sustained by Raymond James resulting from Burstein's dishonest and fraudulent acts.

**ANSWER:** The allegations set forth in paragraph 99 are not directed against Federal, such that no response is required. Federal denies that Raymond James has

established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

100.    As a direct, proximate, and foreseeable result of Beazley's breaches of its duties under the Primary Bond and the Fourth Excess Bond, Raymond James has suffered and continues to suffer damages.

**ANSWER:** The allegations set forth in paragraph 100 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

### COUNT III – BREACH OF CONTRACT (AGAINST TRAVELERS)

101.    Raymond James realleges paragraphs 1 through 85 as if fully set forth herein.

**ANSWER:** Federal repeats and realleges its answers and denials to paragraphs 1 through 86 as though fully set forth herein.

102.    At all times material hereto, Raymond James was insured by Travelers under the First Excess Bond, which is an enforceable contract under the laws of the State of Florida.

**ANSWER:** The allegations set forth in paragraph 102 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

103.    The First Excess Bond obligates Travelers to indemnify Raymond James for loss sustained by Raymond James under the following insuring agreement, the terms of which are expressly incorporated into the First Excess Bond:

"Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:

(a) To cause the Insured to sustain such loss, or

35

(b) To obtain financial benefit for the Employee, or another person or entity."
Primary Bond, Endorsement No. 3.

**ANSWER:** The allegations set forth in paragraph 103 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

104.    Raymond James' loss resulting from Burstein's dishonest and fraudulent acts as described herein is a covered loss under the First Excess Bond.

**ANSWER:** The allegations set forth in paragraph 104 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

105.    No exclusions in the First Excess Bond apply to bar coverage for the claim.

**ANSWER:** The allegations set forth in paragraph 105 are not directed against Federal, such that no response is required.

106.    Travelers has failed and refused to pay Raymond James for the direct loss sustained by Raymond James resulting from Burstein's dishonest and fraudulent acts.

**ANSWER:** The allegations set forth in paragraph 106 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

107.    As a direct, proximate, and foreseeable result of Travelers' breach of its duties under the First Excess Bond, Raymond James has suffered and continues to suffer damages.

**ANSWER:** The allegations set forth in paragraph 107 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage. Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**COUNT IV – BREACH OF CONTRACT (AGAINST GREAT AMERICAN)**

108.    Raymond James realleges paragraphs 1 through 85 as if fully set forth herein.

**ANSWER:** Federal repeats and realleges its answers and denials to paragraphs 1 through 86 as though fully set forth herein.

109.    At all times material hereto, Raymond James was insured by Great American under

the Third Excess Bond, which is an enforceable contract under the laws of the State of Florida.

**ANSWER:** The allegations set forth in paragraph 109 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

110.    The Third Excess Bond obligates Great American to indemnify Raymond James

for loss sustained by Raymond James under the following insuring agreement, the terms of which

are expressly incorporated into the Third Excess Bond:

"Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:

(a) To cause the Insured to sustain such loss, or

(b) To obtain financial benefit for the Employee, or another person or entity."

Primary Bond, Endorsement No. 3.

**ANSWER:** The allegations set forth in paragraph 110 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

111.    Raymond James' loss resulting from Burstein's dishonest and fraudulent acts as

described herein is a covered loss under the Third Excess Bond.

**ANSWER:** The allegations set forth in paragraph 111 are not directed against Federal, such that no response is required. Federal denies that Raymond James has

established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

112.    No exclusions in the Third Excess Bond apply to bar coverage for the claim.

**ANSWER:** The allegations set forth in paragraph 112 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

113.    Great American has failed and refused to pay Raymond James for the direct loss

sustained by Raymond James resulting from Burstein's dishonest and fraudulent acts.

**ANSWER:** The allegations set forth in paragraph 113 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph

114.    As a direct, proximate, and foreseeable result of Great American's breach of its

duties under the Third Excess Bond, Raymond James has suffered and continues to suffer

damages.

