UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-cv-21707-MARTINEZ/BECERRA

RAYMOND JAMES FINANCIAL, INC.,
    Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; and
ST. PAUL MERCURY INSURANCE COMPANY,

    Defendants.
_____/

**PLAINTIFF'S MOTION TO COMPEL DOCUMENTS AND ASSOCIATED TESTIMONY FROM DEFENDANTS AND SUPPORTING MEMORANDUM OF LAW**

Plaintiff, Raymond James Financial, Inc. ("Raymond James"), by and through undersigned counsel and pursuant to Rule 37 of the Federal Rules of Civil Procedure and this Court's Orders at ECF Nos. 71, 76, 79, and 144, moves for the entry of an Order compelling Defendants Federal Insurance Company ("Federal"), Travelers Casualty and Surety Company of America ("Travelers"), Great American Insurance Company ("Great American"), Beazley Insurance Company, Inc. ("Beazley"), and St. Paul Mercury Insurance Company ("St. Paul") (collectively, "Defendants" or "Insurers") to produce documents that pre-date the Insurers' denial of coverage and which were improperly withheld on the basis of the attorney-client privilege and/or the work-product doctrine and supply associated deposition testimony. In support thereof, Raymond James submits the following memorandum of law.

**I.      INTRODUCTION**

Nearly all of the Defendants agree that they have certain non-delegable obligations pertinent to handling insurance claims submitted by their policyholders like Raymond James. These obligations include the following:

    1.    An insurance company must adopt and implement standards for the proper investigation of claims;

2. An insurance company must disclose to its insured all benefits, coverages and time limits that apply to a specific claim;

3. An insurance company must treat its policyholder's interests with equal regard as its own; in fact, a company must give its policyholder the benefit of the doubt when considering the facts in a claim investigation;

4. An insurance company may not misrepresent pertinent facts or policy provisions relating to coverages;

5. An insurance company must conduct a full, fair and prompt investigation of the claim at its own expense;

6. An insurance company must fully, fairly and promptly evaluate and adjust the claim; and

7. An insurance company may not deny a claim or any part of a claim based upon insufficient information, speculation or biased information, and must have conducted a reasonable investigation based on available information.

Travelers, Beazley, and Great American agreed to the above-referenced industry standards.[1] When asked about these non-delegable duties, only Federal's corporate representative refused to answer on the advice of its legal counsel, Scott Schmookler, Esq., that the information was "privileged" (Deposition of Ken West [ECF No. 126-2] ("West Dep.") at 31:6-33:7, 33:10-14, 33:19-20, 34:2-9, 34:16-17). Mr. West did testify that state guidelines would generally apply, though he could not articulate those guidelines for Florida, despite the subject policy being a Florida issued insurance policy. (*Id*. at pp. 36:11-19, 37:11-14, 37:2-4, 37:11-14, 37:16-19, 37:25-38:1, 40:8-12, 40:19-22, 44:3-5, 44:11-19, 44:22-45:1, 45:5). Moreover, Mr. West refused to answer questions about the type of information that Mr. Schmookler sought in connection with the claim. (*Id*. at pp. 149:7-17, 149:19-21, 149:23-150:19). The Insurers, with the exception of

---

[1] Deposition of Matthew Kalin [ECF No. 126-3] ("Kalin Dep.") at pp. 35:6-8, 35:16-18, 36:6-11, 36:13-18, 36:21-22, 36:24-37:2, 37:4-8, 37:10-14, 37:16-19, 37:21-38:2, 38:4-16, 39:2-6, 39:8-15, 39:17-20, 39:22-40:5, 40:7-13, 40:15-19, 40:21-22, 40:24-41:1, 41:3-8, 41:13-15, 41:23-42:1, 42:3-4, 42:11-16, 42:18-43:2, 43:6-10, 43:12-17, 45:3-6, 45:8-10, 45:12-15, 45:18-22, 45:24-25, 46:2-4, 46:6-11, 46:14-21, 46:23-47:2, 47:4-8; Deposition of Antonio Trotta [ECF No. 126-4] ("Trotta Dep."), at pp. 38:11-17, 38:24:-39:4, 39:16-20, 40:7, 40:9-11, 40:15-17, 40:19, 40:21-24, 41:1, 41:19-23, 42:142:11-14, 42:16-17, 42:19-23, 42:25-43:4, 43:6-9, 43:12-13, 43:15-18, 43:12-13, 46:13-15, 46:17; Deposition of Tracey Archbold [ECF No. 126-3] ("Archbold Dep.") at pp. 26:6-14, 27:10-21, 27:23-24; 28:11-19, 28:25-29:13, 29:23-30:3, 30:7-10, 30:22-32:3, 32:5-33:17, 33:19-34:17).

Federal's representative who refused to answer on the advice of counsel, also agreed that the duty to undertake a good faith claim investigation continues even after litigation with the policyholder incepts (West Dep. at 49:15-18, 49:24-25; Kalin Dep. at 41:17-22; Trotta Dep. at 41:3-4, 41:6-7, 41:9-11, 41:15-17; Archbold Dep. at 30:7-10).

The evidence shows, however, that none of the insurance carriers investigated or evaluated Raymond James' claim. Instead, Defendants relied upon lead counsel for Federal (Scott Schmookler, Esq.) to conduct the claim investigation. But, when asked at deposition about information relating to the claim investigation, including the substance of any relevant factual information, Defendants all asserted the attorney-client privilege and refused to disclose routine claim communications long preceding the denial of Raymond James' claim on April 20, 2020.

