**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO: 1:20-cv-21707-MARTINEZ/BECERRA**

RAYMOND JAMES FINANCIAL, INC.,

      Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA; GREAT
AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.;
and ST. PAUL MERCURY INSURANCE
COMPANY,

      Defendants.

## PLAINTIFF RAYMOND JAMES FINANCIAL, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Raymond James Financial, Inc. ("Raymond James" or "RJ"), files this memorandum of in law in opposition to Defendants' Motion for Summary Judgment [ECF No. 129] (the "Motion").

## INTRODUCTION

This insurance coverage dispute arises from Defendants' failure to indemnify Raymond James for covered loss under a series of Financial Institution Bonds (the "Bonds") providing a total of $60M in "single loss" employee fidelity coverage. Raymond James suffered a covered loss under the Bonds resulting directly from dishonest and fraudulent acts committed by a Raymond James employee, Joel Burstein ("Burstein"), while acting alone or in collusion with his former father-in-law Ariel Quiros ("Quiros"), in connection with the purchase, improvement and expansion of the Jay Peak Resort in Vermont.  Among other dishonest acts, Burstein deliberately and selectively edited, misrepresented and withheld critical information from personnel at Raymond James such that Quiros could unlawfully use EB-5 investor funds to purchase the Jay Peak resort. Burstein's scheme involved: (1) causing funds generated by EB-5 investments and owned by the separate limited partnerships to be deposited into Raymond James brokerage accounts; (2) opening identically titled accounts under Quiros' control in order to misappropriate partnership assets to fund the purchase of Jay Peak; (3) concealing the misappropriation by using an intricate web of transfers through multiple accounts; (4) buying Treasury bills on margin to create the appearance that partnership funds remained in the partnership accounts; and (5) preparing misleading correspondence and cross-collateralizing accounts to camouflage the true nature of transactions and hide the existence of margin debits. Through their scheme, over $60M in EB-5 investor funds were converted from limited partnership accounts at Raymond James. None of this misappropriation could have occurred without Burstein, the Financial Advisor on each account and the Miami Branch Manager, orchestrating the scheme and concealing the fraud. Or, as Quiros put it, without Burstein's "RJ MAGIC, according to their "original plan."

Defendants are not entitled to summary judgment because their legal arguments run afoul the plain language of the Bonds and applicable law, and disputed issues of material fact require a trial.  The record evidence amply establishes that (1) Burstein engaged in fraudulent and dishonest acts while acting alone or in collusion with Quiros for their personal benefit; (2) more than $60M in limited partnership funds held by Raymond James and for which it is legally liable was misappropriated; (3) Exclusion (i) does not bar coverage; and (4) the Bonds' "Discovery" provision was not triggered until May 4, 2016 when Raymond James' legal department became aware of the *Daccache* lawsuit.  At best, Defendants have demonstrated that the Bond language is ambiguous, which means the Bonds must be construed in favor of coverage under Florida law.

1

**FACTUAL BACKGROUND**

The facts demonstrating that summary judgment is improper are delineated in Raymond James' Statement of Disputed Material Facts and Statement of Additional Material Facts filed contemporaneously herewith.[1]   Raymond James provides the following summary.

Burstein was the Miami Branch Manager for Raymond James. SOF ¶ 107.  Quiros met with Burstein and his supervisor, Frank Amigo, to discuss potential financing for the prospective purchase of the Jay Peak Resort through Raymond James. SOF ¶ 108.  Both Raymond James Investment Bank and Raymond James Bank declined to provide financing to Quiros. SOF ¶ 109.

Prior to closing, Burstein was specifically told by attorneys for the seller of the resort, MSSI, that the limited partnership funds "must be held and/or used strictly in accordance with the limited partnership agreement," and "may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort." SOF ¶ 115. Burstein did not share this letter, or the restrictions on the use of EB-5 investor funds, with any other personnel at Raymond James. SOF ¶ 116. Instead, Burstein falsely represented to MSSI's counsel that "Raymond James will be financing the transaction through QResorts Inc." SOF ¶ 117.  Raymond James did not finance the transaction.  SOF ¶ 118.  Instead, Burstein lied to the Raymond James' customer account department in order to allow Quiros to improperly use more than $21M of limited partnership funds held at Raymond James to purchase the resort, and then used the remaining cash in the partnership accounts to purchase Treasury bills on margin to make it appear that the investors' money was safely invested. SOF ¶¶ 113, 114, 118, 119, 120.

Following the acquisition of Jay Peak, Quiros and Burstein gained access to all the investor funds held by each limited partnership. SOF ¶ 121. With Burstein's assistance, Quiros unlawfully converted at least $64.2M of limited partnership funds from accounts at Raymond James for his personal benefit to, among other things, acquire Jay Peak, purchase two multi-million dollar luxury condominiums in New York City, and pay Quiros' personal and corporate income taxes. SOF ¶ 122.  Burstein also helped Quiros misuse more than $100M in partnership assets to pay expenses for earlier phases and to pay down balances on the margin loans, in violation of the respective

---

[1] References to Plaintiff's Statement of Disputed Material Facts In Response to Defendants' Motion for Summary Judgment and Statement of Additional Material Facts are cited as "SOF ¶_____."

limited partnership agreements. *Id*. Quiros referred to this scheme as Burstein's "RJ MAGIC" and their "original plan." SOF ¶ 131.

Burstein facilitated three separate margin arrangements for Quiros. In each instance, the Raymond James-held partnership assets collateralized the margin loans. Burstein and Quiros used these margin loans to convert limited partnership funds while concealing from others the absence of those funds in the Raymond James-held partnership accounts. As newly acquired partnership funds were deposited into the partnership-specific Raymond James accounts, Burstein and Quiros disguised the withdrawal of those funds by purchasing Treasury bills on margin in the amounts deposited. SOF ¶ 123. Raymond James only required a customer to have 10% equity in the account to purchase treasury bills on margin. SOF ¶ 121. Burstein then set up "multi-margin," such that only the partnership assets would show up on the partnership account statements, while the margin debit was held in a separate collateral account. SOF ¶ 123. As assets were depleted in each limited partnership, the later-phase limited partnerships were added to collateralize the margin debit then in existence. SOF ¶ 122. Raymond James was always "covered" because it at all times could sell the T-Bills in the collateral accounts to satisfy the margin debit. SOF ¶ 127.

In April of 2016, the SEC initiated litigation against Quiros, which resulted in the appointment of the SEC Receiver. [ECF No. 126 at ¶ 6]. Soon thereafter, numerous lawsuits were filed against Raymond James and Burstein, including an action by the SEC Receiver and the *Daccache* consolidated class action lawsuit by individual investors [*Id.* at ¶ 7].[2] After months of confidential negotiations, on April 13, 2017, Raymond James entered into a Settlement Agreement and Release with the SEC Receiver and class counsel for $150M. [*Id.* at ¶ 8]. The settlement required the SEC Receiver to distribute this payment in specific ways, including $67M to return the $500,000 principal investment to the remaining investors in Phase VII and $15,391,386.47 to pay Phase I investors. SOF ¶ 140.

