UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 1:20-cv-21707-MARTINEZ/BECERRA

RAYMOND JAMES FINANCIAL, INC.,
    Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; and
ST. PAUL MERCURY INSURANCE COMPANY,

    Defendants.
_____/

**PLAINTIFF'S OPPOSING STATEMENT OF MATERIAL FACTS
TO DEFENDANTS' STATEMENT OF MATERIAL FACTS IN SUPPORT
OF THEIR MOTION FOR SUMMARY JUDGMENT [ECF NO. 130]
AND STATEMENT OF ADDITIONAL MATERIAL FACTS**

    Plaintiff, Raymond James Financial, Inc. ("RJ"), by and through undersigned counsel, and pursuant to Rule 56, Fed. R. Civ. P. and Local Rules 56.1, files its Opposing Statement of Material Facts to Defendants Statement of Material Facts in Support of Their Motion for Summary Judgment and Statement of Additional Material Facts [ECF No. 130], as follows. All Exhibits appended hereto are cited to as "EXHIBIT ___."

1. Undisputed, but not material.
2. Undisputed, but not material.
3. Undisputed, but not material.
4. Undisputed, but not material.
5. Undisputed, but not material.
6. Undisputed, but not material.
7. Undisputed, but not material.
8. Undisputed, but not material.
9. Undisputed.
10. Undisputed.
11. Undisputed.
12. Undisputed.
13. Undisputed.
14. Undisputed.
15. Undisputed.
16. Undisputed.
17. Disputed. Not all of the $13,966,088 was deposited by Phase I. $500,000 was deposited by Phase II. (*See,* Blass Report, Schedule B-1, Page 7 of 39, EXHIBIT 22). The remaining $13,466,088 was deposited by Chittenden Bank. The Blass Report provides no account number for the accounts at Chittenden Bank and provides no indication that the funds deposited by Chittenden Bank were Phase I funds (*See,* Blass Report, Schedule B-2, Page 28, EXHIBIT 22).
18. Disputed. The analysis that is referenced as the basis for this statement is incorrect because it fails to include all relevant transfers (*See,* Baez Decl. Ex. 2, ¶28, attached as EXHIBIT 1).
19. Disputed. Mr. Blass fails to include all relevant transfers (*See,* Baez Decl. Ex. 2, ¶28, EXHIBIT 1).
20. Disputed. Not all the $101,000,000 was deposited by Phase II. $2,500,000 was deposited by other phases (*See,* Blass Report, Schedule B-1, Page 9 of 39, EXHIBIT 22).
21. Disputed. *See* response to No. 18, which is incorporated herein by reference.

22. Disputed. *See* response to No. 18, which is incorporated herein by reference.

23. Disputed. The analysis that is referenced as the basis for this statement is incorrect because Mr. Blass fails to include all relevant transfers, including indirect deposits into the RJ phase accounts that are traceable to the phases (Baez Decl. Ex 2 ¶¶ 10-13, 23-33, EXHIBIT 1).

24. Disputed. *See* response to No. 18, which is incorporated herein by reference.

25. Disputed. *See* response to No. 18, which is incorporated herein by reference.

26. Disputed. The analysis that is referenced as the basis for this statement is incorrect because Mr. Blass fails to include all relevant transfers, including indirect deposits into the RJ phase accounts that are traceable to the phases (Baez Decl. Ex 2 ¶¶ 10-13, 23-33, EXHIBIT 1).

27. Disputed. *See* response to No. 18, which is incorporated herein by reference.

28. Disputed. *See* response to No. 18, which is incorporated herein by reference.

29. Disputed. The analysis that is referenced as the basis for this statement is incorrect because Mr. Blass fails to include all relevant transfers, including indirect deposits into the RJ phase accounts that are traceable to the phases (Baez Decl. Ex 2 ¶¶ 10-13, 23-33, EXHIBIT 1).

30. Disputed. *See* response to No. 18, which is incorporated herein by reference.

31. Disputed. *See* response to No. 18, which is incorporated herein by reference.

32. Disputed. The analysis that is referenced as the basis for this statement is incorrect because Mr. Blass fails to include all relevant transfers, including indirect deposits into the RJ phase accounts that are traceable to the phases.(Baez Decl. Ex 2 ¶¶ 10-13, 23-33, EXHIBIT 1).

33. Disputed. *See* response to No. 18, which is incorporated herein by reference.

34. Disputed. *See* response to No. 18, which is incorporated herein by reference.

35. Disputed. The analysis that is referenced as the basis for this statement is incorrect because Mr. Blass fails to include all relevant transfers, including indirect deposits into the RJ phase accounts that are traceable to the phases (Baez Decl. Ex 2 ¶¶ 10-13, 23-33, EXHIBIT 1).

