# EXHIBIT 3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.  1:20-cv-21707-UU**

RAYMOND JAMES FINANCIAL, INC.,

      Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; and
ST. PAUL MERCURY INSURANCE COMPANY.

      Defendants.

_____/

**PLAINTIFF'S DISCLOSURE OF EXPERT WITNESS AND**
**NOTICE OF SERVICE OF EXPERT REPORT OF STEVE URCIA**

Plaintiff, Raymond James, Inc., by and through its undersigned counsel and pursuant to

Rule 26(a)(2) of the Federal Rules of Civil Procedure and this Court's Order dated January 14,

2021 [D.E. 68], hereby discloses to Defendants the following witness who may be used to present

expert testimony and evidence under Rules 702, 703 and/0r 705 of the Federal Rules of Evidence:

      Steve Urcia
      Capital Forensics, Inc.
      1530 East Dundee Road, Suite 333Suite 333
      Palantine, IL  60074
      Telephone:   (847) 392-0900

A written report, prepared and signed by Mr. Urcia in accordance with Fed. R. Civ. P. 26 (a)(2)

(B) is attached.

Dated:  April 20, 2021.                    Respectfully submitted,


_/s/ Jason S. Mazer_
Jason S. Mazer, Esq.
Florida Bar No. 0149871
Joshua R. Alhalel, Esq.
Florida Bar No.  0016320
**CIMO MAZER MARK PLLC**
100 Southeast Second Street, Suite 3650
Miami, Florida  33131
Telephone: (305) 374-6481
Fax: (305)  374-6488
jmazer@cmmlawgroup.com
jalhalel@cmmlawgroup.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2021, a copy of the foregoing Disclosure and Expert

Report was provided to all counsel of record on the attached Service List via electronic mail.


*/s/ Jason S. Mazer*

## SERVICE LIST

| | |
|---|---|
| Kristina L. Marsh, Esq.<br>Florida Bar No. 0311080<br>**GORDON REES SCULLY MANSUKHANI**<br>601 S. Harbor Island Blvd., Suite 109<br>Tampa, FL 33602<br>Telephone (Main): 813-444-9700<br>Telephone (Direct) 813-523-4937<br>Facsimile: 813-377-3505<br>kmarsh@grsm.com<br>and<br>Scott L. Schmookler, Esq.<br>Sarah Riedl Clark, Esq.<br>**GORDON REES SCULLY MANSUKHANI**<br>One North Franklin, Suite 800<br>Chicago, IL 60606<br>Telephone: 312-980-6779<br>sschmookler@grsm.com<br>srclark@grsm.com<br><br>*Counsel for Federal Insurance Company* | James M. Kaplan, Esq.<br>Florida Bar No. 921040<br>**KAPLAN ZEENA LLP**<br>2 South Biscayne Boulevard, Suite 3050<br>Miami, Florida 33131<br>Telephone: (305) 530-0800<br>Facsimile: (305) 530-0801<br>James.kaplan@kaplanzeena.com<br>Elizabeth.salom@kaplanzeena.com<br>service@kaplanzeena.com<br>and<br>Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>C. Adam Brinkley<br>**Clark Hill Strasburger**<br>901 Main Street, Suite 6000<br>Dallas, Texas 75202-3794<br>Telelphone: (214) 651-4718<br>Facsimile: (214) 659-4121<br>mkeeley@clarkhill.com<br>jriddle@clarkhill.com<br>abrinkley@clarkhill.com<br><br>*Counsel for Beazley Insurance Company, Inc.* |
| E.A. "Seth" Mills, Jr., Esq.<br>Florida Bar No. 339652<br>Ryan J. Weeks, Esq.<br>Florida Bar No. 5 7 8 9 7<br>**MILLS PASKERT DIVERS**<br>100 N. Tampa Street, Suite 3700<br>Telephone: (813) 229-3500<br>Facsimile: (813) 229-3502<br>smills@mpdlegal.com<br>rweeks@mpdlegal.com<br>csoltis@mpdlegal.com<br><br>*Counsel for Travelers Casualty and Surety Company of America and St. Paul Mercury Insurance Company* | Dustin C. Blumenthal<br>Florida Bar No. 0149871<br>**Goldberg Segalla**<br>222 Lakeview Avenue, Suite 800<br>West Palm Beach, FL 33401<br>Telephone: (561) 618-4485<br>Facsimile: (561) 618-4549<br>dblumenthal@goldbergsegalla.com<br>lparker@goldbergsegalla.com<br>and<br>Stephen N. Dratch, Esq.<br>**Franzblau Dratch, P.C.**<br>354 Eisenhower Parkway<br>Livingston, New Jersey 07039<br>Telephone: (973) 992-3700<br><br>*Counsel for Great American Insurance Company* |

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.  1:20-cv-21707-UU**

RAYMOND JAMES FINANCIAL, INC.,

      Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; AND
ST. PAUL MERCURCY INSURANCE COMPANY

      Defendants.

_____/

**Expert Report of Steve Urcia**

**April 20, 2021**

I.      EXPERT RETENTION

II.     EXPERT BACKGROUND AND QUALIFICATIONS

III.    SCOPE OF ASSIGNMENT

IV.     SUMMARY OF OPINIONS

V.      SUMMARY/BACKGROUND

    A.  Overview of the Fraud

    B.  The Business of Raymond James

    C.  Joel Burstein

    D.  Financing Attempts

    E.  Margin

VI.     OPINIONS

    A.  The Evidence Shows that Joel Burstein Acting Alone or In Collusion with Others Committed Fraudulent or Dishonest Acts

        1.  The Mechanics of the Fraud
            a.  Setting up of the accounts
            b.  The lie to Jeff Tyler
            c.  Misrepresentations to MSSI's counsel
            d.  The use of additional margin transactions to further the scheme and conceal the fraud
            e.  The No Encumbrance Letter

    B.  The Conversion of Funds

    C.  AML

VII.    CONCLUSION

2

## I.      EXPERT RETENTION

1.      I was retained by the law firm of Cimo Mazer Mark PLLC, counsel for Raymond James, Inc. to provide expert opinions and conclusions with respect to the subject litigation.   In this report, I render opinions and information related to:  (1)  whether Joel Burstein committed dishonest or fraudulent acts, acting alone or in collusion with others, with the intent to cause Raymond James to sustain a loss and/or to obtain financial benefit for himself, or another person or entity[1]; and (2)  explain to the jury the mechanics of the fraud.

## II.     EXPERT BACKGROUND AND QUALIFICATIONS

2.      I am an expert witness at Capital Forensics, Inc.  In that capacity, I provide expert witness services with respect to financial services and regulatory matters, including broker-dealer litigation, broker-dealer compliance, regulatory and internal investigations. My experience in these matters more specifically includes limited partnerships, margin use, margin issues, supervision, damages and anti-money laundering ("AML").

3.      I have been qualified and have testified as an expert witness in various FINRA arbitrations and mediations on issues that include: churning, limited partnerships, private

---

[1] The Primary Bond grants coverage for loss pursuant to the following fidelity insuring agreement:
> Loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others, with the intent:
> (a) To cause the Insured to sustain such loss, or
> (b) To obtain financial benefit for the Employee, or another person or entity."
> Notwithstanding the foregoing, however, it is agreed that with regard to Loans and Trading this bond covers only loss resulting directly from dishonest or fraudulent acts committed by an Employee with the intent to cause the Insured to sustain such loss and to obtain financial benefit for the Employee.

