# EXHIBIT 4

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.  1:20-cv-21707-UU**

RAYMOND JAMES FINANCIAL, INC.,

      Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; and
ST. PAUL MERCURY INSURANCE COMPANY.

      Defendants.

_____/

**PLAINTIFF'S DISCLOSURE OF EXPERT WITNESS AND**
**NOTICE OF SERVICE OF EXPERT REPORT OF JORGE BAEZ**

      Plaintiff, Raymond James, Inc., by and through its undersigned counsel and pursuant to

Rule 26(a)(2) of the Federal Rules of Civil Procedure and this Court's Order dated January 14,

2021 [D.E. 68], hereby discloses to Defendants the following witness who may be used to present

expert testimony and evidence under Rules 702, 703 and/0r 705 of the Federal Rules of Evidence:

      Jorge Baez
      NERA Economic Consulting
      1166 Avenue of the Americas
      New York, New York  10036
      Telephone:  (212) 345-3000

A written report, prepared and signed by Mr. Baez in accordance with Fed. R. Civ. P. 26 (a)(2)

(B) is attached.

**Exhibit**
**Baez 0001**

6/29/2021
Jorge Baez

Dated:  April 20, 2021.     Respectfully submitted,


         */s/ Jason S. Mazer*
         Jason S. Mazer, Esq.
         Florida Bar No. 0149871
         Joshua R. Alhalel, Esq.
         Florida Bar No.  0016320
         **CIMO MAZER MARK PLLC**
         100 Southeast Second Street, Suite 3650
         Miami, Florida  33131
         Telephone: (305) 374-6481
         Fax: (305)  374-6488
         jmazer@cmmlawgroup.com
         jalhalel@cmmlawgroup.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 20, 2021, a copy of the foregoing Disclosure and Expert

Report was provided to all counsel of record on the attached Service List via electronic mail.


*/s/ Jason S. Mazer*

## SERVICE LIST

| | |
|---|---|
| Kristina L. Marsh, Esq.<br>Florida Bar No. 0311080<br>**GORDON REES SCULLY MANSUKHANI**<br>601 S. Harbor Island Blvd., Suite 109<br>Tampa, FL  33602<br>Telephone (Main):  813-444-9700<br>Telephone (Direct)  813-523-4937<br>Facsimile:  813-377-3505<br>kmarsh@grsm.com<br>and<br>Scott L. Schmookler, Esq.<br>Sarah Riedl Clark, Esq.<br>**GORDON REES SCULLY MANSUKHANI**<br>One North Franklin, Suite 800<br>Chicago, IL  60606<br>Telephone: 312-980-6779<br>sschmookler@grsm.com<br>srclark@grsm.com<br><br>*Counsel for Federal Insurance Company* | James M. Kaplan, Esq.<br>Florida Bar No. 921040<br>**KAPLAN ZEENA LLP**<br>2 South Biscayne Boulevard, Suite 3050<br>Miami, Florida  33131<br>Telephone: (305)  530-0800<br>Facsimile: (305)  530-0801<br>James.kaplan@kaplanzeena.com<br>Elizabeth.salom@kaplanzeena.com<br>service@kaplanzeena.com<br>and<br>Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>C. Adam Brinkley<br>**Clark Hill Strasburger**<br>901 Main Street, Suite 6000<br>Dallas, Texas  75202-3794<br>Telelphone:  (214)  651-4718<br>Facsimile:  (214) 659-4121<br>mkeeley@clarkhill.com<br>jriddle@clarkhill.com<br>abrinkley@clarkhill.com<br><br>*Counsel for Beazley Insurance Company, Inc.* |
| E.A. "Seth" Mills, Jr., Esq.<br>Florida Bar No. 339652<br>Ryan J. Weeks, Esq.<br>Florida Bar No.  5 7 8 9 7<br>**MILLS PASKERT DIVERS**<br>100 N. Tampa Street, Suite 3700<br>Telephone: (813) 229-3500<br>Facsimile: (813) 229-3502<br>smills@mpdlegal.com<br>rweeks@mpdlegal.com<br>csoltis@mpdlegal.com<br><br>*Counsel for Travelers Casualty and Surety Company of America and St. Paul Mercury Insurance Company* | Dustin C. Blumenthal<br>Florida Bar No. 0149871<br>**Goldberg Segalla**<br>222 Lakeview Avenue, Suite 800<br>West Palm Beach, FL  33401<br>Telephone: (561)  618-4485<br>Facsimile:  (561)  618-4549<br>dblumenthal@goldbergsegalla.com<br>lparker@goldbergsegalla.com<br>and<br>Stephen N. Dratch, Esq.<br>**Franzblau Dratch, P.C.**<br>354 Eisenhower Parkway<br>Livingston, New Jersey  07039<br>Telephone:  (973) 992-3700<br><br>*Counsel for Great American Insurance Company* |

CONFIDENTIAL

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

RAYMOND JAMES FINANCIAL, INC.,

                Plaintiff,

vs.

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; and
ST. PAUL MERCURY INSURANCE COMPANY,

                Defendants.

CASE NO. 1:20-cv-21707-UU

# EXPERT REPORT

# OF

# JORGE BAEZ

# April 16, 2021

**CONFIDENTIAL**

## TABLE OF CONTENTS

I.     Scope of Assignment and Summary of Findings .................................................. 1

II.    Qualifications and Remuneration ........................................................................ 1

     A.   Qualifications ................................................................................................ 1

     B.   Remuneration ............................................................................................... 2

III.   Materials Considered ........................................................................................... 2

IV.   Background ........................................................................................................... 3

V.     EB-5 Funds diverted for the financial benefit of Mr. Quiros and for purposes
unrelated to any of the Jay Peak Limited Partnerships ...................................... 5

     A.   Acquisition of Jay Peak ................................................................................ 7

     B.   Acquisition of Q Burke Mountain Resort .................................................. 10

     C.   Acquisition of the Setai Condominium ...................................................... 12

     D.   Bogner Land Sale and Acquisition of Trump Place Condominium ........... 15

     E.   Payments for Personal Tax Liability ........................................................... 18

     F.   Payments for Corporate Tax Liability ........................................................ 20

     G.   Payments to AnC Bio Pharm ...................................................................... 24

     H.   Payments to North East Contract Services ................................................ 26

VI.   EB-5 Funds commingled and misused within the Jay Peak Limited Partnerships ........... 28

     A.   Use of JCM account at Raymond James .................................................... 28

     B.   Use of margin loan accounts at Raymond James ....................................... 30

     C.   Direct transfer of funds between limited partnerships ............................... 34

VII.   Focus on misuse of funds in uncompleted phases – Phase VI and Phase VII ........ 34

     A.   Use of the Phase VI investor funds ............................................................ 35

     B.   Use of the Phase VII investor funds ........................................................... 36

CONFIDENTIAL

## I.     SCOPE OF ASSIGNMENT AND SUMMARY OF FINDINGS

1.     We have been asked by counsel for Raymond James & Associates, Inc. ("Raymond James") to analyze the extent to which funds raised through the EB-5 Immigrant Investor Program for the Jay Peak limited partnerships were used in a dishonest or fraudulent manner. We were asked to analyze whether investor funds held at Raymond James were: 1) diverted to benefit Mr. Burstein, Mr. Quiros or entities related to Mr. Quiros for purposes unrelated to *any* of the limited partnerships and 2) diverted away from the intended limited partnerships to other limited partnerships (*i.e.*, moved from one limited partnership to another or commingled).

2.     We found eight different types of transactions, totaling $64.2 million, that diverted investor funds for purposes unrelated to *any* of the Jay Peak limited partnerships and that financially benefited Mr. Quiros or his related entities. In addition, more than $175 million of investor funds were frequently commingled and misused *within* the Jay Peak limited partnerships for the financial benefit of Mr. Quiros. The commingling and misuse of the funds occurred through the use of margin loans, non-segregated, pooled accounts, and by transferring investor funds directly between different limited partnership accounts.

## II.     QUALIFICATIONS AND REMUNERATION

### A.     Qualifications

3.     I am a Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

1

4.      I received a Bachelor's degree in Physics and Economics from Vassar College, and a Master's degree in Business Administration with a concentration in Finance and Statistics from Yale University. In my over 15 years at NERA, I have been frequently engaged as an economic consultant or expert witness in numerous projects involving finance and economics. I have testified as an expert at trials and hearings in Federal District Court, Spanish Court and Swiss Court, and have presented before government regulators in the United States and Mexico. My resume with recent publications and testifying experience is included as Appendix A.

### B.   Remuneration

5.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $750 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## III.   MATERIALS CONSIDERED

6.      In preparing this report, we considered the following categories of materials (a complete list of materials considered is included as Appendix B):

a) Case documents in *Raymond James Financial, Inc., v. Federal Insurance Company et al.* (the "Insurance Case"), *SEC v. Quiros et al.* (the "SEC Case"), *Goldberg v. Raymond James & Associates, Inc., et al.* (the "Receiver Case"), *Daccache v. Raymond James & Associates, Inc., et al.* (the "Class Action Case"), *USA v. Quiros et al.* (the "Federal Prosecutors' Case"), and *SEC v. Burstein* (the "SEC Burstein Case");

b) Declarations, exhibits and testimonies of other experts in the SEC Case;

c) Raymond James account statements and wire transaction information for Jay Peak and related entities;

d) People's Bank account statements and wire transaction information for Jay Peak and related entities;

e) HSBC account statements and wire transaction information for Jay Peak and related entities;

**CONFIDENTIAL**

f)   Internally-prepared financial statements and general ledgers for Jay Peak and related entities;

g)   Receiver-prepared financial statements for Jay Peak and related entities;

h)   Tax returns for Jay Peak and related entities; and

i)   Offering materials for the Jay Peak limited partnerships.

