# EXHIBIT 5

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF FLORIDA

# MIAMI DIVISION

# CASE NO.   1-20 cv 21707-UU

RAYMOND JAMES FINANCIAL, INC.,

      Plaintiff,

vs

FEDERAL INSURANCE COMPANY;
TRAVELERS CASUALTY AND SURETY
COMPANY OF AMERICA;
GREAT AMERICAN INSURANCE COMPANY;
BEAZLEY INSURANCE COMPANY, INC.; and
ST. PAUL MERCURY INSURANCE COMPANY,

      Defendant

---

## EXPERT REPORT OF CLAY L. GRUMKE

Counsel for plaintiff Raymond James Financial, Inc. have retained me as an expert on the role and practices of in-house counsel at a financial services firm.  Counsel has asked me to offer my opinion pertaining to the conduct of Raymond James Legal Department (in-house counsel) as it pertains to the execution of their duties in relation to the Jay Peak accounts and incidental events, and whether in-house counsel became aware of facts that would cause a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others in relation to the Jay Peak accounts prior to the inception of the bond period, **or** in-house counsel received notice of an actual or potential claim in which it is alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.   The following summarizes my opinions.

## QUALIFICATIONS

I am a former Assistant General Counsel responsible for all regulatory matters and litigation in the Wealth and Investment Management Division of Wells Fargo & Co. I retired from the firm December 31, 2017. My resume is provided in Attachment A. My responsibilities included the representation of the firm and its employees in addressing all Wealth and Investment Management litigation and regulatory inquiries, investigations, charges, and the resolution of actions initiated by federal financial regulatory agencies, state financial regulators, and self-regulatory agencies and the oversight and supervision of the legal staff working on these matters. I previously was managing counsel for Wells Fargo & Co. and Wachovia Securities, responsible for the oversight and supervision of all regulatory inquiries, investigations, charges, and the resolution of actions initiated by all financial regulatory agencies and self-regulatory agencies. Prior to these roles, I was the Assistant Director and then Director of Law for A.G. Edwards & Sons. I was responsible for all legal matters including litigation and regulatory matters, customer complaints and a variety of other legal issues. Prior to my management roles, I was counsel for A.G. Edwards serving as first chair attorney on litigation, regulatory matters, customer complaints and a variety of other legal responsibilities. In these roles I both handled and managed the handling of hundreds of regulatory matters which included investigations initiated by the Financial Industry Regulatory Authority (FINRA), the Securities and Exchange Commission (SEC) and a vast majority of the United States including Vermont. I have represented the firms and their employees in on-the-record testimony (depositions) taken by various regulators and reviewed the transcripts of dozens of depositions. I have personally reviewed and responded to multiple customer correspondence inquiries and complaints. The reviews included determination as to whether the drafter of the correspondence qualified as a customer or individual entitled to information on an account. The reviews also included evaluation of the information included to determine the nature of the correspondence and what action, if any, was required by the firm. I worked for 26 years in the securities industry in the above roles. I also served as an industry member on the FINRA Complaints Initiatives Committee responsible for reviewing and revising FINRA's coding regulations for the nature and category of all securities industry customer complaints. Prior to entering the securities industry, I was an assistant prosecuting attorney in the City of St. Louis, Missouri serving as grand jury attorney and on the felony trial staff. In 2018, I began to serve as an expert witness in the securities industry.


## PRIOR EXPERT ENGAGEMENTS

I have testified as an expert in securities regulation and the securities industry in the clearing broker area in three FINRA arbitration hearings which are identified in Attachment B.


## COMPENSATION

My compensation as an expert in this area is $600 per hour.

## FACTS AND INFORMATION CONSIDERED

See list of material considered in Attachment C.

This report is based upon the information available to me and reviewed to date, and I hereby reserve the right to supplement and amend this report in the event additional information becomes available for my review.

## ISSUES CONSIDERED

- Did Raymond James in-house counsel become aware of facts that would cause a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others in relation to the Jay Peak accounts prior to the inception of the bond period on October 1, 2015.

- Did Raymond James in-house counsel receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period on October 1, 2015.

## SUMMARY OF OPINIONS

- Raymond James in-house counsel did not become aware of facts that would cause a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others in relation to the Jay Peak accounts prior to the inception of the bond period on October 1, 2015.

