# EXHIBIT 6

Page 1

1                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF FLORIDA
2

                   Case No.:  20-21707-CV-UNGARO
3

     RAYMOND JAMES FINANCIAL, INC.,
4

5

          Plaintiff,
6

     vs.
7

     FEDERAL INSURANCE COMPANY;
8    TRAVELERS CASUALTY and SURETY COMPANY OF AMERICA;
     GREAT AMERICAN INSURANCE COMPANY; and
9    BEAZLEY INSURANCE COMPANY, INC.; and
     ST. PAUL MERCURY INSURANCE COMPANY,
10

          Defendants.
11   _____
12          V I D E O T A P E D   D E P O S I T I O N
13                          o f
14                      STEVEN URCIA
15           taken on behalf of the Defendants
16
             DATE:           June 22, 2021
17
             TIME:           9:04 a.m. to 7:02 p.m.
18
             PLACE:          Zoom Videoconference
19
20
21           BEFORE:         PHILIP RYAN, RPR
                             Notary Public - State of
22                           Florida at Large
23
24
25    Job No. CS4614177

Page 63

1   did occur and why it occurred.  That's, basically, what

2   I did.

3        Q    Did you assess the credibility of any

4   witnesses in the depositions that you reviewed?

5             MR. MAZER:  Form.

6             THE WITNESS:  Yeah.

7   BY MR. WEEKS:

8        Q    Did you disregard any sworn testimony that you

9   reviewed in those depositions?

10       A    Disregard?  No.

11       Q    Not consider?

12       A    No.  I mean, the testimony, I took in its

13  totality, I mean given -- given what it was, given the

14  circumstances, and looked at it for what it was.

15       Q    Did you review Mr. Burstein's deposition

16  transcript?

17       A    I reviewed the deposition --

18            MR. MAZER:  Object to the form.

19            THE WITNESS:  -- that was taken by the SEC, I

20       think it was 2013.

21  BY MR. WEEKS:

22       Q    Of Joel Burstein?

23       A    Correct.  I think it was the SEC, that was the

24  deposition -- if there's another one, I don't know of,

25  that's what I reviewed.

Page 116

1      Q    Do you know if there have been any criminal

2    actions filed against Mr. Burstein related to

3    this -- the Quiros/Jay Peak matter?

4      A    No.

5      Q    Ultimately by stating that Burstein and Quiros

6    implemented a fraudulent and dishonest scheme, aren't

7    you weighing the evidence that you reviewed to make that

8    determination?

9            MR. ALHALEL:  Form.

10           THE WITNESS:  Am I weigh -- yes.

11   BY MR. WEEKS:

12     Q    Same related to your statements that "Burstein

13   deliberately and selectively edited and misrepresented

14   the information he provided to Raymond James personnel

15   and others to ensure that Quiros' acquisition of Jay

16   Peak and continued use and misappropriation of investor

17   funds was accomplished."

18           Do you see that?

19     A    Yes.

20     Q    And that is your opinion; correct?

21     A    Yes.

22     Q    And aren't you weighing the evidence to make

23   that opinion?

24           MR. ALHALEL:  Form.

25           THE WITNESS:  Yes.

Page 261

1    that was it.  So, yeah.

2          Q    Did you review the insurance agreement that

3    Raymond James had in connection with this matter?

4          A    No, I did not.

5          Q    Do you agree that you -- strike that.

6               Do you know what a financial institution bond

7    is?

8          A    You know, roughly speaking, it's a -- it's

9    insurance against errors, omissions, and that kind of

10   thing.  I mean, if it's the same thing.  I know at Bear

11   we had E and O, errors and omissions, stuff.  So if we

12   messed up, and the firm had to pay monies for acts that

13   were either fraudulent or just mistakes or whatever,

14   that we were insured to some extent.  So I assume that

15   that's the same thing.  I may be wrong, I'm a layperson.

16   But that's what I believe it to be.

17         Q    Okay.  So fair to say that you are not

18   providing any opinions with respect to what the

19   financial institution bond that Raymond James had says

20   or means?

21         A    That's correct.  I don't read it, and I'm not

22   an insurance person.  That's just my layperson's

23   understanding of what firms insure themselves against,

24   or actions.

25         Q    So would you agree that you have no expertise

Page 262

1    in financial institution bonds or insurance?

2          A     That would be correct.

3          Q     Okay.  What -- so going back to the opinions

4    that Joel Burstein acting alone, or in collusion with

5    others, committed fraudulent or dishonest acts.  What

6    expertise do you have specifically in determining

7    whether an employee committed dishonest or fraudulent

8    acts?

9          A     What?  What do I have?

10                MR. ALHALEL:  Expertise.

11   BY MS. CLARK:

12         Q     Expertise.

13         A     The expertise of knowing what we're supposed

14   to be doing, knowing how things are supposed to work

15   within the business, and when you find that -- you know,

16   and finding wrongdoing; okay?

