# EXHIBIT 9

```
                                                              Page 1

 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
 3              CASE NO.:   20-21707-CV-UNGARO
 4
 5     RAYMOND JAMES FINANCIAL, INC.,
 6              Plaintiff,
 7     -vs-
 8     FEDERAL INSURANCE COMPANY;
       TRAVELERS CASUALTY and SURETY
 9     COMPANY OF AMERICA; GREAT
       AMERICAN INSURANCE COMPANY; and
10     BEAZLEY INSURANCE COMPANY, INC.,
       and ST. PAUL MERCURY INSURANCE
11     COMPANY,
12              Defendants.
       _____/
13
14
                    VIDEOTAPED DEPOSITION OF
15                       MARK BARRACCA
16
17              Wednesday, February 3, 2021
                   9:07 a.m. - 1:00 p.m.
18
19
20                   By videoconference
21
22
23
24           Stenographically Reported By:
                Dianelis Hernandez, FPR
25              Job No. CS4427389
```

1        A.    I wanted to -- I had been there for 13
2   years and was ready for a new challenge.
3        Q.    Did you leave Raymond James voluntarily?
4        A.    Yes.
5        Q.    Are you familiar with the Jay Peak Resort?
6        A.    Yes.
7        Q.    How are you familiar with the Jay Peak
8   Resort?
9        A.    I am familiar with it through an SEC
10  request for information that Raymond James received.
11       Q.    When Raymond James received that SEC
12  request for information, is that the first time that you
13  became aware of the Jay Peak Resort?
14       A.    Yes.
15       Q.    Can you tell me approximately when that SEC
16  request for information was received by Raymond James?
17       A.    I believe it was in 2013.
18       Q.    Were you involved in the responding to the
19  SEC request for information related to Jay Peak?
20       A.    Yes.
21       Q.    How were you involved?
22       A.    The matter was assigned to me and my team.
23  So I would be responsible for responding to the SEC's
24  questions.
25       Q.    Who assigned the matter to you?

```
                                                    Page 75
 1      about making a claim under any policy of insurance?
 2              A.    No.
 3              Q.    I'm sorry?
 4              A.    No.
 5              Q.    Did Mr. Burstein ask you about this portion
 6      of this letter related to making a claim under an
 7      insurance policy?
 8              A.    No.
 9              Q.    Did Mr. Burstein ever sign a copy of this
10      letter?  I'm sorry?
11              A.    I don't know.
12              Q.    So earlier you mentioned that you
13      represented Mr. Burstein in his SEC testimony; am I
14      recalling that testimony correctly?
15              A.    Yes.
16              Q.    Were you present in the room for the
17      entirety of Mr. Berstein's testimony?
18              A.    I believe so.
19              Q.    And did you hear the entirety of
20      Mr. Berstein's testimony?
21                    MR. MAZER:  Form.
22              A.    I believe so.
23      BY MS. CLARK:
24              Q.    If you could turn to tab eight in your
25      binder.  It's Exhibit 8, it is the transcript of
```

Page 83

1   to believe that Mr. Burstein did not testify truthfully?
2       A.   No.
3       Q.   Based on the testimony we just read, did
4   you understand on March 27, 2014 that the seller told
5   Mr. Burstein that investor monies could not be used as
6   collateral for margin loans?
7           MR. MAZER:   Form.
8       A.   I don't recall what I knew at that time,
9   but reading this now it's apparent that that's what --
10  that's what Mr. Burstein was saying.
11  BY MS. CLARK:
12      Q.   And you --
13      A.   Mr. James was saying and he agreed.  Sorry.
14      Q.   And you were there -- that's okay.  I
15  interrupted you.
16           And you were there with Mr. Burstein and
17  you heard his testimony?
18      A.   Correct.
19      Q.   From this portion that we just read, did
20  you also understand that the LP-1 and LP-2 accounts at
21  Raymond James held investor funds?
22           MR. MAZER:   Form.
23      A.   I don't believe I knew that.
24  BY MS. CLARK:
25      Q.   Okay.  Did you learn that for the first

Page 84

1    time at Mr. Burstein's testimony on March 20, 2014?
2             MR. MAZER:  Form.
3        A.   Possibly.
4    BY MS. CLARK:
5        Q.   So if you look on the same page, but page
6    number 173, starting at Line 11, please, Mr. Burstein
7    states:  "MMSI agreed to transfer the funds
8    simultaneously.  The funds were there first.  They agreed
9    to transfer the funds to Mr. Quiros first and we gave
10   them the loan afterwards."
11            Mr. James responds:  "Okay.  So you knew at
12   the time -- you meaning yourself and Raymond James -- you
13   knew at the time that that's how the transaction was
14   going to unfold?"
15            Mr. Burstein states:  "Yes."
16            Mr. James says:  "That you are going to
17   issue a margin, I guess, simultaneously as a transaction
18   is occurring?"
19            Mr. Burstein says:  "Yes."
20            Did I read that correctly?
21       A.   Yes.
22       Q.   So on March 27, 2014, you understood that
23   Raymond James issued a margin loan secured by the funds
24   MMSI transferred to Raymond James simultaneously with the
25   transaction, correct?

Page 85

1        MR. MAZER:  Form.
2    A.   Yes.
3  BY MS. CLARK:
4    Q.   And Mr. Burstein in Line 11 is referring to
5  MMSI, I think that -- just so we are clear, I think
6  that's an error, it's MSSI.  Do you know one way or
7  another whether the seller was MMSI or MSSI?
8    A.   I believe it was Mount Savor something, but
9  I don't recall the abbreviation.
10   Q.   Okay.
11   A.   I believe he is referring to the seller.
12   Q.   Okay.  And on -- based on his testimony,
13  looking at Line 17 on page 173, you understood on
14  March 27, 2014 that Mr. James was defining you as
15  Mr. Burstein and Raymond James, correct?
16       MR. MAZER:  Form.
17   A.   I'm not sure whether I caught that during
18  testimony, you know, it's sometimes difficult to grasp
19  every word that's being said and communicated.  So I
20  don't know that that would have -- that particular phrase
21  would have stuck in my mind as something that, you know,
22  I would have remembered.  But I see it here in black and
23  white, and I have no doubt it was said.  Whether I paused
24  to consider what he was saying or not, I couldn't tell
25  you.

Page 88

1  BY MS. CLARK:
2      Q.   Yeah.  So just looking at what's on the
3  page here, I know we talked about on your understanding
4  of March 27, 2014, but I'm asking you to look at what we
5  just read on page 174 between Lines 8 through 18.
6  Looking at what's there in the transcript, do you
7  understand Mr. Burstein to have testified that the seller
8  told him that investor money could not be used as
9  collateral for a margin loan but that it was used in that
10 manner?
11             MR. MAZER:  Form.  Mischaracterizes
12     testimony.
13     A.   I believe that it's the SEC that is making
14 that observation and Mr. Burstein is adding or
15 clarifying, we said they need to discuss that with
16 Mr. Quiros, it was not our place to make an opinion.
17 BY MS. CLARK:
18     Q.   And he also states:  "That's what I
19 remember," correct?
20     A.   Yes.
21     Q.   ████████████████████████████████████████
   ████████████████████████████████████████████
   ██████
24     A.   ████████████████████████████████████████
   ████████████████████████████████████████████