**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO.: 20-21707-CIV-MARTINEZ-BECERRA**

RAYMOND JAMES FINANCIAL, INC.,

       Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
TRAVELERS CASUALTY AND
SURETY COMPANY OF AMERICA,
GREAT AMERICAN INSURANCE COMPANY,
BEAZLEY INSURANCE COMPANY, INC. and
ST. PAUL MERCURY INSURANCE COMPANY,

       Defendants.

_____/

**PLAINTIFF RAYMOND JAMES FINANCIAL, INC.'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S EXPERTS**

       Plaintiff Raymond James Financial, Inc. ("Raymond James"), by and through undersigned counsel and pursuant to Rules 403 and 702 of the Federal Rules of Evidence, submits its memorandum of law in opposition to Defendants' Motion to Exclude Plaintiff's Experts [ECF No. 164] (the "Motion").

## I.     INTRODUCTION

This insurance coverage dispute arises from Defendants' failure to indemnify Raymond James for covered loss under a series of Financial Institution Bonds (the "Bonds") providing a total of $60 million in "single loss" employee fidelity coverage. Raymond James suffered a covered loss under the Bonds resulting directly from dishonest and fraudulent acts committed by a Raymond James employee, Joel Burstein ("Burstein"), while acting alone or in collusion with his former father-in-law Ariel Quiros ("Quiros"), in connection with the purchase, improvement and expansion of the Jay Peak Resort in Vermont. Among other dishonest acts, Burstein deliberately and selectively edited, misrepresented and withheld critical information from personnel at Raymond James such that Quiros could unlawfully use EB-5 investor funds to purchase the Jay Peak resort. Burstein's scheme involved: (1) causing funds generated by EB-5 investments and owned by the separate limited partnerships to be deposited into Raymond James brokerage accounts; (2) opening identically titled accounts under Quiros' control in order to misappropriate partnership assets to fund the purchase of Jay Peak; (3) concealing the misappropriation by using an intricate web of transfers through multiple accounts; (4) buying Treasury bills on margin to create the appearance that partnership funds remained in the partnership accounts; and (5) preparing misleading correspondence and cross-collateralizing accounts to camouflage the true nature of transactions and hide the existence of margin debits. Through their scheme, over $60 million in EB-5 investor funds were converted from limited partnership accounts at Raymond James. None of this misappropriation could have occurred without Burstein, the Financial Advisor on each account and the Miami Branch Manager, orchestrating the scheme and concealing the fraud. Or, as Quiros put it, without Burstein's "RJ MAGIC, according to their "original plan."

Defendants have denied coverage because they contend that (1) Raymond James cannot establish that Burstein engaged in employee dishonesty covered under the Bonds – despite clear evidence that Burstein engaged in fraudulent and dishonest acts while acting alone or in collusion with Quiros for their personal benefit; (2) Raymond James has not suffered covered losses under the Bonds – despite the misappropriation of more than $60 million in limited partnership funds on deposit at Raymond James and Raymond James' repayment of same; and (3) Raymond James failed to timely provide notice under the Bonds – despite Raymond James' legal department first discovering a loss under the Bonds on or after May 4, 2016 and then immediately providing notice

of a claim to Defendants. These are all factual issues that the jury will be asked to decide at trial, based upon this Court's instructions on the meaning of the Bond language. *Jones v. Utica Mut. Ins. Co.*, 463 So. 2d 1153, 1157 (Fla. 1985) (meaning of an insurance policy is question of law for the court; it is for the jury to decide whether the facts of the case fall within the scope of coverage as defined by the court).

To assist the jury in deciding these factual issues, Raymond James has retained three expert witnesses: Steve Urcia, Jorge Baez, and Clay Grumke, respectively – all of whom have specialized knowledge, training, and experience in the areas for which they are being proffered as experts.

Mr. Urcia has forty years of financial industry experience working at broker-dealers, including twenty-one years as a Managing Director with Bear Stearns. He is being offered as an expert witness to, among other things, explain to the jury the mechanics of Burstein's and Quiros' scheme and how Burstein was able to use his position as branch manager to accomplish and perpetuate the scheme. Mr. Urcia also is being offered as a rebuttal expert to respond to Defendants' supposed experts, John Maine and Gregory Hagarty (assuming the Court does not exclude Mr. Hagarty for the reasons discussed in Raymond James' *Daubert* motion [ECF No. 127]).

Mr. Baez is a Yale-educated economist with significant experience calculating losses in fraudulent schemes. He is being offered as an expert witness to, among other things, testify on the more than $60 million in limited partnership funds that were misappropriated for Quiros' personal benefit using accounts at Raymond James. Mr. Baez is also being offered as a rebuttal expert to respond to the numerous flaws in the methodologies and opinions of Defendants' accounting expert Alan Blass.

Mr. Grumke is a lawyer with over twenty-six years of experience working as in-house counsel for financial institutions like Raymond James. He is being offered as an expert witness to, among other things, explain to the jury the role and practices of in-house counsel at a financial services firm and to opine that, based on the information available to the legal department in real time, Raymond James' legal department did not have sufficient facts to trigger discovery prior to the inception of the bond period. Mr. Grumke also is being offered as a rebuttal expert to respond to Defendants' "expert" Sander Ressler (assuming the Court does not exclude Ressler because he has no relevant legal or insurance experience and is offering opinions that are completely inconsistent with the controlling Bond language. [ECF No. 127]).

Defendants now seek the wholesale exclusion of all three experts, because they supposedly lack specialized knowledge of financial institution bonds. Even putting aside that Defendants themselves have retained four purported experts, not even one of whom has more than a passing familiarity with fidelity bonds, this argument is completely irrelevant. None of Raymond James' experts are being offered as an insurance expert. All have substantial experience in the specific areas in which they have been retained to offer expert testimony in this case. Unable to refute their impeccable qualifications and relevant industry-specific expertise, Defendants instead attempt to mislead this Court with a litany of non-material criticisms that, at best, go to the weight to be accorded their trial testimony. Incredibly, moreover, Defendants completely ignore the rebuttal expert reports and rebuttal opinions to be offered by these expert witnesses.[1]

As will be demonstrated herein, Mr. Urcia, Mr. Baez, and Mr. Grumke are well-qualified; their opinions are reliable based upon their decades of experience and their examination of the relevant evidence in this case; and their opinions undoubtedly will assist the jury in deciding disputed factual issues. This Court should accordingly deny Defendants' Motion in its entirety.