**ANSWER:** The allegations set forth in paragraph 114 are not directed against Federal, such that no response is required. Federal denies that Raymond James has established a covered loss under the Primary Bond and denies any allegations suggesting that Raymond James is entitled to coverage.   Federal is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in this paragraph.

**COUNT V – DECLARATORY JUDGMENT (AGAINST ALL INSURERS)**

115.    Raymond James realleges paragraphs 1 through 85 as if fully set forth herein.

**ANSWER:** Federal repeats and realleges its answers and denials to paragraphs 1 through 86 as though fully set forth herein.

116.    This is an action for declaratory judgment pursuant to 28 U.S.C. § 2201 *et seq*. and

Florida Statute 86.011, *et seq*., in the alternative to Counts I through IV, for a declaration that

Raymond James is entitled to coverage under the 2013-2014 Bonds or 2014-2015 Bonds, if

applicable.

> **ANSWER:** Federal admits that Raymond James seeks, in the alternative, to obtain
> a declaratory judgment.  Federal denies the remaining allegations set forth in
> paragraph 116.

117.    Prior to purchasing the Bonds described above, Raymond James purchased from

the Insurers Financial Institution Bonds providing employee fidelity coverage with effective

periods of October 1, 2013 through October 1, 2014 (the "2013-2014 Bonds") and October 1, 2014

through October 1, 2015 (the "2014-2015 Bonds") (collectively, the "Earlier Bonds"). The Earlier

Bonds contain analogous provisions as the Bonds discussed above. True and correct copies of the

2013-2014 Bonds and the 2014-2015 Bonds, including all endorsements, are attached hereto as

Composite Exhibits "B" and "C," respectively.

> **ANSWER:** Federal admits that Raymond James purchased fidelity coverage
> effective from  October 1, 2013 through October 1, 2014 and October 1, 2014
> through October 1, 2015.  Federal denies the remaining allegations set forth in
> paragraph 11.

118.    As alleged above, Raymond James asserts that the covered loss at issue was not

discovered until approximately May 2016, which is within the Bond Period.

> **ANSWER:** Federal admits that Raymond James asserts that the covered loss at
> issue was not discovered until approximately May 2016, which allegation Federal
> denies.  Federal denies the remaining allegations set forth in paragraph 118.

119.    In an April 20, 2020 letter denying coverage, however, Federal took the position

that discovery by Raymond James may have occurred earlier, which could potentially trigger

coverage under the Earlier Bonds. Federal further asserted that Raymond James failed to comply

with unspecified conditions for pursuing a claim under the Earlier Bonds.

> **ANSWER:** Federal admits that Discovery occurred prior to May 2016 at the latest
> (while reserving the right to assert that Discovery occurred earlier than that date)

and that Raymond James failed to comply with conditions precedent to pursue claims under the Earlier Bonds.  Federal denies the remaining allegations set forth in paragraph 119.

120.    In the event it is determined that the loss was "discovered" by Raymond James within an Earlier Bond Period, Raymond James asserts that it is entitled to coverage under the applicable Earlier Bonds.

**ANSWER:** Denied.

121.    Accordingly, an actual controversy exists between Raymond James and the Insurers with respect to the Insurers' obligation to provide coverage under the 2013-2014 Bonds or 2014-2015 Bonds in the event the loss is deemed to have been "discovered" earlier by Raymond James.

**ANSWER:** Denied.

122.    Raymond James seeks a judicial declaration that, in the event it is determined that Raymond James "discovered" the loss earlier than it asserts, Raymond James is entitled to coverage under the applicable Earlier Bonds.

**ANSWER:** Denied.

123.    There is a bona fide, actual need for the declaration of the Insurers' duty and obligation to indemnify Raymond James under the Earlier Bonds should it be determined that Raymond James "discovered" the covered loss during an Earlier Bond Period.

**ANSWER:** Denied.

124.    This Court's declaration will confer certainty on the parties with respect to the Insurers' duty to indemnify Raymond James under the Earlier Bonds, and therefore, will serve the interests of justice.