Under Florida law, the attorney-client privilege does not shield from disclosure communications with attorneys performing claims-handling functions or investigating insurance claims. *See, e.g., Seacoast 5151 Condo. Ass'n v. Great Am. Ins. Co. of New York*, No. 17-23820-CIV, 2018 WL 6653342, at *3-4 (S.D. Fla. Sept. 15, 2018), *report and recommendation adopted*, No. 17-23820-CIV, 2018 WL 6653071 (determining that documents reflecting communications with counsel prior to decision to deny coverage were not protected by the attorney-client privilege); *The Atriums of Palm Beach Condo. Ass'n, Inc. v. QBE Ins. Co.*, 2009 WL 10667478 (S.D. Fla June 17, 2009).

Accordingly, Raymond James is entitled to the production of all documents and communications on the Defendants' Privilege Logs[2] reflecting the Insurers' statutorily required claim investigation which were created or received prior to denying coverage on April 20, 2020, answers to questions relating to those communications that the Insurers' corporate representatives refused to answer on the basis of attorney client and/or work product privilege, and the "market" communications between the Insurers for the period from December 19, 2019 to April 20, 2020.[3]

## II. BACKGROUND

This action arises from Defendants' failure to indemnify Raymond James for covered

---

[2] The Privilege Logs are attached hereto as Composite Exhibit A. Raymond James seeks only the highlighted communications dated prior to April 20, 2020 relating to the investigation of the claim and the "market" communications from December 19, 2020 to April 20, 2020.

[3] As set forth below, the Insurers' agreed to produce these "market" communications prior to December 19, 2019. The Insurers assert that the "market" communications between December 19, 2019 and April 20, 2020 are protected by the attorney-client and/or work product privilege.

losses under a series of Financial Institution Bonds (the "Bonds") that Raymond James purchased from the Defendants providing a total of $60 million in "single loss" employee fidelity coverage. Raymond James suffered a covered loss under the Bonds arising directly from dishonest and fraudulent acts committed by a Raymond James employee, Joel Burstein, in connection with the purchase, improvement and expansion of the Jay Peak Resort in Jay Peak, Vermont, and the Burke Mountain Resort in East Burke, Vermont, by Burstein's former father-in-law Ariel Quiros. As part of their scheme, Burstein and Quiros, with the intent to financially benefit themselves and entities operated and controlled by Quiros and others, converted and misappropriated many millions of dollars in EB-5 investor funds from limited partnership accounts held by Raymond James.

Upon discovery of the scheme, the SEC initiated litigation against Quiros which resulted in the appointment of a Receiver for the Jay Peak limited partnerships and related entitles (the "SEC Receiver"). Soon thereafter, numerous lawsuits were filed against Raymond James and Burstein, including an action by the SEC Receiver and a consolidated class action lawsuit by individual investors who were seeking to recover, among other damages, the funds held by Raymond James that had been misappropriated by Burstein and Quiros. After months of confidential negotiations, Raymond James agreed to settle with the SEC Receiver for the payment of $150 million, at least $78 million of which was for the limited partnerships in order to repay investors whose investment principal was both held at Raymond James and for which Raymond James is legally liable as result of Burstein and Quiros' misconduct.

As a result of the lawsuits, Raymond James first "discovered" a loss under the Bonds and timely reported a claim under the Bonds to the Defendants in May of 2016. It then, as requested by Defendants, timely submitted a proof of loss on February 27, 2018. Thereafter, Raymond James voluntarily provided voluminous documentation (in excess of 150,000 pages) to Defendants to support Raymond James' covered loss. After a lengthy two-plus year "investigation," apparently conducted entirely through outside counsel, on April 20, 2020, Federal, through this same counsel, and as the primary insurer in a follow form tower, sent Raymond James a 28-page letter detailing the results of Federal's investigation and denying coverage. Soon thereafter, the other Insurers sent similar denial letters, all incorporating Federal's denial letter.

Raymond James then brought this action, asserting claims for breach of contract and declaratory relief, and seeking to recover the $60 million in insurance coverage Raymond James purchased from Defendants to cover for the very type of employee fraud and dishonesty committed

by Burstein. The Primary Bond grants coverage for "Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent: (a) To cause the Insured to sustain such loss, or (b) To obtain financial benefit for the Employee, or another person or entity." The Primary Bond applies to "loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable," including money. Each of the excess bonds provides coverage on a follow-form basis incorporating the terms of the Primary Bond. Defendants bear the burden of proving any exclusions to coverage. S*ee, e.g., U.S. Concrete Pipe Co. v. Bould*, 437 So. 2d 1061, 1065 (Fla. 1983) (insurer bears the burden of proving the applicability of any exclusions to coverage).

Raymond James served Federal with a First Request for Production on June 28, 2020. On September 10, 2020, Federal served its objections and responses thereto.[4] Federal subsequently produced four privilege logs between September 16 and 18, 2020, and documents responsive to the First Request for Production on September 22, 2020. In response to Request No. 2, seeking the contents of Federal's claim file, Federal produced very limited documents and otherwise withheld from production numerous documents on the basis of the attorney-client privilege and/or work product doctrine – many of which pre-date Federal's denial of coverage. The other Defendants similarly withheld from production numerous claim file documents which pre-date the denial of coverage. After reviewing the portions of the claim file Federal produced, along with Federal's privilege logs, Raymond James conferred with counsel for Federal (and the other Insurers) on numerous occasions via telephone, email and correspondence to address, among other issues, the fact that Raymond James believed Federal and the other Insurers were improperly withholding from production documents that are not privileged.