Raymond James had purchased from Defendants the Bonds, which provide a total of $60M in "single loss" employee fidelity coverage, with an effective date of October 1, 2015 through

---

[2] On June 29, 2016, Raymond James entered into a settlement agreement with the Securities Division of the Vermont Department of Financial Regulation to resolve alleged violations of Vermont securities laws stemming from Burstein's scheme. Under that settlement agreement, Raymond James paid a total of $5.95M, $2.75M of which represented the "total revenues earned by [Raymond James] . . . in connection with the Quiros controlled accounts." SOF ¶ 141.

October 1, 2016. [ECF No. 138 at ¶¶ 1-6]. The Bonds apply to loss discovered by Raymond James during the bond period. [*Id.* at ¶ 12]. On or after May 4, 2016, Raymond James' legal department learned that the *Daccache* lawsuit had been filed against Raymond James and Burstein. [ECF No. 126 at ¶ 10;].  Prior to that, Raymond James' legal department was not aware of any fraud or dishonesty by Burstein and had no reason to suspect any wrongdoing. SOF ¶¶ 132, 133.  Raymond James then timely provided notice to Defendants of the *Daccache* lawsuit on May 16, 2016. [ECF No. 126 at ¶ 11].

## ARGUMENT

### A.   Settled Principles of Insurance Policy Interpretation

The meaning of an insurance policy is a question of law for the Court.  *Jones v. Utica Mut. Ins. Co.*, 463 So.2d 1153, 1157 (Fla. 1985).  Fidelity bonds are insurance policies under Florida law.  *See Am. Cas. Co. of Reading, Pa. v. Etowah Bank,* 288 F.3d 1282, 1284 (11th Cir.2002) ("Insofar as the law applicable to [interpreting a financial institution bond] is concerned, the bond is just another insurance policy.").

Insuring or coverage clauses in an insurance policy must be read in the broadest possible manner to afford the greatest extent of coverage.  *Hudson v. Prudential Prop. & Cas. Ins. Co.*, 450 So. 2d 565, 568 (Fla. Dist. Ct. App. 1984). Exclusionary clauses, in contrast, are always strictly construed. *Westmoreland v. Lumbermens Mut. Cas. Co.*, 704 So. 2d 176, 179 (Fla. Dist. Ct. App. 1997). Because exclusions are fundamentally contrary to the purpose of insurance, Florida courts hold insurers "responsible for clearly setting forth what [is] excluded from coverage under the terms of the policy." *Fayad v. Clarendon Nat'l Ins. Co.*, 899 So. 2d 1082, 1086 (Fla. 2005). Accordingly, if an insurer intends to exclude or limit coverage, it must do so unambiguously. *Auto-Owners Ins. Co. v. Anderson*, 756 So. 2d 29, 34 (Fla. 2000). Where policy language is susceptible to more than one reasonable interpretation, it is considered to be ambiguous. *Wash. Nat'l Ins. Corp. v. Ruderman*, 117 So. 3d 943, 948 (Fla. 2013). Any ambiguity "must be liberally construed in favor of coverage and strictly against the insurer." *Id.* at 949-50. In other words, where "one reasonable interpretation of the policy provisions would provide coverage, that is the construction which must be adopted." *Id.* at 950.

### B.   Raymond James Suffered a Direct Loss Under the Bonds

Defendants cannot contest the fact that Quiros misappropriated more than $60M in EB-5 investor funds from limited partnership accounts at Raymond James.  Defendants instead argue

that "the Bonds do not cover loss sustained by a third party" (Mot. at p. 8).  But that argument is contrary to both the express language of the Bonds and the law. Let's begin with the insurance policy's plain language.

The Bonds' "Ownership" provision is not limited to money owned by Raymond James; it provides coverage for money which is "held by the Insured in any capacity" or "for which the Insured is legally liable" [ECF No. 138 at ¶ 11] – *i.e.*, the limited partnership funds at Raymond James that were misappropriated.  If that plain language were not clear enough, however, Exclusion (i) (discussed below) excepts from that exclusion the "unlawful withdrawal and conversion of Money" from a *customer's account* due to employee fraud or dishonesty. [*Id.* at ¶ 15]. If the theft of third party funds was never covered – as Defendants suggest – "then the above exception [to Exclusion (i)] would be surplusage without meaning." *See First Defiance Financial Corp. v. Progressive Cas. Ins. Co.*, 688 F.Supp.2d 703, 707–08 (N.D. Ohio 2010) (relying on similar exclusion to explain there must be circumstances where theft from a customer's account constitutes a "direct loss" under the fidelity bond). And, Florida law is clear that "a fundamental principle of contract interpretation is that an interpretation that leaves portions of the contract language useless, inexplicable, inoperative, meaningless, or superfluous should be rejected." *Acheron Portfolio Tr. v. Mukamal*, No. 18-25099-CIV, 2019 WL 12304839, at *5 (S.D. Fla. Aug. 21, 2019). Stated differently, "[w]hy add this language if the [Bond]s do[] not cover employee thefts of this sort?" *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.,* 688 F.3d 265, 269 (6th Cir. 2012).

The Bonds' "Discovery" provision also confirms the propriety of Raymond James' interpretation.  Discovery occurs when Raymond James' legal department "receives notice of an actual or potential claim in which it is alleged that *the Insured is liable to a third party* under circumstances which, if true, would constitute a loss under this bond." [ECF No. 138 at ¶ 14] (emphasis added). At an absolute minimum, the undefined phrases "held by the Insured in any capacity" or "for which the Insured is legally liable" are reasonably interpreted to include the limited partnership funds misappropriated from accounts at Raymond James as a result of Burstein's dishonesty.

Indeed, numerous courts agree that fidelity bonds *do* provide coverage when a third party's funds are lost due to employee fraud or dishonesty and the insured is responsible for the property. *See First Defiance*, 688 F.3d at 270; *Avon State Bank v. Bancsure, Inc.*, 787 F.3d 952 (8th Cir.

2015) (construing identical bond language to hold that loss of third-party funds "may be considered a loss 'resulting directly from' the fraudulent acts of an employee"); *Fidelity Nat. Fin., Inc. v. Nat. Union Fire Ins. Co.,* No. 9-CV-140-GPC-KSC, 2014 WL 4909103 (S.D. Cal. Sept. 30, 2014); *Cedar Lake Homeowners Ass'n v. Nw. Empire Cmty. Mgmt., Inc.*, No. 3:14-CV-00599-PK, 2015 WL 9690846, at *4 (D. Or. Nov. 13, 2015) (because insured both held and was legally liable for third party funds, employee theft of funds caused insured to suffer a direct loss).