36. Disputed. *See* response to No. 18, which is incorporated herein by reference.

37. Disputed. *See* response to No. 18, which is incorporated herein by reference.

38. Disputed. The analysis that is referenced as the basis for this statement is incorrect because Mr. Blass fails to include all relevant transfers, including indirect deposits into the RJ phase accounts that are traceable to the phases (Baez Decl. Ex 2 ¶¶ 10-13, 23-33, EXHIBIT 1).

39. Disputed. *See* response to No. 18, which is incorporated herein by reference.

40. Disputed. *See* response to No. 18, which is incorporated herein by reference.

41. Disputed. *See* response to No. 18, which is incorporated herein by reference.

42. Undisputed.

43. Undisputed. According to the Blass Report, the $221,982,232 only includes advances from two of the Margin Loans and does not include advances from the first margin lending agreement (*See*, Blass Report, p.37, EXHIBIT 22).

44. Undisputed, but not material. Pursuant to the agreement between the Vermont Department of Financial Regulation and RJ, RJ paid the Receiver a total of $4.5 million, including $2.75 million that represented the total revenues Raymond James earned in connection with the Quiros-controlled accounts (*See,* Baez Decl. Ex. 2, ¶35, EXHIBIT 1).

45. Undisputed, but not material.

46. Undisputed, but not material.

47. Disputed, no admissible evidence.

48. Undisputed.

49. Undisputed.

50. Disputed. The statement ignores that the diversions were carried out through an intricate web of transfers in which the use of accounts at Raymond James played an instrumental role, were used to perpetuate the fraud, and were central to the diversion of the funds for Mr. Quiros' benefit. (Baez Decl. Ex. 2, ¶¶ 8, 30, EXHIBIT 1).

51. Undisputed.

52. Undisputed.

53. Disputed. This statement ignores that an additional $0.9M was paid out from the Q Resorts account at RJ for the Acquisition of Jay Peak (Baez Rep. ¶ 13, DE 130-4; Blass Rep., Schedule A, EXHIBIT 22 (showing that Q Resorts transferred a total of $21.9M to Spiegel Sohmer and Burgess Law firms for the acquisition of Jay Peak, which is $0.9 M more than the $21M)).

54. Undisputed.

55. Disputed. The $7M that was used for the Acquisition of Q Burke Mountain Resort was paid out from a margin loan account at RJ (*See,* Baez Decl. Ex. 1, ¶15.b).

56. Disputed. The transactions involved inflows into non-partnership accounts at RJ that could be traced to partnership accounts at RJ (*See,* Baez Rep., ¶15, DE 130-4).

57. Disputed. The commingled accounts at Raymond James were in part used for purposes related to the development and construction of the limited partnerships (*See,* Baez Decl.

3

Ex. 2, ¶16, EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, ¶9, EXHIBIT 1).

58. Undisputed.

59. Disputed. The $3,800,000 that was used for the Acquisition of the Setai Condominium was paid out from Quiros's personal account at RJ (*See,* Baez Decl. Ex 1, ¶16.j, EXHIBIT 1).

60. Disputed. The transactions NERA cited in connection with the acquisition of Setai Condominium included transfers of funds from a partnership account at RJ to a non-partnership account. Specifically, $5.6M from Raymond James Phase V account and $7.5M from Raymond James Phase IV account, both partnership accounts, were transferred to Raymond James Margin Loan III account, a non-partnership account, in connection with the acquisition of Setai Condominium (Baez Decl. Ex. 1 ¶16.g, EXHIBIT 1). Moreover, the transactions involved inflows into non-partnership accounts at RJ that could be traced to partnership accounts at RJ (*See,* Baez Decl, Ex. 1 ¶16, EXHIBIT 1).

61. Disputed. The commingled accounts at Raymond James were in part used for purposes related to the development and construction of the limited partnerships (*See,* Baez Decl. Ex. 2, ¶¶ 16-18. EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, ¶9, EXHIBIT 1).

62. Undisputed

63. Disputed. Of the $6,000,000, $2.2M was used for the purchase of Trump Tower condominium and the payment was made from a Quiros Personal Account at RJ. $3.8M were transferred to Quiros's GSI account at RJ (*See,* Baez Decl. Ex. 1 ¶17, EXHIBIT 1).

64. Disputed. The transactions involved inflows into non-partnership accounts at RJ that could be traced to partnership accounts at RJ (*See,* Baez Decl. Ex. 1 ¶17, EXHIBIT 1).

65. Disputed. The commingled accounts at Raymond James were in part used for purposes related to the development and construction of the limited partnerships (*See,* Baez Decl. Ex. 2, ¶16, EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, EXHIBIT 1).