My understanding is that Burstein qualifies as an "Employee" under the Bonds and the Defendants agree.   Exhibit A to Amended Complaint;  *See, e.g.,*  Federal's Answer to Amended Complaint [D.E. 46].

placements, Reg D offerings, Reg T and Portfolio margin issues, fiduciary duty, market manipulation, over-concentration, suitability, supervision and damages. I have also been qualified as an expert on various investment products, including but not limited to: stocks, bonds, options, equity linked debt, auction rate securities ("ARS"), unit trusts, margin sellout procedures for Reg T and Portfolio margin involving different product types and many other areas.

4.      In addition to my work with FINRA arbitrations and mediations, I have consulted with brokerage firms for projects related to supervision, compliance and surveillance systems (including anti-money laundering investigations), the use of margin, margin sellout procedures, options margin and exposure, portfolio margin, options trading and fixed income trading. CFI and I  regularly consult with broker dealers with respect to their ongoing supervisory and compliance issues.

5.      A copy of my current Curriculum Vitae, which includes my professional experience, and Federal Rules of Civil Procedure Rule 26 Disclosures are attached hereto as Exhibit A.

6.      The opinions and conclusions expressed herein are based upon my understanding of the facts in this case, as well as information gained during the course of my assignment.   I relied upon my education, training, and over 40 years of professional experience in reaching the opinions and conclusions herein.

7.      This report is based upon the information available to me and reviewed to date, and I hereby reserve the right to supplement and amend this report in the event additional information becomes available for my review.

8.      I am being compensated for my work in this matter at the rate of $495 per hour.

### III.    SCOPE OF ASSIGNMENT

9.      The work I performed in connection with this assignment included the review and analysis of documents produced by Raymond James in connection with its Proof of Loss and in the subject litigation, including account statements, email and other communications, and policies and procedures.  I also reviewed the Proof of Loss, Amended Complaint and other pleadings and discovery documents in this case, various pleadings in other matters relating to Jay Peak, and deposition transcripts and exhibits.  Given the volume of documents related to this matter and the time period of events that spanned nearly seven years, I was assisted in my review by other professionals at Capital Forensics, whom I supervised.

10.      NERA Consulting  performed certain work and analyses with respect to the Jay Peak transactions and it rendered a report relating to same.   Such work was conducted largely before the retention of Capital Forensics.   To the extent any such data was relied upon or used by me or used to support my opinions, it is only to support my opinions, which are independent of any work performed by NERA.

### IV.    SUMMARY OF OPINIONS

11.      Based on my training, education, and experience, and the result of my review and analysis of the evidence, I have concluded that Joel Burstein ("Burstein"), acting alone or in collusion with others, committed fraudulent or dishonest acts.   As a result of these dishonest acts, Raymond James ultimately paid $150 million to settle with an SEC-appointed Receiver arising out of the acts committed by Burstein in connection with the purchase, improvement and expansion of the Jay Peak Resort in Jay, Vermont, and the Burke Mountain Resort in East Burke, Vermont,

by Burstein's former father-in-law Ariel Quiros ("Quiros")[2].  Over the course of six years, Burstein and Quiros implemented a fraudulent and dishonest scheme to misappropriate over $60 million in EB-5 investor funds from limited partnership accounts held by Raymond James.[3]  In furtherance of the scheme, Burstein deliberately and selectively edited and misrepresented the information he provided to Raymond James personnel and others to ensure that Quiros' acquisition of Jay Peak and continued use and misappropriation of investor funds was accomplished.  As detailed later in this report, Quiros referred to this scheme as "RJ magic"[4] and Burstein and his "original plan."[5]

## V.      SUMMARY/BACKGROUND

### A.  Overview of the Fraud

12.      Burstein was the Miami Branch Administrative Manager and Vice President of Raymond James' South Florida Complex.  In late 2007, Burstein was approached by his then father-in-law Quiros regarding Raymond James potentially financing the prospective purchase of the Jay Peak resort. Around March of 2008, Burstein, Quiros, and Burstein's supervisor, Frank Amigo ("Amigo"), met to discuss potential avenues for financing through Raymond James:  (1) lending through Raymond James Investment Banking; (2) lending through Raymond James Bank; or (3) funding the purchase through margin loans using Raymond James brokerage accounts.[6] Following that meeting, Burstein approached Raymond James Investment Bank and Raymond James Bank about obtaining conventional financing.  Both declined.[7]

---

[2] RJ-POL 003359 – RJ-POL 003378
[3] NERA Report – RJ-POL 095424 – RJ-POL 095459
[4] RJ-POL 000097 – RJ-POL 000099
[5] RJ-POL 000105
[6] Deposition of Frank Amigo, February 15, 2017, Page 82
[7] RJ-POL 104823, RJ-POL 147947

13.     Burstein then created and carried out a scheme to facilitate Quiros' conversion of Jay Peak limited partnership funds to purchase the Jay Peak Resort, cover expenses of partnerships other than those to which the funds belonged and cover other personal and non-Jay Peak related expenses for Quiros' and his benefit. Generally, the scheme went as follows:

- Deposit funds from EB-5 limited partnership bank accounts to Raymond James limited partnership brokerage accounts.

- Open like titled Raymond James limited partnership brokerage accounts under Quiros' control to misappropriate partnership assets. At the time Burstein facilitated the opening of these accounts under Quiros' control, the same tax ID was used for the Quiros' accounts as was used for the brokerage accounts of the original deposits even though Quiros' had no ownership interest in Jay Peak Resort or the limited partnerships at the time.

- Transfer 90% of the EB-5 funds to the accounts under Quiros' control to use for their benefit.

- Leverage the remaining 10% of the EB-5 funds left in the original accounts to purchase treasury bills on margin and create the appearance that partnership funds remained in the partnership accounts while hiding the existence of a margin debt linked to the funds by cross-collateralizing accounts.

- Hide the misappropriation over time by moving the funds through multiple accounts, issuing correspondence to comfort and mislead those not involved in the scheme, or remaining silent in response to audit and information requests.

Burstein knew from the outset this plan was in violation of the Jay Peak limited partnership agreements, which restricted the use of investor funds.[8]  I have not seen evidence that anyone else at Raymond James other than Burstein knew the EB-5 investment money was being used to purchase Jay Peak Resort in violation of the limited partnership agreements.

14.     Upon discovery of the fraud, the SEC initiated litigation against Quiros which resulted in the appointment of a Receiver for the Jay Peak limited partnerships and related entities (the "SEC Receiver"). Soon thereafter, numerous lawsuits were filed against Raymond James and Burstein, including an action by the SEC Receiver and a consolidated class action lawsuit by individual investors who were seeking to recover, among other damages, the funds held by Raymond James that had been misappropriated.

### B.  The Business of Raymond James

15.     Raymond James is a large financial institution that deals with investor money and deposits and provides a variety of financial services.   Due to the nature of its business, specialization is vital.  A natural result of specialization is departmentalization.  Raymond James is departmentalized. Like other broker dealers, Raymond James' back office operations has distinct units that deal with account openings, account documentation, margin, wire transfers, anti-money laundering, etc.   In my opinion, Burstein took advantage of his knowledge of the structure of Raymond James and the way these various departments interacted in accomplishing and perpetuating the fraud.

Generally, there are two components to the  structure of a full service firm like Raymond James: the front office and the back office. The front office is the revenue producing component,

---

[8] RJ-POL 110552

which would include trading desks and branch offices where financial advisors and their supervisors handle customer accounts. The back office is the support group which would include such functions as the new accounts, cashiering and the margin departments. The legal and compliance group, while not a producing arm, provides support to various departments to assure compliance with the various rules and regulations governing particular activities and includes the Anti Money Laundering ("AML") unit.