## IV.   BACKGROUND

7.       Jay Peak, Inc. ("Jay Peak") is a Vermont corporation that operates the Jay Peak Resort. Jay Peak, in conjunction with others, served as the manager and developer of the limited partnerships for which Ariel Quiros and his associates raised investor funds. Jay Peak is owned by Q Resorts, Inc., a company wholly owned by Mr. Quiros.[1]

8.       Mr. Quiros and his associates, through Jay Peak, attracted foreign investors using the EB-5 Immigrant Investor Program.[2] These investors hoped to earn permanent residence in the United States through investing in projects that create a certain number of jobs.[3] These projects were structured as limited partnerships, whereby each limited partnership would use its investors' funds for specific purposes (the "Jay Peak Limited Partnerships").[4] There were seven limited partnerships that raised $366.5 million (the "EB-5 Funds").[5] The table below shows a description and the amount of EB-5 funds raised for each limited partnership:

---

[1]   *See*, Amended Class Action Complaint, ¶¶24-25; SEC Amended Complaint for Injunctive and Other Relief, May 17, 2016 ("SEC Complaint"), ¶12; and Receiver's First Interim Report, August 12, 2016, p.5.

[2]   *See*, Receiver's First Interim Report, pp.4-5.

[3]   Foreign applicants must invest $500,000 (or $1,000,000, depending on the structure) in a commercial enterprise approved by the U.S. Citizenship and Immigration Service. The foreign applicant may then apply for a conditional green card valid for two years. If the investment creates or preserves at least ten jobs in those two years, the foreign applicant may apply to live and work in the U.S. permanently. *See*, Receiver's First Interim Report, pp.4-5.

[4]   *See*, Receiver's Complaint for Relief, May 20, 2016 ("Receiver's Complaint"), ¶2 and Receiver's First Interim Report, pp.4-5.

[5]   Additionally, there was an eighth limited partnership, Q Burke Mountain Resort, Hotel and Conference Center L.P., which raised $60.5 million to build a hotel, tennis complex and aquatic center, and enhance mountain biking facilities in Burke, Vermont. *See*, Receiver's First Interim Report, pp.31-32. Investor money from Phase VII was used for Mr. Quiros' purchase of the Q Burke Mountain Resort. *See*, section V-B.

CONFIDENTIAL

| Jay Peak Limited Partnerships | | |
|---|---|---|
| **Limited Partnership** | **Description** | **EB-5 Funds Raised** |
| 1. Jay Peak Hotel Suites L.P. ("Phase I") | - 57 suite hotel | $17.5 M |
| 2. Jay Peak Hotel Suites Phase II L.P. ("Phase II") | - 120 suite hotel<br>- Indoor waterpark<br>- Ice rink<br>- Golf club house<br>- Conference center<br>- Multiple restaurants<br>- Arcade | $75.0 M |
| 3. Jay Peak Penthouse Suites L.P. ("Phase III") | - 56 suite hotel<br>- Mountain Learning Center | $32.5 M |
| 4. Jay Peak Golf and Mountain Suites L.P. ("Phase IV") | - 100 suite hotel<br>- Golf cottages<br>- Wedding chapel<br>- Mountain Top Restaurant<br>- Provisions General Store | $45.0 M |
| 5. Jay Peak Lodge and Townhouses L.P. ("Phase V") | - 110 suite hotel<br>- Stateside Day Lodge<br>- Amphitheater<br>- Parking garage | $45.0 M |
| 6. Jay Peak Hotel Suites Stateside L.P. ("Phase VI") | - 84 suite hotel<br>- 84 vacation rental cottages<br>- Guest recreation center<br>- Medical center | $67.0 M |
| 7. Jay Peak Biomedical Research Park L.P. ("Phase VII") | -Biomedical research facility | $84.5 M |
| | **Total** | **$366.5 M** |

**Source:**
Data from Receiver's First Interim Report, filed August 12, 2016.

9.      Mr. Quiros owned and operated several related entities that were involved in the flow of the investor funds.

CONFIDENTIAL

| **Other Jay Peak-Related Entities** | |
|---|---|
| **Entity** | **Description** |
| 1. GSI of Dade County ("GSI") | "Florida corporation with its offices in Miami at the same address as Q Resorts, Quiros is the owner and sole officer and director of GSI." |
| 2. Jay Construction Management ("JCM") | "Vermont corporation with its offices in Miami, Florida, at the same address as Q Resorts. […] Quiros is the sole officer and director of JCM." |
| 3. North East Contract Services ("NECS") | "Florida limited liability company formed in February 2013 and headquartered in Weston, Florida. Northeast acts as project manager for Biomedical Phase VII. William Kelly, who is Jay Peak's COO and a longtime business associate of Quiros, is the managing principal[.]" |
| 4. Q Burke Mountain Resort, LLC | "Florida limited liability company formed in April 2012 and headquartered in Miami at the same address as Q Resorts. Quiros is the managing principal of Q Burke. Q Burke is also the owner of the Burke Mountain Resort located in East Burke, Vermont, which is the site of another EB-5 offering that Quiros promoted called Q Burke Mountain Resort." |
| 5. Q Resorts, Inc. ("Q Resorts") | "Delaware corporation with its offices in Miami, Florida. Q Resorts is the 100 percent owner of Jay Peak, and Quiros is the sole owner, officer and director of Q Resorts." |

**Source:**
Descriptions from Receiver's First Interim Report, filed August 12, 2016.

## V.    EB-5 FUNDS DIVERTED FOR THE FINANCIAL BENEFIT OF MR. QUIROS AND FOR PURPOSES UNRELATED TO ANY OF THE JAY PEAK LIMITED PARTNERSHIPS

10.     We identified EB-5 Funds diverted for the benefit of Mr. Quiros and for purposes unrelated to any of the Jay Peak Limited Partnerships by reviewing: 1) account statements and wire transaction information for Jay Peak, the limited partnerships and other related entities from Raymond James, People's Bank, and HSBC, and 2) case documents in related lawsuits, including declarations, exhibits and testimonies prepared by experts.

**CONFIDENTIAL**

11.     We traced the flow of the funds from the initial investor deposit through when the funds were diverted for the financial benefit of Mr. Quiros and for purposes unrelated to any of the limited partnerships.[6] The flow of funds typically had the following structure:

    a.   Investors deposited funds into a People's Bank *escrow* account for the intended limited partnership;[7]

    b.   The funds were then transferred to a Raymond James *operating* account for the intended limited partnership;[8]

    c.   The funds were then transferred to a People's Bank *operating* account for the intended limited partnership;

    d.   The funds were then transferred to a JCM "commingled account" at Raymond James;

    e.   The funds were then transferred to various accounts until they were diverted for the financial benefit of Mr. Quiros or entities related to Mr. Quiros and for purposes unrelated to *any* limited partnerships.

12.     We found eight different types of transactions, totaling $64.2 million, that diverted investor funds for the financial benefit of Mr. Quiros and for purposes unrelated to *any* of the Jay Peak Limited Partnerships. The table below summarizes these eight diversions:

---

[6]   We did not have access to documentation for the relevant accounts in Citibank, JPMorgan Chase and Merrill Lynch, so we relied on the analyses performed by other experts in lawsuits related to this matter to trace the flow of funds through these accounts.

[7]   *See*, Receiver's Complaint, ¶¶50-52 and Amended Class Action Complaint, ¶¶99-103.

[8]   *See*, SEC Complaint, ¶54 and Amended Class Action Complaint, ¶¶2, 104-105.

6

CONFIDENTIAL

---

### EB-5 funds diverted for the benefit of Mr. Quiros
### for purposes unrelated to any of the limited partnerships

| Transaction Type | Source of Funds | Diverted Amount |
|---|---|---|
| 1) Acquisition of Jay Peak | Phases I/II | $21.9 M |
| 2) Acquisition of Q Burke Mountain Resort | Phase VII | $7.0 M |
| 3) Acquisition of Setai Condominium | Phases IV/V | $3.8 M |
| 4) Bogner Land Sale and Acquisition of Trump Place Condominium | Phase VII | $6.0 M |
| 5) Payments for Personal Tax Liability | Phase VII | $6.0 M |
| 6) Payments for Corporate Tax Liability | Phases V/VI/VII | $5.5 M |
| 7) Payments to AnC Bio Pharm | Phase VII | $6.2 M |
| 8) Payments to North East Contract Services | Phase VII | $7.8 M |
| **Total** | | **$64.2 M** |

---

## A.    Acquisition of Jay Peak

13.     Documents indicate $21.9 million of investor funds ($12.4 million from Phase I and $9.5 million from Phase II) were improperly used by Mr. Quiros' company, Q Resorts, to purchase Jay Peak from the Canadian firm Saint-Sauveur Valley Resorts, Inc. (formerly Mont Saint-Sauveur International, Inc. and herein "MSSI") in June 2008.[9] The following transactions outline the flow of Phase I and Phase II investor funds to the acquisition of Jay Peak (these transactions are illustrated in the chart below):

---

[9]    *See,* Declaration of Michelle Lama, March 3, 2016 ("Lama Declaration"); SEC Complaint, ¶¶57 -77; and Receiver's Complaint, ¶¶58-75.

On June 13, 2008, Mr. Quiros signed an agreement with MSSI to transfer ownership of the real estate and other assets of Jay Peak to Mr. Quiros' company Q Resorts for $25.7 million. The agreement was closed on June 23, 2008. *See,* Lama Declaration, Exhibits A-1 and A-2 and SEC Complaint, ¶58.

CONFIDENTIAL

   a.   MSSI began raising funds for Phase I and Phase II through the EB-5 program before Mr. Quiros' acquisition of Jay Peak.[10]

   b.   On June 23, 2008, as part of the acquisition of Jay Peak, MSSI transferred $11.0 million of Phase I investor funds to the Phase I Raymond James account (RJ #█████6365) and $7.0 million of Phase II investor funds to the Phase II Raymond James account (RJ #█████6370).[11]

   c.   From June 2008 through September 2008, $1.5 million was transferred from the People's Bank Phase I escrow account (PUB #█████9-43-0) to the Phase I Raymond James account (RJ #█████6365) and $5.5 million was transferred from the People's Bank Phase II escrow account (PUB #█████9-48-9) to the Phase II Raymond James account (RJ #█████6370).[12]

   d.   From June 2008 through September 2008, $14.2 million from the Phase I Raymond James account (RJ #█████6365) and $6.8 million from the Phase II Raymond James account (RJ #█████6370) were transferred to the Q Resorts Raymond James account (RJ #█████4772).[13] During the same time period, the Phase I and Phase II Raymond James accounts incurred margins loans to purchase Treasury bills of $11 million and $7 million respectively, matching the amount of investor funds received from MSSI on June 23, 2008 to "give the appearance" that the partnership funds remained in the accounts.[14]

   e.   From June 2008 through September 2008, $1.6 million was transferred from the People's Bank Phase I escrow account (PUB #█████9-43-0) and the People's

---

10   *See*, Lama Declaration, ¶8.