- Raymond James in-house counsel did not receive notice of an actual or potential claim in which it was alleged that Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period on October 1, 2015.

## THE ROLE OF IN-HOUSE COUNSEL AT A FINANCIAL FIRM

In-house counsel (IHC) provides legal representation to the company that employs them.  They represent the overall legal needs of the company through representation of the officers, directors, managers and employees of the firm, whose interests are aligned with the business and legal purpose of the firm and absent any unresolvable conflict of interest.  IHC at financial firms typically represent the company and their employees in reviewing and responding to customer complaints, threatened, or filed litigation either in courts of law or arbitration forums, and regulatory examinations, inquiries, investigations and filed actions.  IHC also advises the company and its employees on options for resolving complaints, litigation, and regulatory matters.  IHC may also advise the company on drafting and revising various legal documents,

3

review of business products or practices, and general review and advice for all aspects of a company's underlying business activities.  IHC must rely on internal firm areas of expertise to provide documentation and information as well as analysis to aid in the representation of the firm.  Areas of expertise would include the Margin Department, Ant-Money Laundering Department (AML), Operations Department, and Compliance Department. IHC may provide business law advice to financial firms as required or requested. IHC may have a regular and continuing role in the review of business transactions and practices.  IHC may also be consulted on an ad hoc basis for particular business accounts, products or deals.  The frequency and depth of IHC involvement in daily business activities varies from firm to firm and is affected by the size and type of business the firm conducts.   IHC may also rely on reasoned business decisions by management, as well as consult with and advise management on regulatory matters, litigation and where otherwise requested.

## OPIONIONS REGARDING THE FACTS OF THIS ACTION

The Defendants have raised several events and periods of time in interrogatory responses alleging that, prior to the inception of the bond period on October 1, 2015, the events should have triggered IHC to have become aware of facts that would cause a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others in relation to the Jay Peak accounts, or, in-house counsel received notice of an actual or potential claim in which it was alleged that Raymond James was responsible for loss resulting directly from dishonest  or fraudulent acts committed by an employee acting alone or in collusion with others.  I will address each of the events and periods of time cited by Defendants.

## KNOWLEDGE AND APPROVAL OF INITIAL TRANSACTIONS AND APPROVAL OF SUBSEQUENT QUIROS TRANSFERS

Defendants have cited various documents including emails, correspondence, and other information to allege that Raymond James was aware of Jay Peak account activity at the initial opening of the accounts and of subsequent transactions.[1]  I saw no evidence in the cited documents that IHC was involved in or aware of the account openings, initial activity or subsequent activity in the Jay Peak accounts.  Additionally, IHC Barracca testified that he did not become aware of the Jay Peak accounts until sometime in 2013.[2]  The lack of knowledge or involvement by IHC in account opening and account transactions is consistent with my industry experience.  Had IHC known of the account openings and transactions, his focus would have been on the authority and documentation on the accounts opened at Raymond James and not on the business plan or business restrictions of the client outside of the accounts handled by Raymond James.  IHC Barracca

---

[1] RJ-POL 102081; Proof of Loss, pg. 6; RJ-POL 11055; RJ-POL 155325; RJ-POL 137582; Amigo Dep. Trans. 184:21-185:1; Amigo Dep. Trans., 197:16 - 198:10; RJ-POL 141449; ROJ-POL 102162; RJ-POL 137758; RJ-POL 000035; Proof of Loss, pg. 7; RJ-POL 102050; RJ-POL 147946; RJ-POL 001029; RJ-POL 000639; RJ-POL00443; ROJ-POL01320; RJ-POL 000446; RJ-POL 000448; RJ-POL 000452; RJ-POL 000453; RJ-POL 000459; RJ-POL 000468; RJ-POL 111625; RJ-POL 112424; RJ-POL 112736; RJ-POL 098703; RJ-POL 111561; RJ-POL 098703; RJ-POL 111561; RJ-POL 097612; RJ-POL 097640; RJ-POL 155590; RJ-POL 155593; RJ-POL 155591.
[2] Mark Barracca deposition dated February 3, 2021 and March 17, 2021.