17                So, for me, the seminal issue here is

18   Burstein's knowledge of what those EB-5 monies were at

19   least not to be used for, and his facilitation of

20   exactly that.  In other words, to take the money out of

21   their control and oversight and put it into a place

22   where Quiros could control information that the ultimate

23   investors were receiving with regard to their accounts.

24         Q     In any of the roles that we discussed in your

25   CV earlier today, were you engaged in reviewing whether

Page 270

1     the net effect of -- of the omissions he made and the --

2     the -- the sort of -- some of the misstatements he gave

3     to some of his fellows, some of the descriptions.  I

4     don't know what his intent was.  The outcome was that

5     people were defrauded.  And everybody else can draw

6     their intent.  I'm only inferring what the net effect

7     was on the investors with regard to his omissions to the

8     people at Raymond James.

9          Q    Do I understand your testimony correctly to be

10    that you understand the end result is that some people

11    were defrauded, but you're not saying one way or another

12    whether Burstein intended to defraud people?

13         A    Oh, I'm absolutely saying that his omissions

14    intended to defraud those people.  He was keeping key

15    information from them at all points.  So, absolutely.  I

16    mean, I can't think of another reason to lie to people

17    about what's happening with their money.

18         Q    So you are offering an opinion today with

19    respect to what Mr. Burstein intended?

20         A    In my opinion, yes.  What he intended was to

21    keep information from people, and the net effect of that

22    was that they went missing monies.

23         Q    As you sit here today, do you have an

24    understanding as to whether it's the role of an expert

25    witness to determine what someone intended?

Page 271

1              MR. ALHALEL:  Object to the form.

2              THE WITNESS:  No.  My purpose isn't to

3         determine intent.  My -- my -- my -- expertise

4         is --

5              MR. ALHALEL:  Steve, that was a yes or no.

6              THE WITNESS:  Oh.  Repeat the question.

7    BY MS. CLARK:

8         Q    So you're saying two different things.  You're

9    saying, in one response to one question, that you have

10   no opinion as to whether Burstein intended to defraud

11   anyone.  And then the answer to my next question, you're

12   saying absolutely it was your intention to offer an

13   opinion as to what Mr. Burstein intended.  I'm trying to

14   figure out which of those two statements is true,

15   because both can't be true.

16              So are you intending to offer an opinion

17   regarding what Mr. Burstein's intent was or not?

18              MR. ALHALEL:  Form.

19              THE WITNESS:  The answer to that would be yes.

20   BY MS. CLARK:

21        Q    You are offering an opinion today regarding

22   what Mr. Burstein intended to do?

23        A    Insofar as the actions he committed, yes.

24        Q    And is that the role of an expert witness to

25   provide an opinion as to what an individual intended to

Page 338

1    which the wire emanated.

2         Q    Can you explain how Naymark learned about the

3    fact that the EB-5 investor funds were used to acquire

4    the resort?

5              MR. ALHALEL:  Object to the form.

6    BY MR. DRATCH:

7         Q    How did she find that out?

8              MR. ALHALEL:  Assume facts in evidence.

9              THE WITNESS:  I don't know if that's what she

10        found out.  I don't know what she knew.  And

11        there's no indication that tells me what she's

12        complaining about in her e-mail.

13   BY MR. DRATCH:

14        Q    It's your understanding that the reason -- you

15   don't understand why Naymark wanted to speak to the

16   legal department of Raymond James?  Is that your

17   testimony?

18             MR. ALHALEL:  Form.

19             THE WITNESS:  It's not clear from the e-mail.

20        If you could tell me what she was complaining

21        about, then enlighten me.

22   BY MR. DRATCH:

23        Q    In your report, on page 3 in footnote number

24   one, you quote the primary bond language, the Fidelity

25   insuring agreement.  Where did you obtain that quota--

Page 339

1    where did you obtain that language to put in your

2    footnote?

3         A    Counsel.

4         Q    Counsel gave you that, and then you

5    incorporated it into your report; is that correct?

6         A    To the extent that they felt it was relevant

7    that we -- that the --

8              MR. ALHALEL:  Do not reveal your substance of

9         your communications with counsel.

10   BY MR. DRATCH:

11        Q    Did you actually have a physical copy of the

12   bond?

13        A    No.

14        Q    So you never had a physical copy of it, and

15   obviously you've never read the bond?

16        A    I believe I testified to that earlier.

17             MR. ALHALEL:  Asked and answered.

18             THE WITNESS:  I didn't read the bond, no.

19   BY MR. DRATCH:

20        Q    Okay.  From everything that you read, did you

21   formulate an opinion as to whether Joel Burstein wanted

22   to cause harm to Raymond James in connection with his

23   relationship with Quiros?

24             MR. ALHALEL:  Form.  Outside the scope.

25             THE WITNESS:  Yeah, we're talking about his