## II.   ARGUMENT

### A.   THE STANDARDS FOR ADMISSIBILITY OF EXPERT TESTIMONY

In considering whether to admit expert testimony, courts within the Eleventh Circuit engage in a three-part inquiry: (1) whether the expert is qualified to testify competently regarding the matters the expert intends to address; (2) whether the expert's conclusions are based upon a reliable foundation; and (3) whether the expert's testimony will assist the trier of fact to understand the evidence in light of the expert's training and experience. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). The Court's gatekeeper role under *Daubert*, however, "is not intended to supplant the adversary system or the role of the jury." *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir. 1999). It is not the role of the trial court to make conclusions about the persuasiveness of the expert's opinions; rather, "vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596 (1993).

---

[1] Mr. Urcia's, Mr. Baez's and Mr. Grumke's Expert Rebuttal Reports are attached hereto as Composite Exhibit "A."

Challenges to assumptions made by an expert, as well as challenges to the underlying facts in support of an expert's opinions, go to the weight and credibility of the expert's testimony, *not* to its admissibility. *See Ward v. Carnival Corp.*, No. 17-24628-CV-SCOLA/TORRES, 2019 WL 1228063, at *7 (S.D. Fla. Mar. 14, 2019). "Indeed, 'in most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility.'" *Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) (quoting *Hemmings v. Tidyman's Inc.*, 285 F.3d 1174, 1188 (9th Cir. 2002)). Importantly, moreover, this Court "must eschew credibility determinations and any assessment of the merits of an expert witnesses' opinion -- which are matters exclusively reserved to juries -- and must instead narrowly focus on whether the proponent of the expert witness has established the Qualification, Reliability, and Helpfulness Requirements." *American K-9 Detection Services, Inc. v. Rutherford Int'l, Inc.*, No. 6:14-cv-1988-Orl-37TBS, 2016 WL 2744958, *4 (M.D. Fla. May 2016).

Once the proponent satisfies the minimum threshold for admissibility, the parties' remaining reliability and relevance disputes must be decided by the jury, preferably based on the litigants': (1) presentation of contrary evidence, such as testimony from the litigant's own expert witness providing both contrary opinions and criticism of -- among other things -- the opposing expert's qualifications and the inaccuracy or unreliability of his or her opinions; and (2) use of cross-examination and appropriate legal argument. *Id.*; *see also Costa v. Wyeth, Inc.*, 8:04–cv–2599–T–27MAP, 2012 WL 1069189, at *2 (M.D. Fla. Mar. 29, 2012).

All three of Raymond James' experts easily meet the standards for admissibility under *Daubert* and its progeny.

### B.   MR. URCIA SHOULD NOT BE EXCLUDED AS AN EXPERT

#### 1.   *Mr. Urcia's Financial Industry Experience Qualifies Him as an Expert*

To determine whether a proposed expert is qualified, "[c]ourts generally look to evidence of the witnesses' education and experience and determine whether such qualifications and experience sufficiently fit with the subject matter of the witnesses' proposed testimony." *American K-9 Detection Services, Inc.*, 2016 WL 2744958 at *4 (internal quotations omitted); *J.G. v. Carnival Corp.*, No. 12–21089–CIV, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (expert may be qualified "by knowledge, skill, experience, training, or education"). "The qualification standard for expert testimony is not stringent, and so long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility."

*Vision I Homeowners Ass'n Inc. v. Aspen Spec. Ins. Co.*, No. 08-81211-CIV, 2009 WL 5103606, at *2 (S.D. Fla. Dec. 28, 2009) (citing *Kilpatrick, v. Breg, Inc.*, No. 08–10052–CIV, 2009 WL 2058384, at *3 (S.D. Fla. June 25, 2009)). The test is "whether the subject matter of the witness's proposed testimony is sufficiently within the expert's expertise." *Golden v. Carnival Corp.*, No. 14-24899-CV-LENARD/GOODMAN, 2016 WL 11547358, at *3 (S.D. Fla. Mar. 18, 2016). Courts routinely find an expert "qualified" on the subject matter of the expert's testimony if the expert possesses some relevant and specialized knowledge, training, or experience in the field. *Frazier*, 387 F.3d at 1261.

Based on his extensive financial services industry knowledge, experience and training, Mr. Urcia unquestionably is qualified to offer expert testimony in this case. As detailed in the CV attached to his Expert Report, and as explained at deposition, Mr. Urcia has over forty years of experience as a broker-dealer. During that time, he spent more than twenty years as a Managing Director with Bear Stearns. Among other responsibilities, Mr. Urcia developed a compliance department and surveillance department, built up the surveillance team and helped develop surveillance techniques. (Urcia Dep. at pp. 12:12-15:25)[2]. He was also a compliance officer and the New York branch office manager. (*Id.*). As branch manager, he was responsible for all activities of the firm's headquarters branch office, including branch manager training and investigating and responding to customer complaints, [ECF No. 164-3 at Ex. A]. His responsibilities as Branch Compliance Manager included monitoring customer account activities, monitoring brokers' outside sales activities in accordance with firm policies, promulgating policies and procedures addressing, among other things, margin issues, and reviewing and approving outgoing correspondence. [*Id.*]. Mr. Urcia also helped develop the firm's anti-money laundering (AML) procedures and policies. (Urcia Dep. at pp. 14:21-15:5, Ex. B). Since 2008, moreover, Mr. Urcia has worked for Capital Forensics, Inc., where his responsibilities include serving as an expert witness in various securities industry matters and consulting with brokerage firms for projects related to, among other things, supervision, compliance and surveillance systems, including AML investigations and the use of margin. [ECF No. 164-3 Ex. A].

Because Mr. Urcia's broker-dealer qualifications are unimpeachable, Defendants instead focus solely on his lack of experience with financial institution bonds as a supposed basis for

---

[2] Excerpts of the deposition of Steven Urcia are attached as Exhibit B (Ex. "B").

excluding his testimony. That is a red herring. Mr. Urcia is not being offered as an insurance expert, and his opinions do not require any insurance expertise. Fraud and dishonesty are not insurance specific terms. Indeed, the Bonds do not even define what constitutes a "dishonest" or "fraudulent" act. (Resp. at p. 11) ("the Bonds do not define those terms"). They must therefore be given their plain and ordinary meaning. *Barcelona Hotel, LLC v. Nova Cas. Co.*, 57 So. 3d 228, 230-31 (Fla. Dist. Ct. App. 2011) ("When an insurance coverage term is not defined, the term should be given its plain and ordinary meaning"). Moreover, where, as here, a policy does not define what constitutes a "dishonest" or "fraudulent" act, courts broadly construe those terms to mean any act involving bad faith, willfulness, breach of honesty or a want of integrity or moral turpitude. *Fed. Deposit Ins. Corp. v. Lott*, 460 F.2d 82, 87 (5th Cir. 1972). Intentional misrepresentations, concealments, and "deliberate deception by pretense and stealth" constitute dishonest conduct. *Fed. Deposit Ins. Corp. v. Aetna Cas. & Sur. Co.*, 426 F.3d 729, 737 (5th Cri. 1970); *Miami Nat. Bank v. Penn. Ins. Co.*, 314 F. Supp. 858, 862 (S.D. Fla. 1970).