**ANSWER:** Denied.

125.    Raymond James has no other adequate remedy at law.

**ANSWER:** Denied.

126.    It is also requested that this Court retain jurisdiction for supplemental relief.

**ANSWER:** Denied.

## AFFIRMATIVE DEFENSES

Federal, without prejudice to its answers and denials to the allegations in the Complaint for Damages, alleges the following Affirmative Defenses.

### FIRST AFFIRMATIVE DEFENSE

Any claim under Insuring Agreement (A) of the Primary Bond is subject to a $1,000,000 deductible, pursuant to Item 4 of the Declarations (as amended by Endorsement/Rider No. 27) and Section 11 of the Conditions and Limitations.  Raymond James is not entitled to recover under the Primary Bond unless it can establish a covered loss in excess of the applicable deductible.

### SECOND AFFIRMATIVE DEFENSE

Any claim under the Second Excess Bond is subject to a $1,000,000 deductible "plus any unpaid portion of the AGGREGATE LIMIT OF LIABILITY of the **Underlying Bonds** on the date of payment of any **Single Loss** under this bond," pursuant to ITEM 4. of the Declarations (as amended by Endorsement No. 5) and Section 1.a. of the Conditions and Limitations.  Raymond James is not entitled to recover under the Second Excess Bond unless it can establish a covered loss in excess of the applicable deductible.

### THIRD AFFIRMATIVE DEFENSE

Any claim under the Third Excess Bond is subject to a $1,000,000 deductible "plus any unpaid portion of the AGGREGATE LIMIT OF LIABILITY of the **Underlying Bonds** on the date of payment of any **Single Loss** under this bond," pursuant to ITEM 4. of the Declarations (as amended by Endorsement No. 3) and Section 1.a. of the Conditions and Limitations.  Raymond

James is not entitled to recover under the Third Excess Bond unless it can establish a covered loss in excess of the applicable deductible.

## FOURTH AFFIRMATIVE DEFENSE

Section 4 of the Primary Bond's Conditions and Limitations states that "Subject to the Aggregate Limit of Liability, the Underwriter's liability for each Single Loss shall not exceed the applicable Single Loss Limit of Liability shown in Item 4 of the Declarations.  If a Single Loss is covered under more than one Insuring Agreement or Coverage, the maximum payable shall not exceed the largest applicable Single Loss Limit of Liability."  Pursuant to Item 4 of the Declarations, any claim under Insuring Agreement (A) of the Primary Bond is subject to a Single Loss Limit of Liability of $10,000,000.  Raymond James cannot recover in excess of this Single Loss Limit of Liability under the Primary Bond.

## FIFTH AFFIRMATIVE DEFENSE

Section 2 of the Second Excess Bond's Conditions and Limitations states that "The COMPANY'S liability for each **Single Loss** shall not exceed the SINGLE LOSS LIMIT OF LIABILITY as stated in ITEM 3. of the DECLARATIONS or the unpaid portion of the AGGREGATE LIMIT OF LIABILITY, whichever is less."  Pursuant to ITEM 3. of the DECLARATIONS, any claim under the Second Excess Bond is subject to a SINGLE LOSS LIMIT OF LIABILITY of $10,000,000 excess of $20,000,000.  Raymond James cannot recover in excess of this SINGLE LOSS LIMIT OF LIABILITY under the Second Excess Bond.

## SIXTH AFFIRMATIVE DEFENSE

Section 2 of the Third Excess Bond's Conditions and Limitations states that "The COMPANY'S liability for each **Single Loss** shall not exceed the SINGLE LOSS LIMIT OF LIABILITY as stated in ITEM 3. of the DECLARATIONS or the unpaid portion of the

AGGREGATE LIMIT OF LIABILITY, whichever is less."  Pursuant to ITEM 3. of the

DECLARATIONS, any claim under the Third Excess Bond is subject to a SINGLE LOSS LIMIT

OF LIABILITY of $20,000,000 excess of $30,000,000.  Raymond James cannot recover in excess

of this SINGLE LOSS LIMIT OF LIABILITY under the Third Excess Bond.