Following telephonic conferences on October 14 and October 19, and as part of the agreed upon conferral process, Raymond James sent a detailed letter to Federal on October 20, 2020, providing Federal with Raymond James' analysis of the applicable law on privilege and its reasons for disputing Federal's claims of privilege. In that letter, Raymond James made clear that, while it was not disputing the attorney-client privilege with respect to certain documents and communications where counsel was providing legal advice concerning the parties' tolling agreement or confidentiality agreements, Raymond James was seeking the production of

---

[4] A copy of Federal Insurance Company's Objections and Responses to Raymond James Financial, Inc.'s First Request for Production is attached hereto as Exhibit "B."

documents and communications between Federal and its counsel relating to the claim investigation, which were created or received prior to Federal's April 20, 2020 denial of coverage.

In response to that letter, on October 22, 2020, Federal sent Raymond James two revised privilege logs: one privilege log covered communications between Federal and its counsel and the other covered "market" communications between the various insurance carriers. After further discussions, the parties agreed that Federal and the other carriers would produce to Raymond James all "market" communications prior to January 1, 2020, without prejudice to Raymond James' right to challenge the carriers' privilege assertions on the remaining documents – namely, the market communications after December 31, 2019 (*i.e.*, for the approximately 3.5 months before the denial of coverage) and all documents and communications reflecting the carriers' statutorily required claim investigation which were created or received prior to denying coverage on April 20, 2020.

Consistent with then Magistrate Judge O'Sullivan's discovery procedures, on January 28, 2021, the parties held a discovery hearing on Raymond James' challenges to Federal's and Travelers' assertions of the attorney-client and/or work product privileges with respect to certain documents on their respective privilege logs. Following the hearing, on January 29, 2021, Magistrate Judge O'Sullivan entered an Order setting a briefing schedule on the attorney-client and work product privilege disputes and ordering the parties to confer in an attempt to narrow the issues. [ECF No. 71]. Following further conferrals, and in an effort to try to resolve the dispute without requiring briefing and a potential *in camera* review of documents, the parties reached an agreement to defer any potential briefing until after Raymond James had taken certain of the Defendants' Rule 30(b)(6) depositions. [ECF No. 76]. In accordance with the parties' agreement, on March 4, 2021, Magistrate Judge O'Sullivan entered an Order deferring briefing on the attorney-client and work product privileges until after Raymond James took the 30(b)(6) depositions of Federal and Travelers. [ECF No. 79].[5]

Raymond James has now taken the Rule 30(b)(6) depositions of each of the Defendants. Those depositions confirmed that Defendants relied on outside counsel to investigate Raymond

---

[5] Each of the other Defendants, Great American and Beazley, have also improperly withheld documents on the basis of the attorney-client privilege and/or the work-product doctrine. Via email dated July 2, 2021, counsel for Beazley indicated that Beazley and Great American were agreeable to proceeding in the manner contemplated by this Order.

James' claim, and that Defendants improperly withheld from production communications where counsel performed solely claims-handling functions. Counsel for the deponents instructed the witnesses, however, not to answer certain questions concerning the investigation and evaluation of Raymond James' claim based on the attorney-client privilege, even though each Defendant admitted that outside legal counsel conducted the claim investigation on its behalf. On August 12, 2021, the successor Magistrate Judge Becerra entered an order establishing a briefing schedule on this matter. [ECF No. 144].

**<u>FEDERAL</u>**

Ken West was the Federal claim adjuster assigned to Raymond James' claim. He admitted at deposition that he only spoke to Raymond James one time regarding the claim (West Dep. [ECF No. 126-2] at 127:16-18:9). Federal retained Scott Schmookler, Esq., counsel of record in this litigation, on March 19, 2018 – less than one month after Raymond James submitted its proof of loss and more than two years before Federal denied coverage (*Id.* at 134:15-135:13). Mr. West's testimony makes it abundantly clear that Federal delegated its entire claim investigation to Mr. Schmookler as of March 19, 2018.[6]

> Q     What, if anything did you do, Mr. West, to investigate Raymond James' claim after March 19, 2019 [sic]?
> A     The date we retained counsel:
> Q     Correct
> A     I didn't - - we didn't - - I didn't - - once that – I'm sorry, once we retained counsel, all communications would go - - were going through counsel.

(*Id*. at p. 139:12-20).

Mr. West admitted that he never reached out to anybody at Raymond James after March 19, 2018, and that all communications after this date were through Mr. Schmookler, though he refused to testify as to what he asked Mr. Schmookler to do and what information he requested Mr. Schmookler seek from Raymond James as part of the claim investigation.

> Q     Well, is it fair to say, Mr. West, in the investigation of the claim done by you on behalf of Chubb following March 19 of 2018, you did not reach out directly to anybody at Raymond James, correct.
> A     I don't recall reaching out to anybody after March 19th of 2018, to anybody at

---

[6] Despite the testimony by Mr. West that Federal "must conduct a full, fair, and prompt investigation of its policyholder's claim at its own expense" (West Dep. [ECF 126-2] at 46:13-17; 46:23-25; 47:10-13; 47:19-23; 48:14-17; 48:19-23), Mr. West somehow could not articulate, after 28 years of experience in claims handling, any specifics. (*Id*. at pp. 52:12-16; 52:22-25, 53:3-5, 53:11-12).