Accordingly, where, as here, a financial institution loses money in its customers' accounts due to employee dishonesty, the financial institution's reimbursement of that money *is* a direct loss under a fidelity bond. In *First Defiance Fin. Corp.*, for example, the Sixth Circuit rejected the precise argument advanced by these insurers that the policyholder's losses were not direct because the funds were stolen from customer accounts. 688 F.3d at 269. As that court explained:

> The "property" loss covered by the policy … includes assets held by someone else under circumstances which make the Insured responsible for the property…. If property qualifies as covered property, and a dishonest employee steals it, the employee "directly" causes the loss.  It is as simple as that, and that is true under any definition of "directly."

*Id.* at 270. Similarly, in *Fidelity Nat. Fin., Inc.*, 2014 WL 4909103, the court held that the policyholder suffered a direct loss under a tower of financial institution bonds after it settled underlying lawsuits with victims whose money was lost years earlier due to the insured employees' participation in a Ponzi scheme. *Id.* at *10; *see also First Am. State Bank v. Continental Ins. Co.,* 897 F.2d 319, 326 (8th Cir. 1990) (settlement stemming from claims of fraud or dishonesty paid to a third party by the insured is direct, covered loss under fidelity bond).

As in *First Defiance Fin. Corp* and *Fidelity Nat. Fin., Inc.*, Raymond James suffered a direct loss under the Bonds. Through their dishonest scheme, Burstein helped Quiros unlawfully convert more than $60M in limited partnership funds from accounts at Raymond James. SOF ¶ 155.  And, indeed, more than $60M of Raymond James' $150M settlement with the SEC Receiver went directly to reimburse the limited partnerships whose funds were misappropriated SOF ¶ 156. That this reimbursement occurred years later in settlement of the underlying lawsuits does not make the loss any less direct. *Fidelity Nat. Financial, Inc.*, 2014 WL 4909103, at *10.

The cases Defendants rely upon, moreover, do not refute this point. All involve situations where either the insured *never* possessed the stolen property, or the losses were contingent on things other than an employee's fraud. *See Fireman's Fund Ins. Co. v. Special Olympics*, 346 F.3d

259 (1st Cir. 2003) (no coverage under commercial crime policy where employee fraudulently raised money from investors for his personal benefit, but noting that had the donations been property of the Special Olympics before the diversion, the theft would have resulted in a direct loss under the policy); *Lynch Props., Inc. v. Potomac Ins. Co.,* 140 F.3d 622 (5th Cir.1998) (no coverage where insured reimbursed third party after employee misappropriated money from a third party's separate personal bank account at a different bank); *Tooling, Mfg. and Technologies Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665 (6th Cir. 2012) (employee's theft of commissions from a separate, uninsured entity is not a direct loss to named insured under policy); *Universal Mortg. Corp. v. Wurttembergische Versicherung AG*, 651 F.3d 759 (7th Cir. 2011) (no direct loss where insured's losses were due to buy-back provisions in the sales contracts for fraudulent loan packages, not employee dishonesty in making sub-standard loans); *RBC Mortg. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 812 N.E.2d 728 (Ill. App. Ct. 2004) (same); *Axos Clearing LLC*, 982 F.3d at 539-40 (no coverage for settlement payment where investors were defrauded by "pump-and-dump" scheme); *Vons Companies, Inc. v. Fed. Ins. Co.*, 212 F.3d 489 (9th Cir. 2000) (no direct loss where insured never held lost property; rather, loss "resulted from the threat of vicarious liability for [the employee's] tort which caused damages to third parties").[3] Indeed, *First Defiance Fin. Corp.* found many of these cases to be "beside th[e] fundamental point" in rejecting the same failed argument Defendants make here that the insured did not suffer a direct loss. 688 F.3d at 270-71.

Raymond James suffered a direct loss under the Bonds because its dishonest employee helped his father-in-law steal limited partnership funds both "held by Raymond James in any capacity" or "for which Raymond James is legally liable." "It is as simple as that." *First Defiance Fin. Corp.*, 688 F.3d at 270.

## C.     The Limited Partnerships Suffered Significant Financial Losses at Raymond James

Raymond James' economic expert Jorge Baez identified $64.2M in limited partnership

---

[3] Defendants' reliance on *Everhart v. Drake Mgmt., Inc.*, 627 F.2d 686 (5th Cir. 1980) also is misplaced. In *Everhart*, a third party lender sued to recover under a fidelity bond issued to the borrower. The court found that the lender did not have standing to bring an action against the *borrower's* insurer. *Id.* at 690-91. *Everhart* is akin to the EB-5 investors whose funds were lost at Raymond James suing Defendants to recover under the Bonds issued to Raymond James. That, of course, is not the situation here. Raymond James, the insured under the Bonds, is suing to recover *its* covered loss resulting directly from Burstein's fraud and dishonesty.

funds that were misappropriated.  Defendants' argument that the limited partnerships did not suffer a loss at Raymond James rests entirely on the flawed and controverted opinions of their purported accounting expert, Alan Blass. As the Eleventh Circuit has made clear, however, "[c]ases which rely heavily on expert testimony do not easily lend themselves to summary judgment." *Childers v. Morgan County Bd. of Educ.*, 817 F.2d 1556, 1559 (11th Cir. 1987). This is because "the credibility of the experts and the weight to be given the opinion of each is not for the Court on summary judgment." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, No. 12-80178-CV-WILLIAMS, 2016 WL 4154912, at *4, n.3 (S.D. Fla. May 24, 2016) (citations omitted); *Centre Hills Courts Condo. Ass'n v. Rockhill Ins. Co.*, 19-cv-80111-BLOOM, 2020 WL 442467, at *6 (S.D. Fla. Jan. 28, 2020) (denying summary judgment where arguments required the Court to improperly weigh evidence and make credibility determinations on conflicting expert opinions). Rather, "it is for the jury to decide whether any, and if any what, weight is to be given to the testimony." *Webster*, 434 F.2d at 1193. For this reason alone, summary judgment is inappropriate.

Raymond James' expert Mr. Baez is an economist with significant experience calculating losses in fraudulent schemes.  Mr. Blass, on the other hand, is an accountant who has no prior experience in cases involving a Ponzi scheme and has never reviewed any economic literature that discusses how to determine when and where losses occur in a Ponzi scheme, even though he admits this case has elements of a Ponzi scheme. SOF ¶ ¶ 143, 144.