66. Undisputed.

67. Disputed. The $6,000,000 that was used for Payments for Personal Tax Liability was paid out from a Citibank account that was collateralized by investor funds (*See,* Baez Decl. Ex. 1 ¶18.h, EXHIBIT 1). The $6M can be traced back to the JCM account at Raymond James (*See,* Baez Rep., ¶18.h, DE 130-4).

68. Disputed. The transactions involved inflows into non-partnership accounts at RJ that could be traced to partnership accounts at RJ (*See,* Baez Decl. Ex. 1 ¶18, EXHIBIT 1).

69. Disputed. The commingled accounts at Raymond James were in part used for purposes related to the development and construction of the limited partnerships (*See,* Baez Decl. Ex. 2, ¶16, EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, ¶9, EXHIBIT 1).

70. Undisputed.

71. Disputed. $1.3M that was used for Payments for Corporate Tax Liability was paid out from the Raymond James JCM account, and $4.2M was paid out from the HSBC JCM account, which can be traced back to the Raymond James JCM account (*See,* Baez Decl. Ex. 1 ¶¶19-20, EXHIBIT 1).

72. Disputed. The transactions involved inflows into non-partnership accounts at RJ that could be traced to partnership accounts at RJ (*See,* Baez Decl. Ex 1 ¶¶19-20, EXHIBIT 1).

73. Disputed. The commingled accounts at Raymond James were in part used for purposes related to the development and construction of the limited partnerships (*See,* Baez Decl. Ex. 2, ¶16, EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, ¶9, EXHIBIT 1).

74. Undisputed.

75. Disputed. $4.7M that was used for Payments to AnC Bio Pharm was paid out from the Raymond James JCM account (*See,* Baez Decl. Ex. 1 ¶21, EXHIBIT 1).

76. Disputed. The transactions involved inflows into non-partnership accounts at RJ that could be traced to partnership accounts at RJ (*See,* Baez Decl. Ex. 1 ¶21, EXHIBIT 1).

77. Disputed. The commingled accounts at Raymond James were in part used for purposes related to the development and construction of the limited partnerships (*See,* Baez Decl. Ex. 2, ¶16, EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, ¶9, EXHIBIT 1).

78. Undisputed.

79. Disputed. $7.8M that was used for Payments to NECS was first transferred through a partnership account at Raymond James (*See,* Baez Decl. Ex. 1 ¶22, EXHIBIT 1).

80. Disputed. The transactions involved inflows into non-partnership accounts that could be traced to partnership accounts at RJ (*See,* Baez Decl. Ex 1, ¶22, EXHIBIT 1).

81. Disputed. Any diminution of assets suffered by any of the limited partnerships involved transfers to and from Raymond James accounts, which did not serve any economic

purpose, and allowed Quiros to conceal the misuse of the funds (*See,* Baez Decl. Ex. 2, ¶9, EXHIBIT 1).

82. Disputed that the referenced testimony supports this fact. Mr. Barracca testified that the accounts were closed (Deposition of Mark Barracca, Vol. II, at 98:13-101:14, EXHIBIT 2). He did not testify that RJ terminated its relationship with Quiros, nor did he testify that RJ requested Quiros to repay the outstanding margin balance. Mr. Barracca further testified that he could not recall whether RJ, through Burstein, asked Quiros to close his accounts (Id. at 101:1-18).

83. Undisputed that on August 31, 2016 an RJF employee drafted an email stating "To reiterate, RJ does not feel the broker/dealer, the branch manager or the financial advisor participated in the alleged fraud in the complaints. However, RJ wants to make sure it does everything it needs to do to retain its rights under the policies." Disputed as to "no employee has engaged in fraudulent activity as a result of this matter."

84. Undisputed.

85. Disputed. Mr. Barracca testified that he was he was "associate corporate counsel" or something similar to that when he left Raymond James (Deposition of Mark Barracca, Vol. I at 16:3-6, EXHIBIT 3.

86. Undisputed, but see Declaration of Mark Barracca, ¶3, EXHIBIT 4.

87. Undisputed, but see Declaration of Mark Barracca, ¶3, EXHIBIT 4; SOF ¶¶ 132, 133, *infra*.

88. Undisputed, but incomplete. See SOF ¶ 89 *infra*.

89. Disputed. The testimony is as follows:

Page 88

```
5      just read on Page 174 between Lines 8 and 18.
6      Looking at what's there in the transcript, do you
7      understand Mr. Burstein to have testified that the seller
8      told him that the investor money could not be used as
9      collateral for a margin loan but that it was used in that
10     manner?
11     MR. MAZER:  Form.  Mischaracterizes
12     testimony.
13     A.  I believe that it's the SEC that is making
14     that observation and Mr. Burstein is adding or
15     clarifying, we said they need to discuss that with
16     Mr. Quiros, it was not our place to make an opinion.
```