In this structure, back office personnel respond to requests from front office personnel and they rely on the instructions or information they are provided to support the processing of a request. Given the foregoing, the front office expects the department responsible for executing the submitted instruction will do so in a timely manner.  Occasionally, a request from a Financial Advisor or branch manager may need some form of approval by a supervisor. If the request indicates approval has already been provided, then the employee will comply with the request without further inquiry as to whether all the components required by the procedure are present, e.g., signed LOA, supervisory initials, appropriate account paperwork on file, etc.  Simply put, the back office personnel may and do rely on information provided to them by Financial Advisors and/or managers.

Similarly, if approval or other positive validation about a particular situation is received from others within the legal or compliance  departments such as the AML department, then the individuals processing the request will do so without any further inquiry.

Within the Raymond James supervisory structure, Joel Burstein was designated as "representative in charge" ("RIC") of the Coral Gables branch office by Frank Amigo, the branch

manager. ████████████████████████ █████████████████████

████████████████████████████████████████████████

███████████████████████████████

███████████████████████████

    ████████████████████████
    ███████████████████████████
    ██████████████████████████████

███████████████████████████

    ███████████████
    ███████████████████████████████
    ███████████████████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████   In my opinion, being the RIC from 2004-2014 allowed Burstein to gain credibility among his colleagues and superiors and in time, that credibility allowed him to dishonestly mislead, condition and influence others when their approval was required for transactions involving the Jay Peak accounts and the fraud.

### C.  Joel Burstein

16.    Burstein was married to Quiros' daughter and Burstein maintained his relationship with Quiros after the dissolution of his marriage.  Burstein consistently received high marks from his immediate supervisor, Frank Amigo. ████████████████████████████

████████████████████████████████████████████████

---

[9] ██████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████[10]   These comments suggest that Burstein was respected and well-regarded by his colleagues.   In my opinion, he used his reputation, together with his knowledge of Raymond James' internal workings to navigate the various aspects of Raymond James' supervisory program to advance the fraud.

17.     As the Miami complex Administrative Manager, Burstein was responsible for general compliance at the complex which included review of the branch office compliance report, complaints, and other supervisory related reports. His position allowed him to anticipate and proactively navigate potential issues that could expose the scheme, often before an event even triggered one (e.g., where a particular transaction might require approval).  When Burstein would foresee a step in the scheme would trigger a review within Raymond James supervisory system, he would contact the relevant department via email or phone to provide a preview of the anticipated event to the person who might ultimately review it.[11]  His explanations often legitimized the events, and it would have been reasonable for others to accept his explanations at face value due to his position as a supervisor in the company.

18.     Burstein was sued by the SEC for his role in the Jay Peak fraud.   In September 2018, Burstein was restrained and enjoined by the SEC from working in the securities industry.

---

[10]Burstein Employment File_Redacted RJ-POL 095506 – RJ-POL 095508
[11] RJ-POL 000660 as example

Burstein agreed to personally pay the SEC an $80,000 fine in connection with his involvement in the Jay Peak scheme.[12]

20.    19.    In May 2019, Quiros and others were indicted by a federal grand jury on criminal charges in connection with the Phase VII project.  In August 2020, Quiros pleaded guilty to conspiracy to commit wire fraud, money laundering and the concealment of material information. He has yet to be sentenced.[13]

### D.  Financing Attempts

20.    Around March of 2008, Burstein, Quiros, and Burstein's supervisor, Frank Amigo, met to discuss potential avenues for financing through Raymond James:  (1) lending through Raymond James Investment Banking; (2) lending through Raymond James Bank; or (3) funding the purchase through margin loans using Raymond James brokerage accounts.[14]  Following that meeting, Burstein approached Raymond James Investment Bank and Raymond James Bank to obtain conventional financing.  Citing a lack of adequate experience with resorts and the EB-5 investment program, both entities declined.[15]

### E.    Margin

21.    Concealment, from the investors, of the fraud was ultimately dependent on the use of margin.  To "margin" or "buy on margin" means to use money borrowed from a broker to purchase securities.   As discussed below in detail, Burstein set up  accounts with margin features to purchase the Jay Peak Resort with investor funds.   When investor funds were received into an

---

[12] RJ-POL 003403 – RJ-POL 003408
[13] See transcript from Change of Plea Hearing for United States of America v. Ariel Quiros from August 14, 2020
[14] Deposition of Frank Amigo, February 15, 2017, Page 82.
[15] RJ-POL 104821, RJ-POL 101992, Deposition of Jozsi Popper, March 23, 2021, Page 40.

RJ account, Burstein, using instructions from Quiros and Stenger, would transfer approximately 90% of the funds received from investors to a Quiros controlled account which was then diverted to pay for the purchase of Jay Peak Resort, other properties and for other personal purposes. The remaining 10% of investor funds were used as collateral to fund the purchase of T-bills equal to the original investor deposit.  (Raymond James required a 10% equity for T-bills meaning an investor could borrow up to 90% of the market value of the T-bills purchased vs. the margin requirement for common stock which was 50%. By using T-bills, Quiros was able to use 90% of investor funds for his own purposes instead of only 50%). The T-bills were purchased to give the impression to the investors that their investment was secure. The investors were reliant on Quiros for information regarding their investments because the statements were sent to Quiros' Florida business address[16]. This enabled Quiros to control the information the investors would receive regarding their investments . By purchasing T-bills in an amount equivalent to the funds deposited Quiros was able to provide the investors information showing only the T-bill position and hide the information showing the margin debit.  The margin accounts were used directly to hide the fact that investor funds were used for the purchase of the resort and to hide the improper use of investor funds and the diversion of those funds to Quiros and Burstein for their personal use.

## VI.    OPINIONS

### A. The Evidence Shows that Joel Burstein Acting Alone or In Collusion with Others Committed Fraudulent or Dishonest Acts

22.    With the financing options with Raymond James off the table, Burstein then created and carried out a scheme to facilitate Quiros' conversion of Jay Peak limited partnership funds to purchase the Jay Peak Resort, cover expenses of partnerships other than those to which the funds

---

[16] Peak-VT-RJA000161

belonged and cover other personal and non-Jay Peak related expenses for Quiros' and his benefit. Generally, the scheme went as follows:

- Deposit funds from EB-5 limited partnership bank accounts to Raymond James limited partnership brokerage accounts.

- Open identically titled Raymond James limited partnership brokerage accounts under Quiros' control to misappropriate partnership assets. At the time Burstein facilitated the opening of these accounts under Quiros' control, the same tax ID was linked to the accounts as the one linked to the brokerage accounts of the original deposits even though Quiros' had no ownership interest in Jay Peak Resort or the limited partnerships at the time.

- Transfer 90% of the EB-5 funds to the accounts under Quiros' control to use for their benefit.

- Leverage the remaining 10% of the EB-5 funds left in the original account to purchase treasury bills on margin to create the appearance that partnership funds remained in the partnership accounts while hiding the existence of a margin debt by cross-collateralizing accounts.

- Hide the misappropriation over time by moving the funds through multiple accounts, issuing correspondence to comfort and mislead those not involved in the scheme, or remaining silent in response to audit and information requests.

23.    Nobody else besides Burstein at Raymond James knew this misuse of  EB-5 investor funds to purchase the resort and for Quiros' personal benefit was in violation of the Jay Peak limited partnership agreements, which restricted the use of investor funds.

24.    As set forth below, the evidence, in my professional opinion, demonstrates that Burstein acted in a deceptive, fraudulent[17], and dishonest manner.