11   *See,* SEC Complaint, ¶68. The transactions came from MSSI's Phase I Raymond James account (RJ #█████0698) and MSSI's Phase II Raymond James account (RJ #█████6389).  In conjunction with those transfers, MSSI wrote a letter to Joel Burstein at Raymond James and Mr. Quiros stating that the transferred investor funds may not be used to purchase Jay Peak. *See*, Receiver's Complaint, ¶¶64-66 and Lama Declaration, ¶¶8, 18 and Exhibit D-4.

12   Phase I People's Bank escrow account (PUB #█████9-43-0) and Phase II People's Bank escrow account (PUB #█████9-48-9) were used by MSSI to deposit investor funds. *See*, Lama Declaration, ¶8.

13   A net amount of $4.3 million was also transferred from the Phase II Raymond James account (RJ #█████6370) to the Phase I Raymond James account (RJ #█████6365) between June 2008 and September 2008. For more details, *see* section VI-C and Dee Declaration, Exhibit F ("Summary of Phase II account at RJ").

14   *See*, Receiver's Complaint, ¶¶83-86. The margin loans were first created on June 25, 2008. *See* Section VI-B for more details.

CONFIDENTIAL

Bank Phase II escrow account (PUB #████9-48-9) directly to the Q Resorts Raymond James account (RJ #████4772).

f.   From June 2008 through September 2008, $21.9 million of Phase I and Phase II investor funds from the Q Resorts Raymond James account (RJ #████4772) was transferred to Spiegel Sohmer, Inc. and Burgess Law Firm for the acquisition of Jay Peak by Mr. Quiros' company, Q Resorts.[15, 16, 17]

---

[15]   *See*, Lama Declaration, ¶¶10 -79 and Exhibits A-1 and K. Spiegel Sohmer represented MSSI and Burgess Law Firm represented Q Resorts in the Jay Peak acquisition. *See,* Lama Declaration, ¶9. The funds were transferred to Spiegel Sohmer's TD Canada Trust account (TD #███0171) and Burgess Law Firm's Community Bank of Broward account (CBB #████1203). The transfers to the Spiegel Sohmer were as follows: $13.5 million on June 23, 2008, $1.5 million on July 1, 2008, $1.0 million on August 29, 2008, $0.5 million on September 5, 2008 and $2.5 million on September 26, 2008. The transfers to the Burgess Law Firm were as follows: $2.0 million on June 25, 2008, $0.6 million on June 26, 2008 and $0.2 million on September 3, 2008. *See*, Lama Declaration, ¶¶10-11.

[16]   The vast majority of the funds in the Q Resorts Raymond James account (RJ #████4772) were from investor funds. Specifically, a net total of $84.5 million was directly transferred from Raymond James Phase I – VI accounts, a net total of $112.0 million was transferred from Raymond James Margin Loan III and IV accounts (accounts that were collateralized and paid off using investor funds  – *see* Section VI-B for more details), a net total of $57.5 million was transferred from Raymond James JCM account (funds that essentially all came from investor funds – *see* Section VI-A for more details), and a net total of $3.9 million was transferred directly from People's Bank Phase V and VI operating accounts.

[17]   Documents indicate that Joel Burstein, a branch manager at Raymond James and Mr. Quiros' son-in-law, assisted Mr. Quiros with the transactions for the acquisition of Jay Peak. *See*, Complaint for Injunctive and Other Relief, September 6, 2018 ("SEC Burstein Complaint"), ¶¶21-28 and ¶¶31-39.

CONFIDENTIAL



**B.   Acquisition of Q Burke Mountain Resort**

14.     Documents indicate that investors funds were improperly used by Mr. Quiros to purchase the Q Burke Mountain Resort, LLC ("Q Burke Mountain Resort") in 2012.[18] Q Burke Mountain Resort was the site of another EB-5 offering that Mr. Quiros was promoting.[19]

15.     The following transactions outline the flow of Phase VII investor funds to the Q Burke Mountain Resort acquisition (these transactions are illustrated in the chart below):

a.   On February 28, 2012, funds from the Phase V Raymond James account (RJ #■■1581) and the Phase VI Raymond James account (RJ #■■3066) were

---

[18]   *See*, SEC Complaint, ¶¶31, 130, 133, 138; Declaration of Mark Dee, dated April 25, 2016 ("Dee Declaration"), ¶48; and Amended Class Action Complaint, ¶¶3, 356.

[19]   *See*, SEC Complaint, ¶138.

CONFIDENTIAL

used as collateral to create Raymond James Margin Loan IV account (RJ #████2589). In August 2013, funds from the Phase VII Raymond James account (RJ #████8224) were added as additional collateral to the Raymond James Margin Loan IV account.[20]

b. On May 16, 2012, $7.0 million from the Raymond James Margin Loan IV account (RJ #████2589) was used by Mr. Quiros to purchase the Q Burke Mountain Resort.[21]

c. From December 2012 through March 2014, $58.0 million of Phase VII investor funds were transferred from the Phase VII People's Bank escrow account (PUB #████9-90-1) to the Phase VII Raymond James account (RJ #████8224).

d. On March 4, 2014, $18.7 million of Phase VII investor funds was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #████6739).

e. On March 4, 2014, $18.2 million of Phase VII investor funds was transferred from the Phase VII People's Bank operating account (PUB #████6739) to the JCM Raymond James account (RJ #████1174).

f. On March 5, 2014, $19.0 million from the JCM Raymond James account (RJ #████1174), of which at least $18.2 million was Phase VII investor funds, was

---

[20]   *See*, SEC Complaint, ¶93 and Dee Declaration, Exhibits RR ("Credit Agreement dated February 28, 2012") and SS ("Credit Agreement dated August 5, 2013").

[21]   The funds were transferred to the law firm Husch Blackwell's COLTAF (Colorado Lawyer Trust Account Foundation) trust Wells Fargo account (WF #████7377) for the purchase of Q Burke Mountain Resort. *See,* Amended Class Action Complaint, ¶356.

CONFIDENTIAL

used to pay off the Raymond James Margin Loan IV account (RJ # ███2589) used to purchase Q Burke Mountain Resort.[22, 23]



C.    Acquisition of the Setai Condominium

16.    Documents show that $3.8 million of Phase IV and Phase V investor funds were improperly used by Mr. Quiros to purchase a condominium at the Setai Fifth Avenue Hotel and

---

[22]  *See*, Dee Declaration, Exhibit W ("Summary of Margin Loan IV at RJ and pay off of Margin Loan IV"). The $19.0 million payment ultimately paid off the total balance of the margin loan, which included $7.0 million for the Q Burke Mountain Resort acquisition, $5.8 million transfer to the Phase VI Raymond James account (RJ # ███3066), $8.0 million transfer to the Q Resorts Raymond James account (RJ # ███4772) and margin loan interest payments. Prior to the $19.0 million payment, only $2.5 million of the balance in the margin loan had been paid off, also through the JCM Raymond James account (RJ # ███1174).

When the Raymond James JCM account (RJ # ███1174) made the $19.0 million transfer, the only cash balance in the account was the $18.2 million Phase VII investor funds that had been transferred the day before.

[23]  Documents indicate that Mr. Burstein assisted Mr. Quiros with the transactions for the acquisition of the Q Burke Mountain Resort. *See*, SEC Burstein Complaint, ¶¶40-46.

**CONFIDENTIAL**

Residences in New York City ("Setai condominium").[24] The following transactions outline the flow of Phase IV and Phase V investor funds to the purchase of the Setai condominium (these transactions are illustrated in the chart below):

    a.   On February 6, 2009, funds from the Phase I Raymond James account (RJ #███6365), the Phase II Raymond James account (RJ #███6370), and a Jay Peak account (RJ #███4710) were used as collateral to create the Margin Loan III account (RJ #███0726). Phase III, IV and V Raymond James accounts (RJ #███9503, RJ #███9776, and RJ #███1581) were subsequently added as collateral between 2010 and 2011.[25]

    b.   On November 15, 2011, $5.6 million and $7.5 million were transferred from the Raymond James Margin Loan III account (RJ #███0726) to the Phase V People's Bank operating account (PUB #███0195) and the Phase IV People's Bank operating account (PUB #███0215), respectively.

    c.   On November 16, 2011, $5.6 million was transferred from the Phase V People's Bank operating account (PUB #███0195) and $7.1 million was transferred from the Phase IV People's Bank operating account (PUB #███0215) to the JCM Raymond James account (RJ #███1174).

    d.   On November 18, 2011, $11.5 million was transferred from the JCM Raymond James account (RJ #███1174) to the Q Resorts Raymond James account (RJ #███4772).[26] In addition, on November 16, 2011, $0.4 million from the Phase IV People's Bank operating account (PUB #███0215) was transferred to the Q Resorts Raymond James account (RJ #███4772).

---

[24]  *See*, SEC Complaint, ¶105 and SEC Preliminary Injunction, November 21, 2016 ("SEC Injunction"), p.18. According to the SEC, only Phase IV funds were used for the acquisition; however, as described below, funds from both Phase IV and Phase V were potentially used to make the acquisition.

[25]  *See*, Dee Declaration, ¶17, and Exhibit QQ ("Credit Agreement dated February 6, 2009"), UU ("Credit Agreement dated October 1, 2010"), VV ("Credit Agreement dated February 10, 2011") and WW ("Credit Agreement dated August 25, 2011").

[26]  This was the most recent deposit into the Q Resorts Raymond James account (RJ #███4772) prior to the purchase of the Setai condominium.