4

testified that when he did review the account opening documents during the 2013-14 SEC investigation of the Jay Peak accounts he believed the accounts had been established appropriately.[3]  Raymond James had no responsibility to oversee or regulate the business practices of Jay Peak.  Additionally, Burstein took affirmative steps to hide his representations concerning Raymond James' participation in financing the initial Jay Peak account openings and initial activity.[4]

Accordingly, there was nothing about the cited Jay Peak account openings, initial activity, or subsequent activity at Raymond James known to IHC that would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.  In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others during the opening of the accounts or initial or subsequent transactions prior to the inception of the bond period.

## AML ANALYSIS AND CONCERNS

Defendants have cited various documents, including primarily emails, alleging that the review of transactions and questions and concerns within the AML Department at Raymond James made Raymond James aware of Jay Peak account activity that was questionable.[5]  I saw no evidence in the cited documents that IHC was involved in or aware of the AML reviews that occurred.  AML Officer Linda Busby stated that she had no recollection of AML contact with IHC concerning the activity in the Jay Peak accounts.[6] The lack of involvement in AML reviews is consistent with my industry experience, absent the AML Department escalating reviews to IHC for consultation and advice.  AML Department involvement and review of Jay Peak transactions would have been activity that gave comfort to IHC as to the oversight and appropriateness of the Jay Peak transactions within the Raymond James accounts.  The AML officers reviewed the Jay Peak accounts on multiple occasions and found no concerns.[7]  AML Officer Busby testified that while she was working at Raymond James she could not recall ever becoming aware of anything that Burstein did that she felt was or might be fraudulent or dishonest.[8] Raymond James and IHC would not have had responsibility to go outside of the account relationship and activity to review Jay Peak's business model and actions.  Accordingly, as IHC was not involved in these reviews which resulted in no concerns for AML there was nothing about the cited reviews that would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period. In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond

---

[3] See id.
[4] RJ-POL 137582, Proof of Loss Pg. 6-7 00.5pdf.
[5] RJ-POL 000667; RJ-POL 096417; NERA Report, pg. 25-26; RJ-POL 110934; RJ-POL 141483; RJ-POL 128124; RJ-POL 149841; RJ-POL 137513; RJ-POL 136763; RJ-POL 154288; RJ-POL 099359RJ-POL 111619; RJ-POL 096974.
[6] Linda Busby deposition dated February 17, 2021.
[7] See id.
[8] See id.

James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

## FINRA INVESTIGATION

The Financial Industry Regulatory Authority (FINRA) is authorized by Congress to protect America's investors by making sure the broker-dealer industry operates fairly and honestly.[9]  Firms like Raymond James are subject to multiple annual regulatory examinations concerning their overall business.  They are also subject to regular examinations of specific accounts, account activity, new investment products, and a variety of other exams.  A firm the size of Raymond James would receive hundreds of inquiries from FINRA each year on a variety of accounts and issues.  The majority of these inquiries are responded to and resolved.  A small number of FINRA exams and inquiries proceed to investigations and enforcement actions.[10]

Defendants have cited a FINRA inquiry about Quiros' margin debit and margin agreements in May of 2009.[11]  FINRA then contacted Raymond James about the accounts in March 2010 inquiring about how the margin debit was collateralized.[12]  Thereafter, on July 12, 2012, FINRA communicated to Raymond James that it "may take issue" with Quiros' multi-margin account.[13]

In August 2013, Raymond James identified Quiros' margin debit as non-compliant with FINRA's requirements and staff in the Margin Department discussed how Quiros could cure the issue.[14] Raymond James allowed accounts with different registrations to be added as collateral for "maintenance purposes" which was disclosed to a Vice President of Operations.[15] Thereafter, the margin department began pursuing repayment of the margin debit.[16]

IHC Barracca testified he had no recollection of involvement in the FINRA contacts.[17]  I saw no evidence of IHC involvement in the decisions made in the Margin Department related to the inquiries or internal concerns about the margin debit balance in the Jay Peak accounts.  The FINRA inquiries spread over the course of three years would not have put IHC on notice of any regulatory action, and certainly not imminent action, by FINRA directed at the Jay Peak accounts.  Additionally, the inquiries from FINRA were focused on an issue, not a client or any Raymond James employee:  the use of multiple accounts to support a single margin debt.  The inquiry was not limited to Jay Peak accounts, but included other accounts not related to

[9] See FINRA.org.
[10] See FINRA.org Statistics.
[11] RJ-POL 137335.
[12] RJ-POL 137341.
[13] RJ-POL 137371.
[14] RJ-POL 153174-175.
[15] RJ-POL 153174-75, RJ-POL 153268.
[16] RJ-POL 095997.
[17] Mark Barracca deposition dated February 3, 2021 and March 17, 2021.