In other words, no financial institution bond experience is required for Mr. Urcia to opine on Burstein's fraudulent or dishonest acts or to explain to the jury, as a former broker-dealer branch manager himself, the mechanics of Burstein's scheme. Instead, it is Mr. Urcia's four decades of *brokerage industry experience and extensive knowledge of brokerage industry practices*, that makes him well-qualified to testify as an expert with respect to the mechanics of the fraud perpetrated by Burstein while employed as a branch manager with Raymond James. Defendants' Motion simply ignores this relevant experience – because it cannot be refuted – in favor of focusing on a narrow insurance product experience that is completely irrelevant to Mr. Urcia's opinions. Therefore, Mr. Urcia unquestionably is qualified to offer expert opinions in this case.

### 2. *Mr. Urcia Offers Reliable and Admissible Opinions Based on the Facts and his Substantial Knowledge, Experience and Training*

Defendants' next argument that Mr. Urcia "does not seek to opine about unique industry standards outside the knowledge of the jury" is belied by Mr. Urcia's actual opinions in this case. Based on his decades of experience in supervisory roles within the brokerage industry, coupled with his specialized knowledge in the areas of compliance, surveillance, margin, and anti-money laundering, Mr. Urcia will explain to the jury, among other things, how large broker/dealers like Raymond James operate [ECF No. 164-3 pp. 8-10], the role of an AML department at a financial institution [*Id.* at pp. 28-29], the role and responsibilities of a financial advisor [*Id.* at pp. 10-11], and the mechanics of Burstein and Quiros' scheme, including how Burstein was able to use his

position as branch manager and knowledge of Raymond James' procedures to implement and then evade detection of the scheme. [*Id.* at pp. 15-27]. This information plainly is outside the understanding of a layperson and is directly relevant to the issues in this case. *See United States v. Rouco*, 765 F.2d 983, 995 (11th Cir. 1985) (expert may be used if his testimony can offer something "beyond the understanding and experience of the average citizen"); *United States v. Burchfield*, 719 F.2d 356, 357 (11th Cir. 1983) (expert testimony admissible where it is "the kind that enlightens and informs lay persons without expertise in a specialized field").

For example, a critical component of the scheme involved buying Treasury bills on margin, and ultimately cross-collateralizing the accounts, to camouflage the unlawful conversion of partnership funds from the partnership accounts at Raymond James. While using margin to buy securities is not well-known to people outside the securities industry, Mr. Urcia has extensive familiarity with margin. He can therefore explain to the jury not only what margin is and how it works (Urcia Dep. at pp. 16:11-17:14, Ex. B), but also how it was used in this case to conceal the absence of partnership funds in the Raymond James-held limited partnership accounts. As Mr. Urcia explained in his Expert Report:

> Concealment from the investors, of the fraud was ultimately dependent on the use of margin. To "margin" or "buy on margin" means to use money borrowed from a broker to purchase securities. As discussed below in detail, Burstein set up accounts with margin features to purchase the Jay Peak Resort with investor funds. When investor funds were received into an RJ account, Burstein, using instructions from Quiros and Stenger, would transfer approximately 90% of the funds received from investors to a Quiros controlled account which was then diverted to pay for the purchase of Jay Peak Resort, other properties and for other personal purposes. The remaining 10% of investor funds were used as collateral to fund the purchase of T-bills equal to the original investor deposit. (Raymond James required a 10% equity for T-bills meaning an investor could borrow up to 90% of the market value of the T-bills purchased vs. the margin requirement for common stock which was 50%. By using T-Bills, Quiros was able to use 90% of investor funds for his own purposes instead of only 50%). The T-bills were purchased to give the impression to the investors that their investment was secure. . . . By purchasing T-bills in an amount equivalent to the funds deposited Quiros was able to provide investors information showing only the T-bill position and hide the information showing the margin debt. The margin accounts were used directly to hide the fact that investor funds were used for the purchase of the resort and to hide the improper use of investor funds and the diversion of those funds to Quiros and Burstein for their personal use.

[ECF No. 164-3 at pp. 12-13; Urcia Dep. at pp. 138:1-10; 142:7-143:17].

Mr. Urcia can also explain to the jury how Burstein was able to use his position as a

Financial Advisor and Miami complex Administrative Manager to evade detection of the scheme by Raymond James. As Mr. Urcia explained in his Expert Report:

> As the Miami complex Administrative Manager, Burstein was responsible for general compliance at the complex which included review of the branch office compliance report, complaints, and other supervisory related reports. His position allowed him to anticipate and proactively navigate potential issues that could expose the scheme, often before an event even triggered one (e.g., where a particular transaction might require approval.

[*Id.* at pp. 10-11].

One such example of Burstein using his position and knowledge to evade review was through a "no encumbrance" letter that Burstein prepared after questions were raised regarding the partnership accounts at Raymond James. This letter allowed Burstein to give the appearance that the accounts listed were not encumbered as of February 27, 2012, even though that was true only for that single business day. As Mr. Urcia testified at deposition, because Burstein's role included the review of incoming and outgoing correspondence (Urcia Dep. at pp. 123:3-9; 239:15-241:19, Ex. B) – something Mr. Urcia himself did at Bear Stearns – Burstein was able to use his "position as the correspondence gatekeeper at Raymond James" to escape supervisory scrutiny. [ECF No. 164-3 at p. 26].

As Mr. Urcia succinctly testified when asked at deposition whether he was merely offering his "opinion as to what happened":

> No. No. My opinion is to why what happened happened, turned out to be fraudulent. In other words, what happened was money movement between accounts and that sort of thing within the Raymond James context. It was Burstein's knowledge that kept Raymond James from knowing that the things they were doing were harming people.

[Urcia Dep. at p. 297:5-15, Ex. B]. In other words, Mr. Urcia can explain the mechanics of Burstein's fraud to the jury, based on his many decades of experience in the brokerage industry.