## SEVENTH AFFIRMATIVE DEFENSE

Section 4 of the Primary Bond's Conditions and Limitations states that "The Underwriter's

total liability for all losses discovered during the Bond Period shown in Item 2 of the Declarations

shall not exceed the Aggregate Limit of Liability shown in Item 3 of the Declarations."  Pursuant

to Item 3 of the Declarations, any claim under the Primary Bond is subject to an Aggregate Limit

of Liability of $20,000,000.  Raymond James cannot recover in excess of this Aggregate Limit of

Liability under the Primary Bond.

## EIGHTH AFFIRMATIVE DEFENSE

Section 2 of the Second Excess Bond's Conditions and Limitations states that "The

COMPANY'S total cumulative liability for all **Single Losses** of all ASSUREDS discovered during

the BOND PERIOD shall not exceed the AGGREGATE LIMIT OF LIABILITY as stated in ITEM
2. of the DECLARATIONS.  Each payment made under the terms of this bond shall reduce the

unpaid portion of the AGGREGATE LIMIT OF LIABILITY until it is exhausted."  Pursuant to

ITEM 2. of the DECLARATIONS, any claim under the Second Excess Bond is subject to an

AGGREGATE LIMIT OF LIABILITY of $20,000,000 excess of $40,000,000.  Raymond James

cannot recover in excess of this AGGREGATE LIMIT OF LIABILITY under the Second Excess

Bond.

## NINTH AFFIRMATIVE DEFENSE

Section 2 of the Third Excess Bond's Conditions and Limitations states that "The

COMPANY'S total cumulative liability for all **Single Losses** of all ASSUREDS discovered during

the BOND PERIOD shall not exceed the AGGREGATE LIMIT OF LIABILITY as stated in ITEM

2. of the DECLARATIONS.  Each payment made under the terms of this bond shall reduce the

unpaid portion of the AGGREGATE LIMIT OF LIABILITY until it is exhausted."  Pursuant to

ITEM 2. of the DECLARATIONS, any claim under the Third Excess Bond is subject to an

AGGREGATE LIMIT OF LIABILITY of $40,000,000 excess of $60,000,000.  Raymond James

cannot recover in excess of this AGGREGATE LIMIT OF LIABILITY under the Third Excess

Bond.

## TENTH AFFIRMATIVE DEFENSE

Section 3 of the Primary Bond's Conditions and Limitations (as amended by

Endorsement/Rider No. 23) states that "This bond applies to loss discovered by the Vice President

of Corporate Insurance and/or Legal Department of the Insured located at the Insured's principal

address as stated in Item 1 of the Declarations during the Bond Period.  Discovery occurs when

the Vice President or Corporate Insurance and/or Legal Department of the Insured first becomes

aware of facts which would cause a reasonable person to assume that a loss of a type covered by

this bond has been or will be incurred, regardless of when the act or acts causing or contributing

to such loss occurred, even though the exact amount or details of loss may not then be known."

Raymond James cannot recover under the Primary Bond unless it proves that discovery, as

described in the Primary Bond, occurred during the Bond Period.

## ELEVENTH AFFIRMATIVE DEFENSE

Section 3 of the Second Excess Bond's Conditions and Limitations (as amended by Endorsement/Rider No. 3) states that "This bond applies only to loss discovered by the Vice President of Corporate Insurance and/or Legal Department of the ASSURED during the BOND PERIOD.  Discovery occurs at the earlier of the Vice President or Corporate Insurance and/or Legal Department of the ASSURED being aware of: a. facts which may subsequently result in a loss of a type covered by this bond, or b. an actual or potential claim in which it is alleged that the ASSURED is liable to a third party, regardless of when the act or acts causing or contributing to such loss occurred, even though the amount of loss does not exceed the applicable **Deductible Amount**, or the exact amount or details of loss may not then be known."  Raymond James cannot recover under the Second Excess Bond unless it proves that discovery, as described in the Second Excess Bond, occurred during the BOND PERIOD.