        Raymond James.

(*Id.* at p. 140:1-7).

> Q      Do you see anything in the claim file that's sitting in front of you that shows you [or] anybody else at Chubb directly requesting any information from Raymond James after March 19 of 2018? If you need to, you can look through the whole thing.
>
> A      It appears after reviewing the claim file after the date we retained Scott Schmookler all requests for information appear to have been made, unless I missed something between Scott Schmookler and your firm.

(*Id*. at 143:14-18; 143:22-144:2).

Mr. West also refused to answer direct questions about the scope of the claim investigation it authorized outside counsel to conduct:

> Q      My question is prior to litigation and throughout the pendency of the claim investigation, after you hired Mr. Schmookler's firm on March 19, 2018, what did you ask them to do?
>
> MR. SCHMOOKLER: Object to the form. That calls for attorney-client communication. Do not answer, Ken.
>
> A      I am not answering the question because it seeks disclosure of attorney-client privileged information.

(*Id*. at pp. 152:18-153:6)

Despite having no communication with Raymond James for over two years, Mr. West authorized Mr. Schmookler to deny the claim (*Id.* at p. 174:17-20). Federal, through Mr. Schmookler, issued its claim denial letter to Raymond James' on April 20, 2020. (*Id.* at p. 174:5-8). Mr. West did not draft any part of the claim denial letter (*Id.* at p. 175:2-6). Although he may have made changes to the draft denial letter, he did not keep those changes in the claim file. (*Id.* at p. 175:7-18).

Mr. West's inability at his deposition to correct a fundamental misunderstanding of a key fact in his case further demonstrates that any claim investigation was conducted by outside counsel. Specifically, in its Verified Interrogatories (ECF No. 122-1), Federal misstates that a margin loan was used to purchase the Jay Peak Resort. This statement is inaccurate. Direct EB-5 investor funds were improperly used to purchase the resort. Had Federal conducted a good faith claim investigation, as opposed to paying outside counsel with ethical obligations to zealously represent the carrier to conduct it, Mr. West undoubtedly would have been aware of this key fact at the time of his deposition. Worse, Mr. West admitted that he did not review any of the deposition testimony

8

taken in this lawsuit prior to testifying. (West Dep. at 181:15-23). Mr. West further refused to say whether interrogatory answers seeking the factual basis for certain contentions raised by Federal were still correct because it would require the disclosure of attorney-client privileged information. (*Id.* at p. 184:5-10). He also refused to answer questions regarding communications with Federal's counsel during the pendency of the claim. *See, e.g.*, (*Id.* at pp. 137:12-138:14;  149:23-150:6-18;  151:9-18;  152:18-153:6; 165:2-165:20).

## GREAT AMERICAN

Great American's corporate representative did not know if anyone outside of Mr. Schmookler's law firm investigated the claim on behalf of Federal (Archbold Dep. [DE-126-2] at 101:25-102:4). Yet, Great American incorporated Federal's denial of coverage letter (prepared by counsel following counsel's investigation) as its own and issued a denial letter to Raymond James on April 29, 2020 (*Id*. at pp. 88:5-15; 89:4-11). Great American's claim "investigation" consisted of coordinating with the "primary" (Federal) to address questions and the review of documents with "counsel's assistance." (*Id.* at 92:2-11; 92:13-14; 92:16-93:15). Great American never reached out to Raymond James for any additional information. (*Id*. at 92:16-93:17). Like Federal, Great American relied on counsel to investigate Raymond James' claim, but refused to answer any questions with respect to communications it  had with outside counsel prior to denying the claim.

> Q   During the course of Great American's claim investigation and to Raymond James' claim [*sic*], were there communications between Great American and Mr. Dratch's law firm concerning that investigation, evaluation and adjustment of Raymond James' claim?
> MR. DRATCH: And I am going to stand on attorney-client privilege and instruct the witness not to answer.
> Q   Are you following that instruction, ma'am?
> A   Counsel, I will not answer that question.

(*Id.* at 87:5-15; *see also* 106:4-108:15). Like Federal, Great American also had factual inaccuracies in its sworn Interrogatories (Archbold Dep. at pp. 116:6-117:18).  Great American's representative could also not accurately testify as to how the Jay Peak resort was bought, a key fact in this case. Had she conducted the required investigation and not relied on counsel, she could have responded to questions about the claim (*Id.* at pp. 99:9-100:15).

## BEAZLEY

Beazley also does not know who investigated the claim on behalf of Federal. (Trotta Dep. at  120:16-17; 120:24-25; 121:5-6; 121:8, 121:10-11, 121:13-14). Beazley did not reach out to or

9

speak with anyone at Raymond James at any time during the claim investigation (*Id.* at pp. 75:14-20; 98:12-99:8). Instead, Beazley relied on its outside counsel to provide advice and guidance as to what documents it should review during the claim investigation.(*Id*. at pp. 91:16-18; 91: 21-23). But Beazley's corporate representative refused to answer any questions relating to communications with its outside counsel regarding the documents prior to the denial of the claim by Beazley (*Id.* at pp. 106:9-107:3). Incredibly, Beazley even refused to disclose what documents it had its counsel request from Raymond James as part of the claim investigation:

> Q       Do you recall – do you recall seeing communications between Beazley and its counsel with respect to additional records that Beazley would request as part of its claim investigation?
> MR. KEELY   I am going to object on the basis of the attorney/client privilege, and Mr. Trotta, instruct you not to answer.
> A       I think I will take my counsel's advice on that.