Not surprisingly, Mr. Blass' methodology and opinions are fundamentally flawed. Mr. Blass claims to have "identified all transactions that would affect the flow of EB-5 limited partnership funds." Baez Decl Ex 1, Pg. 33.  But, Mr. Blass admittedly ignored numerous relevant transactions that undoubtedly "affect the flow of EB-5 limited partnership funds" at Raymond James.  For example, although Mr. Blass includes in his calculation transfers from the JCM, Q Resorts and Margin Loan commingled accounts at Raymond James, he *excludes* from his calculation transfers *into* the JCM, Q Resorts and Margin Loan accounts at Raymond James.[4] Mr. Blass likewise does not include in his analysis transfers between the limited partnership accounts at Raymond James, even though he admits these would affect the flow of funds. *Id.* at pg. 33.  Nor does he include the $156M in limited partnership funds at Raymond James that were used to pay

---

[4] "[T]he transfers to the commingled accounts at Raymond James were an integral part of the 'intricate web of transfers'" used to perpetrate the scheme and "were central to the diversion of the funds for Mr. Quiros's benefit." SOF ¶¶¶ 124, 125, 126.

down the margin debits. *Id.*[5]  Blass Deposition at 197:3-14;  Blass Report at pg. 38. It is simply not credible to purport to do a net-loss/net-benefit analysis without including these relevant transfers. And, because Mr. Blass failed to include them, his "analyses are incorrect."  Baez Decl. Ex. 2, ¶ 30.

Mr. Blass' opinions are also "economically meaningless" given the nature of the fraud. SOF ¶ 124. Mr. Blass opines solely from an "accounting perspective."   He agrees that his opinions are not correct from an "economic perspective." Because limited partnership funds were transferred to comingled accounts at Raymond James as part of the scheme, Mr. Blass agrees that to determine whether the limited partnership suffered an *economic* loss, you must see how the funds from a commingled account at Raymond James were ultimately used.  Because "there is not a loss to the partnership, to the extent that money was used for the purpose it was intended." *Id.* But Mr. Blass did not make any effort to determine how the funds from the commingled accounts were used. *Id.*  And he himself concluded that, given the commingling of funds amongst the limited partnerships, "a partnership-by-partnership analysis did not reveal whether funds were lost while on deposit with Raymond James."  Mr. Blass nevertheless opines that Phase II suffered a net loss of $47,883,798 and Phase VII received a net benefit of $498,327.  Blass Deposition at 104:22-105:1;  126:18-127:6;  129:11-130:6;  130:16-19;  Blass Report at pg. 34, 36.

The economic realities, however, paint a vastly different picture. Whereas Phase II was completed and built, Phase VII did not have nearly enough funds to complete the project—in part because Burstein and Quiros misappropriated tens of millions of dollars from the Phase VII limited partnership account at Raymond James. SOF ¶ 137.[6]  Quiros admitted to fraud in connection with Phase VII transfers.  SOF ¶ 142.  This is precisely why $67M of Raymond James' settlement with the SEC Receiver specifically was allocated to reimbursing $500,000 each to the remaining investors in Phase VII. As Mr. Baez succinctly put it, Mr. Blass is "not looking at the whole economics of how this whole scheme worked. And by doing that, he's making a mistake."  SOF ¶

---

[5] That Raymond James received revenue from interest on the margin loans is entirely beside the point. The limited partnership funds were improperly used to pay down the margin loans, in violation of the limited partnership agreements.   Further, any revenues Raymond James received from the margin loans were forfeited as part of Raymond James' settlement with the Securities Division of the Vermont Department of Financial Regulation. SOF ¶ 141.

[6] Additionally, because of shortfalls with earlier phases, funds from later phases like Phase VII were improperly used to complete earlier phases. SOF ¶ 138.

145. In contrast, Mr. Baez performed a tracing analysis and opined that $26.6M (of the $64.2M) was misappropriated directly out of the limited partnership accounts at Raymond James for purposes unrelated to any limited partnership.  SOF ¶ 139.

As the above amply demonstrates, there are disputed issues of material fact as to the amount of Raymond James' covered loss and the appropriate methodology for calculating that loss. The credibility and weight to be given the parties' competing experts is for the jury to decide at trial.

**D.**     **Raymond James Suffered a Loss of Covered Property Under the Bonds**

The more than $60M in limited partnership funds that Burstein and Quiros misappropriated was property "held by [Raymond James] in any capacity" or "for which [Raymond James] is legally liable." Defendants' arguments to the contrary either misapply the law or otherwise involve disputed issues of material fact. Significantly, however, Defendants concede that at least $21M of the conversion at issue "involved the alleged misuse of money on deposit in a partnership account at RJF." (Mot. at p. 13). Thus, even if Defendants' arguments were correct (and they are not), summary judgment is still inappropriate because Raymond James indisputably suffered a loss of covered property when Burstein helped Quiros convert the $21M from Phase I and II partnership accounts at Raymond James to purchase the Jay Peak Resort.

Defendants' strained argument that the remaining misappropriated partnership funds identified by Mr. Baez were lost when the funds were transferred from a partnership account at People's Bank back to a commingled account at Raymond James is simply not true. Even Defendants' own accountant, Mr. Blass, agrees that a limited partnership did not suffer an economic loss until funds were diverted from commingled accounts *at Raymond James* and used for purposes unrelated to any of the limited partnerships.  As Mr. Baez explained, because the fraud involved an "intricate web of transfers," "trying to pinpoint where in the scheme the loss occurred based on whether the transfer of funds from a limited partnership account to a non-limited partnership account occurred while the funds were at People's Bank or at Raymond James is economically meaningless." SOF ¶ 124.

Raymond James held the limited partnership funds. They were transferred from accounts at Raymond James to accounts at People's Bank and then back to accounts at Raymond James *as part of Quiros' and Burstein's fraudulent scheme*. Defendants agree. (Mot. at p. 14) ("Quiros

conducted the transfers as part of a fraud").[7] There was no legitimate purpose for these transfers. Mr. Blass agrees.  So too does the SEC. SOF ¶ 125. The transfers were done solely to facilitate and conceal the misappropriation of investor funds for Quiros' personal benefit.  Mr. Blass agrees with that too.  SOF ¶ 126.  That some of the misappropriation took place in multiple steps (by design) is irrelevant. Raymond James held the limited partnership funds, and, through Burstein's fraud and dishonesty, they were misappropriated from accounts at Raymond James.  Raymond James therefore is responsible (*i.e.*, "legally liable") for their loss.[8]

The Sixth Circuit's decision in *First Defiance Fin. Corp.* is instructive. First Defiance carried fidelity insurance covering "loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others," for loss of property "(1) owned by the insured, (2) held by the insured in any capacity, or (3) owned and held by someone else under circumstances which make the insured responsible for the property prior to the occurrence of the loss." 688 F.3d at 268. After learning that an employee had transferred money from his clients' brokerage accounts to his own bank accounts, First Defiance reimbursed the stolen money. *Id.* It then filed a claim with its insurer, Progressive, under the bond. Progressive denied the claim and a lawsuit ensued. The Sixth Circuit held that the funds met the criteria of "covered property," because the insured was responsible for the clients' money from the moment the relationship was formed. *Id.* at 269-70.