    17    BY MS. CLARK:
    18    Q:  And he also states: "That's what I
    19    I remember," correct?
    20:    A: Yes

Defendants fail to provide the Court with the preceding testimony where Mr. Barracca testified:

Page 86

    16    Q. So on March 20, 2014, you understood that
    17    Mr. Burstein had a conversation with the seller saying
    18    that investor funds would not be used as collateral for a
    19    margin loan and that he knew that it would be used in
    20    this manner, correct?
    21    MR. MAZER:  Form.
    22    A.  I – again, you know, the difficult thing
    23    with this matter and testimony is there are so many
    24    parties, and so many accounts, and so many transactions
    25    between the entities,  I don't - - it was very difficult

Page 87

    1    for me to follow the flow of funds and the order in which events occurred.
    3    I was aware through the testimony and
    4    possibly even before that that there was a margin loan
    5    provided to the Quiros accounts.

(Barracca Deposition, Vol. I., at 86:16-25; 87:1-5; 88:5-20, EXHIBIT 3).

    90.    Disputed.  The testimony is as follows:

Page 10

    14    So as of March 27th of 2014, you did know that
    15    Quiros put up assets that were brought in from foreign
    16    investors that were given to the partnership; correct?
    17    MR. MAZER: Form.
    18    THE WITNESS: Give me a minute to read the
    19    rest of that page. Okay. At that time, I would
    20    have heard the testimony, yes, that the funds
    21    may -- or the funds used to purchase the ski resort
    22    and other assets were derived from EB-5 assets,
    23    EB-5 investments.
    24    BY MS. CLARK:
    25    Q And let's read on. If you look at page 29,

Page 11

8

```
 1    starting at line 13, Ms. Sindler asks, "And you're
 2    referring to money that these foreign investors made in
 3    limited partnerships." Answer: "Yes."
 4    And then you ask, "May I clarify something?
 5    So you said 'made.' Did you say what foreign investors
 6    made in these?" Mrs. Sindler responds, "Invested."
 7    And you respond, "Or you're saying invested?"
 8    Ms. Sindler: "Invested." Mr. Burstein answered, "Yes."
 9    And you say, "Thanks."
10    Did I read that correctly?
11  A  You did, yes.
12  Q  So, on March 27th of 2014, you clarified that
13    Mr. Burstein was testifying that investor assets were
14    put up for the purchase of the Jay Peak resort; correct?
15    MR. MAZER: Form.
16    THE WITNESS: Yes.
```

(Deposition of Mark Barracca, Vol. II at 10:14-25; 11:1-12, EXHIBIT 2; Declaration of Mark Barracca, ¶3, EXHIBIT 4; SOF ¶¶ 132, 133 *infra*.).

    91.    Disputed, as insufficiently specific.

    92.    Undisputed.

    93.    Undisputed.

    94.    Undisputed.

    95.    Undisputed that the Receiver sought, among other things, rescissionary relief.

    96.    Undisputed.

    97.    Disputed as to materiality.   The flow of funds with respect to one segment of the Ponzi scheme is irrelevant (Deposition of Jorge Baez at 246:3-248:14, EXHIBIT 5).

    98.    Disputed as to materiality.  *See* ¶ 97 *supra*.

    99.    Disputed. The transfer of funds from Phase VII to Jay Construction Management did not result in a diminution in Phase VII funds since some of those funds were used by Jay Construction Management for legitimate purposes on behalf of Phase VII (Deposition of Michael Goldberg at 35:5-11, EXHIBIT 6;  Baez Decl. Ex. 1, ¶27, EXHIBIT 1; Baez Decl. Ex. 2, ¶16, EXHIBIT 1). Any diminution of assets suffered by any of the limited partnerships did not happen until funds were diverted from commingled accounts at Raymond James and used for purposes unrelated to any of the limited partnerships (Baez Decl. Ex. 2, ¶¶ 16-18, EXHIBIT 1).

    100.    Disputed.  Whether J Phase VII was a "creditor" of Jay Construction Management, if material or relevant, is a legal conclusion.   Michael Goldberg testified:

>    Page 29
>
>    20    Q  And as a result, Phase VII was a creditor of
>    21    JCM, correct:
>             * * *
>    24    THE WITNESS:  I -- I – I think that's correct
>    25    although, legally, it had a claim to recover the
>
>    Page 30
>
>    1     stolen funds or misdiverted funds.  So I would
>    2     assume that's correct, yeah.  I mean, I would - - I
>    3     would assume that's correct, the correct
>    4     terminology

(Deposition of Michael Goldberg at 29:20-25; 30:1-4, EXHIBIT 6).