### 1. The Mechanics of the Fraud

#### a. <u>Setting up of the accounts</u>

25.    Between June 23, 2008 and September 26, 2008, Quiros, through Q Resorts and with Burstein's assistance, made five installment payments for the Jay Peak purchase and three installment payments to Quiros' attorneys toward the Jay Peak purchase and Quiros' attorneys' fees. Burstein and Quiros effectuated these withdrawals by funding Quiros' Phase 1 and 2 Raymond James accounts with EB-5 investor funds, transferring those funds through two separate Raymond James accounts, and sending the funds to Saint-Sauveur Valley Resorts, Inc. ("SSVR"). Because Burstein orchestrated the unauthorized transfer of the MSSI-held partnership funds at Raymond James to Quiros-controlled accounts at Raymond James before any payments were received from Quiros, SSVR only saw funds coming from Quiros' Q Resorts account and was unaware that partnership assets were being used to fund the purchase.[18]

26.    Specifically, Burstein set into motion the "RJ Magic"[19] and "original plan"[20] in June 2008, when he set up a series of accounts to hide that the EB-5 investor funds were being improperly used by Quiros to purchase the Jay Peak Resort. On June 13, 2008, Quiros entered

---

[17] The fidelity bonds do not define the term "fraudulent" or "fraud." Accordingly, I subscribe to the meanings of these terms as set forth in Merriam-Webster at www.merriam-webster.com/dictionary/fraudulent and www.merriam-webster.com/dictionary/fraud:
Fraudulent: "characterized by, based on, or done by fraud: deceitful.
Fraud: (a) intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right; (b) an act of deceiving or misrepresenting.
[18] NERA Report – RJ-POL 095424 – RJ-POL 095459
[19] RJ-POL 000097
[20] RJ-POL 000105

into a stock transfer agreement with Mont Saint-Saveur International ("MSSI") for his company,

Q Resorts, Inc. ("Q Resorts") to purchase the real estate and other assets of Jay Peak.[21]   In

connection therewith, Quiros asked MSSI to open brokerage accounts at Raymond James (with

his then, son-in-law, Burstein).  MSSI opened two accounts:

> Jay Peak Hotel Suites L.P.[22]
> (for Phase I investor funds)
> Account No. 54040698
> Tax I.D. No. 20-8514467
>
> Jay Peak Hotel Suites LP[23]
> (for Phase II investor funds)
> Account No. 54046389
> Tax I.D. No. 20-8514467

The Tax ID No. of both accounts is ████4467.  Quiros was not an authorized signer on the

MSSI- controlled accounts.

Burstein, in anticipation of the closing, opened the following additional accounts:

> Jay Peak Hotel Suites LP 1[24]
> Account Number: ████6365
> Tax I.D. No. ████4467
>
> Jay Peak Hotel Suites LP 2[25]
> Account No. ████6370
> Tax I.D. No. ████4467

Burstein used the same Tax I.D. Nos. to not draw attention to the accounts when assets were

transferred between them.  Burstein submitted to New Accounts unit the first and last page of the

---

[21] RJ-POL 002109-002155
[22] RJ-POL 001037
[23] RJ-POL 001064
[24] RJ-POL 001047
[25] Peak-VT-RJA006314

Jay Peak Hotel Suites Limited Partnership I agreement for both that LP 1 and the LP 2 accounts.[26] These accounts were to be controlled by Quiros.  The account statements for both of these accounts were sent to Quiros at a Florida address.[27]

Last, Burstein opened the following account for Q Resorts, Inc., with Quiros as the authorized signatory:

> Q Resorts, Inc.[28]
> Account No. ████4772
> Tax I.D. No. ████1716

27.     Burstein set up the accounts in a "multi-margin" account relationship where the assets in one or more related accounts at Raymond James are used to collateralize a margin debit in a separate account to accommodate several customer scenarios. ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████[29] The use of multi-margin accounts is not a concept typically known to lay persons.   In my opinion, Burstein facilitated the accounts to be set up this way in order to conceal Quiros' unauthorized use of funds in an effort to avoid detection of the fraud by the investors in the various Jay Peak partnerships.

Several years later, Quiros described it as follows in an email to Burstein:

> . . . I TRULY CAN'T BELIEVE IT ALL STARTED ON A NAPKIN… LIKE
> ALWAYS   LET   ME    COME UP WITH THE    SCOPE AND TASK.
> TOGETHER WILL  COME  UP  WITH A PLAN , AND  THEN  YOU  PUT
> YOUR  RJ MAGIC.[30]

---

[26] RJ-POL 001044 – RJ-POL 001046
[27] Peak-VT-RJA000161, Peak-VT-RJA005842
[28] RJ-POL 000999
[29] RJ_EML_00058637
[30] RJ-POL 000097

### b.  **The lie to Jeff Tyler**

28.     On June 16, 2008, Burstein reached out to Jeff Tyler ("Tyler"), a Raymond James customer accounts supervisor, regarding the documentation needed to transfer the funds in the MSSI accounts to Q Resorts.  In his email to Tyler, Burstein described MSSI as having "sold all of their holding to Q.Resorts" and there being "a stock transfer agreement that shows all assets being transferred over to Q.Resorts dated as of last Friday [June 13, 2008]."[31] Burstein knew this was false.   As of June 16th, the transaction had not yet closed.   Relying on Burstein's misrepresentation and a letter from William Stenger addressed to Burstein (which stated in part: "I hereby instruct Raymond James to retitle all accounts that are in the name of Jay Peak Inc including Jay Peak Hotel Suite LP1 and Jay Peak Hotel Suite LP2 and immediately transfer control and title to Q resorts Inc.")[32], Tyler, on June 23, 2008, authorized the transfer of the funds from the MSSI-controlled LP accounts to the Quiros-controlled LP  accounts having the same tax identification numbers as the MSSI Accounts, and then the same day from Quiros-controlled LP accounts to the Q Resorts account.[33]

| acct_num | seq_counter | term_name | log_on | entry_date_yr | entry_date_mo | entry_date_dy | entry_time | trailer | | acct_short_name | amount | user_id |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0698 | 3762 | WEBJOURNAL | JTYLER1 | 8 | 6 | 23 | 1:56:37.62 PM | TRF TO # | 6365 | QUIROS MSSI | 11002566.60 | JT13A |
| 6365 | 3764 | WEBJOURNAL | JTYLER1 | 8 | 6 | 23 | 1:56:37.64 PM | TRF FR # | 0698 | QUIROS HOTEL 1 | -11002566.60 | JT13A |
| 6389 | 3764 | WEBJOURNAL | JTYLER1 | 8 | 6 | 23 | 1:56:37.64 PM | TRF TO # | 6370 | QUIROS MSSI | 7000000.00 | JT13A |
| 6370 | 3765 | WEBJOURNAL | JTYLER1 | 8 | 6 | 23 | 1:56:37.65 PM | TRF FR # | 6389 | QUIROS HOTEL 2 | -7000000.00 | JT13A |
| 6365 | 5018 | WEBJOURNAL | RHADDICK | 8 | 6 | 23 | 4:18:50.18 PM | TRF TO # | 4772 | QUIROS HOTEL 1 | 7600000.00 | RH13A |
| 6370 | 5024 | WEBJOURNAL | RHADDICK | 8 | 6 | 23 | 4:18:50.24 PM | TRF FR # | 6365 | QUIROS RESORTS | -7600000.00 | RH13A |
| 4772 | 4130 | WEBJOURNAL | RHADDICK | 8 | 6 | 23 | 4:19:41.30 PM | TRF TO # | 4772 | QUIROS HOTEL 2 | 6000000.00 | RH13A |
| 4772 | 4133 | WEBJOURNAL | RHADDICK | 8 | 6 | 23 | 4:19:41.33 PM | TRF FR # | 6370 | QUIROS RESORTS | -6000000.00 | RH13A |
| 4772 | 2198 | WSWIRES | WSWIRES | 8 | 6 | 23 | 4:49:21.98 PM | WIRE TO SPIEGEL SOHMER | | QUIROS RESORTS | 13544346.00 | WRTGL |

---

[31] RJ-POL 000004
[32] RJ-POL 000218
[33] RJ-POL 000109

This was critical to Burstein and Quiros' scheme.  It ultimately allowed the investor funds from the MSSI-controlled Jay Peak limited partnership accounts at Raymond James to  be used improperly by Quiros to purchase the resort.