13

**CONFIDENTIAL**

e.  From December 2010 through November 2011, $44.5 million of Phase IV investor funds were transferred from the Phase IV People's Bank escrow account (PUB # ███ 9-61-2) to the Phase IV Raymond James account (RJ # ███ 9776).

f.  From June 2011 through November 2011, $39.5 million of Phase V investor funds were transferred from the Phase V People's Bank escrow account (PUB # ███ 9-68-7) to the Phase V Raymond James account (RJ # ███ 1581).

g.  On November 29, 2011, $5.6 million of Phase V investor funds from the Phase V Raymond James account (RJ # ███ 1581) and $7.5 million of Phase IV investor funds from the Phase IV Raymond James account (RJ # ███ 9776) were used to pay off Raymond James Margin Loan III account (RJ # ███ 0726).

h.  On December 2, 2011, $3.8 million was transferred from the Q Resorts account (RJ # ███ 4772) to the GSI Raymond James account (RJ # ███ 1932).

i.  On December 2, 2011, $3.8 million was transferred from the GSI Raymond James account (RJ # ███ 1932) to Mr. and Mrs. Quiros' Raymond James account (RJ # ███ 7460).

j.  On December 2, 2011, $3.8 million from Mr. and Mrs. Quiros' Raymond James account (RJ # ███ 7460) was transferred to the account at JPMorgan Chase of Louis Ruggiero, Mr. Quiros' real estate lawyer (JPMC # ███ 5765), for the purchase of the Setai condominium.

14

CONFIDENTIAL



## D.    Bogner Land Sale and Acquisition of Trump Place Condominium

17.    Documents indicate $6 million of Phase VII investor funds were improperly used by Mr. Quiros to purchase seven acres of land for Phase VII from GSI, an entity owned by Mr. Quiros,[27] in December 2012. According to case documents, the seven acres of land had been appraised at $620,000 as of December 2012 and the ownership of the land was never transferred to Phase VII.[28] $2.2 million of the proceeds from the land sale were improperly used to purchase

---

[27]    *See*, SEC Complaint, ¶29; Dee Declaration, Exhibits BB ("Summary of Phase VII accounts held at People's Bank, RJ, and Citi") and CC ("Summary of Phase VII accounts at People's Bank for land purchase"); and Declaration of Michael Pieciak, April 1, 2016 ("Pieciak Declaration"), ¶25.

[28]    *See*, SEC Complaint, ¶130; Dee Declaration, ¶53 and Exhibit CC ("Summary of Phase VII accounts at People's Bank for land purchase"); Plaintiff's Exhibit 133 in the SEC Case, dated May 25, 2016; and Pieciak Declaration, ¶¶43-44.

The land was originally purchased by Mr. Quiros, through GSI, as part of a "25-acre tract" for $3.15 million in July 2011. *See*, SEC Complaint, ¶130.

CONFIDENTIAL

a luxury condominium at Trump Place in New York City ("Trump Place condominium").[29] The following transactions outline the flow of Phase VII investor funds to the land sale and the acquisition of the Trump Place condominium (these transactions are illustrated in the chart below):

a. From December 2012 through April 2013, $21.5 million of Phase VII investor funds were transferred from the Phase VII People's Bank escrow account (PUB #██████9-90-1) to the Phase VII Raymond James account (RJ #████8224).

b. On December 28, 2012, $3.0 million was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #██████46739).

c. On December 31, 2012, $3.0 million was transferred from the Phase VII People's Bank operating account (PUB #██████6739) to the GSI Raymond James account (RJ #████1932). This was the first of two $3.0 million payments for the land sale.[30]

d. On April 9, 2013, $3.0 million was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #██████6739).

e. On April 12, 2013, $3.0 million was transferred from the Phase VII People's Bank operating account (PUB #██████6739) to the GSI Raymond James account (RJ #████1932). This was the second of two $3.0 million payments for the land sale.[31]

---

[29] *See*, SEC Complaint, ¶¶130, 137; Receiver's Complaint, ¶92; Amended Class Action Complaint, ¶87; and Dee Declaration, ¶49 and Exhibits X ("Summary of Phase VII accounts at People's Bank used to purchase Trump Tower condo") and CC ("Summary of Phase VII accounts at People's Bank for land purchase").

[30] *See,* Dee Declaration, ¶53 and Exhibit CC ("Summary of Phase VII accounts at People's Bank for land purchase") and Pieciak Declaration, ¶¶43-44.

[31] *See,* Dee Declaration, ¶53 and Exhibit CC ("Summary of Phase VII accounts at People's Bank for land purchase") and Pieciak Declaration, ¶¶43-44.

CONFIDENTIAL

f.  On May 30, 2013, $2.2 million was transferred from GSI Raymond James account (RJ # ███1932) to Mr. and Mrs. Quiros' Raymond James account (RJ # ███7460).[32]

g.  On May 30, 2013, $2.2 million from Mr. and Mrs. Quiros' Raymond James account (RJ # ███7460) was transferred to the account at JPMorgan Chase of Louis Ruggiero (JPMC # ███5765) for the purchase of the Trump Place condominium.



---

32  The GSI Raymond James account (RJ # ███1932) did not receive any other deposits that did not get transferred out on the same day between April 12, 2013, the date of second $3.0 million land payment, and May 30, 2013, the date of the $2.2 million transfer to Mr. and Mrs. Quiros' Raymond James account (RJ # ███7460).

17

CONFIDENTIAL

### E.    Payments for Personal Tax Liability

18.    Documents show that $10.7 million of Phase VII investor funds were improperly used as collateral for a personal line of credit for Mr. Quiros and used to pay $6 million of Mr. Quiros' personal taxes.[33] The following transactions outline the flow of Phase VII investor funds to the payment for Mr. Quiros' personal tax liabilities (these transactions are illustrated in the chart below):

a.    From December 2012 through June 2014, $66.0 million of Phase VII investor funds were transferred from the Phase VII People's Bank escrow account (PUB #█████9-90-1) to the Phase VII Raymond James account (RJ #████8224).

b.    From December 2012 through June 2014, $56.5 million was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #█████6739).

c.    On March 12, April 8, and July 1, 2014, a total of $9.5 million was transferred from the Phase VII People's Bank operating account (PUB #█████6739) to the JCM Raymond James account (RJ #████1174).

d.    On May 6 and July 2, 2014, a total of $9.2 million was transferred from the JCM Raymond James account (RJ #████1174) to the JCM JPMorgan Chase account (JPMC #████5553).

e.    On September 2 and October 7, 2014, a total of $6.1 million was transferred from the Phase VII People's Bank operating account (PUB #█████6739) to the JCM JPMorgan Chase account (JPMC #████5553).

f.    According to the SEC's accounting expert, Mark Dee, on January 9, 2015, $10.8 million was transferred from the JCM JPMorgan Chase account to the JCM Merrill Lynch account.[34]

---

[33]    *See*, SEC Complaint, ¶136.

[34]    *See,* Dee Declaration, Exhibit MM ("Summary of Phase VII accounts at RJ, People's Bank, JPM, and Merrill Lynch").

**CONFIDENTIAL**

g.  According to Mr. Dee, on March 24, 2015, $16.2 million was transferred from the JCM Merrill Lynch account to the JCM Citibank account. [35]

h.  According to Mr. Dee, on April 14, 2015, $6 million was transferred from Mr. Quiros' Citibank loan account to Mr. Quiros' GSI Citibank account. [36] According to Mr. Dee, the Citibank loan account was collateralized with the Phase VII investor funds previously sent from the JCM Merrill Lynch account on March 24, 2015.[37] The $6 million was eventually used to pay the IRS for Mr. Quiros' personal taxes. [38]

---

[35]  *See,* Dee Declaration, Exhibit MM ("Summary of Phase VII accounts at RJ, People's Bank, JPM, and Merrill Lynch").

[36]  *See,* Dee Declaration, Exhibit Z ("Summary of Phase VII accounts at Citi to pay IRS").

[37]  *See,* Dee Declaration, ¶50 and Exhibit MM ("Summary of Phase VII accounts at RJ, People's Bank, JPM, and Merrill Lynch"). The $15 million line of credit from Citibank collateralized with Phase VII investor funds was used to pay for Mr. Quiros' personal taxes, make returns to investors of earlier phases and pay construction-related expenses for other phases. Thus, the Phase VII investor funds used as collateral were not available for use in the Biomedical Phase VII project. *See,* SEC Complaint, ¶¶130-136; Receiver's First Interim Report, p.24; and Dee Declaration, Exhibit FF ("Summary of Phase VII accounts at Citi").

[38]  *See,* Dee Declaration, Exhibit Z ("Summary of Phase VII accounts at Citi to pay IRS").

CONFIDENTIAL



## F.    Payments for Corporate Tax Liability

19.    Documents show that investor funds were improperly used to pay taxes for one of Mr. Quiros' companies.[39] These tax payments totaled $5.5 million and were paid using Phase V and Phase VI investor funds in 2012 and Phase VII investor funds in 2013. The following transactions outline the flow of Phase V and VI investor funds to the 2012 payment for Mr. Quiros' corporate tax liabilities (these transactions are illustrated in the chart below):

    a.    From June 2011 through September 2012, $43.5 million of Phase V investor funds were transferred from the Phase V People's Bank escrow account (PUB #▢▢▢9-68-7) to the Phase V Raymond James account (RJ #▢▢▢1581).

---

[39]    *See*, SEC Complaint, ¶4.

CONFIDENTIAL

b.  From December 2011 through September 2012, $68.5 million of investor funds were transferred from the Phase VI People's Bank escrow account (PUB # ██ 9-73-7) to the Phase VI Raymond James account (RJ # ██ 3066).

c.  On September 5, 2012, $1.9 million was transferred from the Phase V Raymond James account (RJ # ██ 1581) to the Phase V People's Bank operating account (PUB # ██ 0195) and $3.5 million was transferred from the Phase VI Raymond James account (RJ # ██ 3066) to the Phase VI People's Bank operating account (PUB # ██ 6129).

d.  On September 6, 2012, $1.9 million was transferred from the Phase V People's Bank operating account (PUB # ██ 0195) and $3.5 million from the Phase VI People's Bank operating account (PUB # ██ 6129) to the JCM Raymond James account (RJ # ██ 1174).[40]

e.  On September 17, 2012, $0.4 million from the JCM Raymond James account (RJ # ██ 1174) was used to pay taxes to the U.S. Treasury.[41]

---

[40]  The JCM Raymond James account (RJ # ██ 1174) had no other cash inflows in September 2012.