Jay Peak.  FINRA's "may take action" correspondence did not heighten the focus of their attention on Jay Peak accounts, particularly since the margin debt was closed for the Jay Peak accounts in March of 2014. Accordingly, there was nothing about these cited FINRA inquiries or the Margin Department actions that would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.  In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

## SEC INVESTIGATION OF JAY PEAK ACCOUNTS

The Defendants have cited an SEC investigation of Jay Peak accounts which began on May 28, 2013 with an SEC request for information to Raymond James that pertained to the accounts and Quiros' authority to direct activity within the accounts.[18]  The SEC conducted an on-site examination at Raymond James in early 2014.[19]  Raymond James IHC obtained a copy of the SEC formal order of investigation which showed the focus of the investigation was Quiros' activity with Jay Peak, including the accounts at Raymond James.[20]  In March of 2014, the margin debt related to the Jay Peak accounts was paid off.[21]  The transaction to eliminate the debt was approved by Raymond James, including sign off from the AML Department.[22] The SEC took a deposition of Burstein on March 27, 2014 in which a number of questions were asked concerning Quiros' opening of Jay Peak accounts and the instructions and activity related to the accounts. The deposition lasted almost five hours.[23]  After the Burstein deposition and at the completion of the examination, the SEC issued findings and a request for corrective action in May of 2014.[24]  The findings were related to accounting issues specific to the securities industry documentation on reserve formula computation and on industry Financial and Operational Combined Uniform Single Reports (FOCUS reports), accounting issues related to Raymond James' inclusion of Jay Peak margin debt as an allowable asset, and issues related to obtaining account authorization documentation for some of the Jay Peak accounts.[25]  Raymond James responded to the findings on June 25, 2014 and July 11, 2014.[26]  Almost two years later in April of 2016, the SEC took formal action against Quiros and Jay Peak, not Raymond James.[27]

Raymond James received requests for information beginning in May of 2013, was examined on site, presented Burstein for SEC deposition, and received findings and a request for corrective action in May of 2014.  The request for corrective action focused on accounting and account documentation issues, policies

---

[18] RJ-POL 138714.
[19] RJ-POL 137191.
[20] RJ-POL 138729.
[21] RJ-POL 111485.
[22] RJ-POL 095851.
[23] Burstein Dep. Trans.
[24] RJ-POL 137191.
[25] RJ-POL 137191.
[26] RJ 30 Day Response, RJ Response.
[27] SEC Complaint v. Quiros filed 4/16/2016.  The SEC did not take action against Burstein until September of 2018, over four years after his 2014 SEC on the record testimony.

and procedures, and the implementation of the policies and procedures.  While the SEC identified Quiros and Jay Peak accounts in their corrective action letter, the letter also referenced other customer accounts and issues.  Raymond James issued a response to the SEC letter.  IHC counsel sent a second response to the SEC corrective action letter, providing additional information, explanation, and disagreeing with SEC findings.  Prior to the Burstein deposition, the debit balance for the Jay Peak accounts had been paid off, a fact acknowledged in the corrective action letter and confirmed later by the SEC.

IHC sent an email dated March 13, 2014 to the management of Raymond James saying that he believed the SEC focus was on Quiros and the Jay Peak accounts and that he had no concerns about exposure to the Firm.[28]

[31]  The SEC filed an action against Quiros and Jay Peak in April of 2016.  The State of Vermont entered a formal settlement with Raymond James concerning the Jay Peak accounts in June of 2016.  It is clear from the sequence of events that IHC was aware of and directly involved in the SEC and subsequent State of Vermont regulatory inquiry and investigation.  It is also clear IHC believed the focus of the SEC was on Quiros and Jay Peak, while initial inquiries by Vermont showed a potential focus on Raymond James supervision of the Jay Peak accounts.  There is no discussion of dishonest or fraudulent acts of any Raymond James Employee.[32]  When IHC was leaving Raymond James in July of 2015, he sent an email to Burstein asking if Barracca could send his resume to Burstein, one of his "favorite clients."[33]  IHC Barracca testified that while he was employed by Raymond James he was not aware of any fraudulent activity by Burstein and was shocked to learn of the regulatory charges eventually filed against Burstein.[34]  There also is no discussion of an actual or potential claim against Raymond James for loss resulting directly from dishonest or fraudulent acts committed by an employee.  In my experience as both the first chair lawyer on regulatory matters and as the supervisor of many lawyers handling regulatory matters, the opinion of IHC stated in the 2015 memo is reasonable and consistent with my experience based on the sequence of events, timing, and context of the interaction with the regulators.