That Mr. Urcia uses the facts of the case to render his opinions does not make his testimony inadmissible. While it is generally inappropriate for experts to become a vehicle for factual narrative, an expert is certainly allowed to articulate the factual underpinnings upon which they base their opinions. *See Duling v. Domino's Pizza, LLC*, No. 1:13–CV–01570–LMM, 2015 WL 3407602, at *12 (N.D. Ga. Jan. 14, 2015) (citing *FNB Bank v. Park Nat'l Corp.*, 996 F. Supp. 2d 1187, 1190 (S.D. Ala. 2014)). "This makes logical sense, as '[a]n expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded that opinion

8

is for the jury.'" *Id.* (quoting *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012)). Additionally, expert testimony that "synthesizes or summarizes data in a manner that streamlines the presentation of that data" is admissible. *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 45 (S.D.N.Y. 2016). "An expert also may offer commentary on documents in evidence if the expert's testimony relates to the "context in which [documents] were created, defining any complex or specialized terminology, or drawing inferences that would not be apparent without the benefit of experience or specialized knowledge." *Id.*

Here, Mr. Urcia is not being offered "solely for the purposes of constructing a factual narrative." Rather, Mr. Urcia is relying on his extensive experience and specialized knowledge to explain to the jury, based on the evidence in this case, how Burstein's actions were dishonest and how Burstein was able to use his supervisory position at Raymond James and knowledge of Raymond James' procedures to implement and then conceal the scheme from Raymond James and others. In other words, Mr. Urcia is providing expert opinions that are informed by the underlying facts of the case.

*Pledger v. Reliance Trust Co.*, No. 1:15-CV-4444-MHC2020 WL 6101409 (N.D. Ga. Jan. 24, 2020), is instructive. In that case, the defendant sought to exclude expert testimony because it supposedly "largely consist[ed] of a factual narrative." *Id.* at *8. The court disagreed. As the court explained, the expert at issue – much like Mr. Urcia here – "provide[s] more than simple narratives of Plaintiffs' version of the factual events at issue in this case. Instead, [his] expert report[] provide[s] *opinions* based upon facts that *could be* accepted by the [factfinder]." *Id.* (emphasis in original) (citing *Duling*, 2015 WL 3407602 at *12). Therefore, the court found that the expert's testimony would assist the trier of fact.

Defendants' reliance on *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531 (S.D.N.Y. 2004), moreover, is misplaced, because *Rezulin* is readily distinguishable. In *Rezulin*, the expert at issue was being offered merely as a "historian" to "testify to a narrative reciting selected regulatory events concerning Rezulin." *Id.* at 551. As the court explained in excluding the expert's testimony, an expert is not required to comment on what the transcript of an Advisory Committee "noted." *Id.* Mr. Urcia, however, is not serving merely as a "historian" of facts. *Based upon the facts*, he is providing expert opinions that are informed by his intimate working knowledge of a broker-dealer like Raymond James.

### 3.    Mr. Urcia's Testimony is Helpful to the Jury

Lastly, Defendants assert that Mr. Urcia's opinions are "intertwined with impermissible legal opinions." But Fed. R. Evid. 704(a) is clear that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Defendants' argument, moreover, that Mr. Urcia is instructing the jury on the meaning of the words "fraud" and "dishonesty" is silly.[3] Explaining to the jury how Burstein's conduct was "fraudulent" or "dishonest" is not the same as instructing the jury on the meaning of those words. The Court will, of course, instruct the jury on the meaning of those words. And the jury will ultimately have to decide whether Burstein engaged in "fraudulent" or "dishonest" conduct based on the instructions provided by the Court. But Mr. Urcia's substantial experience in supervisory roles within the brokerage industry undoubtedly will assist the jury in that regard. To be sure, Mr. Urcia will help the jury understand the operations of a broker-dealer like Raymond James, the role and responsibilities of someone in Burstein's position and how he was able to use that position and his knowledge to orchestrate the scheme, and common securities industry verbiage (such as buying securities on margin). *See U.S. v. Toner*, 173 F.2d 140, 145 (3d Cir. 1949) (recognizing an expert's value in explaining terminology into terms accessible to lay persons).

Therefore, Mr. Urcia's expert opinions are reliable, helpful, and admissible.

### 4.    *Mr. Urcia Offers Admissible Rebuttal Opinions*

In addition to offering admissible testimony by way of his Expert Report, Mr. Urcia has also authored two Expert Rebuttal Reports to respond to the flawed opinions offered by Defendants' purported "experts" John Maine and Gregory Hagarty. *See* Composite Ex. A. Defendants have offered Mr. Maine to opine that Burstein did not deviate from fundamental principles of segregation of duties and that Raymond James approved withdrawals despite red flags of fraud and money laundering. Mr. Urcia has offered rebuttal expert opinions responding to Mr. Maine's opinions. And while Mr. Hagarty's opinions are inadmissible for the reasons detailed in Raymond James' *Daubert* motion [ECF No. 127], to the extent the Court admits Mr. Hagarty as an "expert," Mr. Urcia offers admissible rebuttal opinions in response to Mr. Hagarty's nebulous and undefined conclusion that Raymond James failed to employ "reasonable investigatory

---

[3] As noted above, because the Bonds do not define "fraud" or "dishonesty," those terms are given their plain and ordinary meaning. *Barcelona Hotel, LLC*, 57 So. 3d at 230-31 (Fla. Dist. Ct. App. 2011). Thus, Mr. Urcia's use of the dictionary definition hardly is objectionable. And it certainly does not provide sufficient grounds to exclude his testimony altogether.

techniques" before concluding that Burstein engaged in fraud or dishonesty. Defendants' Motion does not even address Mr. Urcia's Expert Rebuttal Reports, let alone explain why Mr. Urcia cannot rebut the opinions offered by their purported experts.

In short, Mr. Urcia is well-qualified to testify regarding the brokerage industry matters he intends to address; his conclusions are reliable based upon the facts of this case and his extensive knowledge and experience in the industry; and his testimony will help the jury understand the evidence in light of his specialized knowledge and training. Accordingly, Mr. Urcia's opinions are admissible, and Defendants' request to exclude his testimony at trial should be denied.

### C.    MR. BAEZ SHOULD NOT BE EXCLUDED AS AN EXPERT

Mr. Baez is a Yale-educated economist with significant experience in calculating losses in fraudulent schemes.[4] Based on his education, training, and experience, and using a flow of funds analysis that Defendants' accounting expert Mr. Blass does not dispute, Mr. Baez has identified $64.2 million in limited partnership funds that were misappropriated by Burstein and Quiros for purposes unrelated to any of the Jay Peak limited partnerships and for Quiros' personal benefit. [ECF No. 164-4 at Ex. 4].