## TWELFTH AFFIRMATIVE DEFENSE

Section 3 of the Third Excess Bond's Conditions and Limitations (as amended by Endorsement/Rider No. 3) states that "This bond applies only to loss discovered by the Vice President of Corporate Insurance and/or Legal Department of the ASSURED during the BOND PERIOD.  Discovery occurs at the earlier of the Vice President or Corporate Insurance and/or Legal Department of the ASSURED being aware of: a. facts which may subsequently result in a loss of a type covered by this bond, or b. an actual or potential claim in which it is alleged that the ASSURED is liable to a third party, regardless of when the act or acts causing or contributing to such loss occurred, even though the amount of loss does not exceed the applicable **Deductible Amount**, or the exact amount or details of loss may not then be known."  Raymond James cannot

recover under the Third Excess Bond unless it proves that discovery, as described in the Third Excess Bond, occurred during the BOND PERIOD.

## THIRTEENTH AFFIRMATIVE DEFENSE

Section 5(a) of the Primary Bond's Conditions and Limitations (as amended by Endorsement/Rider No. 25) states that "At the earliest practical moment, not to exceed sixty (60) days, after discovery of loss, the Vice President of Corporate Insurance and/or Legal Department located at the Insured's principal address as stated in Item 1 of the Declarations shall give the Underwriter notice thereof in an amount that is in excess of 50% of the applicable Single Loss Deductible amount, as stated in Item 4 of the Declarations."  Raymond James cannot recover under the Primary Bond unless it proves that it provided timely notice.

## FOURTEENTH AFFIRMATIVE DEFENSE

General Agreement C. of the Second Excess Bond (as amended by Endorsement/Rider No. 4) states that "The ASSURED shall notify the COMPANY at the earliest practical moment, not to exceed sixty (60) days after the Vice President of Corporate Insurance and/or Legal Department receives notice, of any legal proceeding brought to determine the ASSURED'S liability for any loss, claim or damage which, if established, would constitute a collectible loss under this bond or any of the **Underlying Bonds**.  Concurrent with such notice and as requested thereafter, the ASSURED shall furnish copies of all pleadings and pertinent papers to the COMPANY."  Raymond James cannot recover under the Second Excess Bond unless it proves that it provided timely notice.

## FIFTEENTH AFFIRMATIVE DEFENSE

General Agreement C. of the Third Excess Bond (as amended by Endorsement/Rider No. 4) states that "The ASSURED shall notify the COMPANY at the earliest practical moment, not to

exceed sixty (60) days after the Vice President of Corporate Insurance and/or Legal Department receives notice, of any legal proceeding brought to determine the ASSURED'S liability for any loss, claim or damage which, if established, would constitute a collectible loss under this bond or any of the **Underlying Bonds**.  Concurrent with such notice and as requested thereafter, the ASSURED shall furnish copies of all pleadings and pertinent papers to the COMPANY."  Raymond James cannot recover under the Third Excess Bond unless it proves that it provided timely notice.

## SIXTEENTH AFFIRMATIVE DEFENSE

Section 5(b) of the Primary Bond's Conditions and Limitations states that "Within 6 months after such discovery, the Insured shall furnish to the Underwriter proof of loss, duly sworn to, with full particulars."  Raymond James cannot recover under the Primary Bond unless it proves that it provided timely proof of loss.

## SEVENTEENTH AFFIRMATIVE DEFENSE

General Agreement F. of the Primary Bond states that "With respect to this General Agreement, subsections (b) and (d) of Section 5 of this bond apply upon the entry of such judgment or the occurrence of such settlement instead of upon discovery of loss.  In addition, the Insured must notify the Underwriter within 30 days after such judgment is entered against it or after the Insured settles such legal proceeding, and, subject to subsection (e) of section 5, the Insured may not bring legal proceedings for the recovery of such loss after the expiration of 24 months from the date of such final judgment or settlement."  Raymond James cannot recover under the Primary Bond unless it proves that it provided timely notice and submitted timely proof of loss.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Insuring Agreement (A) (as amended by Endorsement/Rider No. 3) provides coverage for "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent: (a) to cause the Insured to sustain such loss; or (b) to obtain financial benefit for the Employee, or another person or entity.  Notwithstanding the foregoing, however, it is agreed that with regard to Loans and Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and to obtain a financial benefit for the Employee." Raymond James cannot recover under the Primary Policy unless it proves it suffered loss resulting directly from an Employee's dishonest or fraudulent acts with the intent to cause Raymond James a loss and to obtain a financial benefit.