(*Id.* at pp. 84:22-85:5).

Like the other Defendants, Beazley adopted Federal's denial letter, though it did not participate in the preparation of Federal's denial letter (*Id.* at pp. 108:3-14; 111:8-14; 116:2-5). Beazley also misstated pertinent facts in its answers to Raymond James' Interrogatories (Trotta Dep at 124:23-125:2, 125:14-15, 126:2-6, 126:17-20), further suggesting that this insurer did not conduct its own investigation.

**TRAVELERS AND ST. PAUL**

Travelers and St. Paul (collectively, "Travelers") had limited communications with Raymond James concerning the claim, consisting of perhaps two phone calls, one conference call, and a few emails very early on (Kalin Dep. [DE 126-5] at pp. 81:19-82:16; 83:19-84:12). Travelers did not request to speak to anyone at Raymond James between the time Raymond James submitted its proof of loss on February 29, 2018 and the issuance of Travelers' denial letter on April 22, 2020 (*Id.* at pp. 85:19-23, 85:25-86:13). Even though Travelers' claim representative testified that he reviewed documents, he did not participate in the drafting of the Federal denial letter, which Travelers adopted (*Id*. at 74:6-25). Travelers' representative similarly refused to answer questions regarding the contents of Travelers' privilege log dated prior to April 20, 2020 (*Id*. at 110:25-111:6-12; 113:6-115:16).

Based on the above, coupled with the fact that counsel authored Federal's detailed April 20, 2020 denial of coverage letter, it is clear that the Insurers conducted their claim investigation

entirely through counsel, with counsel acting as a claims investigator for the carriers.[7] Indeed, many of the entries on Defendants' privilege logs relate to documents and communications years and months before Federal denied coverage on April 20, 2020. These documents could not possibly have been prepared in anticipation of litigation, as opposed to the Insurers' non-delegable duty to investigate, evaluate and adjust Raymond James' claim. These documents and communications are relevant and presumed discoverable, regardless of whether they include counsel, and the Insurers cannot meet their burden to demonstrate otherwise. This Court should accordingly overrule the Insurers' assertions of privilege and order each Defendant to produce all the documents listed on its revised privilege logs that pre-date Federal's denial of coverage on April 20, 2020 and the "market" communications, and order that each Insurer re-produce its corporate representatives to answer questions regarding the claim.[8]

## III.  ARGUMENT

**A.  The Standards for Invoking the Attorney-Client Privilege and Work Product Doctrines in the Insurance Context**

Where, as here, the party asserting the attorney-client privilege is a corporation, its claims of privilege are subject to heightened level of scrutiny "to minimize the threat of corporations cloaking information with the attorney-client privilege in order to avoid discovery." *S. Bell Tel. & Tel. Co. v. Deason*, 632 So. 2d 1377, 1383 (Fla. 1994). The burden of establishing the attorney-client privilege rests on the party claiming it – here, Defendants. *Id.* Among other things, Defendants must establish that the communication would not have been made but for the contemplation of legal services, and that the content of the communication relates to the legal services being rendered. *Id.* "Just because a communication is between an attorney and a client does not mean the privilege automatically arises; the relevant question is whether an attorney was retained to render legal services." *St. Joe Co. v. Liberty Mut. Ins. Co.*, 3:05-CV-1266J- 25MCR, 2006 WL 3391208 at *5 (M.D. Fla. Nov. 22, 2006).

Under Florida law, the attorney-client privilege does not extend to communications with

---

[7] Mr. West would not answer what Federal asked Mr. Schmookler's firm to do after it was hired on March 19, 2018, on the basis of the attorney-client privilege (West Dep. [126-2] at 152:18-153:-6).

[8] Or, at a minimum, Defendants should be ordered to produce these documents to the Court for an *in camera* review.

11

attorneys performing claims-handling functions or investigating insurance claims. "In the insurance context, 'no privilege attaches when an attorney performs investigative work in the capacity of an insurance claims adjuster, rather than as a lawyer, [but] simply because [the attorney's] assigned duties were investigative in nature' does not preclude an assertion of the attorney-client privilege." *Arlen House E. Condo. Ass'n, Inc. v. QBE Ins. (Europe) Ltd.*, No. 07-23199-CIV, 2008 WL 11333859, at *5 (S.D. Fla. Aug. 27, 2008) (compelling production of documents listed on privilege log because counsel did not always act as legal advisor and documents do not concern legal advice, but rather were part of the insurer's standard investigation of the claim) (quoting *Cutrale Citrus Juices USA, Inc. v. Zurich Am. Ins. Group*, No. 5:03-cv-420-Oc-10GRJ, 2004 WL 5215191, at *3 (M.D. Fla. Sept. 10, 2004)). In other words, "to the extent that an attorney acted as a claims adjuster, claims process supervisor, or claim investigations monitor, and not as a legal advisor . . . the attorney-client privilege would not apply. . . ." *Cutrale Citrus Juices*, 2004 WL 5215191, at *3.