---

[7] Although Defendants agree that "Quiros conducted the transfer as part of a fraud," they argue that it does not alter the result. But, the carriers cite to completely irrelevant caselaw.  *See Mazzoni Farms v. E.I. DuPont De Nemours & Co.*, 761 So.2d 306, 313 (Fla. 2000) ("fraudulent inducement renders a contract voidable, not void"); *O'Halloran v. First Union Nat. Bank of Fla.*, 350 F.3d 1197, 1204 (11th Cir. 2013) (bankruptcy trustee for church had standing to pursue a claim against bank for permitting one of corporation's founders to allegedly embezzle fund from debtor's account); *B.R.L. Equip. Rentals Ltd. v. Seabring Marine Indus., Inc.*, 168 F.3d 413, 415-16 (11th Cir. 1999) (holding that under British Columbia law, seller, which obtained possession of boats from supplier via worthless check, had voidable title to boats).

[8] Despite what Defendants suggest in footnote 8, there is no requirement that an insured hold stolen property as a bailee/trustee to be "legally liable" for the loss of property. *See Cedar Lake Homeowners Ass'n*, 2015 WL 9690846, at *4 ("Even in the absence of bailment, the court would still conclude that Northwest Empire both held and was legally liable for the funds"). And, importantly, this Court need only conclude that an ordinary layperson would reasonably interpret the phrases "held by the insured in any capacity" or "for which the insured is legally liable" to apply to the facts of Raymond James' loss for coverage to be required by Florida law.

A similar result was reached in *Fidelity Nat. Financial, Inc.*.  There, the insured submitted a claim under a fidelity bond after it settled underlying lawsuits with certain victims whose money was lost in a Ponzi scheme. 2014 WL 4909103 at *1. The bond provided that "This bond shall apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable." *Id.* at *10. In granting summary judgment as to liability in favor of the policyholder, the court first determined that the insured both "held" the victims' property in its capacity as an escrow company and that it was "legally liable" for the loss of property that was misappropriated while in the insured's possession and control. *Id.* at *10. And, because the insured was legally liable for the funds, it suffered a covered loss stemming from the third party settlements. *Id.*; *see also Avon State Bank v. Bancinsure Inc.,* 787 F.3d 952, 957 (8th Cir. 2015) (rejecting argument that insured merely served as a conduit of funds where insured "held the funds, even if it did so fleetingly"); *Marion v. Hartford Ins. Co.*, 525 Fed. Appx. 129, 133 (3d Cir. 2013) (investment firm did not have to be designated as formal custodian before funds sitting in its accounts could be deemed "held" by the firm).

That same analysis applies here. Burstein helped Quiros to misappropriate more than $60M in limited partnership funds from accounts at Raymond James. Raymond James was responsible for the funds from the moment the custodial relationship between Raymond James and the limited partnerships was formed. *First Defiance Fin. Corp.*, 688 F.3d at 269. None of the misappropriation could have occurred without Burstein's fraud and dishonesty. Burstein  first knowingly helped his father-in-law to convert over $21M in partnership assets to purchase the Jay Peak resort.  As a direct result of that fraud, Quiros got access to all of the EB-5 investor funds in Phases I-VII accounts at Raymond James from which he ultimately misappropriated more than $60M. Any conversion of limited partnership funds as part of the scheme is covered property under the Bonds. And, indeed, more than $60M of Raymond James' settlement with the SEC Receiver specifically was allocated towards the limited partnerships to repay investors whose funds once were held by Raymond James and lost as part of the scheme.  Raymond James therefore "held" and/or is "legally liable" for the limited partnership funds that were misappropriated from accounts at Raymond James as a proximate result of Burstein's fraud and dishonesty.

Defendants' cases do not suggest otherwise. Neither *RealPage v. Nat'l Union First Ins. Co. of Pittsburgh, Pa.*, No. 19-CV-1350, 2021 WL 718366 (N.D. Tex. Feb. 24, 2021) nor *Cooper Indus. v. Nat'l Union First Ins. Co. of Pittsburgh, Pa.*, 876 F.3d 119 (5th Cir. 2017) support the

proposition that Raymond James cannot be "legally liable" for the theft of limited partnership funds through accounts at Raymond James because neither case involved fidelity bonds that included the phrase "for which the insured is legally liable" in the ownership provision. Instead, the bonds in both *RealPage* and *Cooper* only provided coverage for property the insured owned, leased or held for others. *RealPage*, 2021 WL 718366, at *3; *Cooper*, 876 F.3d at 125. Raymond James, however, "contracted for a broader definition of covered property." *RealPage*, 2021 WL 718366, at *11 and n.3 (citing *First Defiance Fin. Corp.* as an example of broader coverage); *First Defiance Fin. Corp.*, 688 F.3d at 269-70 (explaining that ownership provision "reach[ed] property not owned and not held by the insured but *for which the insured is responsible* nonetheless") (emphasis in original).

Beyond that dispositive distinction, the facts in Defendants' cases make them inapposite. In *RealPage*, the insured was determined not to have "held" the funds because, unlike Raymond James, the policyholder *never* "possessed the funds in any manner"; rather, the funds always remained in a Wells Fargo bank account in the name of a third-party processer, not the insured. 2021 WL 718366, at *8. In *Cooper*, the policyholder loaned money in exchange for promissory notes in what turned out to be a Ponzi scheme. The court held that the insured was not entitled to recover under the policy because it did not "own" the lost earnings or principal. *Cooper*, 876 F.3d at 129. And, in *3M Co. v. Nat. Union Fir. Ins. Co.*, 858 F.3d 561 (8th Cir. 2017), the Eighth Circuit determined that the policy did not cover the insured's lost earnings because until the earnings were distributed to the partners, they were property of the limited partnership and not the insured. *Id.* at 567. Thus, the facts of *RealPage*, *Copper* and *3M Co.* are nothing like those here.

Indeed, none of Defendants' cases involve the situation where, as here, an insured financial institution held misappropriated partnership funds that were moved from and between accounts as part of a fraudulent scheme. Some, for example, involved coverage under a fidelity bond where the insured *never* held the stolen property. *See Lynch Props., Inc. v. Potomac Ins. Co. of Ill.,* 140 F.3d 622 (5th Cir.1998) (no coverage where insured reimbursed third party after employee misappropriated money from a third party's separate personal bank account at a different bank and where insured never held or was responsible for the third party's funds); *Vons*, 212 F.3d at 491-92 (no coverage for settlement payment where insured never held the funds that were lost by third parties and settlement resulted from threat of vicarious liability or negligent supervision). Others do not involve coverage under a fidelity bond, *Globe & Rutgers Fire Ins. Co. v. U.S.*, 202 F.2d

13

696 (5th Cir. 1953) (fire insurance policy), or even under an insurance policy at all. *O'Halloran*, 350 F.3d at 1204 (finding that bankruptcy trustee for church had standing to pursue a claim against bank for permitting one of corporation's founders to allegedly embezzle fund from debtor's account).[9]

In short, Raymond James suffered a covered loss of $60M under the Bonds when it re-paid the stolen partnership funds. Even if Raymond James did not at all times "hold" the insured property, summary judgment remains inappropriate because it is still "legally liable" because the funds were misappropriated from accounts at Raymond James and none of the misappropriation could have occurred without Burstein's dishonesty. At best, Defendants' arguments demonstrate that the phrases "held by the insured in any capacity" or "for which the Insured is legally liable" in the ownership provision of the Bonds are susceptible to more than one reasonable interpretation. Because of this ambiguity, the Bonds must be construed in favor of coverage under Florida law. *Wash. Nat'l Ins. Corp.*, 117 So. 3d at 949-50.