    101.    Disputed as to materiality.

    102.    Undisputed.

    103.    Disputed as to materiality and mischaracterized. Ms. Corbishley testified that the motion to dismiss was based on the four corners of the complaint and law, not factual positions. (Deposition of Debbie Corbishley at 32:23-34:19, EXHIBIT 7).

    104.    Disputed as to materiality and as mischaracterized.  Mr. Mazer explained to the court that Raymond James is not a bank, there are no withdrawals, funds are transferred, and the information relating to the eight pertinent transfers subject to this litigation are set forth in expert reports (Jorge Baez) (Transcript of Discovery Hearing at 8:17-10:10, DE 130-115).  Moreover, Magistrate Judge Becerra agreed and sustained Raymond James' objections to the Request for Admissions in their entirety. *Id* at 21-23.

    105.    Disputed.  Defendants cite to no admissible evidence and don't identify any specific transaction.

    106.    Disputed as mischaracterized.  The cited pages do not support this fact. Mr. Amigo did not testify that "all" transactions in the Jay Peak accounts had to be approved (Deposition of Frank Amigo at 121:19-122:2, EXHIBIT 8). Only transactions between accounts of different registrations required a letter of authorization (*Id*. at 125:16-23;  128:8-128:8-22, EXHIBIT 8).

**Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment**

107. Joel Burstein was the branch manager of RJ's Miami office (Amigo Dep at 49:48:24-1; 49:3-7, EXHIBIT 8).

108. Prior to the Quiros's acquisition of the Jay Peak Resort, Burstein and Amigo met with Quiros to discuss potential financing by RJ for purchase of the resort (Amigo Dep at 150:11-151:11, EXHIBIT 8).

109. RJ refused financing (Deposition of Steve Raney at 31:20-32:9, EXHIBIT 23).

110. On June 13, 2008, Quiros entered into a stock transfer agreement with Mont Saint-Saveur International ("MSSI") for Q Resorts, Inc. to purchase Jay Peak (DE 126-1, pg. 5).

111. MSSI opened two accounts at RJ with Burstein: Jay Peak Hotel Suites L.P. (for Phase I investor funds) and Jay Peak Hotel Suites LP (for Phase II investor funds), both with the same Tax I.D. No. of 20-8514467. Quiros was not an authorized signer on the MSSI-controlled accounts (DE 126-1, pg. 5).

112. Burstein and Quiros opened the following additional accounts at RJ controlled by Quiros: Jay Peak Hotel Suites LP I and Jay Peak Hotel Suites LP II. Burstein used the same Tax I.D. No. as the MSSI-controlled accounts. An Account in the name of Q Resorts also was opened at Raymond James (DE 126-1, pgs. 5-6).

113. On June 16, 2008, Burstein emailed Jeff Tyler ("Tyler") an RJ customer accounts supervisor, regarding the documentation needed to transfer the funds in the MSSI accounts to Q Resorts. Burstein described MSSI as having "sold all of their holdings to Q.Resorts" and there being "a stock transfer agreement that shows all of the assets being transferred over to Q.Resorts dated as of last Friday [June 13, 2008]." As Burstein knew, however, as of June 16, the transaction had yet not closed (DE 126-1, pgs. 6-7).

114. Relying on Burstein's misrepresentation, Tyler, on June 23, 2008, would authorize Burstein's request to transfer the funds from the MSSI-controlled limited partnership accounts to the Quiros-controlled limited partnership accounts having the same tax identification numbers (registrations) as the MSSI accounts, and then from the Quiros-controlled accounts to the Q Resorts account (*Id.*).

115. On June 18, 2008, prior to closing, Burstein was specifically informed in writing by the attorneys for MSSI that the limited partnership funds "must be held and/or used strictly in accordance with the limited partnership agreement" and "may not be used in any manner, including

11

as collateral or a guarantee, to fund the purchase of the Jay Peak Resort" (DE 126-1, pg 7; June 18, 2008 Letter, EXHIBIT 9; Deposition of Tracey Archbold at 131:21-:132:1 117:4-18, DE 126-3;  Deposition of Anthony Trotta at 132:15-22, DE 126-4).

116. Burstein did not share this letter with anyone at RJ (DE 126-1, pg. 8), though he had a duty to advise his supervisor of the limitations on the funds and to ensure the funds were not used in violation of those limitations (Deposition John Maine at 68:3-25, 69:24-70:12, EXHIBIT 10).

117. Burstein falsely represented to MSSI's counsel that "Raymond James will be financing the transaction through Q Resorts Inc." and "confirmed" that "[n]one of the funds in the MSSI Jay Peak Hotel Suites LP will be for margin."  He did not copy anyone at RJ on these communications  (DE 126-1 at pg. 8;  Emails, EXHIBIT 11;  Urcia Dep at 242:6-7; 19-23, EXHIBIT 12.