### c.  Misrepresentations to MSSI's counsel

29.     As noted above, Raymond James did not finance the Jay Peak acquisition.   Rather, Burstein permitted Quiros to use the EB-5 investor funds to purchase the resort from MSSI and then margined the remaining assets to make it appear that the investors' money was safely invested in Treasury bills. Specifically, on June 23, 2008, Burstein, without MSSI's authorization, transferred the $11 million in MSSI's Phase I account at Raymond James and the $7 million from MSSI's Phase II account at Raymond James to Quiros' Phase I and Phase II accounts at Raymond James. A portion of these funds, totaling $13.5 million, was then transferred to the Q Resorts account at Raymond James. This amount, which was due to MSSI at closing, was then wired to MSSI's counsel the same day.[34] This allowed Burstein and Quiros to create the illusion to MSSI that the funds came from Q Resorts and not from investor money. Then, on June 25th, Treasury bills were purchased in the Quiros-controlled Jay Peak Hotel Suites LPI and LPII accounts using margin. The value of the Treasury bills purchased in the accounts equaled the original amounts transferred from the MSSI Jay Peak accounts to the Quiros-controlled Jay Peak accounts ($11 million for Jay Peak Hotel Suites 1 and $7 million for Jay Peak Hotel Suites 2).

30.     Burstein knew the investor funds in the limited partnership accounts could not be used in any manner for the purchase of the resort.  On May 20, 2008, MSSI's counsel, Janice Naymark, advised Burstein via email that the Jay Peak Hotel Suites L.P. "account is not to be

---

[34] RJ-POL 000109

linked with any other, nor may it be used as a basis or security for any line of credit or margin account or other form of borrowing."[35]

31.     Knowing that investor funds could not be used to fund the purchase, Burstein once again emailed Jozsi Popper at Raymond James Investment Bank to inquire if there is a renewed interest in financing the project.   Burstein appears to try to gain traction by the dishonest statement that "the deal has significantly changed." [36]   Once again, the request for financing was denied.

32.     Prior to the closing, Burstein then affirmatively misrepresented to MSSI's counsel that Raymond James was financing the acquisition of the resort, despite knowing this was not true. On June 17, 2008, Burstein drafted a proposed letter to MSSI's counsel describing Raymond James as having "been selected by Ariel Quiros, President of QResorts Inc. *to provided (sp) the financing for the above referenced transaction*."[37]   After sending the letter to his supervisor, Frank Amigo ("Amigo"), for review, Amigo sent a revised draft back to Burstein removing the financing language and instead stating that "Raymond James Financial, Inc. has been selected by Ariel Quiros, President of Q Resorts, Inc. *to wire funds for the above mentioned* closing."[38]

33.     The next day, on June 18, 2008 and prior to closing, Burstein was specifically informed in writing[39]  by attorneys for MSSI:

> Further to our telephone conversation of this morning and your letter of yesterday, we would like to confirm the following:
>
> 1.     Raymond James is lending QResorts Inc. the funds necessary for the purchase of the Jay Peak Resort;
> . . . .

---

[35] RJ-POL 110552
[36] RJ-POL 101992
[37] RJ-POL 155325
[38] RJ-POL 137582 – 137584
[39] RJ-POL 000300 – 000301

4.      The funds currently in account number ████0698 belong to the Jay Peak Hotel Suites Limited Partnership.  These funds were invested by immigrant investors in this limited partnership and must be held and/or used strictly in accordance with the limited partnership agreement, a copy of which I understand has already been provided to you.  You confirmed that these funds will not be used in any manner, including as collateral or a guarantee, to finance the Purchase of the Jay Peak Resort.

. . . .

5.      Similarly, any funds received from Investors in connection with Phase II of the Jay Peak EB-5 project are subject to restrictions as to their use and investment. . . Once again these funds may not be used in any manner, including as collateral or a guarantee, to fund the purchase of the Jay Peak Resort.

Burstein should have shared this letter and the restrictions on the use of EB-5 investor funds with Amigo, the legal department, or other appropriate personnel at Raymond James.    I saw no evidence that he did so.

34.      Instead, Burstein sent a series of follow up emails – where neither Amigo nor any other Raymond James personnel were copied – falsely representing to MSSI's counsel that "Raymond James will be financing the transaction through Q Resorts Inc." Burstein also "confirmed" that "[n]one of the funds in the MSSI Jay Peak Hotel Suites LP will be used for margin."[40]

35.      ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ ██

████████████████████████████████████████████████████

---

[40] RJ-POL 000020

[41] RJ_00056819

 and this pivotal

position allowed him to both intercept the instructions of the MSSI attorneys, thereby preventing

Raymond James from learning about the MSSI attorneys' restrictions and instructions. It also

allowed Burstein to assure them, via written response that escaped independent review by

Raymond James due to his position, their instructions would be followed. Due to the fact Burstein

was not a  salesman and because this was a family relationship , the fact that he was the broker of

record for the Quiros accounts did not raise any red flags and would be considered an

accommodation rather than a typical broker/customer relationship. I have seen no evidence that

anyone at Raymond James, including Frank Amigo, knew of Burstein's representations or knew

that the investor funds could not be used to purchase the resort.

### d.  The Use of Additional Margin Transactions to Further the Scheme and Conceal the Fraud

36.     Over the course of their nearly six year scheme, Burstein facilitated three separate

margin arrangements with Quiros. The first use of margin was June 25, 2008, where the margin

debit caused by the purchase of T-bills was carried in the instant accounts, (6365 and 6370). After

concerns were expressed about the Raymond James account information provided by Quiros [42],

Burstein introduced the multi-margin account setup. On Feb 10, 2009, approximately $23 million

---

[42] Deposition of William Stenger, May 21, 2014, Page 96-112.

was transferred from Jay Peak Hotel Suites LP (0726) to 6365 and 6370 to satisfy the margin debt incurred which resulted in those accounts holding only the T-bills purchased while the debit was now held in 0726. This gave the investors the impression their investment was held unencumbered. Subsequently, on Feb 29, 2012 another multi margin facility was set up with an account titled Jay Peak Inc (2589) to hold debit balances collateralized by holdings in Jay Peak Hotel Suites  a/c 3066. The 2589 account was subsequently used to carry the margin debt for various other Jay Peak related investor accounts.  Burstein acted deliberately to assist Quiros in concealing issues related to the accounts as they continued to operate their scheme.   In each instance, the Raymond James-held partnership assets collateralized the margin loans.  Quiros, with Burstein's assistance, used these margin loans to misappropriate partnership funds while concealing from others the absence of limited partnership funds in the Raymond James-held partnership accounts.  As newly acquired partnership funds were deposited into the partnership-specific Raymond James accounts, Burstein disguised the withdrawal of those funds by purchasing Treasury bills in the amounts deposited while increasing the limited partnerships' indebtedness under the margin loans.  As assets were depleted in each limited partnership, the later-phase limited partnerships were added to collateralize the margin loan then in existence. Those proceeds were then used to pay down earlier margin loans until the accounts were closed.[43]

---

[43] The details of the transactions and supporting account evidence for each transaction can be found at RJ-POL 002087-2778;  RJ-POL 002779-002924; RJ-POL 095424-095459; and Folder No. 8 in support of Proof of Loss (Documentation of Tracing Analysis).  Additionally, documentation of the commingling and misappropriation of funds are bates stamped RJ-POL 000422-000551. Additional documentation relating to the margin loans are bates stamped RJ-POL 000552-000600. Additional Account Opening documents are bates labeled RJ-POL 000784-001382.