[41]  *See,* Peak-VT-RJA002689 at 2754 ("Raymond James 2012 Account Statement for Account # ██ 1174").

21

CONFIDENTIAL



20.     The following transactions outline the flow of Phase VII investor funds to the 2013 payments for Mr. Quiros' corporate tax liabilities[42] (these transactions are illustrated in the chart below):

a.   From December 2012 through June 2013, $29.5 million of Phase VII investor funds were transferred from the Phase VII People's Bank escrow account (PUB #████9-90-1) to the Phase VII Raymond James account (RJ #████8224).

b.   From December 2012 through June 2013, $21.8 million was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #████46739).

---

[42]  *See*, SEC Complaint, ¶130. According to Mark Dee, the payments were for JCM's taxes. *See*, Testimony of Mark Dee, May 10, 2016, 89:21-91:18. Mr. Quiros was the sole officer and director of JCM.

**CONFIDENTIAL**

c.  On March 11 and June 20, 2013, a total of $13 million was transferred from the Phase VII People's Bank operating account (PUB #███6739) to the JCM Raymond James account (RJ #███1174).

d.  On April 15, 2013, $0.9 million from the JCM Raymond James account (RJ #███1174) was used for Mr. Quiros' corporate tax liability.[43]

e.  From April 2013 through September 2013, $6.2 million was transferred from the JCM Raymond James account (RJ #███1174) to the JCM HSBC account (HSBC #███8531).

f.  On nine different dates between April and October 2013, a total of $4.2 million from the JCM HSBC account (HSBC #███8531) was used to pay JCM's corporate tax liability.

---

[43]  The funds were transferred to the State of Vermont for taxes. *See,* Peak-VT-RJA002787 at 2816 ("Raymond James 2013 Account Statement for Account #███1174").

23

CONFIDENTIAL



### G.     Payments to AnC Bio Pharm

21.     Documents indicate that $6.2 million of Phase VII investor funds were used by Mr. Quiros to pay AnC Bio Pharm, a Korean entity affiliated with Mr. Quiros, for equipment, distribution, and marketing rights that were never received.[44, 45] The following transactions outline the flow of Phase VII investor funds to the payment to AnC Bio Pharm (these transactions are illustrated in the chart below):

---

[44]   *See*, SEC Injunction, p.11.

[45]   Documents indicate that AnC Bio Pharm, was created by Jong Weon Choi, aka Alex Choi, from South Korea. Documents indicate that Mr. Choi was a "hidden partner" in Mr. Quiros' scheme and had set up plans with Mr. Quiros to embezzle investor funds by using JCM as a "pass-through" entity. *See,* Indictment in *USA v. Quiros et al.*, May 21, 2019, ¶¶9-10, 20-21, and 30-32.

CONFIDENTIAL

a.  From December 2012 through March 2014, $60.5 million of Phase VII investor funds were transferred from the Phase VII People's Bank escrow account (PUB #█████9-90-1) to the Phase VII Raymond James account (RJ #████8224).

b.  From December 2012 through March 2014, $46.9 million was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #█████6739).

c.  From December 2012 through March 2014, $33.8 million was transferred from the Phase VII People's Bank operating account (PUB #████46739) to the JCM Raymond James account (RJ #████1174).

d.  From March 2013 through March 2014, $4.7 million from the JCM Raymond James account (RJ #████1174) were used to pay Mr. Quiros' Korean affiliate AnC Bio Pharm, Inc.[46]

e.  In addition, according to the SEC's accounting expert, another $1.5 million of Phase VII investor funds were paid out from JCM accounts at JPMorgan Chase, Merrill Lynch and Citibank to AnC Bio Pharm.[47] In total, $6.2 million Phase VII investor funds were transferred to AnC Bio Pharm.

---

[46]   The funds were transferred to Anc Bio Pharm's Korea Exchange Bank account (KEB #█████2329).

[47]   *See,* Dee Declaration, Exhibit KK ("Summary of payments for Phase VII investor funds").

CONFIDENTIAL



## H.    Payments to North East Contract Services

22.    Documents show that $7.8 million of Phase VII investor funds were paid to Phase VII's project manager NECS for work that was never performed.[48] NECS is controlled by William Kelly, Jay Peak's Chief Operating Officer and longtime business associate of Mr. Quiros.[49] The following transactions outline the flow of Phase VII investor funds to the payment for the work that was never performed by NECS (these transactions are illustrated in the chart below):

---

[48]  *See*, SEC Complaint, ¶130 and Dee Declaration, ¶52 and Exhibit Y ("Summary of Phase VII account and NECS account at People's Bank"). According to Mark Dee, $5.5 million of these funds were transferred to Mr. Quiros' accounts at HSBC and JPMorgan Chase.

[49]  *See*, Amended Class Action Complaint, ¶87 and SEC Complaint, ¶30.

CONFIDENTIAL

a. From December 2012 through June 2014, $66.0 million of Phase VII investor funds were transferred from the Phase VII People's Bank escrow account (PUB #█████9-90-1) to the Phase VII Raymond James account (RJ #████8224).

b. From December 2012 through June 2014, $56.5 million was transferred from the Phase VII Raymond James account (RJ #████8224) to the Phase VII People's Bank operating account (PUB #█████6739).

c. On four separate dates in 2013 and 2014 – March 11, 2013, June 20, 2013, March 12, 2014, and July 1, 2014 – a total of $7.8 million was transferred from the Phase VII People's Bank operating account (PUB #█████6739) to NECS.[50]



---

CONFIDENTIAL

## VI.    EB-5 Funds commingled and misused within the Jay Peak Limited Partnerships

23.    We analyzed instances of commingling of the EB-5 Funds among the Jay Peak Limited Partnerships. The commingling of the funds allowed Mr. Quiros to misuse and misappropriate investor funds for his financial benefit.[51] Moreover, through commingling of funds, Mr. Quiros was able to disguise the fact that several projects were over budget, experiencing shortfalls, and that funds from later phases were being used to backfill and construct the earlier phases at a time when Mr. Quiros was raising additional funds from new investors.[52]

24.    The JCM account at Raymond James was one of the main non-segregated, pooled accounts used to commingle funds among the limited partnerships.[53] In addition, investor funds were commingled through the use of margin loans and by transferring investor funds directly between the different limited partnership accounts.

### A.    Use of JCM account at Raymond James

25.    Essentially all the funds transferred into the JCM Raymond James account were investor funds:

a.    From 2011 to 2014, the JCM Raymond James account (RJ #███1174) received a net total of $175.4 million from accounts at People's Bank, almost all of which were from Phase III – VII operating accounts at People's Bank.[54]

b.    In addition, the JCM Raymond James account (RJ #███1174) received a net total of $0.6 million from the Phase VII Raymond James account (RJ #███8224)

---

[51]  S*ee,* SEC Injunction, pp. 17-20.

[52]  *See*, SEC Complaint, ¶3 and ¶9.

[53]  *See*, Amended Class Action Complaint, ¶119.

[54]  The People's Bank operating accounts for Phase III (PUB #███0216), Phase IV (PUB #███0215), Phase V (PUB #███0195), Phase VI (PUB #███6129) and Phase VII (PUB #███6739) transferred a net total of $0.9 million, $34.3 million, $35.8 million, $62.8 million and $40.7 million, respectively, into the JCM Raymond James account (RJ #███1174). A general Jay Peak account (#███0316) transferred a net total of $1.0 million into the JCM Raymond James account (RJ #███1174).

CONFIDENTIAL

between March 2014 and April 2014 and $1.4 million from the GSI Raymond James account (RJ #███1932) on April 15, 2013.[55]

26.    The chart below illustrates the investor funds that were transferred directly from the limited partnership accounts to the JCM Raymond James account, totaling a net transfer of $175.0 million.



27.    The JCM Raymond James account was used both for purposes related to the development and construction of the Jay Peak Limited Partnership, as well as for purposes completely unrelated to *any* of the Jay Peak Limited Partnerships and for the financial benefit of Mr. Quiros. In particular, between 2011 and 2014, a net amount of at least $76.7 million was transferred from the JCM Raymond James account (RJ #███1174) to pay for what appears to be

---

[55]    On April 12, 2013, $3.0 million of Phase VII investor funds were transferred from People's Bank Phase VII operating account (PUB #███6739) to the GSI Raymond James account (RJ #███1932). *See*, section V-D for more details. In addition, the vast majority of net inflows into the GSI Raymond James account were from investor funds. Specifically, the GSI Raymond James account received a net total of $21.5 million directly from the Q Resorts Raymond James account (RJ #███4772) (the vast majority of the funds in the Q Resorts Raymond James account, RJ #███4772, were from investor funds - *see* fn. 16 for more details), a net total of $6 million directly from People's Bank Phase VII operating account (PUB #███6739), and a net total of $1.0 million from a Jay Peak Raymond James account (RJ #███4710).

partnership related expenses such as construction costs, legal expenses, and various operating expenses. On the other hand, as discussed in more detail in Section V, a total of $26.6 million was transferred through the JCM Raymond James account for the financial benefit of Mr. Quiros. The $26.6 million included transfers to Mr. Quiros' Q Resorts account, the Raymond James Margin Loan IV account and AnC Bio Pharm, and payments for Mr. Quiros' corporate tax liabilities.