There was nothing in this cited content or sequence of events with the SEC that would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.  In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

---

[28] RJ-POL 154023.
[29] RJ Ins Lit 437256 (1).
[30] See id.
[31] See id.
[32] This email suggests to me that IHC harbored no suspicions about Mr. Burstein's complicity.
[33] RJ Ins Lit 435137
[34] Mark Barracca deposition dated February 3, 2021 and March 17, 2021.

## RAYMOND JAMES TERMINATES RELATIONSHIP WITH QUIROS

In September 2013, Raymond James began rejecting Quiro's requests for journal transfers between accounts for inadequate documentation.[35] In March of 2014, the margin balance for the Jay Peak accounts was paid off, a fact known and acknowledged by the SEC in the letter of findings in May of 2014.[36] In July 2014, Burstein sent an email entitled "Raising my hand… (Jay Peak)".  In the email Burstein discussed concerns he had with a request for certain money transfers.[37]  IHC advised Burstein to inform Quiros's that the "Legal Dept." was questioning the purpose of transferring funds through the Raymond James accounts.[38]  Burstein flagged another transaction in September 2014 and it was decided that restrictions would be placed on the Jay Peak accounts to prevent further funds from being transferred into the accounts.[39] IHC Barracca testified that he was aware of Burstein's concerns and agreed that closing the accounts was appropriate to prevent possible regulatory action against Raymond James.[40]  Quiros closed the Raymond James accounts on November 26, 2014 and the AML Department approved the transfer of all assets out of the accounts resulting in zero balances.[41]  The pay off of the margin debt and subsequent closing of the Jay Peak and Quiros accounts would be viewed by IHC as a positive in regards to any inquiry and review by the regulators.  In my experience, the fact that Burstein initiated, agreed with and participated in the closing of the accounts is consistent with an employee who was willing to take difficult steps, contrary to his own client relationship and personal financial gain, to end an account relationship that had brought regulatory scrutiny on the firm.  Burstein's actions appeared to be aligned with the business interests of Raymond James.

  Nothing in the cited events surrounding the restriction and closing of the Jay Peak and Quiros accounts at Raymond James would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.  In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

---

[35] RJ-POL 105679; RJ-POL 097123.
[36] SEC Examination Findings 05/29/2014.
[37] RJ-POL 154295.
[38] RJ-POL 153830.
[39] RJ-POL 153963.
[40] Mark Barracca deposition dated February 3, 2021 and March 17, 2021.
[41] RJ-POL 111273.

## KNOWLEDGE OF INVESTOR COMPLAINTS

On November 14, 2014, a Jay Peak investor named Sutton sent a letter requesting information about the Raymond James Jay Peak accounts.[42]  The investor made allegations about the use of partnership assets, authorization and legitimacy of certain transactions, and that Burstein was married to Quiros' daughter.[43]  IHC for Raymond James responded to the investor inquiry and stated that Raymond James was legally prohibited from providing information about accounts on which the client had no legal authority.[44]  IHC did instruct the investor what legal steps could be taken to obtain account information.[45]  At the time Quiros closed the Raymond James accounts, he relayed to Burstein that an investor was gathering information and speaking critically of the Jay Peak Projects.[46]  This information was relayed to Raymond James IHC on November 17, 2014.[47]

FINRA defines a customer complaint as "any grievance by a customer or any person authorized to act on behalf of the customer involving the activities of the member or a person associated with the member in connection with the solicitation or execution of any transaction or the disposition of securities or funds of that customer."[48]  The Jay Peak investor was not a client or a person authorized to receive any information on the Jay Peak accounts, which were being closed at Raymond James at the time of the letter.  IHC appropriately denied the request for information from the Jay Peak investor and acted in accordance with industry regulation and practice concerning inquiries from non-customers.  The information relayed in the investor letter concerning the business practices of Jay Peak was not an issue that required investigation by Raymond James IHC as the firm had no responsibility to investigate, review and assess the business practices of their clients outside of the accounts at Raymond James.  IHC █████████████████████████████████████████████████████████████████████████████████████████████████████████[49]██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[50]