Defendants argue that Mr. Baez is attempting to circumvent the terms of the Bonds' because, according to Defendants, Raymond James must "prove the theft of property to which had title, possession or custody." (Resp. at p. 12). But those are *not* the terms used in the Bonds. The Bonds provide coverage for property "owned by the Insured," "held by the Insured in any capacity," or "for which the Insured is legally liable." The meaning of those terms is a question of law for the Court to decide, not Defendants. *Jones*, 463 So. 2d at 1157. Defendants' argument for excluding Mr. Baez, based on their *subjective* interpretation of what the Bonds' ownership provision requires, misapplies the law and is otherwise not a sufficient basis for excluding Mr. Baez's testimony at trial.

First, Defendants' strained argument that Mr. Baez's opinions are irrelevant because certain of the misappropriated funds were not lost from accounts at Raymond James is simply not true. Even Defendants' own accountant, Mr. Blass, agrees that that a limited partnership did not suffer an economic loss until funds were diverted from commingled accounts *at Raymond James*

---

[4] Defendants do not contest that Mr. Baez is qualified and competent to testify on the matters set forth in his Expert Report and his Expert Rebuttal Report. Accordingly, Mr. Baez undeniably satisfies the *Daubert* "qualification" prong.

and used for purposes unrelated to any of the limited partnerships.  As Mr. Baez explained, because the fraud involved an "intricate web of transfers," "trying to pinpoint where in the scheme the loss occurred based on whether the transfer of funds from a limited partnership account to a non-limited partnership account occurred while the funds were at People's Bank or at Raymond James is economically meaningless." [ECF No. 161-1 at ¶ 124].

As Mr. Baez's flow-of-funds analysis makes clear, moreover, Raymond James held the limited partnership funds. They were transferred from accounts at Raymond James to accounts at People's Bank and then back to accounts at Raymond James *as part of Quiros' and Burstein's fraudulent scheme*. [*Id.* at ¶ 126]. Defendants agree. [ECF No. 129 at p. 14] ("Quiros conducted the transfers as part of a fraud"). There was no legitimate purpose for these transfers. They were done solely to facilitate and conceal the misappropriation of investor funds for Quiros' personal benefit. [ECF No. 161-1 at ¶ 125]. Mr. Blass agrees. [*Id.*]. That some of the misappropriation took place in multiple steps (by design) is irrelevant. Raymond James held the limited partnership funds, and, through Burstein's fraud and dishonesty, more than $60 million was misappropriated from accounts at Raymond James. Raymond James therefore is responsible (*i.e.*, "legally liable") for their loss.

The Sixth Circuit's decision in *First Defiance Fin. Corp. v. Progressive Cas. Ins. Co.,* 688 F.3d 265 (6th Cir. 2012), is instructive. First Defiance carried fidelity insurance covering "loss resulting directly from dishonest or fraudulent acts committed by an Employee, acting alone or in collusion with others," for loss of property "(1) owned by the insured, (2) held by the insured in any capacity, or (3) owned and held by someone else under circumstances which make the insured responsible for the property prior to the occurrence of the loss." 688 F.3d at 268. After learning that an employee had transferred money from his clients' brokerage accounts to his own bank accounts, First Defiance reimbursed the stolen money. *Id.* It then filed a claim with its insurer, Progressive, under the bond. Progressive denied the claim and a lawsuit ensued. The Sixth Circuit held that the funds met the criteria of "covered property," because the insured was responsible for the clients' money from the moment the relationship was formed. *Id.* at 269-70.

A similar result was reached in *Fidelity Nat. Fin., Inc. v. Nat. Union Fire Ins. Co.,* No. 9-CV-140-GPC-KSC, 2014 WL 4909103 (S.D. Cal. Sept. 30, 2014). There, the insured submitted a claim under a fidelity bond after it settled underlying lawsuits with certain victims whose money was lost in a Ponzi scheme. 2014 WL 4909103 at *1. The bond provided that "This bond shall

apply to loss of Property (1) owned by the Insured, (2) held by the Insured in any capacity, or (3) for which the Insured is legally liable." *Id.* at *10. In granting summary judgment as to liability in favor of the policyholder, the court first determined that the insured both "held" the victims' property in its capacity as an escrow company and that it was "legally liable" for the loss of property that was misappropriated while in the insured's possession and control. *Id.* at *10. And, because the insured was legally liable for the funds, it suffered a covered loss stemming from the third party settlements. *Id.*; *see also Avon State Bank v. Bancinsure Inc.,* 787 F.3d 952, 957 (8th Cir. 2015) (rejecting argument that insured merely served as a conduit of funds where insured "held the funds, even if it did so fleetingly"); *Marion v. Hartford Ins. Co.*, 525 Fed. Appx. 129, 133 (3d Cir. 2013) (investment firm did not have to be designated as formal custodian before funds sitting in its accounts could be deemed "held" by the firm).

That same analysis applies here. As Mr. Baez's Expert Report establishes, Burstein helped Quiros to misappropriate more than $60 million in limited partnership funds from accounts at Raymond James. Raymond James was responsible for the funds from the moment the custodial relationship between Raymond James and the limited partnerships was formed. *First Defiance Fin. Corp.*, 688 F.3d at 269. None of the misappropriation could have occurred without Burstein's fraud and dishonesty. Burstein first knowingly helped his father-in-law to convert over $21 million in partnership assets to purchase the Jay Peak resort. As a direct result of that fraud, Quiros got access to all the EB-5 investor funds in Phases I-VII accounts at Raymond James from which he ultimately misappropriated more than $60 million. Any conversion of limited partnership funds as part of the scheme is covered property under the Bonds. And, indeed, more than $60 million of Raymond James' settlement with the SEC Receiver specifically was allocated towards the limited partnerships to repay investors whose funds once were held by Raymond James and lost as part of the scheme.

The jury certainly should be entitled to hear relevant and reliable testimony from Mr. Baez regarding the more than $60 million in investor funds that were misappropriated as part of the scheme and how the use of accounts at Raymond James played an instrumental role in the misappropriation. Defendants' cases do not suggest otherwise.