## NINETEENTH AFFIRMATIVE DEFENSE

Section 10 of the Primary Bond's Conditions and Limitations states that "This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable."  Raymond James cannot recover unless it proves that it owned, held, or was legally liable for loss of Property under the Primary Bond.

## TWENTIETH AFFIRMATIVE DEFENSE

Section 11 of the Primary Bond's Conditions and Limitations states that "This bond terminates as to any Employee or any partner, officer, or employee of any Processor (a) as soon as any Insured, or any director or officer not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the

custody of such person…. Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured after the effective date of such termination." Raymond James cannot recover under the Primary Bond for any loss caused by Burstein after any director or officer not in collusion with Burstein learned of any dishonest or fraudulent act committed by Burstein at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under Insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person.

<b>TWENTY-FIRST AFFIRMATIVE DEFENSE</b>

The Primary Bond, pursuant to Exclusion (v) (as amended by Endorsement/Rider No. 22) precludes coverage for "indirect or consequential loss of any nature…." Raymond James alleges a loss sustained to satisfy its liability to a third party; therefore, Raymond James' loss is not covered.

<b>TWENTY-SECOND AFFIRMATIVE DEFENSE</b>

The Primary Bond, pursuant to Exclusion (u) (as amended by Endorsement/Rider No. 5) precludes coverage for "all fees, costs and expenses incurred by the Insured (1) in establishing the existence of or amount of loss covered under this bond, except to the extent covered under the portion of Insuring Agreement (a) entitled Audit Expense; or (2) as a party to legal proceeding whether or not such legal proceeding exposes the Insured to loss covered by this bond." Raymond James seeks to recover fees and costs not covered under the Primary Bond.

<b>TWENTY-THIRD AFFIRMATIVE DEFENSE</b>

The Primary Bond, pursuant to Exclusion (f) precludes coverage for "loss resulting from any violation by the Insured or by any Employee (1) of law regulating (i) the issuance, purchase or sale of securities, (ii) securities transactions upon security exchanges or over the counter market,

49

(iii) investment companies, or (iv) investment advisers, or (2) of any rule or regulation made pursuant to any such law, unless it is established by the Insured that the act or acts which caused the said loss involved fraudulent or dishonest conduct which would have caused a loss to the Insured in a similar amount in the absence of such laws, rules or regulations." Raymond James alleges its Employee violated securities laws; therefore, Raymond James' loss is not covered unless it establishes the Employee's conduct would have caused a loss absent such violations.

### TWENTY-FOURTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (h) precludes coverage for "loss caused by an Employee, except when covered under Insuring Agreement (A)...." Raymond James alleges loss caused by an Employee; therefore, Raymond James' loss is not covered unless it establishes the conditions of coverage in Insuring Agreement (A) (as amended by Endorsement/Rider No. 3).

### TWENTY-FIFTH AFFIRMATIVE DEFENSE

The Primary Bond, pursuant to Exclusion (i) (as amended by Endorsement/Rider No. 35) precludes coverage for "loss resulting directly or indirectly from transactions in a customer's account, whether authorized or unauthorized, except the unlawful withdrawal and conversion of Money, securities or precious metals, directly from a customer's account by an Employee provided such unlawful withdrawal and conversion is covered under Insuring Agreement (A)...." Raymond James alleges loss from transactions in a customer's account; therefore, Raymond James' loss is not covered unless it establishes the conditions of coverage in Insuring Agreement (A) (as amended by Endorsement/Rider No. 3).

### TWENTY-SIXTH AFFIRMATIVE DEFENSE

Under the Second Excess Bond, the Insuring Clause provides coverage for "[l]oss which would have been paid under the **Primary Bond** but for the fact that the loss exceeds the

**Deductible Amount**."  Raymond James cannot recover under the Second Excess Bond unless it proves it is entitled to coverage under the Primary Bond.

### TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Under the Third Excess Bond, the Insuring Clause provides coverage for "[l]oss which would have been paid under the **Primary Bond** but for the fact that the loss exceeds the **Deductible Amount**."  Raymond James cannot recover under the Third Excess Bond unless it proves it is entitled to coverage under the Primary Bond.

### TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Raymond James claim is barred by the applicable statute of limitations and/or contractual limitations period as outlined in the Primary Bond.

### TWENTY-NINTH AFFIRMATIVE DEFENSE

Raymond James claim is barred by the doctrines of waiver, estoppel and ratification.

### RESERVATION OF RIGHTS

Federal reserves the right to seek leave of Court to amend its Answer or add Affirmative Defenses that become known to it through discovery and the course of this litigation.

**WHEREFORE**, Federal denies that Raymond James is entitled to any recovery whatsoever and requests that this Honorable Court dismiss the Complaint for Damages, enter judgment in favor of Federal, and such further relief the Court deems just and appropriate.

July 20, 2020                                    Respectfully submitted,

                                                GORDON & REES, LLP

                                                *s/Kristina L. Marsh*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on July 20, 2020, a true and correct copy of the foregoing was

electronically filed with the Clerk of the Court by using the CM/ECF system and was sent via

electronic mail to:

Jason C. Mazer, Esq.
Joshua R. Alhalel, Esq.
Cimo Mazer Mark PLLC
100 Southeast Second Street
Suite 3650
Miami, Florida 33131
jmazer@cmmlawgroup.com
jalhalel@cmmlawgroup.com
*Attorney for Plaintiff*

Dustin C. Blumenthal, Esq.
Goldberg Segalla LLP
222 Lakeview Avenue, Suite 800
West Palm Beach, FL 33401
dblumenthal@goldbergsegalla.com
lparker@goldbergsegalla.com
*Attorney for Defendant, Great American Insurance Company*

Stephen N. Dratch, Esq.
Franzblau Dratch, P.C.
354 Eisenhower Pkwy., Plaza One
P.O. Box 472
Livingston, NJ  07039
sdratch@njcounsel.com
*Co-Counsel for Defendant, Great American Insurance Company*

Ryan J. Weeks, Esq.
Mills Pasckert Divers
100 N. Tampa St., Suite 3700
Tampa, FL  33602
smills@mpdlegal.com
rweeks@mpdlegal.com
csoltis@mpdlegal.com
*Attorney for Defendant, Travelers Casualty and Surety Company of America*

James Miller Kaplan, Esq.
Kaplan Zeena LLP
2 S. Biscayne Blvd., Suite 3050
Miami, FL  33131
james.kaplan@kaplanzeena.com
Elizabeth.salom@kaplanzeena.com
Service@kaplanzeena.com
*Attorney for Defendant, Beazley Insurance Company, Inc.*

Michael Keeley, Esq.
Clark Hill Strasburger
901 Main Street, Suite 6000
Dallas, TX  75202-3794
mkeeley@clarkhill.com
jriddle@clarkhill.com
abrinkley@clarkhill.com
*Co-Counsel for Defendant, Beazley Insurance Company, Inc.*

GORDON & REES, LLP

*s/Kristina L. Marsh*
Kristina L. Marsh, Esquire
Florida Bar No.: 0311080
Primary: kmarsh@grsm.com
Secondary:cyoung@grsm.com
Secondary: kwarrington@grsm.com
601 S. Harbour Island Blvd., Suite 109
Tampa, FL 33602
Telephone (Main): 813-444-9700
Telephone (Direct): 813-523-4937
Facsimile: 813-377-3505

Scott L. Schmookler, Esquire
Sarah R. Clark, Esquire
Primary: sschmookler@grsm.com
Primary: srclark@grsm.com
1 N. Franklin, Suite 800
Chicago, IL 60606
Telephone: (312) 565-1400
Facsimile: (312) 565-6511

*Attorneys for Defendant,*
*Federal Insurance Company*