Moreover, "communications involving those steps that an insurance company undertakes in its ordinary investigation of a claim do not develop privileged status merely because they involve an attorney." *1550 Brickell Ass'n. v. QBE Ins. Corp.*, 597 F. Supp. 2d 1334, 1337 (S.D. Fla. 2009). "In an insurance context, the attorney-client privilege only attaches when an attorney performs acts for an insurer in his professional capacity and in anticipation of litigation." *Milinazzo v. State Farm Ins. Co.*, 247 F.R.D. 691, 697 (S.D. Fla. 2007).

Similarly, the work-product doctrine only shields discovery of documents or information "prepared in anticipation of litigation or for trial." Fed. R. Civ. P. 26(b)(3). The work product doctrine does not apply unless the party asserting work-product demonstrates that it anticipated litigation "at the time the materials were created or drafted." *Schulte v. NCL (Bahamas) Ltd.*, 10-23265-CIV, 2011 WL 256542, at *2 (S.D. Fla. Jan. 25, 2011) (citing *CSX Transp. Inc. v. Admiral Ins. Co.*, 93-132-CIV- J-10, 1995 WL 855421 (M.D. Fla. July 20, 1995)). "[D]ocuments constituting any part of a factual inquiry into or evaluation of a claim, undertaken in order to arrive at a claim decision, are produced in the ordinary course of an insurer's business and, therefore, are not work product." *Cutrale Citrus Juices*, 2004 WL 5215191, at *2.

In the insurance context, moreover, courts in this District utilize a rebuttable presumption that "documents or things prepared before the final decision on an insured's claim are not work-product, and documents produced after claims denial are work-product." *Milinazzo*, 247 F.R.D. at

701; *Royal Bahamian Ass'n, Inc. v. QBE Ins. Corp.*, 268 F.R.D. 695, 698 (S.D. Fla. 2010). "This presumption may be rebutted only 'by specific evidentiary proof of objective facts, that a reasonable anticipation of litigation existed when the document was produced.'" *Royal Bahamian Ass'n, Inc.*, 268 F.R.D. at 698 (quoting *Harper v. Auto Owners Ins. Co.*, 138 F.R.D. 655, 663-64 (S.D. Ind. 1991) ("To overcome these presumptions, the insurer must demonstrate, by specific evidentiary proof of objective facts, that a reasonable anticipation of litigation existed when the document was produced, and that the document was prepared and used solely to prepare for that litigation, and not to arrive at a (or buttress a tentative) claim decision"). The Insurers cannot sustain their burden.

B.   **The Insurers Have Improperly Withheld from Production Numerous Relevant Documents that Pre-Date Any Denial of Coverage**

Raymond James requested that each insurer produce the contents of its claim file. While the Insurers have produced limited responsive documents, they have withheld as purportedly privileged, numerous documents and communications that pre-date their decision to deny coverage and which clearly relate to the claim investigation. These documents are discoverable because they "related to [the Insurers'] 'investigation, processing, analysis' and ultimate denial of [Raymond James'] claim." *Milinazzo*, 247 F.R.D. at 696.

*Seacoast 5151 Condo. Ass'n*, 2018 WL 6653342, is instructive in this regard. In that case, as here, the carrier (Great American) withheld from production, on the basis of the attorney-client privilege, numerous communications with its coverage counsel that occurred prior to the decision to deny coverage. *Id.* at *2. The policyholder challenged Great American's assertion of the attorney-client privilege. *Id.* As Magistrate Judge Bandstra observed, "when the corporation asserting attorney-client privilege is an insurance company, the requirements and burden on the carrier become even more stringent." *Id.* at *3. Generally, the "'insurer must demonstrate the connection to possible litigation concretely enough to assure the court that it is not simply trying to immunize from discovery its routine claims processing material.'" *Id.* at *3 (quoting *Royal Bahamian Ass'n, Inc.*, 268 F.R.D. at 698). Consistent with these pronouncements, Magistrate Judge Bandstra determined – and the District Court agreed – that Great American must produce all documents (with the exception of two preliminary coverage opinions prepared by counsel) created prior to its decision to deny coverage for the claim. *Id.* at *4. As Magistrate Judge Bandstra correctly explained:

13

> Reviewing the documents withheld here or redacted on the basis of the attorney-client privilege, the undersigned finds that almost all of these documents reflect only preliminary communications with counsel well in advance of Great American's decision to deny the HVAC claim so that they are not protected by the attorney-client privilege. Coverage counsel William Wilson was first retained on or about January 11, 2016—only weeks after the claims were filed by Seacoast and almost a full year before Great American denied the HVAC claim on December 27, 2016. Following his retention, Great American had frequent telephone and email contacts with Mr. Wilson to provide him information on the three claims and the progress of Great American's investigation of those claims. Mr. Wilson provided input into that investigation and assisted Great American in aspects of that investigation relating to information he would need to prepare a coverage opinion later that year. No documents listed on Great American's Amended Privilege Log contain "specific proof of objective facts" that Great American anticipated litigation with Seacoast on any of the three claims prior to the denial of the HVAC claim with the possible exception of the written coverage opinion provided by Mr. Wilson dated November 22, 2016. Even then, Great American did not deny the HVAC claim until December 27—the date certain that Great American could reasonably anticipate a lawsuit with Seacoast.