**E.     Exclusion (i) Does Not Bar Coverage for Raymond James' Loss**

Defendants have not met their burden to prove the unambiguous and undisputed application of Exclusion (i).  First, Exclusion (i) is facially inapplicable, because Raymond James' loss does not involve "transactions in a customer's account." Defendants, again, chose not to define the term "transactions." Their interpretive argument that money movements between accounts at Raymond James constitute "transactions in a customer's account" is simply inconsistent with its commonly understood meaning in the brokerage business – the purchase and sale of securities. *See, e.g.,* FINRA Rule 2111 (explaining in the suitability subsection under "Transactions With Customers" that a "member or an associated person must have a reasonable basis to believe that a

---

[9] Defendants' reliance on *In re Chase & Sanborn Corp.*, 848 F.2d 1196 (11th Cir. 1988) and *In re Colombian Coffee Co. Inc.*, 59 B.R. 643 (Bankr. S.D. Fla. 1986) to argue that Raymond James did not hold the partnership funds because it served merely as a conduit is unavailing. Neither case addressed the meaning of "held in any capacity" or "legally liable" in the context of a fidelity bond. Instead, they addressed whether a bank could be held liable for fraudulent conveyances as an initial transferee under 11 U.S.C.§ 550. For policy reasons, courts have determined that a bank may be deemed a mere conduit in the fraudulent conveyance context – ***even when it otherwise holds funds*** – because it would be "inequitable" to hold a bank liable under § 550, "would impose an unfair burden on the banks," and is not what "Congress had in mind when it created the law regarding fraudulent conveyances." *In re Chase & Sanborn Corp.*, 848 F.2d at 1200-02.

recommended *transaction or investment strategy involving a security or securities* is suitable for the customer" (emphasis added).

None of the limited partnership funds were lost due to the purchase or sale of securities. And if Defendants' "broad construction of Exclusion [i] were correct, the exclusion would vitiate coverage otherwise provided under the Bond[s]." *Rothschild Inv. Corp. v. Travelers Cas. & Sur. Co. of Am.*, No. 05 C 3041, 2006 WL 1236148, at *7-8 (N.D. Ill. May 4, 2006). *Rothschild Inv. Corp.* explained why. There, the insurer (Travelers) argued that the losses at issue, which included transfers and withdrawals from an account, fell within a similar "transactions in a customer's account" exclusion. *Id.* at *6. In rejecting this argument, the court offered the following example:

> Insuring Agreement D provides coverage for losses resulting from situations in which Rothschild transfers, pays or delivers funds based on forged instructions. So if Rothschild processes a withdrawal from a customer's account and the withdrawal instruction turns out to be a forgery, the loss to the customer's account arguably should be covered under the terms of Insuring Agreement D. But if we accept Travelers' construction, a withdrawal is one type of "transaction in a customer's account," so Exclusion G would trump Insuring Agreement D and exclude coverage unless a Rothschild employee committed the forgery. Such a result simply is not consistent with other provisions of the Bond. For one thing, nothing in Insuring Agreement D limits coverage to forgery committed by Rothschild employees. More significantly, . . . Exclusion A provides that losses resulting from forgery are covered under the Bond as long as the losses fall within the scope of Insuring Agreement A(1), D, E or F. Of those four Insuring Agreements, only Insuring Agreement A(1) directly pertains to dishonest or fraudulent acts committed by Rothschild employees. . . . Under the plain terms of Exclusion A, coverage for losses resulting from forgery is not limited to forgery committed by Rothschild employees. Construing Exclusion G to impose such a limitation would render Exclusion A superfluous-a result which makes no sense, particularly given that Exclusion A, not Exclusion G, is specific to forgery.

*Id.* at *6. Therefore, the court "[could not] accept Travelers' broad construction of the language because to do so would eviscerate coverage otherwise provided under the Bond." *Id.* at *7.

Here too, if Raymond James processes a "withdrawal" or "disbursement" from a customer's account and the instruction turns out to be a forgery, the loss to the customer's account should be covered under the terms of Insuring Agreement D. But if the Court accepts Defendants' construction that a "disbursement" or "withdrawal" is an excluded "transaction in a customer's account," Exclusion (i) would trump Insuring Agreement D and exclude coverage unless a Raymond James' employee committed the forgery. Insuring Agreement D, however, is not limited to forgery committed by an employee. And the forgery specific exclusion (Exclusion A) provides

coverage for losses resulting from forgery when covered under Insuring Agreements (A), (D), or (E) – of which only Insuring Agreement A pertains to dishonest or fraudulent acts by an employee. In other words, as in *Rothschild Inv. Corp.*, giving Exclusion (i) the broad construction suggested by Defendants would render Exclusion A superfluous and "would eviscerate coverage otherwise provided under the Bond[s]." 2006 WL 1236148, at *7. This, of course, would violate a "fundamental principle of contract interpretation . . . that an interpretation that leaves portions of the contract language useless, inexplicable, inoperative, meaningless, or superfluous should be rejected." *Acheron Portfolio Tr.*, 2019 WL 12304839, at *5; *Anderson*, 756 So. 2d at 34.

Exclusion (i) therefore does not broadly apply to "any loss involving a customer account" as Defendants suggest. That's why the exclusion speaks to transactions "in" a customer's account as opposed to "involving" a customer's account. Rather, Exclusion (i) is more narrowly intended to apply only to losses resulting from the buying and selling of securities inside a customer's account. At a minimum, and as *Rothschild Inv. Corp.* held, the language in Exclusion (i) "is reasonably susceptible to more than one interpretation and is thus ambiguous." 2006 WL 1236148 at *7.

Even if the Court were to accept Defendants' flawed interpretation, Defendants still would not be entitled to summary judgment because the exception to Exclusion (i) expressly maintains coverage for the unlawful withdrawal and conversion of money directly from a customer's account by an Employee *provided such withdrawal and conversion is covered under Insuring Agreement (A)* (emphasis supplied). That is exactly what happened here.

Insuring Agreement (A) provides, in relevant part, as follows:

Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:

(a) To cause the Insured to sustain such loss, or

(b) To obtain financial benefit for the Employee, or another person or entity.