118. RJ did not finance the transaction as Burstein had represented to MSSI. Quiros, with Burstein's knowledge and assistance, used the EB-5 investor funds to purchase the resort (DE 126-1, pg. 8; Baez Decl. Ex. 1, ¶ 13, EXHIBIT 1;  Deposition of Tracy Archbold Dep. at. 117:4-18, DE 126-3).  Burstein then margined the remaining assets in the limited partnership accounts at RJ to make it appear that the investor funds were safely invested in Treasury bills. (DE 126-1, pgs. 8-10;  Baez Decl. Ex. 1 at  ¶ 13, EXHIBIT 1).

119. Burstein permitted Quiros to convert over $21M in partnership assets to purchase the resort (DE 126-1, pgs 8-10).

120. Defendant Great America admitted that Quiros purchased the resort directly using EB-5 investor funds (Archbold Dep at 117:4-18, DE 126-3).

121.  RJ only required a customer to have 10% equity in the account to purchase treasury bills. (Corp. Rep.Deposition of John Carreiro at 11:22-14:9,  EXHIBIT 13). Quiros had access to all the investor funds held by each limited partnership (DE 126-1, pg. 13).

122. Burstein helped Quiros convert at least $64.2 million for purposes unrelated to any of the Jay Peak limited partnerships and for Quiros' personal benefit (*Id*.; Baez Decl. Ex. 1 ¶ 2, EXHIBIT1).  Burstein and Quiros also misused more than $100 million in partnership assets to pay down margin loans, in violation of the limited partnership agreements (DE 126-1, pg. 10; Baez Decl. ¶ 8; Baez Dec; Ex. 1 ¶ 29, EXHIBIT 1).

123. Burstein facilitated three separate margin arrangements with Quiros to misappropriate partnership funds while using multi-margin to conceal the absence of limited partnership funds in the RJ-held partnership accounts (DE 126-1, pg. 10). This allowed Quiros to camouflage the existence of the margin debt and the continued use of limited partnership funds for his personal benefit (*Id*.; 126-1, pgs. 3, 10, 11).

124. The commingling of funds was through an "intricate web of transfers." (Baez Decl. Ex. 2 ¶8, EXHIBIT 1). "Trying to pinpoint where in the scheme the loss occurred based on whether the transfer of funds from a limited partnership account to a non-limited partnership account occurred while the funds were at People's Bank or at Raymond James is economically meaningless" (*Id*. at pg. 9, ¶ 22).

125. There was no legitimate business purpose for the transfers from accounts at RJ to accounts at People's Bank and then back to accounts at Raymond James (Baez Decl. Ex 2 ¶9, EXHIBIT 1).  Mr. Blass agrees (Blass Dep at 131:8-11, 132:20-22, EXHIBIT 14).  The SEC agrees. (Case No. 1:18-cv-23636-FAM, DE 1, ¶44).

126. The transfers from accounts at RJ to accounts at People's Bank and then back to accounts at Raymond James were done to facilitate and hide the misappropriation of investor funds (Baez Decl. Ex. 2 ¶9, EXHIBIT 1).  Mr. Blass Agrees (Blass Dep at 133:20-25, EXHIBIT 14).

127. RJ was always "covered" because it could sell the T-Bills in the collateral accounts to satisfy the margin debit (Baez Dep at 187:14-17; 191:3-13; 193:8-194:11, EXHIBIT 5).

128. In an August 2009 email, Burstein outlined the mechanics of the scheme to Quiros to show that the account totals match perfectly, making each dollar accounted for." (DE 126-1, pg. 11).

129. Burstein prepared a "no encumbrance" letter dated February 29, 2021.  While the letter accurately states that the accounts listed were not encumbered as of February 27, 2012, Burstein, through a series of account manipulations, caused the accounts to only not be encumbered for that single business day (DE 126-1, pgs. 11-12; EXHIBIT 15).

130. Burstein's role at RJ included the review of incoming and outgoing RJ correspondence (Urcia Dep at 123:3-9; 239:15 -241:19, EXHIBIT 12). There is no indication that the letter was reviewed by Amigo or another supervisor (DE 126-1, pg. 12).