37.     In January 2009, for example, after Jay Peak Inc. raised issues with the Phase 1 and 2 account information being provided[44], Burstein and Quiros opened a separate account in the name of Jay Peak Hotel Suites LP.[45]  The margin debt that previously appeared in the Phase 1[46] and 2[47] accounts was then moved into this new account whose statements were provided only to Quiros. As a result, and as Burstein knew, only the assets (and none of the margin debt) would appear on the Phase 1 and Phase 2 account statements, while the margin debt would appear only in this new account.[48]

38.     Burstein manipulated the structure of the accounts in a manner that would appear innocuous to Raymond James personnel.   Because all the Jay Peak account statements were being sent to a Quiros address in Florida, Quiros, with the assistance of Burstein, could camouflage the existence of the margin debt.[49]

39.     By setting up and linking accounts in this manner, Quiros was able to purchase T-bills in the collateral accounts while maintaining a debit in a separate "margin account" equivalent to 90% of the market value of the purchased T-bills. The EB-5 investors would see their contributions to the partnership accounts in the form of T-bills with no encumbrance because their accounts did not reflect the "margin debit."   This enabled Quiros to continue to use the EB-5 funds while shielding from the investors that their funds were used to purchase the resort and for personal expenditures.

---

[44] Deposition of William Stenger, May 21, 2014, Page 96-112.
[45] RJ-POL 000566 – 000570
[46] Peak-VT-RJA000221 – 000224
[47] Peak-VT-RJA005900 – 005905
[48] Peak-VT-RJA005440 – 005443
[49] Peak-VT-RJA000161, Peak-VT-RJA005842

40.     In August 2009, Burstein sent an email to Quiros outlining the mechanics of the scheme.   Burstein acknowledged that the Treasury bills were purchased to create the appearance that the partnership funds remained in the respective accounts in order to deceive the recipient. Burstein further acknowledged that he "create[s] margin on the account so that there is no time lapse," "create[s] specialized reports," "create[s] a summary statement that shows a snapshot of [each] account as of today with deposits withdrawals and current account balances," and "balance[s] each account so that the totals match perfectly, making each dollar accounted for."[50]

41.     Based on my experience in overseeing financial accounts, this type of activity was purposeful and designed to perpetuate the fraud and continue to conceal from the investors the unauthorized use of their funds.

### e.  The No Encumbrance Letter

42.     Another blatant fraudulent act by Burstein to conceal the fraud was his preparation of the "No Encumbrance Letter."

43.     On February 24, 2012, Burstein sent an email to Quiros: "Per our conversation and according to our original plan, your margin debit has been covered.  If you have any questions, please feel free to contact me with any questions."[51]

44.     On February 28, 2012, Burstein assisted Quiros in reestablishing a margin loan, via a multi-margin account agreement[52], using a debit account in the name of Jay Peak Inc.  The new credit agreement provided that the debit balance in the new account would be secured by the assets of the Jay Peak Lodge and Townhouses LP ("Lodge") and Jay Peak Hotel Suites Stateside LP

---

[50] RJ-POL 000065
[51] RJ-POL 000105
[52] RJ-POL 000584-000589

("Stateside"), later partnership phases holding EB-5 investor money. Using the multi-margin account facility, the investor account statements only reflected the T-bill position giving the impression the assets were unencumbered.

45.     On February 29, 2012, a new debit account was opened in the name of Jay Peak Inc. (2589), secured by a pledge of assets of Lodge and Stateside.[53]

46.     That same day, Burstein prepared a letter on Raymond James letterhead addressed to Bill Stenger that stated the following: "This Letter is to inform you that as of February 27th, 2012, there are no encumbrances on any of the Jay Peak Partnership accounts."[54] The letter also listed each of the account numbers and names of the first six phases of the Jay Peak EB-5 projects. I saw no indication that the letter was reviewed by Amigo, another supervisor, or compliance prior to it being sent out, ████████████████████████████████████. This is just another example of how Burstein's position as the correspondence gatekeeper at Raymond James allowed him to escape supervisory scrutiny and continue to conduct the fraud while keeping Raymond James in the dark.

47.     While the letter accurately states that the accounts listed were not encumbered as of February 27, 2012, the letter is misleading and deceptive. One or more of the accounts listed had been encumbered until the loan was paid off on Friday, February 24, 2012.  And one or more of the accounts were encumbered beginning Tuesday, February 28, 2012 when the credit agreement for the new loan was signed.  Thus, February 27, 2012 was the only business day in this time period where none of the accounts listed were encumbered.

---

[53] RJ-POL 000579 – RJ-POL 000583
[54] RJ-POL 000093

As discussed above, Raymond James' policies regarding ██████████████████

████████████████████████████████████████████████████████████████

█████████████████████████████ █████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████ Burstein submitted a letter to Amigo where Amigo

amended the wording to reflect Raymond James' position.  The "No Encumbrance" letter is

another example of Burstein evading supervisory review with respect to misleading and deceptive

correspondence.

### B. The Conversion of Funds

48.     In a financial institution, the conversion of client funds to one's own personal use

equates to fraud – period.   Following Q Resorts' acquisition of Jay Peak, Quiros had access to all

the investor funds held by each limited partnership. Burstein helped Quiros convert at least $65.8

million of investor money for Quiros' personal benefit, including, among other things, to acquire

Jay Peak, to purchase two multi-million dollar condominiums in New York City, and to pay

Quiros' personal and corporate income taxes.[56]

49.     Burstein was married to Quiros' daughter from 2006 through 2010. They had one

daughter together. Over the course of their scheme, Burstein was paid thousands of dollars in

checks from Quiros' management company for "services." Following Burstein's divorce from

---

[55] See 2012 RJ Correspondence Policy
[56] NERA Report – RJ-POL 095424 – RJ-POL 095459

Quiros' daughter in 2010, Quiros reminded Burstein that their scheme was a "once in a lifetime opportunity for all of us." Quiros pledged to Burstein that he would give "all that I can." Burstein responded: "This is exactly what we planned years ago, [and] it's exciting to see it all coming together."[57]

### C.  AML

50.     The anti-money laundering ("AML") department at Raymond James had oversight of certain back office operations.  In connection with those responsibilities, AML would review activity reports or excessive wire reports.[58]   The head of the AML department was Linda Busby, who oversaw the department's operations.[59]   Burstein started "conditioning"[60] Ms. Busby to the Jay Peak transaction as early April 2008, when he emailed an article about the Jay Peak Resort.[61] He would follow up via email on May 12, 2008, :

> "If you recall a few months ago I told you that my Father-in-law was purchasing a ski resort and we would be able to manage that money. They will be opening accounts here and the EB-5 money will be coming into the accounts and then we will be sending the money out shortly to a bank account registered in the same name or a subsidiary company of the parent account here. What sort of documentation would you require, since you will end of seeing millions come in and then millions going out in a short period of time? We can always talk on the phone if it's easier and I can give you the specifics?"[62]

---

[57] RJ-POL 000097-99; R.J-POL 000102-104;  RJ-POL 155608-155634
[58] Deposition of Linda Busby, Page 21:23-2;  84:3-84:1
[59] See generally, Deposition of Linda Busby, Pages 18:3-22:7
[60] Burstein also "conditioned" other backroom areas of Raymond James. For example, on June 18, 2008 Burstein Steve Bartalo in Customer Accounts to advise that "we will be taking a large margin loan from this registration. However, this is slightly complicated and I wanted to run it by you first."  Bartalo Deposition Exhibit 22 – RJ_EML_00058896
[61] RJ-POL 000604
[62] RJ-POL 000605