### B.  Use of margin loan accounts at Raymond James

28.     Documents indicate that investor funds were diverted through the use of margin loans for purposes unrelated to any of the limited partnerships and for the financial benefit of Mr. Quiros. Investor funds from all of the limited partnerships were misused and commingled by pledging investor funds as collateral for margin loans, and eventually using investor funds to pay off the margin loans.[56] Investor funds were misused and commingled through four different margin loan accounts at Raymond James:[57]

   a.  On June 25, 2008, the Phase I and II Raymond James accounts (RJ #⬛⬛6365 and #⬛⬛6370) incurred margin loans of $7.6 million (Raymond James Margin Loan I) and $6 million (Raymond James Margin Loan II) respectively. The amount of these margin loans matches the amount that was transferred out of Phase I and II Raymond James accounts on June 23, 2008 for the purchase of Jay Peak. All of the funds from the margin loans and the remaining investor funds in the Phase I and II Raymond James accounts were then used to purchase Treasury bills worth $11 million and $7 million respectively.[58] The amount of Treasury bills purchased matched the amount of funds initially received from MSSI in

---

[56]  *See*, SEC Complaint, ¶¶78, 84. Treasury bills purchased with investor funds were used as collateral for the margin loans. *See*, Receiver's Complaint, ¶¶62, 76 and Amended Class Action Complaint, ¶54.

[57]  *See*, Amended Class Action Complaint, ¶¶72-90 and Dee Declaration, ¶¶15-22.

[58]  The Treasury bills were deposited in the Phase I and Phase II Raymond James accounts and served as collateral for the Raymond James Margin Loan I and II. *See,* Amended Class Action Complaint, ¶54.

CONFIDENTIAL

order to "give the appearance" that the partnership funds remained in the accounts.[59]

b.  In February 2009, the balances in the Raymond James Margin Loan I and II accounts were transferred to the newly created Raymond James Margin Loan III account (RJ # ███ 0726).[60] The Raymond James Margin Loan III account was collateralized by funds in the Phase I Raymond James account (RJ # ███ 6365) and the Phase II Raymond James account (RJ # ███ 6370). The Phase III, IV and V Raymond James accounts (RJ # ███ 9503, RJ # ███ 9776, and RJ # ███ 1581) were subsequently added as collateral to the Raymond James Margin Loan III account between 2010 and 2011.[61]

c.  On February 24, 2012, the Phase V and Phase VI Raymond James accounts (RJ # ███ 1581 and RJ # ███ 3066) transferred $16.6 million and $5.8 million respectively to the Q Resorts Raymond James account (RJ # ███ 4772).[62] On the same date, the Q Resorts Raymond James account (RJ # ███ 4772) transferred $23.4 million to Raymond James Margin Loan III account (RJ # ███ 0726), paying off all of the remaining balance.[63]

d.  On February 28, 2012, the Raymond James Margin Loan IV account (RJ # ███ 2589) was created using funds in the Phase V Raymond James account (RJ # ███ 1581) and Phase VI Raymond James account (RJ # ███ 3066) as collateral. On February 29, 2012, the Raymond James Margin Loan IV account transferred

---

[59]  *See*, Receiver's Complaint, ¶¶83-86.

[60]  Documents indicate that Mr. Burstein facilitated the transfer of balances to the Raymond James Margin Loan III account to "hide the margin debt" in Phase I and II Raymond James accounts. *See,* SEC Burstein Complaint, ¶¶34-35.

[61]  *See*, Dee Declaration, Exhibit QQ ("Credit Agreement dated February 6, 2009"), UU ("Credit Agreement dated October 1, 2010"), VV ("Credit Agreement dated February 10, 2011") and WW ("Credit Agreement dated August 25, 2011").

[62]  In addition, on February 24, 2012, the GSI Raymond James account (RJ # ███ 1932) transferred $0.95 million to the Q Resorts Raymond James account (RJ # ███ 4772) (the vast majority of funds in the GSI Raymond James account (RJ# ███ 1932) were from investor funds – *see* fn. 55 for more details).

[63]  After the Raymond James Margin Loan III account was paid off, Mr. Burstein issued a letter to William Stenger stating that "as of February 27th, 2012 there are no encumbrances on any of the Jay Peak Partnership accounts." However, by the next day, February 28, 2012, the Phase V and VI Raymond James accounts (RJ # ███ 1581 and RJ # ███ 3066) were being used as collateral for the newly created Raymond James Margin Loan IV account. *See,* Letter from Joel Burstein to William Stenger dated February 29, 2012.

**CONFIDENTIAL**

$5.8 million to the Phase VI Raymond James account (RJ #████3066), the exact same amount that the Phase VI Raymond James account had transferred to the Q Resorts Raymond James account for paying off the Raymond James Margin Loan III balance.

e. In August 2013, funds from the Phase VII Raymond James account (RJ #████8224) were added as additional collateral to the Raymond James Margin Loan IV account.[64]

f. On March 5, 2014, the JCM Raymond James account (RJ #████1174) transferred $19 million to pay off the remaining balance in the Raymond James Margin Loan IV account, of which approximately $18.2 million had been transferred from the Phase VII People's Bank operating account (PUB #████6739).[65]

29. The chart below illustrates the investor funds that were transferred directly from the limited partnership accounts at Raymond James to the margin loan accounts. Six limited partnership accounts at Raymond James transferred a net total of $114.3 million to the margin loan accounts.[66]

---

[64] *See*, SEC Complaint, ¶93 and Dee Declaration, Exhibit SS ("Credit Agreement dated August 5, 2013").

[65] *See*, Dee Declaration, ¶22 and Exhibit W ("Summary of Margin Loan IV at RJ and pay off of Margin Loan IV"). *See*, Section V for more details.

[66] Including the net outflow of $5.8 million from Raymond James Margin Loan IV to Phase V Raymond James account as described in ¶24.

CONFIDENTIAL



30.     The margin loan accounts were used to transfer funds to the Q Resorts account. A net total of $112.0 million was transferred from the margin loan accounts at Raymond James (RJ #███0726 and #███2589) to the Q Resorts Raymond James account (RJ #███4772). Like the JCM Raymond James account, the Q Resorts Raymond James account was one of the main non-segregated, pooled accounts used to commingle funds among the Jay Peak Limited Partnerships. In addition, investor funds were funneled through commingled accounts to pay off the margin loans. As discussed above, even though the Phase VII Raymond James account never made a direct transfer to a margin loan account, at least $18.2 million of Phase VII investor funds transferred to the JCM Raymond James account were used to pay off margin loans.

**CONFIDENTIAL**

### C.    Direct transfer of funds between limited partnerships

31.    Documents show that investor funds were inappropriately transferred directly between different Jay Peak limited partnership accounts.[67] Below is a summary of the net amount that was transferred between the limited partnership accounts at Raymond James:

    a.  Net transfer of $15.4 million (in cash and Treasury bills) from the Phase II Raymond James account (RJ # ███6370) to the Phase III Raymond James account (RJ # ███9503).[68]

    b.  Net transfer of $4.7 million (in cash) from the Phase II Raymond James account (RJ # ███6370) to the Phase I Raymond James account (RJ # ███6365).

    c.  Net transfer of $2.5 million (in cash) from the Phase II Raymond James account (RJ # ███6370) to the Phase V Raymond James account (RJ # ███1581).

    d.  Net transfer of $0.05 million (in cash) from the Phase I Raymond James account (RJ # ███6365) to the Phase III Raymond James account (RJ # ███9503).

## VII.  FOCUS ON MISUSE OF FUNDS IN UNCOMPLETED PHASES – PHASE VI AND PHASE VII

32.    We focused on the misuse of funds in the uncompleted phases: Phase VI and Phase VII. The plan for Phase VI included an 84-unit hotel, 84 vacation rental cottages, a guest recreation center, and a medical center, yet only the hotel and 59 cottages are in some form of completion as of August 12, 2016.[69] The plan for Phase VII included a biomedical research facility, yet other than site preparation, "no significant work has been done on the facility."[70]

---

[67]  *See*, Dee Declaration, ¶¶29-30 and Exhibits F ("Summary of Phase II account at RJ") and G ("Summary of Phase II account at RJ").

[68]  Treasury bills purchased with investor funds were used as collateral for the margin loans. *See*, Receiver's Complaint, ¶¶62, 76 and Amended Class Action Complaint, ¶54.

[69]  According to the Receiver, "35 […] cottages are in some form of completion" and "24 of the cottages were being bought from a modular home builder and based on preliminary information a large part of the purchase price of these 24 modular homes has been paid." *See*, Receiver's First Interim Report, p.9.

[70]  *See*, Receiver's First Interim Report, p. 10.

CONFIDENTIAL

33. To determine the use of the Phase VI and Phase VII investor funds, we tracked the investor funds, analyzed documents related to construction costs, and reviewed case documents in lawsuits related to this matter.

### A.    Use of the Phase VI investor funds

34. We found that Phase VI raised $67.0 million (net of investor returns) for the project and collected $6.3 million in administrative fees.[71] The $67.0 million of Phase VI investor funds were used as follows:

   a. $23.5 million was used for Phase VI construction costs.[72]

   b. $3.0 million was used for prepaid land and building leases for Phase VI.[73]

   c. $0.9 million was used for other Phase VI project costs, such as permits and consulting fees.[74]

   d. $0.4 million was diverted to pay for purposes unrelated to any of the Jay Peak Limited Partnerships.[75]

   e. $39.3 million was used for expenses associated with other Jay Peak Limited Partnerships.[76]

---

[71] Based on transactions through the Phase VI People's Bank escrow account (PUB #██████9-73-7), Phase VI People's Bank admin account (PUB #█████9-74-5), Phase VI Raymond James account (RJ #████3066) and Phase VI People's Bank operating account (PUB #█████6129).

[72] *See,* JCM Phase VI 2015 payment schedule spreadsheet ("Stateside - PHS payments 12-2015.xlsx").

[73] On March 7, 2012, $2.5 million was transferred from the Phase VI People's Bank operating account (█████6129) to the Jay Peak, Inc. People's Bank account (PUB #████1736) to acquire a prepaid land lease for the cottages. *See,* Business Plan in Phase VI PPM and 2012 Phase VI general ledger.

On May 7, 2012, $0.5 million was transferred from the Phase VI People's Bank operating account (PUB #█████6129) to the Q Resorts Raymond James account (RJ #████4772) to lease the Snowline Lodge building for the medical center. *See,* 2012 Phase VI general ledger.

[74] For example, a $125,000 check was sent to the Vermont Electric Cooperative, Inc. on July 16, 2012 (check 1006), a $43,195 check was sent to Wiemann-Lamphere Architects, Inc. on February 14, 2013 (check 1069) and a $75,203 check was sent to the Vermont Department of Public Safety (check 1075) on March 25, 2013 from the Phase VI People's Bank operating account (PUB #█████6129).