Oversight of individual business practices and their relationship with investors is the responsibility of various entities, including the SEC, but not Raymond James.  IHC was aware of review of Jay Peak by the SEC at the time the investor sent the November 14, 2014 letter.   There is no information contained in the cited documents about the Jay Peak investor inquiry that would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.  In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

---

[42] RJ-POL 000679.
[43] RJ-POL 000679.
[44] RJ-POL 000773, RJ-POL 000782.
[45] RJ-POL 000782.
[46] RJ-POL 153812.
[47] RJ-POL 153816.
[48] FINRA Rule 4513(b).
[49] Mark Barracca deposition dated February 3, 2021 and March 17, 2021.
[50] See id.



[53] He stated he had no concern about exposure to Raymond James or Burstein.[54] IHC opined in the April 1, 2015 memo that the Vermont requests for commission runs and Raymond James supervisory procedures suggested that the State was looking at the Raymond James supervision of the Quiros-controlled accounts.[55] IHC stated that Raymond James was actively engaged in the discussed matters and would provide update of any material updates or further concerns.[56] The SEC filed an action against Quiros and Jay Peak in April of 2016.[57] The State of Vermont entered a formal settlement with Raymond James in regard to the Jay Peak accounts in June of 2016.[58] It is clear from the sequence of events that IHC was aware of and directly involved in the SEC and subsequent State of Vermont regulatory inquiry and investigation over the course of several years. It is also clear IHC believed the focus of the SEC investigation was on Quiros and Jay Peak, while inquiries by Vermont may have shown a focus on Raymond James' supervision of the Jay Peak accounts. IHC Barracca testified that based on all correspondence and contact with the SEC, he assessed the focus was on Quiros and Jay Peak.[59] Some concern about potential regulatory action is documented, however there is no discussion, nor any evidence, that dishonest or fraudulent acts of any Raymond James employee was under investigation by the regulators. There also was no discussion of an actual or potential claim against Raymond James for loss resulting directly from dishonest or fraudulent acts committed by an employee. In my experience as both the first chair lawyer on regulatory matters and as the supervisor of many lawyers handling regulatory matters, the opinion of IHC stated in the April 2015 memo is reasonable and consistent with IHC opinion and knowledge based on the sequence of events, timing, and context of the interaction with the regulators.

There is nothing in these cited disclosures by IHC to the Raymond James management that would have caused a reasonable person to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period. In-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or

---

[51] RJ-POL 154792.
[52] RJ-POL 154792.
[53] RJ-POL 154023.
[54] See id.
[55] RJ-POL 154792.
[56] See id.
[57] SEC Complaint v. Quiros filed 4/16/2016.
[58] Vermont Administrative Consent Order dated June 29, 2016.
[59] Mark Barracca deposition dated February 3, 2021 and March 17, 2021.

fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

## CONCLUSION

It is my opinion that having reviewed the documents cited for the events and periods of time raised by Defendants in their interrogatory responses addressed above and based upon my training, education and more than 26 years as IHC of financial institutions like Raymond James, IHC did not become aware of facts that would have caused a reasonable person in Raymond James' legal department to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period, and in-house counsel did not receive notice of an actual or potential claim in which it was alleged Raymond James was responsible for loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period.

Respectfully submitted,

Dated: April 20, 2021

*/s/ Clay L. Grumke*

Clay L. Grumke



# ATTACHMENT A

**Clay Grumke**
**St. Louis, MO**

Main:   503.670.7772
Fax:     503.670.9997
Email:   CGrumke@batesgroup.com

## BIOGRAPHY

Clay Grumke is a consultant and expert affiliate with Bates Group, based in St. Louis, Missouri. Mr. Grumke uses his expertise in Retail Securities, Regulatory Investigations and Compliance and to serve our financial services clients and their counsel.