For starters, none of Defendants' cases involve the determination of where losses occurred in a fraudulent scheme. Moreover, neither *RealPage v. Nat'l Union First Ins. Co. of Pittsburgh, Pa.*, No. 19-CV-1350, 2021 WL 718366 (N.D. Tex. Feb. 24, 2021) nor *Cooper Indus. v. Nat'l*

*Union First Ins. Co. of Pittsburgh, Pa.*, 876 F.3d 119 (5th Cir. 2017), support the proposition that Raymond James cannot be "legally liable" for the theft of limited partnership funds through accounts at Raymond James because neither case involved fidelity bonds that included the phrase "for which the insured is legally liable" in the ownership provision. Instead, the bonds in both *RealPage* and *Cooper* only provided coverage for property the insured owned, leased or held for others. *RealPage*, 2021 WL 718366, at *3; *Cooper*, 876 F.3d at 125. Raymond James, however, "contracted for a broader definition of covered property." *RealPage*, 2021 WL 718366, at *11 and n.3 (citing *First Defiance Fin. Corp.* as an example of broader coverage); *First Defiance Fin. Corp.*, 688 F.3d at 269-70 (explaining that ownership provision "reach[ed] property not owned and not held by the insured but *for which the insured is responsible* nonetheless") (emphasis in original). Defendants apparently want this Court to believe that the phrase "for which the Insured is legally liable" somehow is completely meaningless. (Resp. at p. 14) ("the Bonds require a specific analysis and specific determination – the theft of money owned or held by RJF"). But Florida law is clear that "a fundamental principle of contract interpretation is that an interpretation that leaves portions of the contract language useless, inexplicable, inoperative, meaningless, or superfluous should be rejected." *Acheron Portfolio Tr. v. Mukamal*, No. 18-25099-CIV, 2019 WL 12304839, at *5 (S.D. Fla. Aug. 21, 2019).

Beyond that dispositive distinction, the facts in Defendants' cases make them inapposite. In *RealPage*, the insured was determined not to have "held" the funds because, unlike Raymond James, the policyholder *never* "possessed the funds in any manner"; rather, the funds always remained in a Wells Fargo bank account in the name of a third-party processer, not the insured. 2021 WL 718366, at *8. In *Cooper*, the policyholder loaned money in exchange for promissory notes in what turned out to be a Ponzi scheme. The court held that the insured was not entitled to recover under the policy because it did not "own" the lost earnings or principal. *Cooper*, 876 F.3d at 129. And, in *3M Co. v. Nat. Union Fir. Ins. Co.*, 858 F.3d 561 (8th Cir. 2017), the Eighth Circuit determined that the policy did not cover the insured's lost earnings because until the earnings were distributed to the partners, they were property of the limited partnership and not the insured. *Id.* at 567. Thus, the facts of *RealPage*, *Copper* and *3M Co.* are nothing like those here.

Ultimately, it will be up to the Court to decide the meaning of the Ownership provision in the Bonds and to instruct the jury accordingly. Mr. Baez's testimony regarding the more than $60 million in limited partnership funds that were misappropriated for purposes unrelated to any of the

Jay Peak limited partnerships and for Quiros' personal benefit using accounts at Raymond James undoubtedly will assist the jury in determining the amount of Raymond James' covered losses under the Bonds. Mr. Baez has thoroughly explained the methodology used to reach his conclusions and why his conclusions are reliable given his experience as an economist and in calculating losses in fraudulent schemes. Defendants' arguments for excluding him are essentially nothing more than Defendants' disagreement with Mr. Baez's methodology. While Defendants are certainly free to challenge Mr. Baez's opinions and methodology *at trial*, those challenges go to the weight and credibility of his opinions, not their admissibility. *Centre Hills Courts Condo. Ass'n v. Rockhill Ins. Co.*, No. 19-cv-80111-BLOOM/Reinhart, 2020 WL 475633, at *5 (S.D. Fla. Jan. 27, 2020) ("Defendant's challenges to Mr. James's methodology are challenges to the weight and credibility of the evidence, rather than the admissibility"). At best they are inquiries to explore during cross-examination, and not grounds for excluding his testimony. *See Daubert*, 509 U.S. at 596 ("vigorous cross examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking [debatable] but admissible evidence").

Additionally, Defendants never address Mr. Baez's rebuttal of Defendants' expert Mr. Blass. Mr. Blass is an accountant who has no prior experience in cases involving a Ponzi scheme and has never reviewed any economic literature that discusses how to determine when and where losses occur in a Ponzi scheme, even though he admits this case has elements of a Ponzi scheme. [ECF 161-1 at ¶¶ 144]. Mr. Blass opines solely from an "accounting perspective." He agrees his opinions are not correct from an "economic perspective." Mr. Baez has undertaken a point-by-point rebuttal of Mr. Blass' opinions and has offered numerous critiques. As described by Mr. Baez in his Expert Rebuttal Report (Ex. A) and at his deposition, Mr. Baez has concluded that Mr. Blass' analyses are not only fundamentally flawed, but also "economically meaningless" given the nature of the fraud. [ECF No. 161-1 at ¶ 124]. As Mr. Baez succinctly put it, Mr. Blass is "not looking at the whole economics of how this whole scheme worked. And by doing that, he's making a mistake." [*Id.* at ¶ 145].

Having designated their own accounting expert, Defendants should not now be heard to argue that Raymond James cannot call Mr. Baez as an expert economist to rebut Mr. Blass' opinions and explain to the jury the numerous flaws in Mr. Blass' opinions and methodologies. Mr. Baez's rebuttal opinions clearly are also the proper subject of expert testimony.

In short, Mr. Baez's opinions are admissible, reliable, and helpful, because they will assist the jury in determining the amount of Raymond James' covered loss under the Bonds. Mr. Baez also is well-qualified to offer them. Defendants never suggest otherwise. Therefore, Defendants' request to exclude Mr. Baez from offering any expert testimony at trial should be denied in its entirety.

### D.    MR. GRUMKE SHOULD NOT BE EXCLUDED AS AN EXPERT

Under the Bonds, Raymond James was required to provide notice to Defendants after it "discovered" a loss.  The Bonds, in turn, provide the following with respect to Discovery:

> This bond applies to loss discovered by the Vice President of Corporate Insurance and/or Legal Department of the Insured located at the Insured's principal address as stated in Item 1 of the Declarations during the Bond Period. ***Discovery occurs when the Vice President of Corporate Insurance and/or Legal Department of the Insured first becomes aware of facts that would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred***, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known.
>
> **Discovery also occurs when the Vice President of Corporate Insurance and/or Legal Department of the Insured receives notice of an actual or potential claim in which it is alleged that the Insured is liable to a third party under circumstances which, if true, *would constitute a loss under this bond*."**

[ECF No. 127 at p. 15].

Raymond James first "discovered" the loss under the Bonds on or after May 4, 2016, when its legal department learned that the *Daccache* lawsuit had been filed against Raymond James and Burstein. Raymond James then timely provided notice of that lawsuit to Defendants on May 16, 2016 – well within sixty days of discovery. Nevertheless, Defendants have taken the position that Raymond James failed to provide timely notice because its legal department supposedly discovered the loss by March 27, 2014, despite absolutely no evidence that Raymond James' legal department had any appreciation that Burstein engaged in dishonest conduct before Raymond James was sued.