*Id*. at *4.

Raymond James anticipates that the Insurers may attempt to argue that Magistrate Judge Matthewman's decision in *Ranger Constr. Indus., Inc. v. Allied World Nat. Assurance Co.*, No. 17-81226-CIV, 2019 WL 436555 (S.D. Fla. Feb. 5, 2019), somehow changes this analysis. It does not. At most, *Ranger* suggests a divergence of opinions in this District only as to whether documents must be prepared in anticipation of litigation for the attorney-client privilege to apply. *Ranger* still makes clear, however, that the attorney-client privilege does not apply when counsel performs a claim investigation. "Clearly, the privilege should not attach when the attorney is working for the corporate insurer solely as a conduit, claims adjustor or a mere claim investigator rather than as an attorney rendering legal advice or legal services." *Id.* at *6.

The Insurers, however, are attempting to assert the privilege under those very circumstances. Raymond James timely reported a claim of loss in May of 2016, and timely provided a proof of loss in February of 2018. Federal did not deny coverage until April 20, 2020. The other Defendants similarly denied coverage shortly thereafter. From a review of their privilege logs and the portions of the claim files each produced, coupled with the Rule 30(b)(6) deposition testimony from each Defendant, it is clear that Defendants conducted their claim investigation through counsel, with counsel acting as a claims investigator. Counsel for Defendants, much like

the lawyer in *Seacoast*, certainly, at the very least, "provided input into the investigation and assisted [Defendants] in aspects of that investigation relating to information he would need to prepare a coverage opinion later that year." 2018 WL 6653342, at *4. Tellingly, none of the corporate representatives could articulate either what was done to investigate Raymond James' claim for Employee dishonesty or why certain relevant actions either were, or were not, undertaken.

While many of the entries on the logs are generally described, for example, as communications regarding "documentation necessary to provide legal advice," many of these withheld documents almost certainly include requests for documentation necessary for counsel to investigate the claim and ultimately prepare a coverage letter. And while Federal, for example, has indicated that certain documents and communication on its privilege log relate to counsel's analysis of certain case law, given counsel's role in investigating the claim, it is impossible to tell from the description of the documents on the privilege logs whether the entirety of those documents contain legal advice or whether the documents contain legal advice mixed with factual information learned by counsel as part of the claim investigation. Certainly, the Insurers' decision to have counsel conduct the claim investigation has blurred the line between what arguably qualifies as legal advice and what constitutes ordinary claim handling functions. To the extent Defendants claim documents contain legal advice, they should therefore, at the very least, be subject to an *in camera* review by the Court to determine whether those communications also contain discoverable information concerning counsel's claim investigation on behalf of the carriers. Indeed, it was this same counsel that prepared the 28-page letter to Raymond James denying coverage.

Based on the law in this District, Raymond James is entitled to those documents evidencing what was being done by the Insurers to arrive at their claim decision, regardless of whether the investigation was being done by counsel. This would include, for example, any facts communicated between the Insurers and counsel and any communications describing what counsel was being asked to investigate, or was investigating, as part of the claim process. "[C]ommunications involving those steps that an insurance company undertakes in its ordinary investigation of a claim do not develop privileged status merely because they involve an attorney." *1550 Brickell Ass'n*, 597 F. Supp. 2d at 1337.

Moreover, many of the entries on the privilege logs relate to documents created long before

15

Federal denied coverage on April 20, 2020. Plainly, all of these documents could not possibly have been prepared in anticipation of litigation as opposed to the Insurers' non-delegable duty to investigate, evaluate and adjust the claim. Any documents created prior to the denial of coverage are presumed discoverable, and the Insurers cannot meet their burden of demonstrating otherwise. There is nothing in the privilege log descriptions to suggest a reasonable anticipation of litigation existed when the documents were created – particularly as to those documents generated or received prior to even denying coverage for the claim.

Lastly, the common interest privilege asserted by the carriers is not a sufficient basis to withhold otherwise discoverable documents. The joint defense or common interests doctrine "is an extension of the work product doctrine and allows parties facing a common litigation opponent to exchange privileged communications and attorney work product in order to prepare a common defense without waiving either privilege." *Fojtasek v. NCL (Bahamas) Ltd.*, 262 F.R.D. 650, 654 (S.D. Fla. 2009). In other words, it is a necessary condition of the common interest doctrine that the documents otherwise be privileged in the first instance. Because the documents at issue are not protected from disclosure under the attorney-client privilege and/or the work-product doctrine, the common interest privilege is unavailing.

In short, the Insurers have improperly withheld from production, as purportedly privileged, numerous documents and communications that pre-date Federal's April 20, 2020 decision to deny coverage and which clearly relate to their claim investigation. Their privilege assertions should be overruled and they should be ordered to produce to Raymond James all such documents and communications that were created or received prior to April 20, 2020, as well as the "market" communications prior to April 20, 2020. Having retained counsel to handle the claim investigation each Defendant was required to conduct, Defendants should not now be heard to argue that those documents and communications are protected by the attorney-client privilege and/or work product doctrine. Florida law clearly says they are not.