[ECF No. 128 at ¶ 9]. Where, as here, a policy does not define what constitutes a "dishonest" or "fraudulent" act, courts broadly construe those terms to mean any act involving bad faith, willfulness, breach of honesty or a want of integrity or moral turpitude. *Fed. Deposit Ins. Corp. v. Lott*, 460 F.2d 82, 87 (5th Cir. 1972). Intentional misrepresentations, concealments, and "deliberate deception by pretense and stealth" constitute dishonest conduct. *Fed. Deposit Ins. Corp. v. Aetna*

*Cas. & Sur. Co.,* 426 F.2d 729, 737 (5th Cir. 1970); *Miami Nat. Bank v. Penn. Ins. Co.*, 314 F. Supp. 858, 862 (S.D. Fla. 1970).

There is ample evidence establishing Burstein's dishonest conduct.  Indeed, Defendants don't seriously argue otherwise.   Instead, they simply point out the unremarkable fact that Burstein could not unilaterally effectuate money movements.  That is a red herring.  The Bonds merely require the unlawful withdrawal and conversion of money from the customer accounts by an Employee, where such unlawful withdrawal and conversion is accomplished through employee fraud or dishonesty, either alone or in collusion with others.  Undoubtedly, partnership funds were unlawfully converted directly from customer accounts at Raymond James, through Burstein's fraud and dishonesty, while acting in collusion with Quiros.  Burstein first allowed Quiros to convert $21M to purchase the Jay Peak resort, and to gain access to all of the EB-5 investor money in Phases I-VII.  He then actively worked to conceal the theft by purchasing T-bills on margin, and ultimately cross-collateralizing the accounts to camouflage the unlawful conversion.  When questions were raised, Burstein orchestrated the deceptive "No Encumbrance" letter to perpetuate the scheme. SOF ¶ 129.  Indeed, none of the unlawful conversion of limited partnership funds from accounts at Raymond James could have occurred without Burstein's "RJ MAGIC."

Defendants' lame argument that Quiros somehow could not make an "unlawful" withdrawal because he was an authorized signatory on the accounts is patently absurd. Regardless of whether Quiros had the authority to effect money movements among the Raymond James accounts as an authorized signer, he certainly did not have the authority to convert EB-5 investor funds for his personal benefit. And Quiros was indicted by a federal grand jury and has since pleaded guilty for his role in the fraud. Burstein, too, was ultimately enjoined by the SEC from working in the securities industry for 10 years and agreed to pay the SEC an $80,000 fine in connection with his role in the scheme. SOF ¶ 136.

Therefore, there are disputed issues of material fact that preclude summary judgment. *See RBC Dain Rauscher Inc. v. Federal Ins. Co.*, 370 F. Supp. 2d 886, 890-91 (D. Minn. 2005) (denying Federal's request for summary judgment on the application of a similar exclusion).

**F.**   **Raymond James Timely Provided Notice to Defendants After its Legal Department Received the Daccache Lawsuit**

Raymond James first "discovered" the loss under the Bonds on or after May 4, 2016, when its legal department learned that the *Daccache* lawsuit had been filed against Raymond James and

Burstein.  Raymond James then timely provided notice of that lawsuit to Defendants on May 16, 2016 – well within sixty days of discovery. Defendants' argument that its legal department supposedly discovered the loss by March 27, 2014, is not supported by the record evidence and otherwise involves disputed issues of material fact that cannot be resolved on summary judgment.

The discovery standard in the Bonds includes both a subjective and objective component – the trier of fact must identify what facts and information Raymond James' legal department knew during the relevant time period[10], and it must determine, based on those facts, the conclusions that a reasonable person would draw from them. *Resolution Trust Corp. v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 630 (3d Cir. 2000); *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 365 (8th Cir. 1971). "[C]ourts have consistently defined 'discovery' as occurring when a[n] [insured] has sufficient knowledge of specific dishonest acts to justify a careful and prudent person in charging another with dishonesty or fraud." *Fid. & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 774 (3d Cir. 1981); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*, 748 F.2d 118, 121-22 (2d Cir. 1984). "Mere suspicion of dishonesty or wrongdoing is not enough." *Hudson United Bank*, 653 F.2d at 774; *Resolution Trust Corp.*, 205 F.3d at 630 ("unsupported suspicions of employee misconduct" do not constitute discovery). Discovery "does not occur until the insured discovers facts showing that dishonest acts occurred and *appreciates the significance of those facts;* suspicion of loss is not enough." *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1058-59 (9th Cir. 2001) (emphasis in original).

Courts agree, moreover, that "***given the inherently fact-driven nature of the inquiry***," *Resolution Trust Corp.*, 205 F.3d at 632 (reversing summary judgment on issue of discovery under fidelity bond) (emphasis added), it can be "extremely difficult . . . to determine on summary judgment when the insured discovered a loss caused by employee dishonesty." *St. Paul Ins. Co. v. F.D.I.C.*, No. 08-21192-CIV, 2011 WL 1195402, at *3 (S.D. Fla. Mar. 29, 2011) (denying summary judgment as to discovery) (quoting *Resolution Trust Corp.*, 205 F.3d at 632); *see also ABCO Premium Fin. LLC v. Am. Int'l Grp., Inc.*, No. 11-23020-CIV, 2012 WL 3278628, at *10 (S.D. Fla. Aug. 9, 2012) (material factual disputes preclude summary judgment on when insured discovered or should have discovered the fraud and therefore whether insured's notice and proof of loss were timely); *F.D.I.C. v. Fid. & Deposit Co. of Maryland*, 64 F. Supp. 3d 1225, 1231 (S.D.

---

[10] "Later acquired knowledge is not relevant." *Fid. Nat. Fin., Inc.*, 2014 WL 4909103, at *22.

Ind. 2014) (issue of material fact as to when reasonable person would have believed a loss occurred under financial institution bond).

There is no evidence that, prior to May of 2016, Raymond James' legal department had any suspicions, let alone knowledge, that Burstein acted dishonestly. The testimony Defendants rely on does not establish any knowledge of Burstein's fraud or dishonesty. At best, it establishes that one member of Raymond James' legal department may have sat through testimony from Burstein that investor funds were used in some manner to purchase the resort. But Raymond James' legal department did not know this was prohibited. Indeed, nobody at Raymond James other than Burstein knew that using the limited partnership funds to purchase the resort was a violation of the limited partnership agreements, or knew that Burstein had misrepresented facts to both Raymond James' customer accounts department and MSSI even prior to closing in order to put the fraudulent scheme in motion.  It is one thing to hear during a deposition that Quiros used partnership funds in some manner to purchase the resort, and quite another to know (or even suspect) that their use involved fraud and dishonesty by Burstein.  It is knowledge of the latter that is required for discovery under the Bonds. [11]

Defendants cannot point to any evidence establishing that Raymond James' legal department had knowledge (or frankly even suspicions) of any fraud or dishonesty by Burstein. To the contrary, Mr. Barracca testified at deposition that he was not aware of any facts that led him to believe Burstein engaged in fraud or dishonesty.