131. Roughly two months later, Quiros wrote to Burstein, in part:

> . . . WE MUST PLAY THE SAME PROTOCALL [sic] GOING FORWARD, IT WORKS. NO TALKING HAS PROVEN TO BE THE BEST WAY. I TRULY CAN'T BELIEVE IT ALL STARTED ON A NAPKIN. NOW THAT YOU ARE WILLING TO OPEN THE ESCROW ITS GOING TO BE UNBLIEVABLE. THIS DIMENSION HAS TO BE WELL CALCULATED. LIKE ALWAYS LET ME COME UP WITH THE SCOPE AND TASK. TOGETHER WE WILL COME UP WITH A PLAN, AND THEN YOU PUT YOUR RJ MAGIC. WE ARE IN A CLOUD PROTECTED BY THE GOVERNMENT. READ BETWEEN THE LINES. ONCE IN A LIFE TIME OPPORTUNITY. FOR ALL OF US.

(DE 126-1, pg. 5; Email, EXHIBIT 16; Urcia Dep at197:19-198:10, EXHIBIT12).

132. Mark Barracca ("Barracca"), an attorney for RJ, emailed in March 2014: "from what I've seen thus far, I do not have any concerns about exposure to the Firm or Joel Burstein" (Barracca Dep Vol. II at 11:22-23; 17:15-18:5, EXHIBIT 2: Email, EXHIBIT 17).

133. Barracca was not aware of any facts that led him to believe Burstein engaged in fraud or dishonesty:

> Q: Okay. And are – during the time that you worked for Raymond James, did you become aware of any – what you felt of any facts by Mr. Burstein that you felt were dishonest or fraudulent in some way?
> A: No.

(Barracca Dep Vol II at 157:25-158:4, EXHIBIT 2). Barracca had no reason to suspect that Burstein was involved in any wrongdoing." (Barracca Dep. Vol I at 71:12-17, EXHIBIT 3).

134. While he sat through Joel Burstein's testimony before the SEC on March 27, 2014, Barracca did not learn any facts that caused him to assume that RJ would incur loss resulting directly from dishonest or fraudulent acts committed by Joel Burstein acting alone or in collusion with Quiros (Barracca Declaration at ¶3, EXHIBIT 5; Barracca Dep Vol II at 148:14-21, EXHIBIT 2). RJ's expert Clay Grumke opined that Barracca "did not become aware of facts that would have caused a reasonable person in Raymond James' legal department to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period" (Deposition of Clay Grumke at 13:16-14:8, EXHIBIT 18).

135. RJ's legal department first discovered a loss under the Bonds on or after May 4, 2016, when it received the *Daccache* lawsuit (DE 126, ¶ 10).

136. In September 2018, Burstein was restrained and enjoined by the SEC from working in the securities industry for 10 years (EXBHIBIT 19) and was fined $80,000 (D.E. 5, Case 1:18-cv-23636-FAM. (EXHIBIT 20).

14

137. Phase II was completed and built (Baez Dep at 203:11-13, EXHIBIT 5). Phase VII was not - in part because Burstein and Quiros misappropriated tens of millions of dollars from the Phase VII limited partnership account at Raymond James (Baez Decl. Ex. 2 pg. 11 ¶ 26, pg. 13 ¶ 32, EXHIBIT 1;  Goldberg Dep at 28:9-18;  28:16-18;  28:21, EXHIBIT 6).

138. Because of shortfalls with earlier phases, funds from later phases like Phase VII were improperly used to complete earlier phases (Baez Decl. p. 9, ¶ 21, EXHIBIT 1; Blass Dep at 86:6-24, 88:11-22, EXHIBIT 14).

139. $26.6 M was misappropriated directly out of the limited partnership accounts at RJ. (Baez Decl. Ex. 1, pg. 30, EXHIBIT 1;  Baez Dep at 416:12-417:8, EXHIBIT 5).

140. Raymond James paid $150M to settle the Receiver's claims with respect to the Jay Peak matter (DE 126, ¶¶ 8, 9).  More than $60M had to be used by the Receiver to repay investors the money that was misappropriated (Goldberg Dep at 100:6-11; 102:7-19; 102:15; 102:21-24; 138:3-5,  EXHIBIT 6;  ECF 126, ¶  8; *SEC v. Quiros, et. al.*, Case No. 16-CV-21301-GAYLES (S.D. Fla.) at ECF No. 315, Ex. "A;  Baez Decl.  Ex. 1 ¶ 21, EXHIBIT 1;  Deposition of Alan Blass at 86:6-24, 88:11-22, 187:8-11; 189:4;  190:13-17, EXHIBIT 14).

141. Any revenue RJ received in connection with the Quiros controlled accounts were forfeited as part of Raymond James' settlement with the Securities Division of the Vermont Department of Financial Regulation (Vermont Settlement Agreement, EXHIBIT 21).

142. Quiros admitted to fraud in connection his and Burstein's transfers from the Phase VII bank accounts at Raymond James (Transcript of Change of Plea Hearing, EXHIBIT 24).