Busby understood that the government vets the EB-5 source of funds, that the EB-5 money is "Some of the cleanest money".[63]   In my opinion, this was another key piece of the fraud.  Burstein was careful to gain Busby's understanding of the money so that the initial transaction would not be scrutinized.  As described in FINRA NTM 02-21[64], many AML "red flags" can be summarized as "The customer wishes to engage in transactions that lack business sense or apparent investment strategy or are inconsistent with the customer's stated business strategy."  Many of the activities engaged in by the Jay Peak accounts involved movement of funds between accounts and many in and out wire transactions.   In my experience, these activities would routinely be the subject of AML review, but even before a single transaction had taken place Burstein previewed the situation for AML to avoid review on the basis that the activity would be  "inconsistent with the customer's stated business strategy" issue.  Rather, Burstein established the understanding that the customer's "stated business strategy" would involve the deposit of EB-5 funds which would then be used in connection with the operations and improvements of the Jay Peak resort and other properties. This explanation satisfied AML concerns because they were satisfied the incoming funds were from sources already vetted by the EB-5 process and the disbursement of those funds appeared to be consistent with Burstein's stated purpose for such transfers. The initial Jay Peak transaction in June 2008 did not trigger any AML review.   In later years, AML prepared four reports with respect to the Jay Peak accounts.   For example, in 2011 Burstein "met with AML department to provide information related to large dollar transactions that will be occurring in this new account opened and related to Quiros Hotel and Jay Peak."  Research indicates "Linda is aware of program" with

---

[63] Deposition of Frank Amigo, February 15, 2007 Pages 182:10-25
[64] FINRA Notice to Members 02-21

resolution listed as "No AML issue."[65]   Other AML reviews found "account activity appears logical."[66]   As Ms. Busby testified, she trusted Burstein and never had reason to believe that he was fraudulent or dishonest.[67]

## VII.   CONCLUSION

51.     My opinions in this report are based on my education, training, and over 40 years of practical experience in the financial industry as outlined in my curriculum vitae.   My opinions and the bases for them are derived from my knowledge of financial industry practice and procedures, margin practices, forensic investigations, and supervision and monitoring of customer accounts.   It is my professional opinion that Burstein engaged in dishonest and fraudulent acts to financially benefit Quiros and/or himself.   It is also my opinion that Burstein actively concealed material information from and misled Raymond James personnel, causing Raymond James to ultimately fund a $150 million settlement with the SEC-appointed Receiver for the limited partnerships.

**Steve Urcia**

---

[65] RJ-POL 128115-128123
[66] RJ-POL 000637-000641
[67] Deposition of Linda Busby, Pages 218:24-219:3

# Steve Urcia

Steve.Urcia@capitalforensics.com



Capital Forensics, Inc.

**PROFESSIONAL EXPERIENCE:**

**2008 to Present** – *Capital Forensics, Inc.*

I have consulted with Counsel for FINRA arbitrations and mediations and been retained to testify as an expert by both Claimants and Respondents in FINRA arbitrations on issues that include: churning, limited partnerships, private placements, Reg D offerings, Reg T and Portfolio margin issues, fiduciary duty, market manipulation, over- concentration, suitability, supervision, damages, and products, including but not limited to; options, equity linked debt, ARS, unit trusts, use of margin, margin sellout procedures for Reg T and Portfolio margin, and many other areas.

In addition to my work with FINRA arbitrations and mediations, I have consulted with brokerage firms for projects related to supervision, compliance and surveillance systems, including anti-money laundering investigations, the use of margin, margin sellout procedures, options margin and exposure, portfolio margin, options trading, trading fixed income securities and the establishment of a surveillance system for fee based accounts. CFI and I are regularly consulting broker dealers with their ongoing supervisory and compliance issues.

**2006 to 2008** – *Bear Stearns Compliance Technology Group*

I was responsible for coordinating our compliance technology initiatives to upgrade existing systems to assure compliance with the rapidly changing regulatory environment. These efforts included upgrading Fixed Income Dept. trading and surveillance systems to track issues such as wash trades, mark-ups, or parking and to assure compliance with new NASD trade reporting requirements. Building on regulatory compliance, I refined existing Private Client Services (PCS) reports (e.g. mutual fund switch, mutual fund share class, active accounts review, 5% mark-up, option trading surveillance) and implemented "customer identification" tracking to comply with PATRIOT Act requirements.

In tandem with Bear Stearns clearing operations, I was part of the team that implemented the Portfolio Margin pilot program. I improved regulatory reporting systems, e.g. Large Option Position Reporting, option aggregation, and position limit reporting. I also evaluated and customized software solutions (MANTAS, Actimize) of independent providers. MANTAS was the then premier AML software vendor and the brokerage industry began adopting MANTAS as their AML platform of choice. The problem with the adoption of MANTAS' software was the need for its clients to adopt their existing software platforms to the MANTAS architecture. My contribution to the integration process was my expertise with the Firm's existing surveillance software portfolio as well as knowledge of the requirements of compliance with the PATRIOT Act.

**1985 to 2006** – *Bear Stearns Retail Compliance Officer/Branch Compliance Manager*

As a Managing Director, I was recruited from Bear Stearns' Compliance Department to the Private Client Services (PCS) division to be the branch office compliance manager (BCM), for the Firm's N.Y. branch. As a branch manager my responsibilities included all activities of the firm's headquarters branch office.

# Steve Urcia
Steve.Urcia@capitalforensics.com



Some of my notable responsibilities included; overall sales practice supervision of the retail sales force, (which averaged 150 to 180 registered representatives during that period), branch manager training, and investigating and responding to customer complaints. Through my role as Branch Compliance Manager I was responsible for monitoring customer account activities such as 144 & 145 sales, compliance with firm policy regarding 10b5-1 sales guidelines, monitoring and supervision, promulgation of policies and procedures addressing regulatory changes, margin issues, (advisement of brokers, monitor firm risk, supervising margin sellouts), monitoring brokers' outside sales activities in accordance with firm policies, and enforcement of firm policies in connection with the underwriting of IPO's, review and approval of outgoing correspondence, monitoring of the branch error account, (including review and approval of transactions placed in the error account) and conducting annual compliance meetings.

In addition to the duties of a Branch Manager, I served as the Firm's Senior Registered Options Principal (SROP). My responsibilities as SROP included oversight of the Firm's options sales practices (i.e. monitoring and supervision of options trading activities, review and approval of option related sales materials, compliance policies and procedures relating to options), as well as the Firm's options clearing and regulatory reporting.

I was also a member of the Compliance Committee representing PCS. I participated in development of suitability and sales guidelines for new products (e.g. CMOs, CDOs, options related products, index warrants and foreign securities). I developed procedures for handling and supervision of "managed accounts" (WRAP accounts). I also collaborated on development of the firm's broker desktop order entry, mutual fund order entry, and bond desk order entry to assure these systems were compliant with current rules and firm policies regarding order entry such as mutual fund breakpoint checks, time stamping, account documentation/authorization for order size or product, etc.

During this timeframe I was the Compliance/BOM part of a team delegated to integrating our Latin American retail business within the Firm's existing Retail sales platform. My function was to promulgate policies and procedures to accommodate the handling of retail customer accounts whose owners were residents of various Latin American countries such as Venezuela, Columbia, Brazil and Argentina, to name a few.

Those procedures included consideration of AML concerns, such as the source of wealth, movement of funds, dealing with "foreign finders' compensation issues and the handling of foreign denominated securities delivered into such accounts.