[75] $0.4 million of Phase VI investor funds were used to pay JCM's corporate taxes. *See,* section V-F.

[76] Based on the $67.0 million Phase VI investor funds received less the $27.3 million spent on project costs and the $0.4 million that was diverted to pay for purposes unrelated to any Jay Peak Limited Partnerships.

CONFIDENTIAL

### B.  Use of the Phase VII investor funds

35.  We found that Phase VII received $87.4 million (net of investor refunds) for the project and collected $7.7 million in administrative fees.[77] The $87.4 million of Phase VII investor funds were used as follows:

   a.  $5.9 million was used for Phase VII project costs.[78]

   b.  $38.0 million was diverted to pay for purposes unrelated to any Jay Peak Limited Partnership.[79]

   c.  $17.9 million remains in the Phase VII People's Bank escrow account.[80]

   d.  $25.6 million was used for expenses associated with other Jay Peak Limited Partnerships.[81]

_Jorge Baez_ (signature)

Jorge Baez

---

[77]  Based on transactions through the Phase VII People's Bank escrow account (PUB #▮▮▮▮9-90-1), Phase VII People's Bank admin account (PUB #▮▮▮▮5-71-8), Phase VII Raymond James account (RJ #▮▮▮8224) and Phase VII People's Bank operating account (PUB #▮▮▮▮6739). There may be additional investor deposits or refunds through other banks. We did not have access to documentation for the relevant accounts in Citibank, HSBC, JPMorgan Chase and Merrill Lynch.

[78]  _See,_ Phase VII 2016 general ledger. Includes payments to PeakCM LLC for construction contracts ($3.7 million) and payments for permits, design and architectural fees, engineering fees, FDA certification costs, property taxes, market demand studies and business planning ($2.1 million).

[79]  _See,_ sections V-B, V-D, V-E, V-F, V-G, and V-H.

[80]  As of June 30, 2016.

[81]  Based on the $87.4 million Phase VII investor funds received less the $5.9 million spent on project costs, the $38.0 million that was diverted to pay for purposes unrelated to the Jay Peak Limited Partnerships and the $17.9 million left in the escrow account.



**Jorge Baez**
Director

National Economic Research Associates, Inc.
1166 Avenue of the Americas
New York, New York 10036
+1 212 345 3000 Fax +1 212 345 4650
Direct dial: +1 212 345 5753
jorge.baez@nera.com
www.nera.com

# Appendix A

# Jorge Baez
## Director

## Education

**Yale University**
MBA, Specialization in Statistics and Finance, 2009

**London School of Economics**
Advanced coursework in Statistics, 2003

**Vassar College**
BA in Economics and Physics, 2004

## Professional Experience

2009-Present    **National Economic Research Associates, Inc.**
Director. Responsible for economic analysis in the areas of securities, finance and tort economics.
Associate Director.
Senior Consultant.
Consultant.

2008    **BearingPoint, Inc.**
Consultant. Formulated marketing, organization, and overall business strategies for the Strategy and Transformation Group within the Management Consulting Practice.

2004-2007    **National Economic Research Associates, Inc.**
Analyst.
Associate Analyst.
Research Associate.

Jorge Baez

## Testimony and Expert Reports (last 4 years)

Expert Report before the Mexican Economic Competition Commission (COFECE) in response to the Investigative Authority's Liability Report in File IO-006-2016, 2020.

Expert Report before the Court of the Chancery of the State of Delaware in *In re Daily Funder, LLC*, 2019.

Expert Report before the Mexican Economic Competition Commission (COFECE) in response to the Investigative Authority's Preliminary Opinion in File No. DC-003-2018, 2019.

Expert Report before the Mexican Economic Competition Commission (COFECE) in response to the Investigative Authority's Preliminary Opinion in File IO-006-2016, 2019.

Expert Report before the Court of First Instance, Madrid, Spain, in *Inversión Corporativa I.C., S.A. v. Banco Santander, S.A. and HSBC Bank plc*, 2019.

Testimony and Deposition Testimony before the United States District Court of the Virgin Islands, Division of St. Thomas and St. John, in *Government Employees' Retirement System of the Virgin Islands v. Valdamier Collens, Commissioner of Finance and the Government of the Virgin Islands*, 2018.

Expert Report before the United States District Court for the Southern District of New York, in *Ashraf Khodeir et al., v. Marwan Sayyed and Subhi Sayyed*, 2018.

Expert Report and Deposition before the United States District Court for the Southern District of Florida, in *Securities and Exchange Commission v. Jeffrey Brooks*, 2017.

Expert Report before the European Court of Justice in the Banco Popular litigation, 2017.

## Publications and Presentations

"The Short-Term Effect of Goodwill Impairment Announcements on Companies' Stock Prices" (co-author), *International Journal of Business, Accounting and Finance,* Volume 14, Number 2, Fall 2020.

"Private Securities Litigation" presented at the Florida Bar's 37th Annual Federal Securities Institute, Miami, FL, February 11, 2019.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, March 16, 2018.

Jorge Baez

"Asbestos: Economic Assessment of Bans and Declining Production and Consumption," (co-author), World Health Organization, 2017.

"Update on Economic Analysis of Price Impact in Securities Class Actions Post-Halliburton II," (co-author), *Harvard Law School Forum on Corporate Governance and Financial Regulation*, September 8, 2015.

"Recent High Profile Securities Law Decisions," presented at the Federal Bar Association, New York, April 25, 2014.

"The Effect of Short Sales on Damages in Securities Class Actions," presented as part of *Current Economic Issues in Financial Regulation*, hosted by the SEC Historical Society, Washington, DC, July 23, 2013.

"The Inside Scoop on Securities Litigation for 2013," presented at the Ross Institute Roundtable, hosted by the Stern School of Business, New York University, 2013.

"SEC Settlements Trends: 2H12 Update," (co-author), NERA publication, January 14, 2013.

"Cyber-Security and Risk," presented at the Center for Insurance Education, hosted by Howard University, New York, New York, 2012.

CONFIDENTIAL

## Appendix B

**Case documents in lawsuits related to this matter**

1. No Encumbrance Letter, dated February 29, 2012
2. Federal Insurance Company Endorsement/Rider No. 23, with effective date of October 1, 2015, Page 1
3. Form 14 (Rev. 10/87)/Form TSB 5062b (Rev. 10/87), Page 16 of 17, "Conditions and Limitations"
4. Declaration of Michelle Lama, dated March 3, 2016, including exhibits
5. Declaration of Michael Pieciak, dated April 1, 2016, including exhibits
6. Declaration of Mark Dee, dated April 6, 2016, including exhibits
7. Declaration of Mark Dee, dated April 25, 2016, including exhibits
8. Testimony of Michael Pieciak, April 25, 2016
9. Testimony of Mark Dee, May 10, 2016
10. SEC Amended Complaint for Injunctive and Other Relief, dated May 17, 2016
11. Receiver's Complaint for Relief, dated May 20, 2016
12. Plaintiff's Exhibit 101 and 103, dated May 25, 2016
13. Amended Class Action Complaint, dated August 9, 2016
14. Receiver's First Interim Report, dated August 12, 2016
15. SEC Preliminary Injunction, dated November 21, 2016
16. Receiver's Second Interim Report, dated November 22, 2016
17. Plaintiffs' Motion for Class Certification and Incorporated Memorandum of Law, dated December 23, 2016, including exhibits
18. Declaration of Michael Goldberg, dated December 23, 2016
19. Plaintiffs' Response to Defendants' Motion for Extension of Time to Respond to Plaintiffs' Motion for Class Certification, dated January 19, 2017
20. Settlement Agreement and Release, dated April 13, 2017, including exhibits
21. Settlement Order, dated June 30, 2017
22. Raymond James Proof of Loss Letter, dated February 27, 2018
23. Complaint for Injunctive and Other Relief in *SEC v. Burstein*, dated September 6, 2018
24. Indictment in *USA v. Quiros et al.*, dated May 21, 2019
25. Letter from Federal to Cimo Mazer Mark PLLC, dated April 20, 2020
26. First Amended Complaint for Damages, dated July 8, 2020
27. Federal's Objections and Responses to Raymond James' First Set of Interrogatories, dated September 21, 2020

**Raymond James account statements and wire transaction information for Jay Peak and related entities**

1. Jay Peak Hotel Suites L.P. (MSSI) (#██████0698) (2008)
2. Jay Peak Hotel Suites Phase II L.P. (MSSI) (#██████6389) (2008)
3. Jay Peak Hotel Suites L.P. (#██████6365) (2008 – 2014)
4. Jay Peak Hotel Suites Phase II L.P. (#██████6370) (2008 – 2014)
5. Jay Peak Penthouse Suites L.P. (#██████9503) (2010 – 2014)
6. Jay Peak Golf and Mountain Suites L.P. (#██████9776) (2010 – 2014)
7. Jay Peak Lodge and Townhouses L.P. (#██████1581) (2011 – 2014)
8. Jay Peak Hotel Suites Stateside L.P. (#██████3066) (2011 – 2014)

**CONFIDENTIAL**

9. Jay Peak Biomedical Research Park L.P. (#███8224) (2012 – 2014)
10. AnC Bio VT, LLC (#███4996) (2013 – 2014)
11. Ariel I Quiros and Ary Quiros (#███1918) (2009 – 2014)
12. Ariel I Quiros and Okcha Quiros (#███7460) (2007 – 2014)
13. GSI of Dade County, Inc. (#███1932) (2009 – 2014)
14. Jay Construction Management (#███1174) (2011 – 2014)
15. Jay Peak, Inc. (#███4710) (2009 – 2012)
16. Margin loan collateralized with Phase I – V funds (#███0726) (2009 – 2012)
17. Margin loan collateralized with Phase V – VII funds (#███2589) (2012 – 2014)
18. Q Burke Mountain Resort Hotel and Conference Center L.P. (#███7674) (2013)
19. Q Resorts, Inc. (#███4772) (2008 – 2014)
20. Other accounts (#███8996, #███0509, #███0541, #███0635, #███8060, #███0698, #███2269, #███3583, #███6570 and #███6313)