Prior to joining Bates, Mr. Grumke was Assistant General Counsel with Wells Fargo, where he was responsible for all litigation and regulatory matters for the Wealth and Investment Management Division, which included Wells Fargo Advisors, Trust, and Retirement Services.  Mr. Grumke and his team were in charge of regulatory inquiries, investigations and enforcement matters from the SEC, FINRA, OCC, FED, CFTC, and U.S. states and territories.  They also represented the firm and employees in litigation involving clients and competing firms. Additionally, his team conducted internal investigation and responded to third party subpoenas and garnishments.  Mr. Grumke provided ongoing advice to the CEOs and other leaders of the business units, including the Director of Wealth and Investment Management.  He met regularly with senior staff of various regulators to discuss cases, theories, positions and possible settlements or enforcement actions.

Mr. Grumke spent 26 years representing A.G. Edwards and Sons, Wachovia Securities, and Wells Fargo and their employees.  He handled hundreds of internal investigations, regulatory and litigation matters, seeing over 50 arbitration matters through hearing.  As the Director of A.G. Edwards Legal Division, Mr. Grumke led his team through mergers with Wachovia and then Wells Fargo.

Prior to joining Edwards, Mr. Grumke was a Felony Staff Attorney for the St. Louis Circuit Attorney's office, prosecuting criminal cases and trying 40 jury trials to verdict.  He has handled everything from individual customer complaints to major multi-million-dollar regulatory settlements.  Mr. Grumke is a proven problem solver, crises manager, and advocate. He received his juris doctor and bachelor's in Accountancy from the University of Missouri – Columbia.

## EXPERIENCE

**Clay L. Grumke**, St. Louis, MO, *Attorney*, 2018-Present

**Wells Fargo & Company**, St. Louis, MO, A*ssistant General Counsel – Wealth and Investment Management*, 2013-2017; *Managing Counsel – Regulatory*, 2008-2013

**Wachovia Securities, LLC**, St. Louis, MO, *Sr. Vice President & Manager – Regulatory*, 2007-2008



**A.G. Edwards & Sons, Inc**., St. Louis, MO, *Vice President & Director of Law*, 2007; *Vice President & Assistant Director of Law*, 2001-2007; *Associate Vice President & Litigation Counsel*, 1994-2001; *Litigation Counsel*, 1991-1994

**Circuit Attorney's Office, City of St. Louis**, St. Louis, MO, *Assistant Circuit Attorney*, 1987-1991

**U.S. District Court**, Eastern District of Missouri*, Law Clerk*, Judge John K. Regan, 1986-1987

**EDUCATION**

**University of Missouri – Columbia**, *J.D., Chairman of the Order of the Barristers, Business Law Teaching Assistant*, 1986

**University of Missouri – Columbia**, *B.S. Accountancy, President of Business and Public Administration Student Council, Member Delta Sigma Pi Business Fraternity*

**PROFESSIONAL AFFILIATIONS & LICENSES**

Missouri Bar
Illinois Bar
Securities Industry and Financial Markets Association (SIFMA)
Speaker at FI

## ATTACHMENT B – PRIOR EXPERT EXPERIENCE

(1) Sanford, Rowlett et al v. Pershing LLC, FINRA Case Nos. 18-03797 and 18-00651.  May 2019

(2) Lewis, Smith et al v. Pershing LLC, FINRA Case Nos. 18-04019, 18-04209, and 19-00042.  February 2020

(3) Fink et al v. Pershing LLC, FINRA Case No. 20-00613.  April 2021

# ATTACHMENT C - DOCUMENTS AND INFORMATION CONSIDERED

1. Bates stamped documents:

   RJ-POL 0000001-15578
   RJ_Ins Lit_ 0000001-0438128

2. Raymond James' Proof of Loss.
3. Amended Complaint and Exhibits.
4. Federal Insurance Company Letter dated April 20, 2020.
5. Travelers Letter dated April 22, 2020.
6. Beazley Letter dated June 1, 2020.
7. Federal's Responses and Objections to Interrogatories dated and documents cited therein.
8. Deposition of Mark Barracca dated February 3, 2021 and March 17, 2021, and exhibits thereto.
9. Deposition of Linda Busby dated February 17, 2021, and exhibits thereto.

Additional Documents:

10. Complaint SEC v. Quiros.
11. Complaint State of Vermont v. Quiros, et al.
12. FINRA Rule 4513(b).
13. FINRA.org

I reserve the right to amend my report with respect to any additional deposition testimony in this matter, any additional documents produced in this case, or any third party production provided.