The discovery standard in the Bonds includes both a subjective and objective component – the trier of fact must identify what facts and information Raymond James' legal department knew during the relevant time period, and it must determine, based on those facts, the conclusions that a reasonable person would draw from them. *Resolution Trust Corp. v. Fid. & Deposit Co. of Maryland*, 205 F.3d 615, 630 (3d Cir. 2000); *United States Fidelity & Guar. Co. v. Empire State Bank*, 448 F.2d 360, 365 (8th Cir. 1971). "[C]ourts have consistently defined 'discovery' as

occurring when a[n] [insured] has sufficient knowledge of specific dishonest acts to justify a careful and prudent person in charging another with dishonesty or fraud." *Fid. & Deposit Co. of Maryland v. Hudson United Bank*, 653 F.2d 766, 774 (3d Cir. 1981); *Utica Mut. Ins. Co. v. Fireman's Fund Ins. Companies*, 748 F.2d 118, 121-22 (2d Cir. 1984). "Mere suspicion of dishonesty or wrongdoing is not enough." *Hudson United Bank*, 653 F.2d at 774; *Resolution Trust Corp.*, 205 F.3d at 630 ("unsupported suspicions of employee misconduct" do not constitute discovery). Discovery "does not occur until the insured discovers facts showing that dishonest acts occurred and *appreciates the significance of those facts*; suspicion of loss is not enough." *Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1058-59 (9th Cir. 2001) (emphasis in original).

To assist the jury in this "inherently fact-driven inquiry," *Resolution Trust Corp.*, 205 F.3d at 632, Raymond James has retained Clay Grumke, Esq. Defendants argue that Mr. Grumke should be excluded because he lacks insurance expertise. But he is not being offered as an insurance expert. He is being offered as a financial institution *legal department* expert. Discovery under the Bonds is tied to facts learned by Raymond James' legal department. As detailed in his Expert Report, Mr. Grumke worked for over twenty-six years as in-house counsel for financial services firms like Raymond James. It is this relevant experience that makes him well-qualified to offer expert testimony on "the role and practices of in-house counsel at a financial services firm" so that the jury may properly assess the relevant question of knowledge possessed by Raymond James' legal department.

Defendants next argue that because the Bonds adopt a "reasonable person" standard, the jury can decide the issue without expert assistance. This argument is belied by the fact that Defendants themselves have retained a supposed "expert," Sander Ressler, to offer testimony as to when a "reasonable" securities broker-dealer would have provided notice of a claim under the Bonds. While Mr. Ressler has absolutely no relevant qualifications or experience and his opinions are completely inconsistent with the controlling notice and discovery provisions in the Bonds [ECF No. 127], Defendants obviously believe expert testimony on this issue *will* assist the jury. They should not now be heard to argue that expert testimony will not assist the jury simply because they don't want the jury to hear from a qualified expert whose testimony undermines their theory of the case. Indeed, unlike Mr. Ressler, Mr. Grumke has significant experience working in the legal departments of financial institutions and is offering expert testimony consistent with the relevant discovery standard under the Bonds.

In any event, the fact that the Bonds include a "reasonable person" standard does not make expert testimony inadmissible. To the contrary, courts allow expert witness testimony when it relates to the "reasonable person" standard. *See MapleWood Partners, L.P. v. Indian Harbor Ins. Co.*, 295 F.R.D. 550, 625 (S.D. Fla. 2013) ("reasonableness is measured by a 'reasonable person' standard and can be established through expert witnesses"); *Kehle v. USAA Casualty Ins. Co.*, No. 17-80447-CV-MARRA/MATTHEWMAN, 2017 WL 6729186, at *8 (S.D. Fla. Dec. 28, 2017) ("determination of whether a settlement is reasonable is made by a 'reasonable person standard,' and is usually established by expert testimony").

The appropriateness of allowing Mr. Grumke to offer expert testimony is even more apparent here given that discovery is tied to facts learned by Raymond James' legal department. The jury will hear percipient testimony from, among others, former associate corporate counsel Mark Barracca that, while working in Raymond James' legal department, he was not aware of any facts that led him to believe Burstein engaged in fraud or dishonesty.

> Q: Okay. And are – during the time that you worked for Raymond James, did you become aware of any – what you felt of any facts by Mr. Burstein that you felt were dishonest or fraudulent in some way?
>
> A: No.

[ECF No. 161-1 at ¶ 133]. But the jury would also benefit from hearing testimony from Mr. Grumke and having him put the information learned by Raymond James' legal department in its proper context. To be sure, based on his extensive in-house counsel experience, Mr. Grumke can explain to the jury the role of in-house counsel at a financial services firm like Raymond James, provide the jury with helpful context on the FINRA and SEC investigations that Defendants claim triggered discovery, and explain to the jury how a legal department may reasonably view and interpret certain information learned during a regulatory investigation into a customer's accounts, or otherwise. All of this is directly relevant to the issues of notice and discovery under the Bonds, and none of it is within the knowledge of an average layperson.

Given his relevant expertise, Defendants' argument that Mr. Grumke's testimony is "not based upon any specialized knowledge" rings hollow. His testimony is absolutely based upon his specialized knowledge working as in-house counsel in the legal department of financial institutions like Raymond James.

The cases Defendants principally cite to – *Pyznski v. Thomas & Betts, Corp.*, 16-cv-1998, 2018 WL 3390243, at *3 (M.D. Fla., June 15, 2008) and *Umana- Fowler v. NCL (Bahamas) Ltd.*,

49 F. Supp. 3d 1120, 1123 (S.D. Fla. 2014) – also are readily distinguishable.  In *Pyznski*, for example, the court excluded the expert because it believed that an average citizen would be able to "form an opinion as to whether Plaintiff would be unable to safely carry the items expected in his position with only one arm" without the need for expert testimony. *Id.* at *3. In other words, no specialized knowledge was required. Here, however, the jury almost certainly has no knowledge of the role of a legal department at a financial institution and how the legal department processes inquiries from regulators about the firm's clients. Mr. Grumke, of course, has specialized knowledge in these areas. In *Umana- Fowler*, the expert's opinions were deemed unreliable because the expert claimed he was going to conduct site inspections, take photographs and collect data, but did not do any of those things. *Id.* at 1122-23. The expert also could not sufficiently explain how his analysis was conducted and how his opinions were informed by that analysis. In contrast, Mr. Grumke reviewed and analyzed the documents and information he relied upon to form his opinions in this case. He also explained his conclusions and methodology throughout his expert report and at deposition, and his opinions are inexorably based on his specialized experience and knowledge.