At the very least, the Insurers should be ordered to submit the documents to the Court for an *in camera* review, because there is nothing included in Defendants' general descriptions of the documents in the privilege logs that would allow this Court to determine that these documents are otherwise protected, in whole or in part. *See, e.g.*, *AIG Centennial Ins. Co. v. O'Neill*, No. 09-60551-CIV-ZLOCH, 2010 WL 4116555, at *9 (S.D. Fla. Oct. 18, 2010) (directing insurer to file *in camera* the documents for which it claimed privilege). However, "it is wise for the Court to

not consider an *in camera* review until the party asserting privilege has done all that it reasonably could to establish privilege. *In camera* review 'is not to be used as a substitute for a party's obligation to justify its withholding of documents.'" *Campero USA Corp. v. ADS Foodservice, LLC*, 916 F. Supp. 2d 1284, 1289, n.4 (S.D. Fla. 2012).

## CONCLUSION

Based on the foregoing, Raymond James respectfully requests that this Court enter an Order overruling the Insurers' privilege objections as to documents that pre-date April 20, 2020 and compelling their production, compelling the Insurers to produce the "market" communications dated between December 19, 2019 and April 20, 2020, and directing the Insurers to each produce a corporate representative to testify as to the substance of those communications prior to the trial in this matter.

Date: August 25, 2021                     Respectfully submitted,

*/s/ Jason S. Mazer*
Jason S. Mazer, Esq.
Florida Bar No. 0149871
Joshua R. Alhalel, Esq.
Florida Bar No. 0016320
**CIMO MAZER MARK PLLC**
100 Southeast Second Street, Suite 3650
Miami, Florida 33131
Telephone: (305) 374-6481
Fax: (305) 374-6488
jmazer@cmmlawgroup.com
jalhalel@cmmlawgroup.com

## LOCAL RULE 7.1 CERTIFICATION

Pursuant to Local Rule 7.1(a)(3)(A), I hereby certify that the undersigned has conferred numerous times with counsel for Defendants by electronic mail on August 24, 2021, and was unable to resolve this discovery dispute.

## CERTIFICATE OF SERVICE

I hereby certify that on August 25, 2021, I electronically filed this Motion to Compel and Memorandum of Law with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Jason S. Mazer*

**SERVICE LIST**

| | |
|---|---|
| Kristina L. Marsh, Esq.<br>Florida Bar No. 0311080<br>**GORDON REES SCULLY MANSUKHANI**<br>601 S. Harbor Island Blvd., Suite 109<br>Tampa, FL  33602<br>Telephone (Main):  813-444-9700<br>Telephone (Direct)  813-523-4937<br>Facsimile:   813-377-3505<br>kmarsh@grsm.com<br>afiorito@grsm.com<br>cflores@grsm.com<br>fgude@grsm.com<br>kwatson@grsm.com<br>Tampapleadings@grsm.com<br><br>and<br><br>Scott L. Schmookler, Esq.<br>Sarah Riedl Clark, Esq.<br>Chantal Christine Wonder, Esq.<br>Angel Lewosz, Esq.<br>**GORDON REES SCULLY MANSUKHANI**<br>One North Franklin, Suite 800<br>Chicago, IL  60606<br>Telephone:  312-980-6779<br>sschmookler@grsm.com<br>srclark@grsm.com<br>cwonder@grsm.com<br>aruff@grsm.com<br>alewosz@grsm.com<br><br>*Counsel for Federal Insurance Company* | James M. Kaplan, Esq.<br>Florida Bar No. 921040<br>**KAPLAN ZEENA LLP**<br>2 South Biscayne Boulevard, Suite 3050<br>Miami, Florida  33131<br>Telephone: (305)  530-0800<br>Facsimile: (305)  530-0801<br>James.kaplan@kaplanzeena.com<br>Elizabeth.salom@kaplanzeena.com<br>service@kaplanzeena.com<br>and<br>Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>**Clark Hill Strasburger**<br>901 Main Street, Suite 6000<br>Dallas, Texas  75202-3794<br>Telelphone:  (214)  651-4718<br>Facsimile:   (214) 659-4121<br>mkeeley@clarkhill.com<br>jriddle@clarkhill.com<br><br>*Counsel for Beazley Insurance Company, Inc.* |

| | |
|---|---|
| E.A. "Seth" Mills, Jr., Esq.<br>Florida Bar No. 339652<br>Ryan J. Weeks, Esq.<br>Florida Bar No. 5 7 8 9 7<br>**MILLS PASKERT DIVERS**<br>100 N. Tampa Street, Suite 3700<br>Telephone: (813) 229-3500<br>Facsimile: (813) 229-3502<br>smills@mpdlegal.com<br>rweeks@mpdlegal.com<br>csoltis@mpdlegal.com<br><br>*Counsel for Travelers Casualty and Surety Company of America* | Dustin C. Blumenthal<br>Florida Bar No. 0149871<br>**Goldberg Segalla**<br>222 Lakeview Avenue, Suite 800<br>West Palm Beach, FL 33401<br>Telephone: (561) 618-4485<br>Facsimile: (561) 618-4549<br>dblumenthal@goldbergsegalla.com<br>lparker@goldbergsegalla.com<br>and<br><br>Stephen N. Dratch, Esq.<br>Julian Wilsey, Esq.<br>**Franzblau Dratch, P.C.**<br>354 Eisenhower Parkway<br>Livingston, New Jersey 07039<br>Telephone: (973) 992-3700<br>sdratch@njcounsel.com<br>jwilsey@njcounsel.com<br>*Counsel for Great American Insurance Company* |