> Q: Okay. And are – during the time that you worked for Raymond James, did you become aware of any – what you felt of any facts by Mr. Burstein that you felt were dishonest or fraudulent in some way?
>
> A: No.

SOF ¶ 133.  In fact, "while [he] was employed at Raymond James [Mr. Barracca] had no reason

---

[11] Defendants' own cases make that clear. In *USLIFE Savings & Loan Ass'n v. Nat'l Sur. Corp.*, 115 Cal. App. 3d 336 (Cal. Ct. App. 1981), the insured knew specifically of fraudulent and dishonest acts committed by an employee prior to the bond period. Likewise, in *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*, 748 F.2d 118 (2d Cir. 1984), the insured had knowledge of both unusual trading and "unauthorized conduct" by an employee, which the court found was "sufficient to have alerted a reasonable person to the fact that there may have been dishonesty or fraud." *Id.* at 122.

to suspect that [Burstein] was involved in any wrongdoing." *Id.* [12]

Raymond James' expert Clay Grumke agrees. Mr. Grumke worked for over 26 years as in-house counsel for financial institutions like Raymond James.   Based on his substantial experience, coupled with his review of the information available to Raymond James' legal department, Mr. Grumke opined that Mr. Barracca "did not become aware of facts that would have caused a reasonable person in Raymond James' legal department to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period," SOF ¶ 134. At an absolute minimum, Mr. Grumke's opinions demonstrate that reasonable minds can differ on when Raymond James' legal department first discovered a loss under the Bonds. *See Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997) ("If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment").

The record evidence demonstrates that Raymond James' legal department never suspected any fraud or dishonesty by Burstein until after it learned of the *Daccache* lawsuit on or after May 4, 2016, and thereafter hired outside counsel to investigate. Raymond James timely notified Defendants on May 16, 2016 because, pursuant to Endorsement No. 23, "Discovery also occurs when the … Legal Department of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, would constitute loss under this bond." [D.E 39-1, pg. 53].  Defendants' argument that Raymond James' legal department discovered the loss on an earlier date plainly involves disputed issues of material fact that cannot be resolved on summary judgment.

## <u>CONCLUSION</u>

In closing, ample record evidence supports Raymond James' claim for covered loss of $60M under the Bonds resulting directly from dishonest and fraudulent acts committed by Burstein, while acting alone or in collusion with Quiros, with the requisite intent to benefit Quiros or himself. The record evidence also demonstrates that Raymond James timely provided notice to Defendants after receipt of the *Daccache* lawsuit. This case must therefore be decided by a jury, and summary judgment in Defendants' favor is entirely inappropriate.

---

[12] Burstein was not the focus of the SEC's investigation, and Mr. Barracca did "not have any concerns about exposure to the Firm or Joel [Burstein]." SOF ¶ 132.

Date:  August 27, 2021                    Respectfully submitted,

                                          */s/ Jason S. Mazer*
                                          Jason S. Mazer, Esq.
                                          Florida Bar No. 0149871
                                          Joshua R. Alhalel, Esq.
                                          Florida Bar No.  0016320
                                          **CIMO MAZER MARK PLLC**
                                          100 Southeast Second Street, Suite 3650
                                          Miami, Florida  33131
                                          Telephone: (305) 374-6481
                                          Fax: (305)  374-6488
                                          jmazer@cmmlawgroup.com
                                          jalhalel@cmmlawgroup.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 27, 2021, I electronically filed this Plaintiff Raymond James Financial, Inc.'s Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Jason S. Mazer*

**SERVICE LIST**

| | |
|---|---|
| Kristina L. Marsh, Esq.<br>Florida Bar No. 0311080<br>**GORDON REES SCULLY**<br>**MANSUKHANI**<br>601 S. Harbor Island Blvd., Suite 109<br>Tampa, FL  33602<br>Telephone (Main):  813-444-9700<br>Telephone (Direct)  813-523-4937<br>Facsimile:   813-377-3505<br>kmarsh@grsm.com<br>afiorito@grsm.com<br>cflores@grsm.com<br>fgude@grsm.com<br>kwatson@grsm.com<br>Tampapleadings@grsm.com<br><br>and<br><br>Scott L. Schmookler, Esq.<br>Sarah Riedl Clark, Esq.<br>Chantal Christine Wonder, Esq.<br>Angel Lewosz, Esq.<br>**GORDON REES SCULLY**<br>**MANSUKHANI**<br>One North Franklin, Suite 800<br>Chicago, IL  60606<br>Telephone:  312-980-6779<br>sschmookler@grsm.com<br>srclark@grsm.com<br>cwonder@grsm.com<br>aruff@grsm.com<br>alewosz@grsm.com<br><br>*Counsel for Federal Insurance Company* | James M. Kaplan, Esq.<br>Florida Bar No. 921040<br>**KAPLAN ZEENA LLP**<br>2 South Biscayne Boulevard, Suite 3050<br>Miami, Florida  33131<br>Telephone: (305)  530-0800<br>Facsimile: (305)  530-0801<br>James.kaplan@kaplanzeena.com<br>Elizabeth.salom@kaplanzeena.com<br>service@kaplanzeena.com<br>and<br>Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>**CLARK HILL STRASBURGER**<br>901 Main Street, Suite 6000<br>Dallas, Texas  75202-3794<br>Telelphone:  (214)  651-4718<br>Facsimile:   (214) 659-4121<br>mkeeley@clarkhill.com<br>jriddle@clarkhill.com<br><br>*Counsel for Beazley Insurance Company, Inc.* |
| E.A. "Seth" Mills, Jr., Esq.<br>Florida Bar No. 339652<br>Ryan J. Weeks, Esq.<br>Florida Bar No.  5 7 8 9 7<br>**MILLS PASKERT DIVERS**<br>100 N. Tampa Street, Suite 3700<br>Telephone: (813) 229-3500<br>Facsimile: (813) 229-3502<br>smills@mpdlegal.com | Dustin C. Blumenthal<br>Florida Bar No. 0149871<br>**GOLDBERG SEGALLA**<br>222 Lakeview Avenue, Suite 800<br>West Palm Beach, FL  33401<br>Telephone: (561)  618-4485<br>Facsimile:  (561)  618-4549<br>dblumenthal@goldbergsegalla.com<br>lparker@goldbergsegalla.com |

| | |
|---|---|
| rweeks@mpdlegal.com<br>csoltis@mpdlegal.com<br><br>*Counsel for Travelers Casualty and Surety Company of America* | and<br><br>Stephen N. Dratch, Esq.<br>Julian Wilsey, Esq.<br>**FRANZBLAU DRATCH, P.C.**<br>354 Eisenhower Parkway<br>Livingston, New Jersey  07039<br>Telephone:  (973) 992-3700<br>sdratch@njcounsel.com<br>jwilsey@njcounsel.com<br>*Counsel for Great American Insurance Company* |