143. Mr. Baez is an economist with experience calculating losses in Ponzi schemes (Deposition of Jorge Baez at  37:9-12, 41:10-13, 249:9-11, 313:10-14, EXHIBIT 5).

144. Mr. Blass has no prior experience in cases involving a Ponzi scheme, has not studied Ponzi schemes, but admits this case has elements of a Ponzi scheme (Deposition of Alan Blass at 83:10-12;  87:10-16, 125:9-13 (EXHIIBT 14).

145. Mr. Blass did not look at the whole economics of how this whole scheme worked. And by doing that, he made a mistake (Baez Dep at 370:9-371:19, EXHIBIT 5.

Date:  August 27, 2021                             Respectfully submitted,

/s/ Jason S. Mazer
Jason S. Mazer, Esq.
Florida Bar No. 0149871
Joshua R. Alhalel, Esq.
Florida Bar No.  0016320
**CIMO MAZER MARK PLLC**
100 Southeast Second Street, Suite 3650
Miami, Florida  33131
Telephone: (305) 374-6481
Fax: (305)  374-6488
jmazer@cmmlawgroup.com
jalhalel@cmmlawgroup.com

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2021, I electronically filed this Plaintiff's Opposing Statement of Material Facts to Defendants' Statement of Material In Support of Their Motion for Summary Judgment [ECF No. 130] and Statement of Additional Material Facts with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Jason S. Mazer

## SERVICE LIST

| | |
|---|---|
| Kristina L. Marsh, Esq.<br>Florida Bar No. 0311080<br>**GORDON REES SCULLY MANSUKHANI**<br>601 S. Harbor Island Blvd., Suite 109<br>Tampa, FL  33602<br>Telephone (Main):  813-444-9700<br>Telephone (Direct)  813-523-4937<br>Facsimile:   813-377-3505<br>kmarsh@grsm.com<br>afiorito@grsm.com<br>cflores@grsm.com<br>fgude@grsm.com<br>kwatson@grsm.com<br>Tampapleadings@grsm.com<br><br>and<br><br>Scott L. Schmookler, Esq.<br>Sarah Riedl Clark, Esq.<br>Chantal Christine Wonder, Esq.<br>Angel Lewosz, Esq.<br>**GORDON REES SCULLY MANSUKHANI**<br>One North Franklin, Suite 800<br>Chicago, IL  60606<br>Telephone:  312-980-6779<br>sschmookler@grsm.com<br>srclark@grsm.com<br>cwonder@grsm.com<br>aruff@grsm.com<br>alewosz@grsm.com<br><br>*Counsel for Federal Insurance Company* | James M. Kaplan, Esq.<br>Florida Bar No. 921040<br>**KAPLAN ZEENA LLP**<br>2 South Biscayne Boulevard, Suite 3050<br>Miami, Florida  33131<br>Telephone: (305)  530-0800<br>Facsimile: (305)  530-0801<br>James.kaplan@kaplanzeena.com<br>Elizabeth.salom@kaplanzeena.com<br>service@kaplanzeena.com<br>and<br>Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>**Clark Hill Strasburger**<br>901 Main Street, Suite 6000<br>Dallas, Texas  75202-3794<br>Telelphone:  (214)  651-4718<br>Facsimile:   (214) 659-4121<br>mkeeley@clarkhill.com<br>jriddle@clarkhill.com<br><br>*Counsel for Beazley Insurance Company, Inc.* |

| | |
|---|---|
| E.A. "Seth" Mills, Jr., Esq.<br>Florida Bar No. 339652<br>Ryan J. Weeks, Esq.<br>Florida Bar No.  5 7 8 9 7<br>**MILLS PASKERT DIVERS**<br>100 N. Tampa Street, Suite 3700<br>Telephone: (813) 229-3500<br>Facsimile: (813) 229-3502<br>smills@mpdlegal.com<br>rweeks@mpdlegal.com<br>csoltis@mpdlegal.com<br><br>*Counsel for Travelers Casualty and Surety Company of America* | Dustin C. Blumenthal<br>Florida Bar No. 0149871<br>**Goldberg Segalla**<br>222 Lakeview Avenue, Suite 800<br>West Palm Beach, FL  33401<br>Telephone: (561)  618-4485<br>Facsimile:  (561)  618-4549<br>dblumenthal@goldbergsegalla.com<br>lparker@goldbergsegalla.com<br>and<br><br>Stephen N. Dratch, Esq.<br>Julian Wilsey, Esq.<br>**Franzblau Dratch, P.C.**<br>354 Eisenhower Parkway<br>Livingston, New Jersey  07039<br>Telephone:  (973) 992-3700<br>sdratch@njcounsel.com<br>jwilsey@njcounsel.com<br>*Counsel for Great American Insurance Company* |