I also collaborated with a dedicated team of programmers and operations personnel in creating an in-house AML program to deal with the AML issues that began to come to prominence in the early '90s. My knowledge of back office operations and procedures as well as the AML and other Compliance issues involved in this undertaking provided needed expertise to the software developers towards creating a surveillance system that fit within the existing software and operational environment.

# Steve Urcia

Steve.Urcia@capitalforensics.com



From a legal/compliance perspective, I interfaced with NYSE and NASD regulators on annual sales practice inspections in addition to assisting both in-house and outside counsel with preparation for arbitrations and testifying as a corporate representative to illustrate how Bear Stearns complied with and helped set industry standards.

***1982 to 1985 –*** *Supervisor of all PCS branch trading surveillance*

As an Associate Director and member of the Compliance Department, my responsibilities had expanded to include the development of compliance procedures for retail branch office managers covering all products sold, (e.g. stocks, mutual funds, high yield bonds, etc.), as well as surveillance and exception reports to facilitate supervision of retail sales practices. I was responsible for surveillance of trading desk operations, which included assuring order flow, trade reconciliation, and verification of marks on individual trades. I also was responsible for conducting annual Compliance audits of the Firm's various branch offices. In this role, I was able to gain significant experience in both RIA (Registered Investment Advisor) and independent broker platforms through various clearing firms and directly with Bear Stearns.

***1980 to 1982 –*** *Compliance Options Surveillance Supervisor*

I was recruited by Bear Stearns as a compliance officer with expertise in options trading activities to promulgate written supervisory procedures for the surveillance and supervision of retail options trading. My responsibilities included the development of suitability guidelines with regard to various option trading strategies employed in the accounts of retail customers, the design and implementation of surveillance reports used by both supervisory and compliance personnel to assure compliance with the rules and guidelines of the various SROs regarding options trading; the training of supervisory and compliance personnel and interfacing with the various SROs during audits of the Firm's options related sales activities.

***Prior to 1980***

· *1978 – 1980*

  o Recruited by the Blythe Eastman Dillon Compliance Dept. as their options expert. Served as a compliance officer where I developed option surveillance reports, performed routine surveillance functions, and conducted branch office audits.

# Steve Urcia

Steve.Urcia@capitalforensics.com



- *1968 – 1978*

  o Worked at various brokerage firms and learned how to calculate margin, buying power, Reg. T calls, etc. by hand as there were no computer programs available to the industry at that time; e.g. 1968, fall; At Walston & Co. I learned margin and option margin calculations as well as the interaction of all aspects of brokerage accounting that might affect an account, such as SMA calculation, stock segregation, dividends, approval of check and wire requests (for availability of cash) and buying power calculation. Next, I moved from Walston & Co, (they were merged into F.I. DuPont by Ross Perot) to CBWL Hayden Stone where I was the sole option margin analyst. I then moved to Loeb Rhodes, where I was the lead options margin analyst and as a result of my knowledge of back office operations also served on a task force assigned to assist in the conversion of the books and records of introducing broker/dealers that wished to become correspondent firms using Loeb's clearing functions. In 1975 I moved to LEWCO Securities, which was a clearing firm jointly owned by Lehman Brothers and Wertheim & Co., as an Options Margin supervisor where I handled the option/margin needs of several hedge funds which were employing sophisticated option strategies, such as spreads and straddles using OTC options on equities as well as fixed income securities like treasuries. During this period (1968-1978), due to the fact that the margin analyst was responsible for reconciling any and all operational issues with an account and the fact that virtually all operation functions were done manually, (requiring a paper entry for each item like crediting a dividend to an account), I gained extensive knowledge and experience with back office and brokerage clearing operations, including cashiering, stock record, stock loan, dividend and interest operations and DVP/RVP operations and new accounts documentation procedures.

- *1967*

  o Started on Wall Street with U.S. Trust Co. in October of '67 working in Operations as a troubleshooter. I received an introduction and training in brokerage back office functions such as stock record and account statement problems.

- *1965 – 1967*

  o U.S. Army, served in Vietnam.

# Steve Urcia

Steve.Urcia@capitalforensics.com



**_LICENSES:_**

| | |
|---|---|
| Registered Options Principal | Series 4 |
| NYSE Branch Manager | Series 12 |
| NYSE Compliance Officer | Series 14 |
| General Securities Principal | Series 24 |
| Municipal Securities Principal | Series 53 |
| Interest Rate Options | Series 5 |
| General Securities Representative | Series7 |
| Foreign Currency Options | Series 15 |
| Uniform Investment Adviser Law | Series 65 |
| Uniform Securities Agent State Law | Series 63 |

STEVE URCIA

STATEMENT OF COMPENSATION

Raymond James Financial Inc. has agreed to compensate me at the rate of $495 per hour for my services in this matter plus expenses.   To the extent  I requested other professionals to work on this case, their hourly rates range from $85 to $250 per hour.   Compensation in this matter is not contingent upon the outcome of this case.

# Steve Urcia Testimony (Past 4 Years)

| Case Name | Forum | Case Number |
|---|---|---|
| White, James E. & Janet v. OptionsHouse, et al | FINRA | 16-01661 |
| Allen, Myron v. Merrill Lynch | FINRA | 14-02368 |
| Seibert v. Cetera | FINRA | 16-01326 |
| Diamond v. Morgan Stanley | FINRA | 17-01072 |
| Mack v. US Bank | FINRA | 17-02269 |
| Nebo v. Jefferies | FINRA | 17-01986 |
| Jones v. Cantella | FINRA | 18-00166 |

Expert Report of Steve Urcia

Below is a listing of materials[1] provided to me to review to formulate my opinions:

1. Documents previously produced in this case bates labeled as follows:

   RJ-POL 0000001-15578
   RJ_Ins Lit_ 0000001-0438128

2. Raymond James' Proof of Loss.
3. Amended Complaint and Exhibits.
4. Federal Insurance Company Letter dated April 20, 2020.
5. Travelers Letter dated April 22, 2020.
6. Beazley Letter dated June 1, 2020.
7. Federal's Responses and Objections to Interrogatories dated and documents cited therein.
8. Deposition of Mark Barracca dated February 3, 2021 and March 17, 2021, and exhibits thereto.
9. Deposition of Linda Busby dated February 17, 2021, and exhibits thereto.
10. Deposition of Joszi Popper dated March 23, 2021, and exhibits thereto.

New Documents Not Previously Produced In This Case:

11. Raymond James' Incoming Correspondence Policies for 2007, 2011, and 2012.
12. Raymond James' Letters of Authorization Policies for 2007, 2008, 2010, 2011 and 2012
13. Raymond James' Improper Use of Assets Policies for 2007, 2009, and 2010.
14. Raymond James' New Account Documentation Policies for 2008, 2009, 2010, 2011, and 2012.
15. Raymond James' Branch Management Supervision Policies for 2007, 2009, 2011, and 2012.
16. Raymond James' Client Complaint Policy for 2007.
17. Deposition of William Stenger dated May 21, 2014.
18. Final Judgment dated September 14, 2018 against Joel Burstein, Civil Action No. 1:18-cv-23636-FAM, United States District Court, Southern District of Florida.
19. Order Instituting Administrative Proceedings In the Matter of Joel N. Burstein, Administrative Proceedings File No. 3-18804.
20. Indictment dated May 21, 2019 as to Ariel Quiros, Civil Action No. 5:19-cr-00076-gwc, United States District Court, District of Vermont.
21. Transcript of Hearing August 14, 2020, Civil Action No. 5:19-cr-00076-gwc, United States District Court, District of Vermont.
22. Special NASD Notice to Members 02-21

---

[1] As discovery has not yet closed, I reserve the right to amend my report based on any additional documents produced, any additional deposition testimony and exhibits provided, and any third party productions.