**People's Bank account statements and wire transaction information for Jay Peak and related entities**
1. Jay Peak Hotel Suites L.P. Escrow (#███9-43-0) (2008)
2. Jay Peak Hotel Suites L.P. Operating (#███0594) (2014 – 2016)
3. Jay Peak Hotel Suites L.P. Disbursing (#███1205) (2014)
4. Jay Peak Hotel Suites L.P. Money Market (#███1221) (2014 – 2015)
5. Jay Peak Hotel Suites Phase II L.P. Escrow (#███9-48-9) (2008 – 2016)
6. Jay Peak Hotel Suites Phase II L.P. Operating (#███0659) (2014 – 2016)
7. Jay Peak Hotel Suites Phase II L.P. Administrative (#███9-47-1) (2006 – 2013)
8. Jay Peak Hotel Suites Phase II L.P. Money Market (#███0667) (2015 – 2016)
9. Jay Peak Penthouse Suites L.P. Escrow (#███9-55-4) (2010 – 2014)
10. Jay Peak Penthouse Suites L.P. Operating (#███0216) (2012 – 2014)
11. Jay Peak Penthouse Suites L.P. Operating (#███7509) (2014 – 2016)
12. Jay Peak Penthouse Suites L.P. Administrative (#███9-56-2) (2010 – 2013)
13. Jay Peak Golf and Mountain Suites L.P. Escrow (#███9-61-2) (2010 – 2014)
14. Jay Peak Golf and Mountain Suites L.P. Operating (#███0215) (2011 – 2016)
15. Jay Peak Golf and Mountain Suites L.P. Administrative (#███9-62-0) (2010 – 2013)
16. Jay Peak Lodge and Townhouse L.P. Escrow (#███9-68-7) (2011 – 2014)
17. Jay Peak Lodge and Townhouse L.P. Operating (#███0195) (2011 – 2016)
18. Jay Peak Lodge and Townhouse L.P. Administrative (#███9-69-5) (2011 – 2013)
19. Jay Peak Hotel Suites Stateside L.P. Escrow (#███9-73-7) (2011 – 2015)
20. Jay Peak Hotel Suites Stateside L.P. Operating (#███6129) (2012 – 2016)
21. Jay Peak Hotel Suites Stateside L.P. Administrative (#███9-74-5) (2011 – 2013)
22. Jay Peak Biomedical Research Park L.P. Escrow (#███9-90-1) (2012 – 2016)
23. Jay Peak Biomedical Research Park L.P. Operating (#███6739) (2012 – 2016)
24. AnC Bio Vermont GP Services, LLC Operating (#███6758) (2013 – 2016)
25. AnC Bio Vermont GP Services, LLC Administrative (#███5-71-8) (2012 – 2016)
26. AnC Bio VT, LLC Operating (#███6756) (2013 – 2016)
27. AnC Bio VT, LLC Expense Reserve (#███6757) (2013 – 2016)
28. Burke Mountain Operating Company, Inc. (#███6722) (2015 – 2016)
29. Jay Peak, Inc. (#███1736) (2014 – 2016)
30. North East Contract Services, LLC (#███0221) (2013 – 2016)

CONFIDENTIAL

31. North East Contract Services, LLC (#██████3588) (2014 – 2016)
32. Q Burke Mountain Resort, LLC Escrow (#██████9-97-6) (2013 – 2016)
33. Q Burke Mountain Resort Hotel L.P. Operating (#██████6886) (2013 – 2015)
34. Q Burke Mountain Resort Administrative (#██████5-80-9) (2013 – 2016)
35. Q Burke Mountain Resort LLC (#██████4113) (2014 – 2015)
36. Q Resorts, Inc. (#██████6737) (2012)

**HSBC account statements and wire transaction information for Jay Peak and related entities (RJ_InsLit_0000001 to RJ_InsLit_0003516)**

**Internally-prepared financial statements for Jay Peak and related entities**
1.  Jay Peak Hotel Suites L.P. (2009 – 2013)
2.  Jay Peak Hotel Suites Phase II L.P. (2009 – 2015)
3.  Jay Peak Penthouse Suites L.P. (2010 – 2015)
4.  Jay Peak Golf and Mountain Suites L.P. (2010 – 2015)
5.  Jay Peak Lodge and Townhouses L.P. (2013 – 2015)
6.  Jay Peak Hotel Suites Stateside L.P. (2013 – 2015)
7.  Jay Peak Biomedical Research Park L.P. (2013 – 2015)
8.  AnC Bio Vermont, LLC (2014 – 2015)
9.  Jay Peak, Inc. (2009 – 2015)
10. Q Burke Mountain Resort, LLC (2013)
11. Q Resorts, Inc. (2012 – 2014)

**Internally-prepared general ledgers for Jay Peak and related entities**
1.  Jay Peak Hotel Suites L.P. (2007 – 2014)
2.  Jay Peak Hotel Suites Phase II L.P. (2008 – 2016)
3.  Jay Peak Penthouse Suites L.P. (2010 – 2016)
4.  Jay Peak Golf & Mountain Suites L.P. (2010 – 2016)
5.  Jay Peak Lodge and Townhouses L.P. (2011 – 2016)
6.  Jay Peak Hotel Suites Stateside L.P. (2011 –2016)
7.  Jay Peak Biomedical Research Park L.P. (2012 – 2016)
8.  AnC Bio Vermont, LLC (2012 – 2016)
9.  AnC Bio Vermont GP Services, LLC (2013 – 2016)
10. Jay Peak Capital Acquisitions, Inc. (2011 – 2016)
11. Jay Peak GP Services, Inc. (2011 – 2016)
12. Jay Peak GP Services Golf, Inc. (2012 – 2016)
13. Jay Peak GP Services Lodge, Inc. (2012 – 2016)
14. Jay Peak GP Services Stateside, Inc. (2012 – 2016)
15. Jay Peak Investment Holdings, LLC (2011 – 2016)
16. Jay Peak Management, Inc. (2008 – 2016)
17. Jay Peak, Inc. (2007 – 2016)
18. Q Burke Mountain Resort, Hotel & Conference Center L.P. (2013 – 2016)
19. Q Burke Mountain Resort, LLC (2013 – 2016)
20. Q Burke Mountain Resort GP Services, LLC (2014 – 2016)
21. Jay Construction Management Payment Records (2011 – 2015)

CONFIDENTIAL

**Receiver-prepared financial statements for Jay Peak and related entities**
1. Jay Peak Hotel Suites Phase II L.P. (2015 – 2016)
2. Jay Peak Penthouse Suites L.P.  (2015 – 2016)
3. Jay Peak Golf and Mountain Suites L.P. (2015 – 2016)
4. Jay Peak Lodge and Townhouses L.P. (2015 – 2016)
5. Jay Peak Hotel Suites Stateside L.P. (2015 – 2016)
6. Jay Peak Biomedical Research Park L.P. (2016)
7. AnC Bio Vermont, LLC (2016)
8. AnC Bio Vermont GP Services, LLC (2015 – 2016)
9. Jay Peak Capital Acquisitions (2015 – 2016)
10. Jay Peak GP Services, Inc. (2015 – 2016)
11. Jay Peak GP Services Golf, Inc. (2015 – 2016)
12. Jay Peak GP Services Lodge, Inc. (2015 – 2016)
13. Jay Peak GP Services Stateside, Inc. (2015 – 2016)
14. Jay Peak, Inc. (2016)
15. Jay Peak Investment Holdings, LLC (2015 – 2016)
16. Jay Peak Management, Inc. (2015 – 2016)
17. Q Burke Mountain Resort, Hotel & Conference Center L.P. (2016)
18. Q Burke Mountain Resort, LLC (2016)
19. Q Burke Mountain Resort GP Services, LLP (2015 – 2016)

**Tax returns for Jay Peak and related entities**
1. Jay Peak Hotel Suites L.P. (2011 – 2014)
2. Jay Peak Hotel Suites Phase II L.P. (2011 – 2015)
3. Jay Peak Penthouse Suites L.P. (2011 – 2015)
4. Jay Peak Golf and Mountain Suites L.P. (2011 – 2015)
5. Jay Peak Lodge and Townhouses L.P. (2011 – 2015)
6. Jay Peak Hotel Suites Stateside L.P. (2011 – 2015)
7. Jay Peak Biomedical Research Park L.P. (2012 – 2015)
8. AnC Bio Vermont GP Services, LLC (2012 – 2015)
9. AnC Bio VT, LLC (2012 – 2015)
10. Burke Mountain Operating Company & Subs. (2011 – 2014)
11. Jay Peak, Inc. (2011 – 2015)
12. Jay Peak Investment Holding, LLC (2012 – 2013)
13. Jay Peak Management, Inc. (2011 – 2015)
14. Q Aviation, Inc. (2012 – 2015)
15. Q Burke Mountain Resort, Hotel and Conference Center L.P. (2013 – 2015)
16. Q Burke Mountain Resort, LLC (2013 – 2014)
17. Q Burke Mountain Resort GP Services, LLC (2013 – 2015)

**Offering materials for the Jay Peak Limited Partnerships**
1. Jay Peak Hotel Suites L.P. Offering Memorandum, dated December 22, 2006
2. Jay Peak Hotel Suites Phase II L.P. Amended Offering Memorandum, dated June 20, 2008
3. Jay Peak Penthouse Suites L.P. Offering Memorandum, dated July 8, 2010
4. Jay Peak Golf and Mountain Suites L.P. Offering Memorandum, dated December 22, 2010
5. Jay Peak Lodge and Townhouses L.P. Offering Memorandum, dated May 18, 2011

**CONFIDENTIAL**

6. Jay Peak Hotel Suites Stateside L.P. Offering Memorandum, dated October 31, 2011
7. Jay Peak Biomedical Research Park L.P. Offering Memorandum, dated November 30, 2012
8. Jay Peak Biomedical Research Park L.P. Amended Offering Memorandum, dated January 30, 2015
9. Q Burke Mountain Resort, Hotel and Conference Center L.P. Offering Memorandum, dated June 14, 2013