Lastly, Defendants' argument that Mr. Grumke somehow is narrating the facts Raymond James' deems important, while "exclud[ing] or minimiz[ing] others" is equally unavailing. As Defendants know, and as Mr. Grumke's Expert Report explains, Defendants have in interrogatory answers and otherwise, identified certain documents or information that *they* claim triggered "discovery" prior to the inception of the bond period. Mr. Grumke has reviewed those events identified by Defendants and concluded, based upon on his ample experience as in-house counsel, that Raymond James' legal department "did not become aware of facts that would have caused a reasonable person in Raymond James' legal department to assume that Raymond James would incur loss resulting directly from dishonest or fraudulent acts committed by an employee acting alone or in collusion with others prior to the inception of the bond period." [ECF No. 164-5 at p. 12]. Beyond that, any argument that Mr. Grumke is ignoring or minimizing evidence (which Raymond James disputes) goes to the weight and credibility of Mr. Grumke's opinions, not its admissibility. *Jones v. Otis Elevator Co.*, 861 F.2d 655, 663 (11th Cir. 1988) ("weaknesses in the underpinnings of the expert's opinion go to its weight rather than its admissibility"). And while Defendants are free to explore any perceived any weaknesses in Mr. Grumke's opinions at trial, they do not constitute grounds for his excluding his opinions as unreliable.

In short, Mr. Grumke is well-qualified to offer expert testimony regarding in-house counsel at a financial firm – indeed that was his job for over twenty-six years. His testimony is also reliable and will assist the jury in deciding when discovery occurred under the Bonds based upon information learned by Raymond James' legal department. Therefore, Defendants' request to exclude Mr. Grumke from testifying at trial should be denied.

### III.    <u>CONCLUSION</u>

Raymond James clearly has met its burden under Fed. R. Evid. 702 and *Daubert* to establish the admissibility of the expert testimony of Steve Urcia, Jorge Baez, and Clay Grumke. Based upon their collective knowledge, training and experience, they are all well-qualified to render the opinions outlined in their Expert Reports and at their depositions. Their opinions also are reliable and will help the jury in determining disputed factual issues in this case. Defendants' Motion is nothing more than an unsupported attempt to keep their opinions from reaching the jury which, undoubtedly, is where they properly belong. Accordingly, Defendants' Motion should be denied in its entirety.

Dated: September 16, 2021.                    Respectfully submitted,

<div style="margin-left: 40%;">

*/s/ Jason S. Mazer*
Jason S. Mazer, Esq.
Florida Bar No. 0149871
Joshua R. Alhalel, Esq.
Florida Bar No.  0016320
**CIMO MAZER MARK PLLC**
100 Southeast Second Street, Suite 3650
Miami, Florida  33131
Telephone: (305) 374-6481
Fax: (305)  374-6488
jmazer@cmmlawgroup.com
jalhalel@cmmlawgroup.com

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on September 16, 2021, I electronically filed this Memorandum of Law in Opposition to Defendants' Motion to Exclude Plaintiff's Experts with the Clerk of Court using CM/ECF. I also certify that the foregoing document is being served this day on parties listed in the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ Jason S. Mazer*

**SERVICE LIST**

| | |
|---|---|
| Kristina L. Marsh, Esq.<br>Florida Bar No. 0311080<br>**GORDON REES SCULLY**<br>**MANSUKHANI**<br>601 S. Harbor Island Blvd., Suite 109<br>Tampa, FL 33602<br>Telephone (Main): 813-444-9700<br>Telephone (Direct) 813-523-4937<br>Facsimile: 813-377-3505<br>kmarsh@grsm.com<br>afiorito@grsm.com<br>cflores@grsm.com<br>fgude@grsm.com<br>kwatson@grsm.com<br>Tampapleadings@grsm.com<br><br>and<br><br>Scott L. Schmookler, Esq.<br>Sarah Riedl Clark, Esq.<br>Chantal Christine Wonder, Esq.<br>Angel Lewosz, Esq.<br>**GORDON REES SCULLY**<br>**MANSUKHANI**<br>One North Franklin, Suite 800<br>Chicago, IL 60606<br>Telephone: 312-980-6779<br>sschmookler@grsm.com<br>srclark@grsm.com<br>cwonder@grsm.com<br>aruff@grsm.com<br>alewosz@grsm.com<br><br>*Counsel for Federal Insurance Company* | James M. Kaplan, Esq.<br>Florida Bar No. 921040<br>**KAPLAN ZEENA LLP**<br>2 South Biscayne Boulevard, Suite 3050<br>Miami, Florida 33131<br>Telephone: (305) 530-0800<br>Facsimile: (305) 530-0801<br>James.kaplan@kaplanzeena.com<br>Elizabeth.salom@kaplanzeena.com<br>service@kaplanzeena.com<br>and<br>Michael Keeley, Esq.<br>John R. Riddle, Esq.<br>**Clark Hill Strasburger**<br>901 Main Street, Suite 6000<br>Dallas, Texas 75202-3794<br>Telelphone: (214) 651-4718<br>Facsimile: (214) 659-4121<br>mkeeley@clarkhill.com<br>jriddle@clarkhill.com<br><br>*Counsel for Beazley Insurance Company, Inc.* |
| E.A. "Seth" Mills, Jr., Esq.<br>Florida Bar No. 339652<br>Ryan J. Weeks, Esq.<br>Florida Bar No. 5 7 8 9 7<br>**MILLS PASKERT DIVERS**<br>100 N. Tampa Street, Suite 3700<br>Telephone: (813) 229-3500 | Dustin C. Blumenthal<br>Florida Bar No. 0149871<br>**Goldberg Segalla**<br>222 Lakeview Avenue, Suite 800<br>West Palm Beach, FL 33401<br>Telephone: (561) 618-4485<br>Facsimile: (561) 618-4549 |

| | |
|---|---|
| Facsimile: (813) 229-3502<br>smills@mpdlegal.com<br>rweeks@mpdlegal.com<br>csoltis@mpdlegal.com<br><br>*Counsel for Travelers Casualty and Surety Company of America* | dblumenthal@goldbergsegalla.com<br>lparker@goldbergsegalla.com<br>and<br><br>Stephen N. Dratch, Esq.<br>Julian Wilsey, Esq.<br>**Franzblau Dratch, P.C.**<br>354 Eisenhower Parkway<br>Livingston, New Jersey  07039<br>Telephone:  (973) 992-3700<br>sdratch@njcounsel.com<br>jwilsey@njcounsel.com<br>*Counsel for Great American Insurance Company* |